# Exhibit B

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA
 2

 3                        - - - -

 4   ROBERT STIFFLER,          )
                               )
 5                             )
             Plaintiff,        )   Civil Action No.
 6                             )   2:21-cv-00523-JFC
             - vs -            )
 7                             )
     APPLE INCORPORATED and    )
 8   VERIZON, INCORPORATED,    )
                               )
 9                             )
             Defendants.       )
10

11
                          - - - -
12
       REMOTE VIDEOTAPE DEPOSITION OF:  ROBERT STIFFLER
13
                      (Volume I)
14
                          - - - -
15
                   DATE:  January 7, 2022
16                         Friday, 10:13 a.m.

17              TAKEN BY:  Defendants

18           REPORTED BY:  Tammie Elias, RPR
                           Notary Public
19                         No. TE81405

20
                          - - - -
21

22           NETWORK DEPOSITION SERVICES
                  1101 GULF TOWER
23                707 GRANT STREET
          PITTSBURGH, PENNSYLVANIA  15219
24                 412-281-7908

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

1    REMOTE VIDEOTAPE DEPOSITION OF ROBERT STIFFLER,
     a witness, called by the Defendants for examination,
2    in accordance with the Federal Rules of Civil
     Procedure, taken by and before Tammie Elias, RPR and
3    Notary Public in and for the Commonwealth of
     Pennsylvania, at Zoom Meeting, on Friday, December
4    7, 2022, commencing at 10:13 a.m.

5
                              - - - -
6
     APPEARANCES:
7
          FOR THE PLAINTIFF:
8    Michael F. Santicola, Esq.
     michael@ssslawyer.com
9    SANTICOLA STEELE & FEDELES, P.C.
     722 Turnpike Street
10   Beaver, PA  15009
     724-775-3392
11
12        FOR THE DEFENDANTS:
     Lili C. Ozarowski, Esq.
13   lozarowski@schiffhardin.com
     SCHIFF HARDIN, LLP
14   1185 Avenue of the Americas
     Suite 3000
15   New York, NY  10036
     212-753-5000 p
16   212-753-5044 f

17
18        ALSO PRESENT:
     Denise McNamara, Videographer
19
20
21
22
23
24
25

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

3

```
 1                    EXAMINATION INDEX

 2

 3   ROBERT STIFFLER
          BY MS. OZAROWSKI . . . . . . . . . . . .   5
 4

 5
     Certificate of Court Reporter . . . . . . 125
 6   Errata Sheet  . . . . . . . . . . . . . 126
     Notice of Non-Waiver of Signature . . . . 127
 7

 8

 9

10

11

12
                 (No Exhibits were marked.)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

4

```
 1                  - - - -

 2                 PROCEEDINGS

 3                  - - - -

 4           THE VIDEOGRAPHER:  Good morning.

 5    The date today is January 7th, 2022, and the

 6    time is 10:13 a.m.  This is the videotape

 7    deposition of Robert Stiffler taken in the

 8    matter of Robert Stiffler versus Apple,

 9    Incorporated and Verizon, Incorporated, filed

10    in the United States District Court for the

11    Western District of Pennsylvania.  Case No.

12    2:21-cv-00523-JFC.

13           This deposition is being held via

14    Zoom.  My name is Denise McNamara.  The court

15    reporter is Tammie Elias, and we are both from

16    Network Deposition Services.

17           At this time will counsel please

18    state their appearances for the record, after

19    which the court reporter may swear in the

20    deponent.

21           MS. OZAROWSKI:  Lili Ozarowski.

22    L-I-L-I, O-Z-A-R-O-W-S-K-I.  I represent

23    Apple.

24           MR. SANTICOLA:  Attorney Michael

25    Santicola, S-A-N-T-I-C-O-L-A.  I represent the
```

5

```
 1            Plaintiff, Robert Stiffler.
 2                    - - - -
 3                  ROBERT STIFFLER,
 4            having been duly sworn,
 5        was examined and testified as follows:
 6                    - - - -
 7                  EXAMINATION
 8                    - - - -
 9   BY MS. OZAROWSKI:
10   Q.    Good morning, Mr. Stiffler.  Before we start,
11         I'm just going to go through a couple rules.
12         We spoke about a few of them before the
13         recording started.  First of all, as we have
14         already discovered over Zoom, sometimes it's a
15         little hard to hear each other.  So if you
16         can, please try to speak slowly and keep your
17         voice up and speak towards the microphone if
18         you can.  Is that okay?
19   A.    Yes, ma'am.
20   Q.    The next thing is because we have a court
21         reporter here who's writing down everything we
22         say, please give verbal answers only.  So no
23         gestures or sounds like uh-huh or uh-uh.  Is
24         that okay?
25   A.    Yes, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

6

```
 1   Q.    Please allow me to finish asking a question
 2         fully before you start answering.  I know
 3         sometimes it's easy to anticipate what I'm
 4         trying to say, you know, in a conversational
 5         manner.  But because we have a court reporter
 6         writing down what we're saying here, please
 7         allow me to finish the whole question.  Is
 8         that all right?
 9   A.    Yes, ma'am.
10   Q.    Please also let me know at any point if you
11         don't understand something that I'm asking and
12         I'm happy to rephrase.  If you don't let me
13         know that you don't understand, I will assume
14         that you do understand.  Is that okay?
15   A.    Yes, ma'am.
16   Q.    Do you understand the difference between a
17         guess and an educated guess?
18   A.    Yes.  I know the difference.
19   Q.    So here we don't want you to guess.  If you
20         don't know the answer to a question, the
21         answer is that you don't know.  If you want to
22         make an educated guess, that's fine.  Please
23         just let me know that this is an educated
24         guess.
25   A.    Okay, ma'am.  Okay.  Sure.  Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

7

```
 1   Q.     And again as your attorney just mentioned, if
 2          you would like to take a break at any time,
 3          that's completely fine.  I just ask that you
 4          answer any open question first and then we can
 5          take a break.  Is that all right?
 6   A.     Yes, ma'am.
 7   Q.     Have you taken any medication within the past
 8          24 hours?
 9   A.     Yes, ma'am.
10   Q.     Can you please tell me what medication you
11          have taken?
12   A.     Temazepam, which is Restoril.  I took it last
13          night for sleep.  I take Methadone for the
14          pain.  Risperdal, it's a psychotic they gave
15          me after this, 2 milligrams.
16   Q.     So let's go through those.  You said
17          Risperidone, I believe that's R-I-S-P-E-R --
18   A.     No, no, no.  Risperdal.  Temazepam.
19   Q.     Okay.
20   A.     Temazepam, 30 milligrams.  It's like a
21          sleeping tablet.
22   Q.     Okay.  And you said it's Risperdal?
23   A.     We can say Temezepam.
24                 MR. SANTICOLA:  It's the same drug.
25   BY MS. OZAROWSKI:
```

8

```
 1   Q.    The same thing?
 2   A.    Same drug, just a different -- they renamed
 3         it.  It's a generic name.
 4   Q.    Got it.  And when did you take that
 5         medication?
 6   A.    At bedtime last night.
 7   Q.    What time was that?
 8   A.    I didn't sleep last night, so I guess I take
 9         it at 12.
10   Q.    12 midnight?
11   A.    12 midnight, yep.  Yes, ma'am.
12   Q.    And you said you took 2 milligrams?
13   A.    30 milligrams.  30.  30.
14   Q.    Okay.  Who prescribed this medication?
15   A.    Dr. Jasbir Kang.
16   Q.    Can you spell the last name, please?
17   A.    K-A-N-G.
18   Q.    Where does Dr. Kang work out of?
19   A.    Crossroads Counseling.
20   Q.    When was this medication first prescribed to
21         you?
22   A.    May 24, 2005.
23   Q.    Have you always taken the same dosage?
24   A.    No.  I moved up from 7.5 to 15 to 30.
25   Q.    Can you generally tell me how you moved up in
```

```
 1          the medication, a general timeline is what I
 2          mean?
 3   A.     How many years I was on each dosage?
 4   Q.     Sure.  Just generally, you know, say, you were
 5          on X amount for this amount of time, et
 6          cetera.
 7   A.     Okay.  7.5, probably '05 to '09 and '09 to
 8          '13.  And '15 and probably 2018 right after
 9          this, they bumped me up to 30 milligrams.
10          They bumped my medicines up since this.
11   Q.     And what is this medication Temazepam for?
12   A.     Sleep, ma'am.
13   Q.     Generally how often do you take it?
14   A.     Maybe 15 times a month.
15   Q.     How many times did you take it in December of
16          2021?
17   A.     13.
18   Q.     Does this medication have any impact on your
19          ability to recall events?
20   A.     No.  No.  No, ma'am.  No, ma'am.
21   Q.     Does this medication have any impact on your
22          memory in general?
23   A.     No, ma'am.
24   Q.     And I believe you also mentioned that you took
25          Methadone within the past 24 hours; is that
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

10

```
 1          correct?
 2    A.    Yes, ma'am.
 3    Q.    How much of that did you take?
 4    A.    40 milligrams.
 5    Q.    When did you last take that?
 6    A.    6:00 this morning.
 7    Q.    How often at this point do you take Methadone?
 8    A.    In the morning, that's it.
 9    Q.    So am I correct in understanding that you take
10          40 milligrams once a day in the morning?
11    A.    Supposed to take 40 in the morning and 40 at
12          night.  And --
13    Q.    Do you -- you can continue.
14    A.    But it has been constipating me.  Like just I
15          just went, back there in the bathroom, I just
16          went this morning.  It was awful.  I'm going
17          through hell here.
18    Q.    Okay.  So am I correct in understanding that
19          you have been taking it once a day?
20    A.    I'm taking it twice.  I just took -- I thought
21          you said in the last 24 hours what I took, and
22          that's when I took it, within the last 24
23          hours.
24    Q.    Got it.  But generally you take it twice a
25          day; is that correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

11

```
 1   A.    Yes.  In the last 24 hours, I have only taken
 2         it once, one tablet.
 3   Q.    Understood.  When was Methadone prescribed to
 4         you for the first time?
 5   A.    At the hospital at Mercy.  August, say August
 6         1st, 2018.
 7   Q.    Starting in 2018, did you take the same dose
 8         of medication that you take now?
 9   A.    No.  They bumped me up.  He moved me up 20
10         milligrams a day.
11   Q.    When did you move up the 20 milligrams?
12   A.    Well, I moved up twice in different months.
13         So I think as soon as I got out of the
14         hospital, he jumped me up 10 milligrams.  And
15         then like six months ago he jumped me up 10
16         milligrams.  If I'm talking too loud, please
17         tell me.
18   Q.    Talking loud is great actually.
19   A.    I don't want to be yelling at you.
20   Q.    Have you ever taken Methadone prior to 2018?
21   A.    Yes, I have.  Yep.  Yep.
22   Q.    When was that?
23   A.    When I got shot in my stomach in 2015 and I
24         was given it.  And I have peritonitis, so
25         after peritonitis they gave it to me.  They
```

```
 1            took three and a half feet out of my small

 2            intestine, duodenum.

 3     Q.     All right.  I'll ask you some questions about

 4            that later on.  Right now I'm just going to

 5            ask you about the Methadone.  Since 2005 --

 6            actually strike that.

 7                        Were you taking the Methadone then

 8            from 2005 to 2018 or something different?

 9     A.     No.  No.  They had me weaned off of it.  I was

10            weaned off of it.  I was doing good.

11     Q.     When did you wean off of the Methadone?

12     A.     It was 2006, ma'am, after I got shot.  Then

13            they gave me -- then I had peritonitis.

14            That's when my bowel got infected and they had

15            to take 177 centimeters, which is 3.3 feet.

16            And then they put me on it because I was on

17            another medication and they couldn't have me

18            on that because they had to give me more

19            surgeries.

20     Q.     And how long did you take the Methadone when

21            you started taking it in 2006?

22     A.     It will be six years, ma'am.

23     Q.     Did you take any Methadone in between

24            approximately 2012 and 2018?

25     A.     No.  Not until like probably July 29, 2018.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

13

```
 1          Right after the fire -- after the shit
 2          started, the fire really started everything
 3          going up again, you know.  The doctor was just
 4          talking about that.
 5     Q.   What doctor prescribed the Methadone in 2006?
 6     A.   Dr. Stephen Osmanski.
 7     Q.   Where does Dr. Osmanski work out of?
 8     A.   Staunton Clinic.
 9     Q.   Do you know how to spell that?
10     A.   S-T-A-T-O-N.
11               MR. SANTICOLA:  I think it's
12          S-T-A-U-N-T-O-N out of Heritage Valley
13          Sewickley.
14   BY MS. OZAROWSKI:
15     Q.   Other than the two medications we have just
16          discussed, have you taken -- actually strike
17          that.
18                  Backing up for a minute to ask you
19          about the Methadone.  Does the Methadone
20          impact your ability to recall past events?
21     A.   No.  Not at all, ma'am.
22     Q.   Does the Methadone impact your memory in any
23          way?
24     A.   No, ma'am.
25     Q.   When are you supposed to take your next dose
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

14

```
1           of Methadone?

2    A.     8:00 tonight, ma'am.

3    Q.     Has any doctor ever explained how this

4           medication could impact recall of prior

5           events?

6    A.     No.  I have never had that explained to me,

7           no.  No.

8    Q.     Has any doctor ever explained how this drug

9           may impact memory in general?

10   A.     No, ma'am.

11   Q.     Other than the two medications we have just

12          spoken about, the Methadone and the Temazepam,

13          have you taken any other medications in the

14          past 24 hours?

15   A.     I take Advil.  That's about it.  Ibuprofen.

16   Q.     When did you take the Advil?

17   A.     Last night.

18   Q.     At what time?

19   A.     All through the night.  1:00, 3:00, just 5:00.

20   Q.     Are you talking about a.m. or p.m. times?

21   A.     P.m.  I have been sick all week.  Lots of pain

22          in my stomach.

23   Q.     How often do you take Advil?

24   A.     When I mostly get pain.  It's a thought, it's

25          a thought.  I take it once a day.  Yeah, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

15

```
 1           take it once a day.  I don't take that much.

 2           I usually don't take that much.

 3    Q.     How much do you take when you take it once a

 4           day?

 5    A.     800 milligrams.

 6    Q.     Is this Advil that's over-the-counter or --

 7    A.     Yes.

 8    Q.     -- something that's prescribed by a doctor?

 9    A.     Over-the-counter, ma'am.

10    Q.     How long have you been taking Advil once a

11           day?

12    A.     It's at the hospital.  While I was in the

13           hospital, probably since July 16, 2018.

14    Q.     Did you take any Xanax within the past 24

15           hours?

16    A.     I haven't taken my Xanax yet, no, but I need

17           to.

18    Q.     When are you supposed to take the Xanax?

19    A.     I just did.  I just did.  I took a half a

20           piece right now, yes, I did.  I took a half a

21           piece right now.  I'm sorry.  I'm racing.

22    Q.     I'm sorry.  I didn't understand.

23    A.     I'm sorry.  I have been racing.  I just took

24           this half a piece right now.

25    Q.     How many milligrams did you take?
```

```
 1    A.    1 milligram.  That's it that I took.  No.  In

 2          the last 24 hours, I have taken 3 milligrams.

 3    Q.    Can you explain that to me?

 4    A.    I took one yesterday at 12.  Last 24 hours.

 5    Q.    Yes.

 6    A.    And 6 p.m. last night.  And then one right

 7          now.

 8    Q.    So am I understanding correctly that you took

 9          1 milligram at 12 noon yesterday, 1 milligram

10          at 6 p.m. last evening and 1 milligram just

11          now around 10:00 a.m.; is that correct?

12    A.    Yes, ma'am.

13    Q.    Who prescribed this medication?

14    A.    Dr. Jasbir Kang.

15    Q.    Is Dr. Kang the same doctor who prescribed the

16          Temazepam?

17    A.    Yes, ma'am.

18    Q.    When was this medication first prescribed to

19          you?

20    A.    May 2nd.  Wait.  No.  That was in, yeah, May

21          2nd, 2005.  Actually I was in the military

22          when I first got it.  So, no, it was actually

23          2004, April.  April 2004.

24    Q.    How long have you taken -- or strike that.

25                       Have you taken the Xanax
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

17

1       continuously since it was first prescribed in

2       2004?

3   A.      No.  No, ma'am.

4   Q.      Can you describe for me the timeline of taking

5           Xanax?

6   A.      I was prescribed to it at Parris Island.  And

7           then Dr. Kang had me on it until 2012, had

8           weaned me down.  And then I got back on it in

9           2015 he put me back on it.  And then I bumped

10          up recently to high dose again, 6 milligram a

11          day.  You know what I mean, this is very

12          psychologically bad, so I'm on it constantly.

13          Because I can't take Quetiapine, which is

14          Seroquel, in the adult burn patients.  It

15          brings you down.  They really help me, but it

16          makes me manic.

17              MS. OZAROWSKI:  Tammie, would it be

18          possible to read that answer back to me?

19  A.      What I just said?

20              MR. SANTICOLA:  She's asking the

21          court reporter.

22              MS. OZAROWSKI:  Off the record while

23          she's looking for that.

24                      - - - -

25              (The record was read back by the

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

18

```
 1          Reporter.)

 2                     - - - -

 3   A.    They weaned me from .5 to 1.0 to 2.0 three

 4         times a day, which I was on four times a day

 5         at one time, so ...

 6                     - - - -

 7              (The record was read back by the

 8         Reporter.)

 9                     - - - -

10   BY MS. OZAROWSKI:

11   Q.    Can you explain to me what you meant when you

12         said very psychologically bad?

13              MR. SANTICOLA:  Say that again,

14         Lili.

15   BY MS. OZAROWSKI:

16   Q.    Can you explain to me what you meant by very

17         psychologically bad?

18   A.    I don't know what I used that in.  I have been

19         up for five days.  I have been constipated for

20         32 days.  Just everything else going on.  The

21         bowels just -- I don't remember.  As of what?

22         What's my definition of that?

23   Q.    Sure.  What did you mean?  You testified a

24         moment ago, you said it is very

25         psychologically bad, and I'm just trying to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

19

```
 1          understand what you mean by that?
 2    A.    Just --
 3               MR. SANTICOLA:  What you're
 4          suffering from, yeah.
 5    A.    Just because with the Seroquel, which is
 6          protocol, it helped me be relaxed so I'm not
 7          so manic, you know.  I mean, this Xanax won't
 8          do that, you know.  The Seroquel, everybody is
 9          on it and calm, you know.  I got these birds
10          that's just like I can't sleep at all.  It's
11          just this has been a nightmare.  I have been
12          through so much hell because this has been a
13          nightmare.  Just psychologically I guess,
14          would it be mind bad?  I mean, psych, what you
15          call that?  I mean, being manic, your mind
16          being bad, racing, not sleeping.
17    Q.    Has any doctor ever discussed with you the
18          impact Xanax may have on your ability to
19          recall past events?
20    A.    No, ma'am.
21    Q.    Has any doctor ever discussed with you the
22          impact Xanax may have on your memory in
23          general?
24    A.    No, ma'am.
25    Q.    Has the Xanax had any impact on your ability
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

20

```
 1          to recall past events?
 2    A.    No, ma'am.
 3    Q.    Has the Xanax had any impact on your memory in
 4          general?
 5    A.    No, ma'am.
 6    Q.    Did you take any Oxycodone today?
 7    A.    No, I have not taken any Oxycodone.  I need
 8          to.
 9    Q.    Are you supposed to take Oxycodone today?
10    A.    Yes.  But I was, like I said, I was
11          constipated this morning.  I try not to take
12          that because that doesn't do good for me.  It
13          keeps me constipated, so -- we can discuss
14          stuff like that, right?
15                MR. SANTICOLA:  Oh, yeah.
16    A.    Okay.  Yeah, that stuff constipates me.
17          Oxycodone, yes.
18    BY MS. OZAROWSKI:
19    Q.    When were you supposed to take the Oxycodone?
20    A.    8:00.  But I'll take it as soon as we get off
21          here.
22    Q.    When you say 8:00, do you mean 8 a.m. this
23          morning?
24    A.    Yes, ma'am.
25    Q.    When was the last time you took Oxycodone?
```

```
 1   A.    Yesterday 6 a.m. -- I mean, 6 p.m.

 2   Q.    How much did you take?

 3   A.    I take 15 milligrams.  Because I'm trying to

 4         go to the bathroom and I was taking less and

 5         less of this pain medicine.

 6   Q.    Who prescribed the Oxycodone?

 7   A.    Dr. Stephen Osmanski.

 8   Q.    When was the Oxycodone first prescribed to

 9         you?

10   A.    2006 after my peritonitis surgery.

11   Q.    How long did you take it for starting in 2006?

12   A.    To 2015.

13   Q.    When did you start taking it again?

14   A.    This time they start putting me on higher

15         doses of this.  July 16, 2018.

16   Q.    What dose did you take from 2006 to 2015?

17   A.    I was on 10 and 15 milligram.  That's it.  And

18         then, boom, the only thing is the 30

19         milligram, which they have me on now.

20   Q.    So you're on 30 milligrams right now; is that

21         correct?

22   A.    Yes, but I'm not -- I'm supposed to be taking

23         that, but with my constipation, I haven't been

24         taking that.

25   Q.    Yesterday at 6 p.m., how many milligrams did
```

22

1        you take?

2   A.    15 milligrams.  You already asked that

3         question, do you know that prior to this?

4         Okay.

5   Q.    Does the Oxycodone impact your ability to

6         recall past events?

7   A.    No, ma'am.  No.

8   Q.    Impact your memory in general?

9   A.    No, ma'am.

10  Q.    Has any doctor ever explained to you its

11        potential to impact either recall or memory in

12        general?

13  A.    No, ma'am.

14  Q.    And just to make sure I understand you

15        correctly.  Risperidone is the same thing as

16        Temazepam?

17  A.    No, no, no.  Restoril and Temazepam are the

18        same.  Risperidone is an antipsychotic.

19  Q.    Okay.  Did you take --

20  A.    It comes in 2 milligrams.  Like different --

21        it's lower milligrams.  It's an antipsychotic.

22        Risperdal is Temazepam or a sleeping medicine.

23  Q.    Understood.  And did you take an antipsychotic

24        today?

25  A.    No, I have not.  I'm supposed to, but I have

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

23

```
 1          not.  I had a crazy morning.  I haven't got to
 2          my medicine too much.
 3     Q.   When was the last time you took the
 4          antipsychotic?
 5     A.   Yesterday morning.
 6     Q.   At what time?
 7     A.   But it was -- maybe 5:30.
 8     Q.   How much did you take?
 9     A.   2 milligrams.
10     Q.   When were you supposed to take the
11          antipsychotic today?
12     A.   8:00.
13     Q.   How often do you take it generally?
14     A.   Twice a day.
15     Q.   At what times are you supposed to take it?
16     A.   Morning and at night.
17     Q.   Does the antipsychotic impact your ability to
18          recall past events?
19     A.   No, it does not.
20               MS. OZAROWSKI:  Counsel, I don't
21          know if you realized that you're doing it, but
22          you are -- you're making gestures to answer
23          his questions.  I think it may be involuntary.
24               MR. SANTICOLA:  Yeah, it is
25          involuntary.  He can't see me.  I'm behind
```

24

```
 1          him, just so you know.  That's me, you're
 2          good.  No, you're good.  Stay right where you
 3          are.
 4     BY MS. OZAROWSKI:
 5     Q.   So just to make sure I understand everything
 6          correctly.  It's my understanding that you
 7          have taken three different medications this
 8          morning and there are two other medications
 9          that you are supposed to take but you haven't
10          taken; is that correct?
11     A.   Yes, ma'am.  Yes, ma'am.
12     Q.   Have any of these medications that we have
13          discussed caused hallucinations for you?
14     A.   No, ma'am.
15     Q.   Have any medications ever caused
16          hallucinations for you?
17     A.   No, ma'am.
18     Q.   Have any of the medications we have discussed
19          cause delusions?
20     A.   No, ma'am.
21     Q.   Other than the two medications we have just
22          discussed, are there any other medications you
23          were supposed to take today that you haven't
24          taken?
25     A.   No, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

25

```
 1   Q.    Does anybody currently have power of attorney
 2         over you?
 3   A.    No, ma'am.
 4   Q.    I should have asked this first, but do you
 5         understand what power of attorney is?
 6   A.    Yes, I do, ma'am.
 7   Q.    Has a judge ever made any sort of ruling on
 8         your competency?
 9   A.    No, ma'am.
10   Q.    Do you understand what that means?
11   A.    Yes, I do.
12   Q.    Do you sign your own legal documents?
13   A.    Yes, ma'am.
14   Q.    Is there any reason that you would --
15              MR. SANTICOLA:  One moment.  He just
16         asked me if he can get a drink real quick.  Is
17         that okay, can we take one quick minute?
18              MS. OZAROWSKI:  Sure.
19              THE VIDEOGRAPHER:  The time is
20         10:43, and we are off the record.
21                        - - - -
22     There was a brief Recess in the proceedings.
23                        - - - -
24              THE VIDEOGRAPHER:  The time is
25         10:49 a.m., and we are back on the record.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

26

```
 1   BY MS. OZAROWSKI:
 2   Q.    Mr. Stiffler, is there any reason you would
 3         not be able to give truthful and accurate
 4         testimony today?
 5   A.    No, ma'am.
 6               MS. OZAROWSKI:  At this point I'm
 7         going to put a statement on the record.  We're
 8         going to reserve our right to question
 9         Mr. Stiffler's competency based on the
10         medication he's taken today.  We're still
11         going to go forward in the interest of
12         continuing with discovery, but we're not
13         making any statement here on whether or not we
14         agree to his competency based on the
15         medications he's taken today.
16               MR. SANTICOLA:  Noted.
17               THE WITNESS:  They are saying that
18         I'm not right in the head?
19               MR. SANTICOLA:  No.  No.
20               THE WITNESS:  I don't understand
21         what they are saying.
22               MR. SANTICOLA:  They can make an
23         argument that -- I'll talk to him later.  You
24         can keep going.
25   BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

27

```
 1   Q.    Mr. Stiffler, have you ever been deposed
 2         before?
 3                  MR. SANTICOLA:  Have you ever had a
 4         deposition before?
 5   A.    No, ma'am.
 6   BY MS. OZAROWSKI:
 7   Q.    How did you prepare for this deposition today?
 8   A.    Nothing.  Nothing.
 9   Q.    Did you look at any documents in preparation
10         for giving testimony today?
11   A.    Nope.
12   Q.    Did you look at any photos or videos in
13         preparation for today?
14   A.    No.
15                  THE WITNESS:  We talked about when
16         it was on the news?
17                  MR. SANTICOLA:  No.  No.
18   BY MS. OZAROWSKI:
19   Q.    Mr. Stiffler, I'll just ask that when I ask
20         you a question, you need to answer the
21         question to the best of your ability.  You're
22         not allowed to ask your attorney for
23         assistance in answering the question.
24   A.    I'm sorry.  I just need clarified.
25                  MR. SANTICOLA:  Don't overthink.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

28

```
 1   A.      Clarify what you're saying.
 2                   MR. SANTICOLA:  Then you can ask a
 3           question.
 4   BY MS. OZAROWSKI:
 5   Q.      Exactly.  Feel free at any time to ask me to
 6           clarify the question and I'm happy to do so.
 7   A.      Okay, ma'am.
 8   Q.      Did you speak to anybody other than your
 9           attorney in seeking advice on how to behave
10           during the deposition today?
11   A.      No.
12   Q.      Have you ever performed internet research on
13           iPhones?
14   A.      Yes, ma'am.
15   Q.      What kind of research have you performed?
16   A.      That they have blown up.  I did very fast, 100
17           percent.  Just bought the phone brand new.
18   Q.      When did you research iPhones?
19   A.      Probably first time was August 4th, 2018.
20   Q.      How did you perform this research?
21   A.      From my first cousin's phone in the hospital.
22   Q.      What did you do?
23   A.      Just searched it, Googled it, iPhones.  I put
24           IPhone 6 Pluses that are blowing up because I
25           knew something bad had to happen for my face
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

29

```
 1            to get burnt for me to be like this because to
 2            allow this to happen to me.
 3                    MR. SANTICOLA:  Just answer her
 4            question.
 5  BY MS. OZAROWSKI:
 6  Q.    What results did you find when you performed
 7            that Google search?
 8  A.    Horrible.  Tons of -- tons of things blowing
 9            up.  People dying.  It was awful.
10  Q.    Do you know what web sites you went to in
11            performing this research other than Google?
12  A.    No.  There's so many of them that you have --
13            I don't know.  They are blowing up all over
14            the place.
15  Q.    What did the web sites say?
16  A.    That they are blowing up when they are hot.  I
17            --
18                    MR. SANTICOLA:  Okay.  I don't
19            remember is an okay answer, by the way.
20  A.    Just they are blowing up.
21                    MS. OZAROWSKI:  Counsel, I'll just
22            ask you not to --
23                    MR. SANTICOLA:  I know.  We didn't
24            go through that with him prior to the
25            deposition.  Just so for the record you
```

```
 1              understand, Robert, you know, yes, no and I
 2              don't know response.  You don't have to guess,
 3              and that was what she was trying --
 4                      THE WITNESS:  Sorry.
 5                      MR. SANTICOLA:  -- to get to in the
 6              beginning.  You don't have to guess or try to
 7              come up with an answer that you don't know.
 8              If you don't know, say I don't know or I don't
 9              remember, that's okay.  It's an okay answer.
10   BY MS. OZAROWSKI:
11   Q.    So Mr. Stiffler, can you give me any specific
12         examples of what you read when you performed
13         this research?
14   A.    That charging them while they are hot wasn't
15         good.  That's all I got pretty much.
16   Q.    You testified a moment ago something about
17         iPhones blowing up, what did you read about
18         that when you performed this research?
19   A.    I read that they have blown up, killed people.
20         Blown up, burned people very bad.  It's
21         everywhere.  Especially the iPhone 6 Plus,
22         iPhone 6S, all the 6s.  That's the ones I'm
23         seeing.
24   Q.    What did you see that referenced iPhone 6 Plus
25         or iPhone 6 Ss specifically?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

31

```
 1    A.      What I did see?

 2    Q.      Correct.  What did you see on these web sites?

 3    A.      I seen the phone blowing up.  The lady had it

 4            on the dashboard, it blew up, she went crazy.

 5            And then a girl had it under -- she was

 6            sleeping with her ear phones on and it killed

 7            her.  I seen quite a few things.  Do you want

 8            me to keep going?

 9    Q.      Sure.

10    A.      I seen the guy got blown up in his pocket.  I

11            seen the Apple stores, the iPhone 6s are

12            blowing up in the Apple stores, so they have

13            to take the Apple iPhone 6s out, I seen that.

14            I seen lawsuits going through in passing.

15            Just the iPhone 6.  That's about all I seen,

16            nothing else.

17    Q.      Can you clarify for me what you mean when you

18            say you seen these things, were these videos,

19            were they --

20    A.      Videos.  YouTube.  All YouTube.  And I

21            searched them too.

22    Q.      What do you mean by that?

23    A.      That would search engines, ma'am.  Search

24            engine, ma'am.  Search engines.

25    Q.      Okay.  So what was the process, would you go
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

32

```
1              to YouTube first and then Google afterward?
2      A.     Like Google, that's a search engine.  And then
3             I would punch in that and just read stuff.
4      Q.     I'm just going to remind you, if you can, to
5             try to remember to allow me to finish asking
6             the question before you respond.
7      A.     Okay.  I'm sorry.
8      Q.     No worries at all.  So if I understand your
9             testimony correctly, you would go to YouTube
10            first and then you would Google what you saw
11            on YouTube or something different?
12     A.     No.  I was watching YouTube and I just
13            searching.  YouTube didn't have me go directly
14            to these -- to the search engine.  Just, you
15            know, that's when I just wanted to know what
16            was going on with this phone and it's just
17            awful to learn what was going on.
18     Q.     In doing your research, did you read any
19            message boards?
20     A.     I don't message -- you mean the comments?
21     Q.     You tell me.
22     A.     I don't know what you're --
23                    MR. SANTICOLA:  That's it.
24     A.     I'm 43 years old.  I don't know what a message
25            board is, ma'am.  What's a message board?  A
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

33

```
 1         comment board?
 2   BY MS. OZAROWSKI:
 3   Q.    Sure.  Did you read any comment boards?
 4   A.    No, I didn't read any comment board.  I just
 5         watched the videos and the articles that
 6         people wrote in the paper.
 7   Q.    And when you say articles that people wrote,
 8         do you mean news articles or blog, personal
 9         blogs?
10   A.    Columns, newspapers.
11   Q.    Okay.  Did you read any personal accounts that
12         people wrote about their iPhones in doing this
13         research?
14   A.    No.  I'm not a big reader.  I read a little
15         bit and then I stop.  No, not really.  No, I
16         never read a whole story to justify any of the
17         things that I'm -- you know, no.  It makes me
18         sick.  I can't read the whole things, just --
19   Q.    Did you ever read any Reddit discussions or
20         other sorts of discussions between people on
21         the internet about iPhones?
22   A.    Nope, no discussion.  No chats or anything
23         like that, no.
24   Q.    Did you ever read any social media posts about
25         iPhone explosions?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

34

```
 1    A.      Just like Facebook and stuff like that, is
 2            that what you're saying?
 3    Q.      Right.
 4    A.      No.  Except what I need to.  And I didn't go
 5            through the comments on YouTube, so no.  No.
 6            No, ma'am.
 7    Q.      Do you know who posted the videos on YouTube
 8            that you watched?
 9    A.      No.  no, ma'am.
10    Q.      What were the search terms that you put into
11            Google when you were performing this research?
12    A.      The iPhone is blowing up injuring people.
13            IPhone 6 Pluses.  That's it.  No other phone
14            but that phone.  And then I did other
15            searches, every phone.  The general consensus
16            is the iPhone 6 out of any phone by far.
17            Just --
18    Q.      Did you learn anything else during your
19            internet research about iPhones?
20    A.      I learned that these phones were given out and
21            they didn't have a cool-down system and they
22            still gave them out.  They didn't put a
23            cool-down system until about the 8 or the 9,
24            right?  Am I wrong?
25                     MR. SANTICOLA:  Just answer the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

35

```
 1      question.
 2   A.    Okay.  I know they didn't put a cool-down
 3         system into them.
 4   BY MS. OZAROWSKI:
 5   Q.    Where did you learn that?
 6   A.    Like I said, I read it.
 7   Q.    Where did you read it?
 8   A.    I forget.  I think it was either Wall Street
 9         Journal.  Wall Street Journal I think it was.
10   Q.    How many times have you researched either
11         iPhones or iPhones blowing up as you just
12         testified?
13   A.    Maybe ten times, if that.
14   Q.    What is your full legal name?
15   A.    Robert Arthur Stiffler.
16   Q.    Have you ever filed for bankruptcy?
17   A.    No, ma'am.
18   Q.    I apologize for asking you this, but this is
19         something that we have to ask all witnesses.
20         Have you ever been convicted of a crime?
21   A.    No, ma'am.  Oh, yes.  I have been a
22         misdemeanor.  I got a DUI one time back when I
23         was 29.
24              MR. SANTICOLA:  Let me just for the
25         record, there was no conviction.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

36

```
 1    A.     Yeah.  Thank you.

 2    BY MS. OZAROWSKI:

 3    Q.     Mr. Stiffler, I'm going to ask your Social

 4           Security Number, but I'm going to ask that the

 5           whole thing be off the record.

 6                  THE VIDEOGRAPHER:  Hold off one

 7           second then, sir, before you answer.  The time

 8           is 11:02 a.m., and we are off the record.

 9                         - - - -

10           (There was a discussion off the record.)

11                         - - - -

12                  THE VIDEOGRAPHER:  The time is

13           11:03 a.m., and we are back on the record.

14    BY MS. OZAROWSKI:

15    Q.     What is your date of birth, Mr. Stiffler?

16    A.     January 17, 1978.

17    Q.     Where were you born?

18    A.     Sewickley Hospital, Sewickley, Pennsylvania.

19           Sewickley Valley Hospital, Sewickley,

20           Pennsylvania.

21    Q.     Do you currently treat with a primary care

22           physician?

23    A.     Yes, ma'am.

24    Q.     Who is that?

25    A.     Dr. Stephen Osmanski.
```

```
 1    Q.    Dr. Osmanski is the doctor we spoke about
 2          previously; is that correct?
 3    A.    Yes, ma'am.
 4    Q.    Do you have a yearly physical?
 5    A.    I have three or four yearly.
 6    Q.    Are those with Dr. Osmanski?
 7    A.    Yes.  And I have three or four with Kang too.
 8    Q.    Are there any other doctors with whom you
 9          treat regularly?
10    A.    Well, since the burns, yes.  Dr. Guy Stofman,
11          he's my plastic surgeon.  I have a burn
12          surgeon too, Dr. Ziembicki.  But he's the head
13          of the burn -- he's the head of the plastic
14          and she's the head of the burn emergency.
15    Q.    So Dr. Stofman and Dr. Ziembicki?
16    A.    S-T-O-F-M-A-N, Stofman, Guy Stofman.
17    Q.    Okay.  And those two doctors are at Mercy you
18          said?
19    A.    Yeah.  They are the heads of each department.
20    Q.    Have you ever smoked cigarettes?
21    A.    Yes, I did, ma'am.
22    Q.    When?
23    A.    Off and on from 1999 until 2018.
24    Q.    I'm going to back up for a minute and ask you
25          something.  Again, please don't take offense.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

38

```
 1          This is something we ask everybody.  Did you
 2          take any illegal substances in the past 24
 3          hours?
 4   A.     No, ma'am.
 5   Q.     Did you take any marijuana in the past 24
 6          hours?
 7   A.     No, ma'am.  I wish they could give me that.
 8   Q.     Did you drink any alcohol in the past 24
 9          hours?
10   A.     No, ma'am.
11   Q.     Did you smoke cigarettes in July 2018?
12   A.     Yes, ma'am.
13   Q.     How often did you smoke?
14   A.     10 to 15 cigarettes a day.
15   Q.     When did you stop smoking?
16   A.     After the fire.  Because I got so much of the
17          soot of the house in my lungs, they had to put
18          nitrogen in and suck all of that out.  They
19          told me not to smoke.  So I'm scared to death
20          to smoke.
21   Q.     Where do you currently live?
22   A.     With my parents.
23   Q.     What's the address?
24   A.     1332 Main Street, Crescent Township, PA 15046.
25          P.O. Box 402, you have to put that.
```

39

```
 1    Q.    Where did you live on July 16, 2018?

 2    A.    The same address.

 3    Q.    Prior to July 16, 2018, how long had you lived

 4          at that house?

 5    A.    2009 I moved in -- 2010 I moved in here.  I

 6          have been here since 2010, before that.

 7    Q.    Am I correct that this house is owned by your

 8          parents, Arthur and Sandra Stiffler?

 9    A.    Yes, ma'am.  But it was a duplex before that,

10          so it was two homes.  Before the house burned

11          down, it was two homes.

12    Q.    Who owned the second home?

13    A.    My parents did.

14    Q.    Okay.

15    A.    They rented it out to me.

16    Q.    Okay.  So in July 2018, both sides of the home

17          were owned by your parents, but they rented

18          out one half to you; is that correct?

19    A.    No.  No.  My grandma got sick and for a month

20          she was living over there and I was back up in

21          my room.  Well, I was back up in my sister's

22          room.  My room I didn't go in.

23    Q.    So just so I understand the living

24          arrangements.  In July of 2016 prior to the

25          fire, your parents owned both sides of the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

40

```
 1          house, your grandmother was in one side of the

 2          house and you and your parents were in the

 3          other side of the house, is that accurate?

 4    A.    Yes, ma'am.

 5    Q.    In July of 2018, were you paying rent to your

 6          parents?

 7    A.    Yes, I was.

 8    Q.    How much did you pay?

 9    A.    $450.

10    Q.    Was that a month or something else?

11    A.    A month.  I was actually giving them 650 a

12          month.  650, including groceries, 650.

13    Q.    Is that the amount that you had paid since you

14          moved in in approximately 2010?

15    A.    Yep.  Yes, ma'am.

16    Q.    What is your grandmother's name?

17    A.    Dorothy Zimmerman.

18    Q.    Was anybody else living in the house on July

19          16th, 2018?

20    A.    No, ma'am.

21    Q.    Was anybody else at the house at the time of

22          the fire on July 16, 2018?

23    A.    No, ma'am.

24    Q.    Are you married?

25    A.    No, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

41

```
 1    Q.    Do you have any children?

 2    A.    No, ma'am.

 3    Q.    What is the highest level of education you

 4          have obtained?

 5    A.    I have college, some -- I have college and I

 6          was in the military.

 7    Q.    Where did you go to college?

 8    A.    Community College of Allegheny County.

 9    Q.    I'm sorry.  I didn't hear you.

10    A.    Community College of Allegheny County.

11    Q.    When did you earn that degree?

12    A.    I had four credits.  I didn't get my

13          associate's degree because I went off into the

14          military.  9/11 happened and I went right to

15          the military.

16    Q.    So what years did you attend college?

17    A.    '97 to 2001 off and on.

18    Q.    How many credits did you earn during that

19          time?

20    A.    61 I'm thinking.

21    Q.    What did you study?

22    A.    Criminology.  And physical therapy too.  I

23          just want to be honest.

24    Q.    Am I correct in understanding that you were

25          pursuing an associate's degree?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

42

```
 1   A.    Yes, ma'am.

 2   Q.    Why did you stop pursuing that degree?

 3   A.    I did keep pursuing it.  I went to the Marine

 4         Corps and that's what my MOS was, my military

 5         occupational skill was MP.

 6   Q.    So when did you join the military?

 7   A.    Oh, my goodness.  June -- wait.  Let's see.  I

 8         think September.  September of 2011 -- I mean,

 9         September of 2001.

10   Q.    Can you explain to me what you mean by the

11         MOS?

12   A.    Military occupational skill.

13   Q.    And what is that?

14   A.    Military police.  Camp Lejeune, North

15         Carolina.

16   Q.    So is Camp Lejeune, was that where you

17         underwent training?

18   A.    Yes.  At the boot camp after Parris Island.

19   Q.    So you went to boot camp and then you

20         underwent further training at Camp Lejeune; is

21         that correct?

22   A.    Yes.  Yes.

23   Q.    You can continue.

24   A.    No, that's it.  Yep.  That's it.

25   Q.    What sort of training did you undergo at Camp
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

43

```
 1          Lejeune?
 2    A.    I did my MP, then they switched me, my MOS, to
 3          construction utilities.  And then I actually
 4          had a seizure and then they put me on
 5          medicine.  And the next thing I knew -- I got
 6          an honorable discharge, but I got discharged a
 7          little bit over a year in.
 8    Q.    Can you explain to me what an MP is?
 9    A.    Military police officer.
10    Q.    So did you become an MP or were you training
11          to become an MP?
12    A.    I was training to become an MP, police
13          officer.
14    Q.    How long did you train for that?
15    A.    Nine weeks.
16    Q.    Why did you switch over to construction
17          utilities?
18    A.    I had no choice.  My senior -- my officer made
19          me switch.  I had no choice.
20    Q.    Did you ever earn any sort of certificate or
21          any other sort of professional licenses or
22          anything like that while you were training at
23          Camp Lejeune?
24    A.    Oh, I got awards, but they burned down in the
25          house and I can't remember.  I got the
```

44

```
 1          Freedom -- I don't know exactly.  I got only
 2          two awards and stuff, but that was, like I
 3          said, I forget what they were, but in my mind
 4          right now, I just don't remember exactly what
 5          they were.  I got the Merit of -- I don't even
 6          want to say because I don't know.  I don't
 7          know.
 8    Q.    Did you earn any sort of certificate in
 9          construction utilities?
10    A.     No, ma'am.
11    Q.    You testified a moment ago that --
12    A.     Yes, I did.  I just don't remember the name.
13          I'm sorry.  I don't remember the name.  It
14          will come to me.  I'm trying to be as honest
15          as I can.
16    Q.    Sure.  So if I understand you correctly, you
17          earned some sort of certification as a result
18          of completing courses having to do with
19          construction utilities; is that correct?
20    A.     Yes, ma'am.  Yes, ma'am.
21    Q.    And what does that qualify you to do?
22    A.     I was actually just doing commercial plumbing
23          at the time.  And they were getting me ready
24          to do bridges, so I got a certificate for
25          that.
```

```
 1   Q.    What sort of certificate is that or what does
 2         that qualify you to do?
 3   A.    My mom has all of this stuff, she has it.  I
 4         probably don't remember.  This fire really got
 5         my PTSD bad.  I did not want to be that,
 6         that's why.  I didn't want to be a
 7         construction utilities.  I didn't want to do
 8         that.
 9   Q.    Understood.  When you say you were doing
10         commercial plumbing, was that during this time
11         period in about 2001, 2002 with the military?
12   A.    Yes.  Yeah, 2002, 2003.  Because it was --
13   Q.    You testified a moment ago that you suffered a
14         seizure at some point.  Can you talk about
15         that a little bit, please?
16   A.    I don't really remember what happened, but I
17         woke up and I was in the infirmary and they
18         told me I had a seizure during our cadence and
19         I don't know.  I woke up and I have had like
20         four or five since then.  That's all I have
21         had since then, and that was probably the last
22         one was 2004.  They said it was because of the
23         stress and -- I don't know.  I have been
24         through a lot.  I just don't know.  That's
25         what they said, it was from the stress, the
```

```
 1          psychologist.
 2   Q.     Did you start taking any medication after the
 3          seizure?
 4   A.     No.  No, ma'am.  Until I got back home, the VA
 5          put me on Xanax.
 6   Q.     Where were you when you suffered this seizure?
 7   A.     Camp Lejeune.
 8   Q.     Were you ever stationed anywhere other than
 9          Camp Lejeune during your time in the military?
10   A.     No.  I was getting ready to be put on a fleet,
11          but nope.
12   Q.     You testified a moment ago that you received
13          an honorable discharge.  Was this after the
14          seizure, in connection with the seizure or
15          something different?
16   A.     Just when I got discharged from the military
17          from the seizure, it was from the seizure.  So
18          medical discharge was an honorable discharge.
19          That's my DD214s.
20   Q.     Okay.  So my understanding from your testimony
21          is that you had a medical discharge, an
22          honorable discharge, as a result of this
23          seizure you sustained in about 2004; is that
24          correct?
25   A.     Yes.  After two years, it became -- it was
```

47

```
 1              general, then it became honorable.  I just
 2              want to be accurate as I can.
 3       Q.     After you were discharged from the military,
 4              did you have an occupation?
 5       A.     Yes.
 6       Q.     What was it?
 7       A.     I managed a pizza shop and I was a physical
 8              trainer.
 9       Q.     What was this pizza shop called?
10       A.     Pizza Roma.
11       Q.     When did you manage Pizza Roma?
12       A.     2006 to '10, 2010.
13       Q.     Did you have a job from 2004 to 2006?
14       A.     I was a physical trainer.  I was getting my
15              license for that.
16       Q.     Where were you a physical trainer?
17       A.     YMCA Sewickley, yeah, and Brighton Township.
18              Brighton Township YMCA.
19       Q.     Did you earn a certificate to be a physical
20              trainer?
21       A.     Yes, ma'am.
22       Q.     When did you earn that?
23       A.     2006 -- wait.  2005, 5.
24       Q.     How long did you work as a physical trainer?
25       A.     Up until this happened.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

48

```
 1   Q.    By that, do you mean --
 2   A.    July 16, 2018.  So July 15.  I took care of
 3         myself up until that date.
 4   Q.    Were you employed at the Brighton Township
 5         YMCA during this entire time?
 6   A.    No, no.
 7   Q.    Where were you employed from 2005 to 2018?
 8   A.    Jeez.  Gorilla Gym, it's over in Ambridge.
 9         And Polish Falcon Club in Ambridge.
10   Q.    I'm sorry.  What was that?
11   A.    Polish Falcon Club.
12   Q.    Okay.
13   A.    And that's it.  I did the Pizza Roma and then
14         I worked at TriState Plastics.
15   Q.    When did you work at Gorilla Gym?
16   A.    2008 to 2013.
17   Q.    Were you an employee, were you someone who
18         used the facility or something different?
19   A.    No.  No.  I trained, just did the physical
20         training from there.
21   Q.    Were you on the payroll at Gorilla Gym or --
22   A.    Yes, I was.
23   Q.    What were your duties in that position?
24   A.    I used to taught people how to lift, how to
25         lift correctly.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

49

```
 1   Q.    Was it a full-time or part-time position?
 2   A.    That was part-time.
 3   Q.    Approximately how many hours a week did you
 4         work?
 5   A.    I didn't work that much because I had the
 6         peritonitis and I had a gun shot that I had
 7         pancreatitis.  I have been through a lot.  I
 8         have had lots of surgeries.
 9   Q.    Do you recall approximately how many hours a
10         week you worked at Gorilla Gym?
11   A.    I don't know.  18 hours a week say.  17 hours.
12   Q.    Did you work at the Polish Falcon Club after
13         Gorilla Gym?
14   A.    No.  I was working both of them at the same
15         time off and on.
16   Q.    How many hours a week did you work at the
17         Polish Falcon Club?
18   A.    Was it 15 to 17 hours a week.  I was allowed
19         to work 17 hours a week because my SSI had me
20         because of my surgeries.  I had lots of
21         surgeries on my stomach.  I'm not going to
22         lift my shirt up, but I have tons of surgeries
23         on my stomach.
24   Q.    I'll ask you about that in a moment.  I'm just
25         trying to get an idea of your employment
```

```
 1         history right now.
 2    A.    Okay.
 3    Q.    When did you work for TriState Plastics?
 4    A.    2008 to 2013.
 5    Q.    What did you do there?
 6    A.    I did forklift -- I was doing forklift
 7         operator.  Then I was a lay minister right
 8         here at my church.  At Glenwood United
 9         Methodist, I was a lay minister there.
10    Q.    When did you do that?
11    A.    From 2012 to July 16, 2018.  I have been at
12         the church since then.
13    Q.    How many hours a week did you work at TriState
14         Plastics?
15    A.    40 hours a week.
16    Q.    Why did you stop working there in 2013?
17    A.    I had a surgery, I had another surgery.  I had
18         a surgery on my stomach.  I was obstructed.
19    Q.    As a lay minister at the United Methodist
20         Church, how many hours a week did you work?
21    A.    Sunday mornings, and then I go to Bible study
22         Monday night.  So I'd say 10 hours.  But the
23         fellowship and all the -- you know, I was -- I
24         went to all of that, you know, all the things
25         that are going on in a church, you know,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

51

```
1            hanging of the greens, all the stuff that, you

2            know, I was a part of.  But I don't know, I

3            believe in God.  I don't know if that's a job,

4            but I did that too.

5     Q.     Were you paid by the church?

6     A.     No.  No.  No.  So I guess that wouldn't be

7            considered -- I mean, it's your choice if you

8            want to get paid or not.  It's your choice.

9     Q.     So --

10    A.     I didn't get paid.

11    Q.     So is it correct that this was a volunteer

12           position?

13    A.     Yes.  I guess it would be volunteer.  So if I

14           would have been paid, it wouldn't have been

15           volunteer, is that what you're saying, ma'am?

16    Q.     I'm sorry.  I didn't understand the last

17           question.

18    A.     I said if I would have got paid, if I would

19           have said, hey, give me money, that would have

20           been the job, that would have been a career?

21    Q.     Oh, I don't know.  I'm just asking you what

22           happened and whatever your answers are your

23           answers.

24    A.     Yes, ma'am.

25    Q.     How much were you making hourly at TriState
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

52

```
 1         Plastics?
 2    A.    13.40.
 3    Q.    Were you employed anywhere other than the
 4          church from 2013 to 2018?
 5    A.    Just doing the physical training, ma'am.
 6    Q.    Where did you do the physical training from
 7          2013 to 2018?
 8    A.    Say Gorilla Gym.  And Yankello, Tommy
 9          Yankello, he had what's called the Polish
10          Falcon Club and Tommy Yankello runs that.
11    Q.    I think maybe I misunderstood you.  I had
12          noted that you worked at those places until
13          2013, is that inaccurate?
14    A.    Yeah, it's inaccurate.  I was off and on.  I
15          lifted all the way up until this happened.
16    Q.    So --
17    A.    I have a picture of me right before this
18          happened, the day before this happened.  Like
19          night and day compared to when this happened.
20    Q.    So I'm going to give you a specific time
21          period.  From 2015 to 2018, were you working
22          at the Gorilla Gym?
23    A.    2018 to 2020?
24                MR. SANTICOLA:  2015 to 2018.
25    A.    Yes.  Yes, I was.  Yep.
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

53

```
 1    BY MS. OZAROWSKI:

 2    Q.    How many hours a week were you working?

 3    A.    Oh, gosh, maybe 15 hours.

 4    Q.    Were you an employee of Gorilla Gym?

 5    A.    Yes, I was.

 6    Q.    Were you paid hourly?

 7    A.    Yes, I was.

 8    Q.    What were you paid?

 9    A.    12.50.

10    Q.    During this same time period, 2015 to 2018,

11          were you also working at the Polish Falcon

12          Club?

13    A.    No, ma'am.  No.

14              MS. OZAROWSKI:  Are you making a

15          claim for lost wages here?

16              MR. SANTICOLA:  We are not.

17    A.    I just want my face fixed and my hands fixed.

18    BY MS. OZAROWSKI:

19    Q.    Do you now receive unemployment benefits?

20    A.    No.  No.

21    Q.    From 2006 to 2016, did you ever receive

22          unemployment benefits?

23    A.    Nope.  No, ma'am.

24    Q.    Prior to July 2016, had you ever received

25          disability payments?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

54

```
 1    A.     Say that again, ma'am.

 2    Q.     Prior to July 2016, had you ever received

 3           disability payments?

 4    A.     Yes, ma'am.

 5    Q.     When was the first time you applied for

 6           disability?

 7    A.     2006.

 8    Q.     I'm going to ask you about disability in

 9           detail a little bit later.  I think it's

10           probably easiest to ask you about the gun shot

11           wound that you have mentioned a few times.

12           When did that occur?

13    A.     May 2nd, 2005.  Can I ask you a question?  How

14           much longer is this going to be?

15                  MR. SANTICOLA:  It's going to be a

16           little bit.

17    A.     Yeah, my stomach -- this has to be cut out.

18                  MR. SANTICOLA:  If you want to take

19           a break, we'll take a break.

20    A.     Yeah, take a little break in a little bit.  I

21           can't go -- I have been through hell this

22           week.

23                  MR. SANTICOLA:  Yeah.

24    A.     No sleep, just --

25    BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

55

```
1    Q.    Sure.  Mr. Stiffler, any time you want to take
2          a break for a few minutes, we can take a break
3          and you can relax and then we can go back on
4          the record.  You just let me know.  Is that
5          all right?
6    A.    Yes.  Yes.  In a little bit here I'd like to
7          take a break, I mean.
8                MR. SANTICOLA:  That's okay.
9    A.    It was a bad morning.
10   BY MS. OZAROWSKI:
11   Q.    Would you like to take a break now or do you
12         want to continue?
13   A.    I lost 30 pounds.
14               MR. SANTICOLA:  Why don't we try to
15         go another 20 minutes or so to get closer to
16         noon and then we can take a break.
17               MS. OZAROWSKI:  Okay.  Sounds good.
18   BY MS. OZAROWSKI:
19   Q.    So, Mr. Stiffler, I believe you just testified
20         that you sustained the gun shot wound on May
21         2nd, 2005?
22   A.    Yes, ma'am.
23   Q.    Did you explain to me the circumstances
24         surrounding that?
25   A.    I actually got jumped and I got shot and they
```

56

```
 1              took all of my money.  It's written down.
 2                      MR. SANTICOLA:  That's all right.
 3              Just tell her what happened.
 4      A.   Yeah, they took all of my money.  And then the
 5              guy put the gun to my head first -- and I was
 6              just walking.  And then I thought it was going
 7              to be an air gun, because I was in the
 8              military before and I thought maybe it was an
 9              air gun, but he put the gun to my head and it
10              was hard, I knew what it was.  And he fired on
11              me point blank with a snub-nose .38.
12      Q.   Is it my understanding that he fired on you
13              into the stomach?
14      A.   Right.  Yes.  Right here and came all the way
15              through right here.  It's still in there.
16      Q.   Is it correct that you were indicating your
17              abdomen area just now?
18                      MR. SANTICOLA:  Yeah.  For the
19              record, it's his left abdomen to the right.
20      A.   Yeah, it's right here.  It came all the way
21              across.
22  BY MS. OZAROWSKI:
23      Q.   Where did this incident occur?
24      A.   Sheffield, Aliquippa.
25      Q.   I'm sorry.  What was -- you said Sheffield,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

57

```
 1          and I didn't hear?
 2     A.   Aliquippa, Pennsylvania.
 3     Q.   I'm sorry.  I spoke over you again.
 4     A.   Aliquippa, Pennsylvania.
 5     Q.   Thank you.  Were you a part of a lawsuit of
 6          any kind in connection with this incident?
 7     A.   I went down -- a lawsuit?  No, ma'am.
 8     Q.   Were you part of a criminal investigation of
 9          any kind in connection with this incident?
10     A.   Yes.  They give me -- I went and looked at the
11          five guys that they thought one of them shot
12          me with the detective and that's how it
13          happened, but I couldn't pick them out 100
14          percent.  And I didn't want to put someone
15          that I wasn't sure of in jail, but I was
16          pretty -- I don't know, it sucked.  So, yeah,
17          there was a criminal investigation as part of
18          it.
19     Q.   Do you have an understanding of what the
20          results of the criminal investigation was?
21     A.   They didn't get him.  Never got him.  He's on
22          Facebook.
23     Q.   What do you mean by that?
24     A.   The kid that shot me is on Facebook.  I mean,
25          he didn't get in no trouble.  He's on
```

58

```
 1          Facebook.  It's just horrible.
 2                    MR. SANTICOLA:  What do you mean by
 3          Facebook?
 4   A.   He has a profile, the kid that shot me.  He
 5        didn't get in no trouble or anything.  He's in
 6        Facebook.
 7   BY MS. OZAROWSKI:
 8   Q.   Is this someone that you know?
 9   A.   No.  No.  I can remember his face.  I was just
10        looking through.  You know, when you live in
11        the same area, I seen his face.  I know what
12        he looks like.  It's pretty sad.
13   Q.   When you say when you're looking through, what
14        do you mean by that?
15   A.   You never been on Facebook before?  I'm just
16        saying.  Looking through Facebook.
17   Q.   Okay, great.  I was just asking you to clarify
18        what you meant by that.
19   A.   Yeah.  Yes, we have, say, mutual friends,
20        which I don't know if that's mutual friends or
21        what.  I'm not on it no more, but --
22   Q.   Am I correct in understanding that this was a
23        robbery or something different?
24   A.   Oh, yes.  Robbery, 100 percent.
25   Q.   How long were you in the hospital following
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

59

```
 1         this incident?
 2    A.    Three months.
 3    Q.    Can you please give me a general overview of
 4          what your injuries were and what the treatment
 5          was?
 6    A.    I had 76 shots through my small intestine and
 7          my large intestine.
 8    Q.    When you say shots, do you mean sutures or
 9          something else?
10    A.    The bullet went through my small intestine,
11          went through my large intestine 76 times, 76
12          holes.
13    Q.    Understood.
14    A.    And now it sits in my pelvic area.
15    Q.    What sort of surgical procedures did you have
16          as a result of this incident?
17    A.    They had to stop all the holes.  And it caused
18          an infection in my bowel six months later and
19          I went septic.  And they had to take out 3.3
20          feet of my bowel, 177 centimeters of my bowel
21          in December.  That's been fun.  Yep, that's
22          it.
23    Q.    So the surgery on your bowel took place in
24          approximately December 2005?
25    A.    December 16, 2005, yep.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

60

```
 1    Q.     When you were discharged from the hospital --
 2           or strike that.
 3                      When were you discharged from the
 4           hospital following this incident?
 5    A.     For the peritonitis?
 6                      MR. SANTICOLA:  The first time?
 7           Lili, are you saying the first time or the
 8           second, after the surgery there?
 9    BY MS. OZAROWSKI:
10    Q.     Well, if you can explain, if you can briefly
11           explain the timeline to me, that would be
12           great.
13    A.     Timeline of which incident?
14    Q.     Following the gun shot.
15    A.     Okay.  I was in there from December 14th to
16           December 23rd.  They got me out right before
17           Christmas.  And then I got sick again and,
18           boom, went right back in there after being
19           sick, they got me better, and I came back
20           home.  Dr. Matthew Rosengart, that was my --
21           the trauma surgeon that did my surgeries.
22    Q.     Was this Mercy Hospital or somewhere else?
23    A.     Presby.  UPMC Presby, Pittsburgh.
24    Q.     So am I correct that you had two hospital
25           admissions in connection with this incident
```

```
 1          with the gun shot wound?
 2                    MR. SANTICOLA:  Just for
 3          clarification.  After the initial or --
 4                    MS. OZAROWSKI:  In total.
 5                    MR. SANTICOLA:  Then it would be
 6          more than that.
 7     A.    More than that, way more than that.  Oh, my
 8          goodness.  I have been in the hospital so many
 9          times for my bowels.  What else do you want to
10          know?  Next question.
11     BY MS. OZAROWSKI:
12     Q.    Sure.  I can clarify what I meant.  I'm trying
13          to get a general understanding of what
14          happened after the gun shot wound.  So, you
15          know, how many times were you in the hospital,
16          how long were you in the hospital?
17     A.    I was probably in the hospital after the gun
18          shot, probably six times.  Only one time for
19          surgery.  They thought I was obstructed a few
20          times.  I was obstructed in 2011.  I had the
21          surgery again there and they took a little
22          piece out.
23                    MR. SANTICOLA:  There's more than
24          one surgery.  You had the surgery initially
25          when you were shot.
```

62

```
 1   A.     Yes, initially when I was shot.  And then I
 2          had another surgery when I had the
 3          peritonitis.  Then I had pancreatitis and,
 4          yeah, I had the surgery there.  Then I had
 5          surgery again because I had a kink in my
 6          bowel.
 7   BY MS. OZAROWSKI:
 8   Q.     Are you still treating for issues that relate
 9          back to this gun shot wound?
10   A.     I was fine until the fire.  I was doing all
11          right until this fire.  I'll show you a
12          picture of me I was doing right before the
13          fire.  I have a picture.  I have July --
14                  MR. SANTICOLA:  Just wait and answer
15          the question.
16   BY MS. OZAROWSKI:
17   Q.     When was the last surgery you underwent in
18          connection with the injury sustained from the
19          gun shot wound?
20   A.     What's that?
21                  MS. OZAROWSKI:  I'm sorry.  Tammie,
22          could you repeat that question?
23                       - - - -
24                  (The record was read back by the
25          Reporter.)
```

```
 1                         - - - -
 2    A.     2012.
 3    BY MS. OZAROWSKI:
 4    Q.     What type of surgery was that?
 5    A.     Removement of the piece of my duodenum, my
 6           small intestine.
 7    Q.     After 2012, did you treat with any medical
 8           providers for injuries related to the gun shot
 9           wound?
10    A.     Give me pain medicine.  I mean, but it just --
11           I don't know if it's just because he wanted to
12           give it to you.  I mean, they want to keep you
13           filed up.
14    Q.     With which doctors did you treat from 2012 to
15           2016 for injuries related to the gun shot
16           wound?
17    A.     All the way up to 2018.  You want to go to
18           2016?  Dr. Osmanski.
19    Q.     Did your medications change from -- or strike
20           that.
21                         How did the gun shot wound impact
22           your life physically?
23    A.     I got better.  I mean, I'll show you a
24           picture, I got better.  I was doing good
25           before.  Not negatively.  By the time 2016, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

64

```
 1            was 100 percent better.  100 percent better.
 2   Q.    Was there anything in 2016 that you couldn't
 3         do anymore as a result of the gun shot wound?
 4   A.    Nope.  Not until July 16th, 2018, now I am
 5         restricted.  I was totally 100 percent.  I
 6         have pictures.  I was 100 percent.
 7   Q.    What medications were you taking for your
 8         stomach or any stomach-related issues from
 9         January 1st, 2016 to July of 2016?
10   A.    Miralax, which is over-the-counter.
11                MR. SANTICOLA:  You mean July 2018,
12         Lili?  You said July '16.
13                MS. OZAROWSKI:  Apologies, yes.  I'm
14         sorry.  I meant -- so we can strike that
15         question.
16   BY MS. OZAROWSKI:
17   Q.    The question I meant to ask was:  What
18         medications were you taking from January 1st,
19         2018 to July 2018 in connection with any
20         injury sustained from the gun shot?
21   A.    I was taking Miralax.  Can we cut it off?  My
22         father is coming right now.  Can we just -- I
23         need a second.  I need a break too.
24                MR. SANTICOLA:  Yeah, we can take a
25         break.  His dad is walking in the door, that's
```

```
 1          why.  Do you want to take a break?
 2   A.     Yeah.  He has radiation treatment.  I just
 3          want to take a break.
 4                    MR. SANTICOLA:  How about we take 15
 5          minutes?
 6                    THE WITNESS:  Yeah, take 20 minutes.
 7                    MR. SANTICOLA:  You guys want to
 8          come back at 12:05, is that okay?
 9                    MS. OZAROWSKI:  Yes.  That's fine.
10          I just want to make sure we're going to have
11          enough time to finish today so we don't have
12          to come back another day.
13                    MR. SANTICOLA:  Right.
14                    THE VIDEOGRAPHER:  The time is
15          11:43 p.m., and we are off the record.
16                           - - - -
17       There was a brief Recess in the proceedings.
18                           - - - -
19                    THE VIDEOGRAPHER:  The time is
20          approximately 12:11 p.m., and we are back on
21          the record.
22   BY MS. OZAROWSKI:
23   Q.     Mr. Stiffler, before we broke, we were talking
24          about the gun shot wound you sustained in 2005
25          and your subsequent medical treatment of the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

66

```
 1        injuries that resulted from that incident.  Is
 2        it my understanding that you first applied for
 3        disability as a result of the injuries from
 4        the gun shot wound?
 5   A.   Yeah, it was.  Yep, that's it.
 6   Q.   When did you first apply for disability?
 7   A.   It was kind of the end of May.  Maybe July of
 8        that year.
 9   Q.   July of 2006?
10   A.   Yes, ma'am.
11   Q.   When did you start receiving payments?
12   A.   They gave it to me quick.  Within 15 days I
13        got it.
14   Q.   Was this partial, temporary or full
15        disability, what was the level of disability?
16   A.   I had 17 hours of work, so I don't know what
17        it is.  Full, I guess it was full.
18   Q.   What was your basis for your application for
19        disability benefits?
20   A.   Basis, can you explain that?
21               MR. SANTICOLA:  Why did you apply?
22        What was your disability?  What did you claim
23        as a disability?
24               THE WITNESS:  Mental.
25               MR. SANTICOLA:  Tell her.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

67

```
 1    A.     Mental.

 2    BY MS. OZAROWSKI:

 3    Q.     Can you explain what you mean by that?

 4                  THE WITNESS:  What is she talking

 5          about?

 6                  MR. SANTICOLA:  Disability.

 7    A.     Would you --

 8    BY MS. OZAROWSKI:

 9    Q.     I can clarify for you.

10    A.     Okay.

11    Q.     So my question is:  When you first applied to

12           disability and the forms or the doctor who was

13           going to be reviewing your case, when they

14           asked you why are you applying for disability,

15           what did you answer?

16    A.     My anxiety disorder.  My seizures.

17                  MR. SANTICOLA:  Did you guys hear

18          that?

19                  MS. OZAROWSKI:  I heard that.

20    BY MS. OZAROWSKI:

21    Q.     I heard you say your anxiety disorder and

22           seizures; is that correct?

23    A.     Yes, ma'am.

24    Q.     When did you develop an anxiety disorder?

25    A.     In the service.  It got worse and worse and I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

68

```
 1        got --
 2                  MR. SANTICOLA:  You have to speak up
 3        a little bit.
 4   A.    It was in the service.  Service.
 5   BY MS. OZAROWSKI:
 6   Q.    I believe you testified before that you
 7        developed PTSD while you were in the service;
 8        is that correct?
 9   A.    No, I got PTSD after this.  I didn't have PTSD
10        until I got the burns.
11   Q.   When did you develop the anxiety disorder in
12        the service, approximately what year?
13   A.    I don't -- see, I had seizures, but I didn't
14        have what I have now.  I don't have the racing
15        thoughts, like the stuff I have now, I didn't
16        have that.
17                  MR. SANTICOLA:  She's asking you.
18   BY MS. OZAROWSKI:
19   Q.    So at this point I'm trying to get an
20        understanding of why you initially applied for
21        disability in 2006?
22   A.    Because they told me I needed to do that, the
23        doctors.
24   Q.    Who was that?
25   A.    Dr. Jasbir Kang told me I needed to do that to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

69

```
 1          get the medicine I needed so they could pay
 2          for it.  And they put me on -- yeah.  I tell
 3          you -- I forget.  I have been on so much crap.
 4    Q.    So when you filled out that initial
 5          application for disability in 2006, you wrote
 6          that your basis for applying was an anxiety
 7          disorder and seizures; is that correct?
 8    A.    I had a seizure, but it was anxiety disorder
 9          too.  I mean, it accompanies that.  I'm no
10          psychiatrist, but yeah.  Yes, ma'am.
11    Q.    Who was the doctor who supported your
12          application for disability?
13    A.    Dr. Jasbir Kang.
14    Q.    Did you undergo a physical evaluation in
15          connection with your application for
16          disability in 2006?
17    A.    Say that again.
18              MS. OZAROWSKI:  I'm sorry.  Tammie,
19          can you repeat that question?
20                    - - - -
21              (The record was read back by the
22          Reporter.)
23                    - - - -
24    A.    Yes.  Yes.
25    BY MS. OZAROWSKI:
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

70

```
 1    Q.    Who performed that evaluation?
 2    A.    The SSI board, they did up in Oakland.  Yeah,
 3          in Oakland.  They did a physical and then they
 4          did a mental.
 5    Q.    Do you have an understanding of what the SSI
 6          board's findings were in 2006?
 7    A.    I have no clue, ma'am.  No.  No.
 8    Q.    Did you use the assistance of an attorney to
 9          apply for disability in 2006?
10    A.    No, ma'am.
11    Q.    What about your medical condition in 2006
12          prevented you from working?
13    A.    It was the seizures.  I had a seizure at work,
14          you know.  Like that's what they thought.
15          That was the conclusion.
16    Q.    When you said they, do you mean the SSI board
17          or Dr. Kang or somebody else?
18    A.    Dr. Kang.  And then I went there and they
19          agreed on it, that's why I got it.   I
20          wouldn't have got it if they didn't agree on
21          it.
22    Q.    Starting in 2006, how much were you paid from
23          the SSI board?
24    A.    Oh, I was getting 750 bucks.
25                MR. SANTICOLA:  Per month?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

71

```
 1   A.      Yeah, per month.  They make it to the day,
 2           close to that day.  It's amazing.
 3   BY MS. OZAROWSKI:
 4   Q.      Who paid you that money?
 5   A.      SSI, 750.
 6   Q.      How did you receive the payment?
 7   A.      Check.
 8   Q.      How long did you receive these $750 a month
 9           payments?
10   A.      What's that?  How many -- how long?
11   Q.      Yes.
12   A.      2013 they stopped me because I was all right.
13           Can we stop here for two minutes?
14                   MR. SANTICOLA:  Hold on.  I want to
15           make sure.
16                   THE VIDEOGRAPHER:  The time is
17           12:19 p.m., and we are off the record.
18                       - - - -
19       There was a brief Recess in the proceedings.
20                       - - - -
21                   THE VIDEOGRAPHER:  The time is
22           12:20 p.m., and we are back on the record.
23   BY MS. OZAROWSKI:
24   Q.      Mr. Stiffler, as we get started again, I'm
25           just going to ask you to try to remember to
```

```
 1            speak slowly and speak clearly so that both
 2            the court reporter and I am able to hear your
 3            responses.  You were doing a great job
 4            earlier, so just giving you a quick reminder,
 5            if that's okay.
 6                      MR. SANTICOLA:  Thank you.
 7    A.      Yes, ma'am.  My bad.  I'm good.
 8    BY MS. OZAROWSKI:
 9    Q.      Can you explain to me why the SSI payments
10            were stopped in 2013?
11    A.      Because they said I was doing -- they said I
12            was doing good enough I didn't need them.
13    Q.      Who is they?
14    A.      SSI.
15    Q.      From 2006 until 2013, did you have to
16            periodically reapply for disability?
17    A.      Nope.  Not until the fire.
18    Q.      So my question is specifically about the
19            disability payments you received during that
20            time period, were they renewed each year or
21            something different?
22    A.      They were renewed each year.  I have to see a
23            doctor each year.  Is that what you mean?
24            Yeah.  They kept on giving them to me.
25    Q.      Was there any event that precipitated the
```

73

```
 1        payments stopping in 2013?
 2   A.    Well, they gave me a check.  They checked me
 3         again.  And at the time -- I'll show you.  So
 4         2013 they gave me a check.  This is what I
 5         looked like.
 6              MR. SANTICOLA:  They won't be able
 7         to see that.  We'll provide that later.
 8   A.    I'm just saying, they made me work.  This
 9         nightmare happened.
10   BY MS. OZAROWSKI:
11   Q.    So just to make sure I understand you
12         correctly.  You underwent a physical
13         examination in 2013 and --
14   A.    Yes.
15   Q.    -- the SSI board determined that you were no
16         longer --
17   A.    Eligible.
18   Q.    -- eligible for SSI; is that correct?
19   A.    Yes, ma'am.
20   Q.    Between 2013 and 2018, did you receive any SSI
21         payments?
22   A.    No, ma'am.
23   Q.    Did you receive any SSI payments -- or strike
24         that.
25              Between 2013 and 2018, did you take
```

```
 1            any medications for any conditions or symptoms
 2            that were caused initially by the gun shot?
 3   A.    No, ma'am.
 4   Q.    For clarity, the anxiety disorder and seizures
 5            that led to your SSI payments, were they
 6            determined by any medical professional to be
 7            related to the gun shot wound?
 8   A.    No.  You mean the peritonitis?
 9   Q.    Well, the disability payments, were those
10            determined to be in any way --
11   A.    No.
12   Q.    -- connected to the gun shot wound?
13   A.    No.  The gun shot wound was my bowels.
14                  MR. SANTICOLA:  Her question is:
15            Did the anxiety disorder and seizures have
16            anything to do with the gun shot wound --
17   A.    No.
18                  MR. SANTICOLA:  -- that you know as
19            far as you know?
20   A.    I didn't have anxiety until this happened.
21            No, I didn't.  I had in the service, but it
22            had nothing to do with the gun shot, no.  This
23            kid came up and robbed me.
24   BY MS. OZAROWSKI:
25   Q.    So to make sure I understand correctly.  The
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

75

```
 1          disability payments you received until 2013
 2          were not as a result of the gun shot wound; is
 3          that accurate?
 4     A.   Yes, ma'am.
 5     Q.   From 2013 to 2018, did you treat with any
 6          medical provider for your anxiety disorder?
 7     A.   Dr. Kang.  You know, just Dr. Kang.
 8     Q.   From 2013 to 2018, did you take any
 9          medications for your anxiety disorder?
10     A.   I took sleeping medicine.  Just for sleeping.
11     Q.   What medication was that?
12     A.   Risperdal -- I mean, Temazepam, 30 milligrams.
13          The same thing I'm taking right now.
14     Q.   Earlier today you testified briefly about an
15          antipsychotic medication.  I believe that you
16          testified you started taking that in 2005; is
17          that correct?
18     A.   Yes, ma'am.
19     Q.   Did you take that continuously from 2005 until
20          today or something different?
21     A.   I take different medicine.  I have been on
22          different medicine.
23              MR. SANTICOLA:  Not that specific
24          one.  Have you been taking it since 2005 until
25          today?
```

```
 1    A.    Have I been taking it continuously, no.

 2    BY MS. OZAROWSKI:

 3    Q.    Have you taken any form of antipsychotic

 4          continuously since 2005?

 5    A.    No.  Antidepressants, not psychotic.

 6    Q.    Can you give me an idea generally of what time

 7          periods you took antipsychotic medications?

 8    A.    Gosh.  Antipsychotic, right?

 9    Q.    Correct.

10    A.    I only took the Risperidone is the only

11          psychotic I took.  I took Depakote, that's not

12          an antipsychotic, no.  Just that.  Depakote is

13          an antidepressant, like a mood stabilizer, so

14          that's not --

15    Q.    So it's my understanding that you took an

16          antipsychotic in 2005 and you are also taking

17          one now; is that correct?

18    A.    Yes, ma'am.  Yes, ma'am.  Yes, ma'am.

19    Q.    And it's also my understanding that you have

20          not taken an antipsychotic continuously from

21          2005 until now, is that accurate?

22    A.    No.  But there's antidepressants, I guess

23          that's --

24    Q.    Correct.

25    A.    -- that's antipsychotic medicines I have been
```

```
 1          taking.
 2   Q.     So I'm focusing only right now on the
 3          antipsychotic medications.  Can you tell me
 4          which time periods you have taken the
 5          antipsychotic medications?
 6   A.     2000.  Risperdal?
 7   Q.     Yes.
 8   A.     Three years, three and a half years.
 9   Q.     When was that?
10   A.     July 16th.  Wait.  No, they put me on that
11          right when I was in the coma.  So I don't know
12          because I was in a coma because I couldn't
13          take Seroquel because I get manic on it.  And
14          that's protocol for burn patients, they put me
15          on this Risperdal.
16   Q.     Understood.  How long did you take the
17          antipsychotic in 2005?
18   A.     I think all the way up until they stopped me
19          on everything, my SSI, everything.  So 2013.
20          I'm trying to think.
21   Q.     Did you take any form of antipsychotic
22          medication, whether it was Risperidone or
23          something else from 2013 until 2018?
24   A.     No.  I didn't take nothing.  Nothing.  That's
25          the reason I got taken off SSI because I was
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

78

```
 1          getting taken off all of my medicines.
 2   Q.    We spoke about this a little bit before, but
 3          I'm going to ask you a little bit about the
 4          Methadone that you have been prescribed.  When
 5          did you start taking that?
 6   A.    2018.  2000 -- I guess.  Let's just say August
 7          2nd, 2018.
 8   Q.    Did you take Methadone at any time prior to
 9          the fire in July 2018?
10   A.    I think they gave me my same -- Dr. Smith gave
11          me for a little bit back with my gun shot,
12          then took me off of it and put me on some
13          OxyContin.  And then beyond that, I was
14          hearing all kind of stuff about it, so they
15          put me on Percocet.  I guess Percocet.
16   Q.    Is it accurate to say then that you were
17          prescribed Methadone for a period of time
18          following the gun shot wound?
19   A.    Restate that, please.
20   Q.    Is it accurate to say that you were prescribed
21          Methadone for a period of time after the gun
22          shot wound?
23   A.    Yes, ma'am.
24   Q.    And it's my understanding that you were then
25          placed on OxyContin as a result of the gun
```

```
 1        shot wound?

 2   A.   Yes, I was.

 3   Q.   How long did you take that?

 4   A.   Gosh, for probably two months and then

 5        it -- two months.

 6   Q.   Were you then switched to Percocet?

 7   A.   I had to be because it made me sick, I had to

 8        stop taking it.

 9   Q.   How long did you take the Percocet?

10   A.   2013 I think.  Yes.  I'm going to say 2013.

11   Q.   From 2013 to 2018, did your stomach conditions

12        impact your daily life?

13   A.   Say the dates again, please, ma'am.

14   Q.   2013 to 2018 before --

15   A.   No.  They did not impact my life, no.

16   Q.   From 2013 to 2018, did your anxiety disorder

17        impact your daily life?

18   A.   Nope.  Nope.  Those five years were probably

19        the best five years since '98 and before.

20   Q.   Were you employed from 2013 to 2016?

21   A.   At the church.  And I actually just gave my

22        heart to the church and I did my physical

23        therapy.  I mean, physical training myself,

24        just -- that's it and going to church.  That's

25        all I was doing.  That's what I was doing.
```

```
 1   Q.    How many seizures did you have in between 2013
 2         and 2018?
 3   A.    I didn't have none between then, none between.
 4         Because after my grandfather died December 24,
 5         2011, I never had another seizure.  The last
 6         seizures I had was when I was locking up
 7         straight, locking up straight he said.  That's
 8         the last time I had seizures.
 9   Q.    Did you sustain any other major physical
10         injuries before July 2018 other than the gun
11         shot wound and the other injuries that we have
12         already discussed?
13   A.    No.  Thank God, no.
14   Q.    You testified previously that in July 2016 you
15         smoked approximately 10 to 15 cigarettes a
16         day; is that correct?
17   A.    Yes, ma'am.
18   Q.    Did you ever smoke when you were at home?
19   A.    Yes, I did.
20   Q.    Where would you smoke when you were at home?
21   A.    Smoked on the back porch.  My mom cannot take
22         cigarette smoke.  She's never smoked in her
23         whole life and either can my sister.  So the
24         kids would come down, so we can't have
25         cigarette smoke in the house.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

81

```
 1   Q.    When you smoked on the back porch, where did
 2         you put out the cigarettes?
 3   A.    We put them -- I put them out right outside.
 4         My dad was always outside too, always outside,
 5         so -- because it wasn't a -- as I read it,
 6         it's a sun room.  A sun room has windows, it's
 7         climate controlled.  This was a porch with
 8         screen all around it.  It wasn't part of the
 9         house.  It wasn't a sun room.
10   Q.    When you say you put the cigarettes outside,
11         do you mean you threw them out the window or
12         something different?
13   A.    There's an ashtray in the middle of the -- you
14         know, there's a table and put them out right
15         in the middle of the table.
16   Q.    What kind of ashtray was it?
17   A.    A glass ashtray, a big glass one.
18   Q.    Would you deposit cigarette butts anywhere
19         else on that porch area?
20   A.    I didn't deposit any.  I didn't, no, just
21         right there.
22   Q.    Did anybody else deposit cigarette butts
23         anywhere else --
24   A.    Yes.
25   Q.    -- on that porch area?
```

```
 1   A.      Yep.  My father did.

 2   Q.      Just a quick reminder to please try to let me

 3           finish asking the question completely before

 4           you answer.

 5   A.      Okay, ma'am.

 6   Q.      Did you ever smoke in the kitchen of your

 7           home?

 8   A.      No.  I told you all we did was smoke outside.

 9   Q.      In July 2016 prior to the fire, did you ever

10           smoke in your bedroom?

11                   MR. SANTICOLA:  You mean '18 or '16?

12                   MS. OZAROWSKI:  Apologies.  I don't

13           know why I keep saying that.  2018.  So let me

14           strike that question and reask.

15   BY MS. OZAROWSKI:

16   Q.      In July of 2018, did you ever smoke inside

17           your bedroom?

18   A.      Did I ever smoke cigarettes inside my bedroom?

19   Q.      Correct.

20   A.      Nope.

21   Q.      In July of 2018 prior to the fire, did you

22           ever smoke cigarettes anywhere in your house

23           other than the porch?

24   A.      Nope.  Nope.

25   Q.      This may seem silly, but I need to ask it
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

83

```
 1          anyway.  Prior to the fire in July 2018, did

 2          you ever put out cigarettes anywhere in your

 3          house other than on the porch area?

 4   A.     I used to.  Sometimes I go outside, okay, and

 5          I have a little stoop right there and I would

 6          smoke a cigarette and then I put it out.

 7          Instead of having cigarette butts all out

 8          there, I used to put them in my empty Marlboro

 9          pack.  I would put them in there, you know.

10   Q.     Where would you put the empty Marlboro pack

11          after you did that?

12   A.     I put them in my pocket.  Like that night that

13          they found that butt on me, that had to be it

14          was right on top of that mantle because --

15   Q.     Who do you mean by they?

16   A.     The fire inspector.  Whoever took the

17          pictures.  They had one picture of it.

18   Q.     When you say it, what do you mean?

19   A.     The Marlboro pack of cigarettes that I was

20          smoking.

21   Q.     How often would you say you put the cigarette

22          butts into the cigarette package and put it in

23          your pocket?

24   A.     Just to go outside from the porch to --

25          there's the porch and I walk right outside.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

84

```
 1              There's a stoop right there and I can sit

 2              right there and I can smoke to get away from

 3              my dad sometimes.  We need a little bit

 4              separation.

 5    Q.    Would there ever be occasions where you put

 6              out a cigarette, put it in the cigarette box,

 7              put that cigarette box in your pocket and then

 8              went inside the house?

 9    A.     To put out the cigarette, put it in my

10              cigarette box, and then went in the house?

11                     MR. SANTICOLA:  Yes.

12    BY MS. OZAROWSKI:

13    Q.     Correct.

14    A.     Oh, yes.  Uh-huh.  Yes.

15    Q.     To clarify my question is where you would put

16              a cigarette butt in the cigarette box, then

17              put the cigarette box in your pocket and go

18              inside?

19    A.     Yes.

20    Q.     Would you ever go into your bedroom with the

21              cigarette butt in a cigarette box in your

22              pocket?

23    A.     Yes.  I'm sure I have, yes.  Like I'm throwing

24              away or -- like I'm throwing it away?

25    Q.     Sorry.  I didn't understand what you said.
```

```
 1    A.      Like I'm throwing them away.  Because where
 2            the garbage can was on the porch, my dad was
 3            behind it, so just like to --
 4    Q.      From the beginning of 2018 to July 2018, did
 5            you ever smoke marijuana?
 6    A.      What was the dates again?
 7    Q.      The beginning of 2018 to July 2018.
 8    A.      Yes.  Yes, I used to smoke marijuana.  Yes, I
 9            did.  I did the edibles.  I done edibles, the
10            gummies.  I was taking gummies, Stoney
11            patches.  I have to show you?  Are you going
12            to --
13                    MR. SANTICOLA:  No.
14    BY MS. OZAROWSKI:
15    Q.      No.  During that time period, so I'm talking
16            about 2018 prior to the fire, how often would
17            you have edibles?
18    A.      Oh, gosh.  Maybe once or twice a month.  Just
19            when I could get them.
20    Q.      Where would you get them?
21    A.      Somewhere.  They are legal, they are CBD.
22            It's legal in Pennsylvania.
23    Q.      Would you purchase them from a dispensary or a
24            private person or something else?
25    A.      Yeah.  You can get them from stores right now
```

86

```
 1          right here.  You can get them from liquor
 2          stores.
 3                     MR. SANTICOLA:  Yeah, that's
 4          different than what -- I think you're
 5          confusing the CBD with THC marijuana here.
 6                     MS. OZAROWSKI:  Okay.  Let me have
 7          Mr. Stiffler clarify.
 8   BY MS. OZAROWSKI:
 9   Q.     So if I'm asking about edibles, are you
10          talking about simply the CBD edible --
11   A.     Yeah.  Yes.
12   Q.     -- or marijuana?
13   A.     Cannabidiol, CBD, yes.
14   Q.     Let's also try to be really careful not to
15          talk over each other.  So then I will ask you
16          specifically about marijuana with THC in it,
17          did you ever have edibles during 2018 before
18          the fire that had THC in them?
19   A.     Yes, ma'am.
20   Q.     Where would you get those generally?
21   A.     At various places.
22   Q.     From private citizens?
23   A.     Yes.
24   Q.     You don't have to give names.
25   A.     Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

87

1    Q.    Would you ever smoke marijuana during that
2          same time period, 2018?
3    A.    No.  I used to.  But, no, that's why I did the
4          edibles.  Marijuana made me very paranoid.
5    Q.    Did the edibles make you paranoid?
6    A.    No.  They hurt my stomach.
7    Q.    When you say you used to smoke marijuana, just
8          approximately when was that?
9    A.    Gosh.  2000 maybe 7, 8, in there.  I used
10         to -- that's it.  I used to smoke it.
11   Q.    Throughout 2018 prior to the fire, did you
12         ever smoke any sort of substances out of pipes
13         in your room?
14   A.    No.  No.  No.  No way.  I couldn't smoke
15         anything in my room because the kids and
16         my -- no, no, no.
17   Q.    Which kids do you mean?
18   A.    I have a niece and a nephew, they are always
19         down at my house.
20   Q.    How often would your niece and nephew be at
21         your house in 2018 prior to the fire?
22   A.    Weekly?
23   Q.    Just generally how often would they be there?
24   A.    Three to four times a week.
25   Q.    Were these visits, did they live there, were

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

88

```
 1          they receiving child care?
 2   A.     Child care.
 3   Q.     Who was performing the child care?
 4   A.     I did for some time and then my mom did, my
 5          dad did.  It's a joint effort of us three.
 6   Q.     During what time period did you babysit the
 7          children?
 8   A.     2012 to 2016 for about four hours a day.  I
 9          did it five days a week for her.
10   Q.     Did you receive monetary compensation for
11          this?
12   A.     No, I did not.  Can you wait one second,
13          ma'am?  Wait one second, please?
14   Q.     Sure.
15              MR. SANTICOLA:  What do you need?
16              THE VIDEOGRAPHER:  The time is
17          12:43 p.m., and we are off the record.
18                    - - - -
19      There was a brief Recess in the proceedings.
20                    - - - -
21              THE VIDEOGRAPHER:  The time is
22          12:45 p.m., and we are back on the record.
23   BY MS. OZAROWSKI:
24   Q.     From January 2018 to July 2018, before the
25          fire, did you ever take any illegal substances
```

```
 1           other than the marijuana we have already

 2           discussed?

 3    A.     Beer?

 4    Q.     No.  Illegal substances?

 5    A.     No.  No.

 6    Q.     Did you ever take any heroin during this time

 7           period?

 8    A.     No.  Never did heroin in my life.  No.  Never.

 9    Q.     Did you take any pain medications

10           recreationally, if you understand what I

11           meant?

12    A.     Nope.  I was only prescribed them and that's

13           the only time I took them.

14    Q.     How often did you drink alcohol in 2018 from,

15           say, January until July when the fire

16           occurred?

17    A.     Gosh.  Maybe once or twice a month, if that.

18           Can I --

19                   MR. SANTICOLA:  That's good.

20    A.     When I get -- my belly with all the surgeries,

21           I can't drink carbonation because I get like

22           pressure in my stomach, so I had to stop, you

23           know.  I stop drinking because to tell you the

24           truth, my buddies, they like their beers.  No,

25           I couldn't.  I didn't drink hardly at all.  If
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

90

```
 1          I did, it was a -- I had to have a mixed drink
 2          because I couldn't have carbonation.
 3     Q.   In July 2018 before the fire, did you ever
 4          vape?
 5     A.   Never.  I don't like the vapes.  No.  No.
 6     Q.   In July 2018, did you own any vape products
 7          like that could be used to vape?
 8     A.   No.  No, I didn't.
 9     Q.   I'm going to switch gears a little bit and I
10          want to talk to you about the iPhone that is
11          the subject of your lawsuit.
12     A.   Yes, ma'am.
13     Q.   Can you tell me what type of iPhone are you
14          alleging is the basis of your lawsuit?
15     A.   IPhone 6 Plus.
16     Q.   When was this device purchased?
17     A.   July 8th, 2018.
18     Q.   Where was it purchased?
19     A.   Verizon Robinson Township.
20     Q.   Who purchased this device?
21     A.   I did.
22     Q.   What was the color?
23     A.   It was like a metallic gray.  Like grayish,
24          smoke gray.  Smoke gray?
25     Q.   You tell me.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

91

```
 1    A.     Does it come in smoke gray?

 2    Q.     Your answers are based on your recollection.

 3    A.     Smoke gray I'm going to say.

 4    Q.     What was the memory size, if you recall?

 5    A.     32 I think it was.  It wasn't 64.  It had to

 6           be 32.  Maybe it was 16.  16.  16 gigabyte.

 7    Q.     How did you purchase the device, meaning cash,

 8           credit card, something else?

 9    A.     Credit card.

10    Q.     Was the device new or used at the time you

11           purchased it?

12    A.     Brand new.

13    Q.     Do you understand what refurbishment is?

14    A.     No.  Can you explain it to me, please?

15    Q.     Do you have an understanding of whether or

16           not --

17    A.     No.

18    Q.     Let me ask the question first, please.

19                   MR. SANTICOLA:  Let her finish.

20    BY MS. OZAROWSKI:

21    Q.     Do you have an understanding of whether the

22           device was refurbished at the time you bought

23           it?

24    A.     No.

25    Q.     Let me clarify that.  Is it that it wasn't
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

92

```
 1          refurbished or you don't know whether it was
 2          refurbished?
 3    A.    I don't know whether it was refurbished or
 4          not.  I don't even know what refurbished
 5          means.  So it wasn't touched before I had it.
 6          It was brand new.
 7    Q.    What did the box look like that the device
 8          came in?
 9    A.    Apple, it was an Apple iPhone 6 box.  Like I
10          guess like every other one would come in,
11          right?
12    Q.    What color was it, the box?
13    A.    I don't know.
14               MR. SANTICOLA:  You can say I don't
15          know.
16    A.    I don't know.  Whatever.
17    BY MS. OZAROWSKI:
18    Q.    Was the box sealed when you purchased the
19          device?
20    A.    Oh, yeah.  I got it right from the store, from
21          a store.  I got it from a Verizon store.
22    Q.    How was the box sealed, meaning with what?
23    A.    It was in plastic, like brand new.
24    Q.    Do you still have that box?
25    A.    No.  My whole room has been burned to pieces.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

93

1            There's nothing left.

2    Q.    Do you have photos of the box that the subject

3          device came in?

4    A.    Nope.  Nope.

5    Q.    Let me just clarify for you.  Throughout my

6          questioning I may refer to the subject device,

7          and what I mean by the subject device is the

8          device that is the basis of your lawsuit.  Is

9          that okay?

10   A.    Yes, ma'am.

11   Q.    What else came in the box with the subject

12         device?

13   A.    Charger and -- a charger.

14   Q.    Do you still have the charger for that device?

15   A.    No.  No, it burned in the room.

16   Q.    Did you read the instruction manual for the

17         iPhone when you purchased it?

18   A.    No.

19   Q.    Did you read the instruction manual at any

20         time prior to the fire?

21   A.    I read it on -- not the iPhone 6 one, but I

22         read the iPhone 4 one.  Yeah.  No.

23   Q.    When did you read the iPhone 4 instruction

24         manual?

25   A.    Gosh.  2005 when I bought that phone.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

94

```
 1   Q.     Did you ever go online and look up any
 2          information about the iPhone 6 prior to the
 3          fire?
 4   A.     No.
 5   Q.     And let me just clarify.  You testified that
 6          this was an iPhone 6 Plus; correct?
 7   A.     Yes, ma'am.
 8   Q.     Do you know the serial number?
 9   A.     I do not, ma'am.
10   Q.     Do you know the IMEI number?
11   A.     No, ma'am.
12   Q.     What was the telephone number that was
13          associated with this iPhone 6 Plus?
14   A.     I think it was --
15                  THE WITNESS:  Tell her now?
16                  MR. SANTICOLA:  You can tell her.
17   A.     724-601-7185.
18   BY MS. OZAROWSKI:
19   Q.     Did you have any other personal telephone
20          numbers in July 2018?
21   A.     No.
22   Q.     What is your current telephone number?
23   A.     The same.
24   Q.     When you purchased the device in July 2018,
25          did you register it with iTunes?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

95

```
 1    A.    No, I didn't.  No, ma'am.
 2    Q.    Did you have an Apple account associated with
 3          the phone in July of 2018?
 4    A.    I had a Verizon account.
 5    Q.    Did you have an iCloud account in July of
 6          2018?
 7    A.    What's that?
 8    Q.    Did you have an iCloud account in 2018?
 9    A.    Yes, I did.
10    Q.    With what e-mail address did you register for
11          the iCloud account?
12    A.    I don't remember.
13    Q.    Would it be your current e-mail address?
14    A.    No, ma'am.
15    Q.    How do you know?
16    A.    Because I know it isn't.
17    Q.    How do you know, is it have you used --
18    A.    Because I used my grandmother's birthdate, and
19          that is the first time I used my grandmother's
20          birthdate as part of it.
21    Q.    Okay.  So when you say you used your
22          grandmother's birthdate, you're talking about
23          your current e-mail address or old e-mail
24          addresses?
25    A.    Current.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

96

```
 1   Q.    In 2018, did you have a number of e-mail
 2         addresses or one or something different?
 3   A.    I had two, two e-mail addresses.
 4   Q.    What were the two e-mail addresses you had in
 5         2018?
 6   A.    I don't even know what my iCloud is, but I
 7         know Rob62323@Gmail.com.  June 23, 1923.
 8   Q.    And what was the other e-mail address?
 9   A.    I don't know.  It was an iCloud, so that's my
10         iCloud that I have.  I just don't know what it
11         is because I don't use it.
12   Q.    We'll just leave a space in the record and if
13         there is some sort of documentation that you
14         have that you can look at that will refresh
15         your recollection as to what that other e-mail
16         address is, you can fill it in later.
17               MR. SANTICOLA:  Okay.
18   BY MS. OZAROWSKI:
19   Q.    Between the time that you purchased the device
20         and the fire on July 16th, 2018, was the
21         iPhone 6 Plus ever damaged?
22   A.    No.
23   Q.    Did you ever have it repaired?
24   A.    No.  I put it -- can I talk?  Can I say
25         something?
```

```
 1   Q.    Sure.
 2               MR. SANTICOLA:  You can, but answer
 3         the question.
 4               THE WITNESS:  I can answer the
 5         question?
 6               MR. SANTICOLA:  Yeah.
 7               MS. OZAROWSKI:  Counsel, I just
 8         request if he wants to continuing answering
 9         the question --
10   A.    No, I don't need to.  I just want to keep
11         going.
12   BY MS. OZAROWSKI:
13   Q.    What was the condition of the iPhone 6 Plus on
14         the day of the fire prior to the fire?
15   A.    It was perfect.  I mean, you mean the
16         condition of the phone?
17   Q.    I'll clarify.
18   A.    Brand new.
19   Q.    So I'm talking about the physical conditions.
20         Were there any cracks to the screen --
21   A.    No.
22   Q.    -- were there dents to any parts of the phone,
23         anything like that?
24   A.    No.  Because as soon as I got it, I was just
25         going to say this, I had a Lifeproof case.  As
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

98

```
 1           soon as I got that, I stuck the Lifeproof case
 2           on it.
 3    Q.     You said it was a Lifeproof case?
 4    A.     Lifeproof, yep.
 5    Q.     Can you describe this case for me, what was it
 6           made out of, what did it look like?
 7    A.     No.
 8    Q.     Was this a rubber case or a plastic case or
 9           something different?
10    A.     Rubber and plastic because it was waterproof.
11           I used to be able to kayak, so I needed that.
12    Q.     Had you purchased this case for any previous
13           devices or was it purchased specifically for
14           this device?
15    A.     That's the first one that I have had.  That's
16           the first one I have bought for the -- yeah,
17           because it was a waterproof case.
18    Q.     When did you purchase this case?
19    A.     The same day as the phone.
20    Q.     Where did you purchase the case?
21    A.     My fault.  I got it off of eBay I think a
22           couple of days before that.  And then it got
23           delivered from eBay and as soon as I got home,
24           I put it right -- I didn't take the phone
25           because, I mean, them phones cost so much
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

99

```
 1          money.  I stuck it -- I took it right out of
 2          the case, put it right into the phone, you
 3          know.
 4     Q.   Is it accurate that your testimony is you
 5          ordered the Lifeproof case from eBay before
 6          you purchased the phone and then you put it on
 7          the phone when you --
 8     A.   Yes.
 9     Q.   You can clarify for me.
10     A.   Kevin, my ex-best friend, bought it for me and
11          gave it to me and he gave it to me, just to
12          clarify.
13               MR. SANTICOLA:  It was not a
14          purchase on eBay for you?
15     A.   No.  It's would be Kevin's name.
16   BY MS. OZAROWSKI:
17     Q.   So Kevin purchased it on eBay and then gave it
18          to you; is that correct?
19     A.   Yep.  For my birthday.
20     Q.   Was this a case that had any sort of external
21          battery or power source?
22     A.   Nope.  No, ma'am.
23     Q.   What part of the iPhone 6 Plus did the case
24          cover?
25     A.   The whole phone, the whole entire phone.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

100

```
 1    Q.    Did it cover the screen portion of the iPhone?
 2    A.    Yeah.  The thin plastic film on top of it.
 3    Q.    Was that thin plastic film connected to the
 4          back portion of the case --
 5    A.    Yes, ma'am.
 6    Q.    -- or were they two separate pieces?
 7    A.    Well, there's two separate pieces to the
 8          phone.
 9    Q.    Can you describe for me how you put the case
10          on your iPhone?
11    A.    It had latches.  You come up and snap them and
12          they snap again and they snap at the top.
13          That's all I can remember.  I only had it for
14          like a week, so didn't get to play with it
15          much.
16    Q.    So am I understanding correctly that the
17          portion with the latches was on the back part
18          of the phone; is that correct?
19    A.    No.  It was on the sides and there's two at
20          the top, both at the top -- I mean, one at the
21          top, one at the bottom.  So one, two, one,
22          two.  Six all together.
23    Q.    So these latches were around the sides of the
24          phone and then the case extended, it covered
25          the back of the phone; is that correct?
```

```
 1    A.    Oh, yeah.  It covered the phone all the way up
 2          so if it fell in the water, it would not get
 3          destroyed.
 4    Q.    And the portion of the case that covered the
 5          screen of the phone, was that connected to the
 6          portion with the latches?
 7    A.    Oh, yes.  It was all -- like yes.  What do you
 8          mean connected?  It connected when it came
 9          together because it has like latches.  It came
10          together and snapped, yes.  Yeah, it was
11          connected when they were snapped together,
12          ma'am.
13    Q.    So this is different from a situation where
14          people buy maybe a screen protector; is that
15          correct?
16    A.    Oh, yes.  This was a $90, $100 case.
17    Q.    Now, you mentioned that you used to go
18          kayaking.  When did you go kayaking?
19    A.    I was kayaking my whole life.  Practically the
20          whole time.
21    Q.    Did you kayak in 2018?
22    A.    Yes, I kayaked in 2018.
23    Q.    When generally?
24    A.    I don't know.  Like generally maybe three
25          times a week.  I don't understand.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

102

```
 1   Q.    Sure.
 2              MR. SANTICOLA:  When, how.
 3   A.    I live on the Ohio River.  Maybe tops two or
 4         three times a week.  When I had time.  I was
 5         working too, you know, so I mean as much as I
 6         could.  As best as I could fish.  You fish
 7         when you can.
 8   BY MS. OZAROWSKI:
 9   Q.    Did you go kayaking with the subject iPhone 6
10         Plus --
11   A.    No.
12   Q.    -- prior to the fire?
13   A.    Nope.  I didn't even take my phone kayaking
14         yet.  When you pay for something that much,
15         you're afraid at first to get the thing even
16         near it.  I don't even trust that Lifeproof
17         case.
18   Q.    How long after you purchased the iPhone did
19         you put the Lifeproof case on it?
20   A.    Half hour.  As fast as I could get -- as fast
21         as I could get home.  I drove home and then
22         put it on.
23   Q.    Could you charge the iPhone while it was in
24         the Lifeproof case?
25   A.    Yes, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

103

```
 1    Q.    Can you please describe for me your usage of
 2          the subject iPhone 6 Plus during the time
 3          period from when you bought it to the fire?
 4    A.    Like how many hours a day did I use it?
 5    Q.    Sure.  I can clarify what I mean by that.  I
 6          mean, when did you charge it?  What did you
 7          use it for, was it phone calls, was it
 8          internet searching, was it music, was it
 9          something else?  I'm just asking:  I would
10          like to get a picture of how you used the
11          phone and what you did with it prior to the
12          fire?
13    A.    I'm not into computers or anything.  I used it
14          for phone calls, listening to Pandora and a
15          little bit of Facebook.  That's about it.  I'm
16          not a big computer person, internet person.
17    Q.    So there's about a week approximately in
18          between the time that you purchased the device
19          and the time of the fire; is that correct?
20    A.    Yes, ma'am.
21    Q.    So during that week, how many times would you
22          say you made phone calls on the device?
23    A.    Maybe 10 to 15 times a day.
24    Q.    A day or times in total?
25                MR. SANTICOLA:  Per day I think he
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1          said.
 2    A.    Per day.  Per day, yeah.
 3                    MR. SANTICOLA:  I think he said
 4          that.
 5    A.    Yeah, definitely.
 6    BY MS. OZAROWSKI:
 7    Q.    How long approximately were these phone calls?
 8    A.    I use my phone 5, 10 minutes, that's it, if
 9          that.  I don't like being on the phone, you
10          know.
11    Q.    How often did you use the phone to listen to
12          Pandora?
13    A.    Not often.  Just when -- just when I was out
14          fishing, you know, I could hook it up.
15    Q.    How many times did you go fishing with the
16          device in between the time you bought it and
17          the fire?
18    A.    I didn't take that one out yet, but when I
19          did, I had an iPhone -- no, I had a Droid
20          before that and I used to listen to Pandora
21          all -- I don't know, I used to listen to it
22          the whole time I was on there out on the
23          river.
24    Q.    So I'm just asking you right now specifically
25          about the iPhone 6 Plus that is the subject of
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1            the lawsuit.  So I understand from your
 2            testimony that you said you would make 10 to
 3            15 phone calls on it per day during the week
 4            that you had it before the fire.  What else
 5            did you do with the device during that week?
 6   A.    Walked around with it in my pocket.  I don't
 7         know what else.
 8   Q.    Did you listen to Pandora at any point?
 9   A.    Yeah.  And Facebook, I mean, looked through
10         Facebook a few times.
11   Q.    So let's just focus on Pandora for now.  How
12         many times do you think you used the device to
13         listen to Pandora?
14   A.    None.  The only time I used Pandora was when I
15         was fishing with that.
16   Q.    A little bit unclear here because you have
17         testified that you did use the subject device
18         to listen to Pandora, but you're also --
19   A.    Did I say that?
20   Q.    Yes.
21   A.    I said I used my iPhone 6.  I said, no, when I
22         go kayaking I use it.  I never said that I
23         used that phone -- I never said that.  I never
24         said that.
25   Q.    So then we have -- there's an understanding
```

```
 1          that you used the phone, the device, to talk
 2          to people on phone calls?
 3   A.     Yes.
 4   Q.     Did you use the device to look at Facebook or
 5          the internet during the week --
 6   A.     Yes, ma'am.
 7   Q.     -- you had it before the fire?
 8   A.     Yes, ma'am.
 9   Q.     About how many hours a day would you say you
10          used the device to either look at the internet
11          or Facebook or something like that?
12   A.     Maybe half an hour, tops.  I'm not even on
13          Facebook no more.  Tops, half hour.
14   Q.     The half an hour, would that be Facebook
15          specifically or the internet in general?
16   A.     Yeah, Facebook.
17   Q.     About how many hours per day would you use the
18          internet on the phone during that first week?
19   A.     Not even an hour.  I would say probably 15
20          minutes to 20.  20 minutes.  People are so
21          shocked that I got it because I'm so against
22          computers and everything.  I like to be
23          outside, I like to walk outside.  You know,
24          I'm not a computer person.
25   Q.     So then the time period where you had the
```

```
 1          phone before the fire, do you use it for

 2          anything other than looking at Facebook,

 3          looking on the internet and phone calls?

 4   A.     No.

 5   Q.     After you purchased the subject device, did

 6          you charge it?

 7   A.     Yeah, I charged it.

 8   Q.     When was the first time you charged it after

 9          you purchased it?

10   A.     Oh, God.  I don't know.  That was a nightmare.

11          It was only a week of it.  I don't know.  I

12          don't know.

13   Q.     Can you explain what you mean by it was a

14          nightmare?

15   A.     It was seven days.  I don't really recall.

16          And since then it's been a nightmare, so I

17          mean, have you ever been burned?

18   Q.     Let's just try to focus on the time period --

19   A.     I'm just trying to understand.  You asked me a

20          question.

21   Q.     Okay.

22              MR. SANTICOLA:  Just answer her

23          questions.

24              THE WITNESS:  Yep.  Okay.

25   BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

108

```
 1    Q.    Let's try to focus on just the time period
 2          that you had the device from the time you
 3          purchased it until the fire.
 4    A.    Okay.
 5    Q.    And my questions are what you know.  So if you
 6          don't know, you don't know, that's fine.  So
 7          when was the first time you charged the iPhone
 8          after you bought it?
 9    A.    I don't know.
10    Q.    Did you charge the iPhone at any point between
11          the time that you bought it and the time of
12          the fire?
13    A.    I'm sure.
14    Q.    I'm sorry?
15    A.    I'm sure.
16    Q.    How many times did you charge the phone?
17    A.    I don't know.
18    Q.    You mentioned a few minutes ago that you had
19          an iPhone 4 at some point; is that correct?
20    A.    Yes, ma'am.
21    Q.    Did you have the iPhone 4 directly --
22    A.    Yes.
23    Q.    -- immediately preceding the iPhone 6 Plus?
24    A.    No.  I got a Droid.  I didn't like iPhones.
25    Q.    So can you explain to me, so speaking about
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1              the cell phone that you had before the subject
 2              iPhone 6, generally how often would you charge
 3              it, where and how, meaning would you use a
 4              charger, would you use an extension cord,
 5              something else?
 6    A.        I used the charger, my Droid charger.  I
 7              always had a Droid, but my best friend loves
 8              iPhones and he pushed me to get another one
 9              and I work with him, so ---
10    Q.        How often would you charge that Droid?
11    A.        Every other day.
12    Q.        Why would you charge it, would it be because
13              the battery ran down, because there was a
14              specific time you charged things or something
15              else?
16    A.        Because the battery was getting low, ma'am.
17    Q.        So when would you have charged the iPhone once
18              you purchased that?
19    A.        At nighttime.
20    Q.        Would you charge it every night as you went to
21              bed, when the battery went down?
22    A.        Yes.  Yep.  Yes, ma'am.  Every night before I
23              went to bed, I put it on the charger.
24    Q.        Okay.
25    A.        At night it was very hot and I even told him,
```

```
 1            I said my phone is hot.  It was only like 2
 2            percent.  And I plugged it in and then I had a
 3            circular like this and I had a 27 inch TV on
 4            it and I just plug it right in there.  And I
 5            slept on my left-hand side and the incident
 6            happened.  I woke up at Mercy.
 7    Q.    I'm going to give you a chance to discuss all
 8            of that.  I just want to talk a little bit
 9            longer about prior to the fire.  So the week
10            before the fire, did you charge the iPhone in
11            the same spot every night?
12    A.    Yep.  Yes, ma'am.
13    Q.    Was this through a USB port in the TV?
14    A.    No.  I plugged it into an AC outlet that I got
15            up and I put my phone like this and then I put
16            it right on my table like this.
17    Q.    So another tricky thing about a deposition is
18            that the court reporter isn't able to take
19            down actions or when you say things like this.
20            So please try to describe things in words.  So
21            my understanding is then you would charge the
22            device every night in an AC adapter -- or an
23            outlet, sorry, is that correct?
24    A.    Yes, ma'am.
25    Q.    What charger would you use?
```

```
 1   A.      The block that they gave me.  It had a block
 2           that you plugged in and then I put the phone
 3           charger that they gave to me at that time.  It
 4           came in with the iPhone.
 5   Q.      Where would you put the phone while it was
 6           charging?
 7   A.       In front of my face.
 8                    MR. SANTICOLA:  No.  Like where.
 9   A.      I had a circular thing to put my TV on.  I had
10           a 27 inch TV and then I put the TV in front of
11           me, but my eyes, I have had bad eyes.
12                    MR. SANTICOLA:  Let the record
13           reflect that he's gesturing with his arms as a
14           circle table.
15   A.      Circular table.  And I had a 27 inch TV on
16           there, so I just put it right up on there.  I
17           never even thought -- I'm just saying, I put
18           it right on there.
19                    MR. SANTICOLA:  Answer the question.
20           You put it on the table.
21   A.      Yeah, and then I put it on the table.
22   BY MS. OZAROWSKI:
23   Q.      All right.  Each night when you charged the
24           iPhone, did you happen to notice how much
25           battery was left?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

112

```
 1   A.    No.  No.

 2   Q.    How long would you charge it each night

 3         approximately?

 4   A.    When I got up and had to go to work the next

 5         morning.  So probably -- depending on when I

 6         went to bed.  Like that night I would have

 7         only got about three and a half to four hours

 8         of sleep.  It would be four hours of charge.

 9   Q.    The nights preceding the fire, can you

10         estimate how long the device charged?

11   A.    Oh, my gosh.

12               MR. SANTICOLA:  Did you say the

13         night of the fire?

14               MS. OZAROWSKI:  No.  No.

15   BY MS. OZAROWSKI:

16   Q.    So the week before the fire, just generally do

17         you have any idea of how many hours per night

18         it was charged?

19   A.    How many nights that this phone --

20               MR. SANTICOLA:  No.  How many hours

21         a night would you average charge it?

22   A.    Oh, five hours, let's say.  Five hours tops.

23   BY MS. OZAROWSKI:

24   Q.    When you woke up in the morning, was the

25         device fully charged?
```

```
 1   A.    Sometimes.  Sometimes it was.

 2   Q.    Apologies.  I find that I write very slowly

 3         now that we type everything these days.

 4                       In the week before the fire, did you

 5         ever notice or feel the subject iPhone 6 Plus

 6         get hot?

 7   A.    No.  Only that night before that, that's it.

 8         I never, never, never.  I couldn't remember

 9         too much.  I just remember that night and it

10         was hot.  And the only reason I remember it

11         was hot is because I told -- I said the phone

12         is hot.  It was on 2 percent too.  And that's

13         the only reason I remember that.

14   Q.    Did you have any issues with the subject

15         iPhone prior to the fire?

16   A.    No.

17   Q.    Did you notice that the battery had swelled at

18         all?

19   A.    No.  I wouldn't have known swelling, no.

20   Q.    Did you notice that the screen had popped off?

21   A.    No.

22   Q.    Did you ever accidentally bend the device?

23   A.    No.

24   Q.    Did you accidentally get the device wet at any

25         point?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

114

```
 1   A.     No.

 2   Q.     Did you ever see any smokes, flames or melting

 3          prior to the fire?

 4   A.     I have never seen a phone smoke, no.

 5   Q.     Did you lend the subject iPhone 6 Plus to

 6          anybody during the time --

 7   A.     No.

 8   Q.     -- between when you bought it and the fire?

 9   A.     No, ma'am.

10   Q.     Did you ever lose or misplace the device

11          during that time period before the fire?

12   A.     No.

13   Q.     So now I want to move onto the day of the

14          fire.  For clarity sake, my understanding is

15          that the fire took place on July 16th, 2018

16          during the night, is that accurate?

17   A.     Yes, ma'am.

18   Q.     So let's talk then about July 15th, 2018.  Can

19          you walk me through what you did that day?

20   A.     I went to my pastor's birthday and then I got

21          done around -- his party was over about 6:30,

22          7 and I went fishing.

23   Q.     Can I ask you to clarify.  Was this a.m.

24          or p.m.?

25   A.     P.m.  A.m. -- no, wait.  P.m.  P.m.
```

1    Q.    So your pastor's birthday party ended around
2          6:30, 7 p.m. on July 15th; is that correct?
3    A.    Yeah.  Yes, ma'am.
4    Q.    So let's back up a little bit.  In the morning
5          of July 15th, 2018 -- or sorry, let's back up
6          a little bit further.  The night of July 14th,
7          2018, did you charge the subject iPhone?
8    A.    I don't know.
9    Q.    When you woke up on July 15, 2018, where was
10         the subject iPhone?
11   A.    I don't know.  Wait.  Say that again.  July
12         15th, that morning?
13   Q.    Correct.
14   A.    It was right where I usually charge it.  It
15         had to be right there.  It's always right
16         there.  You know, I charge it in the same
17         place every night.  I'm sure it was right
18         there.
19   Q.    Do you recall how many hours you slept on the
20         night of the 14th?
21   A.    Four and a half hours.  It was about how much
22         time I slept.
23   Q.    So would it be accurate to say that the
24         subject iPhone 6 Plus had been charging for
25         four and a half hours when you woke up on July

```
 1        15th?
 2   A.    Yes.
 3   Q.    Did you see that morning whether or not it was
 4         fully charged?
 5   A.    No, I didn't.
 6   Q.    When you woke up, what did you do?
 7   A.    Woke up, I put a gas meter in.  And then I
 8         went up to my buddy's house, we played some
 9         video games and then I went to my pastor's
10         birthday party.
11   Q.    Where did you put in a gas meter?
12   A.    Oh, gosh.
13             MR. SANTICOLA:  You don't have to be
14         specific.
15   A.    Moon Township.  It was Moon Township.  Moon
16         Township.
17   BY MS. OZAROWSKI:
18   Q.    How did you come to be putting in a gas meter
19         through the township?
20   A.    Moon Township.  I worked with my buddy.  My
21         best friend owns his own plumbing company and
22         I help him out once in awhile.
23   Q.    Was this a paid job?
24   A.    No.  I was just helping him out.  I mean, I
25         really don't do too much.  He just needs me to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

117

```
 1              be there just to get his tools and stuff, hand
 2              it to him.
 3     Q.       I'm sorry.  Can you repeat that last part?
 4     A.       I said, he's a master plumber.  I just go
 5              there and I help him with, you know, hand him
 6              tools, getting him stuff because I know where
 7              all the stuff is.  And the gas meter, I don't
 8              know how to put in too well, so I just give
 9              him his tools, he explains stuff to me, you
10              know.
11     Q.       Understood.  Around what time did you do this?
12     A.       10 a.m. -- or 9:30 a.m.
13     Q.       And then what was the next thing you did, was
14              it go play video games with your friend?
15     A.       We went back to his shop, emptied the truck.
16              Took his daughter to his -- to the pool.
17              Yeah, took his daughter to the pool.  Then we
18              went back and played video games I guess.
19              Yeah, Golden Tee.
20     Q.       Did you use the subject iPhone 6 Plus while
21              you were helping him install the gas meter?
22     A.       Yes.
23     Q.       How did you use it?
24     A.       It was in my pocket.  You mean -- no, I didn't
25              use it.  I turn my phone off while I'm
```

```
 1        working.
 2   Q.   Around when did you turn the phone off?
 3   A.   Probably about 9:30 as soon as we started
 4        working.
 5   Q.   When did you turn it back on again?
 6   A.   Probably about 11.  11 I'd say.
 7   Q.   Is that because you were finished installing
 8        the gas meter?
 9   A.   Yes, ma'am.
10   Q.   Did you use the phone during the time period
11        you were I guess hanging out with your buddy,
12        taking his daughter to the pool and playing
13        video games?
14   A.   Yes.  Yes.
15   Q.   How did you use the phone?
16   A.   I was talking to my ex-girlfriend.
17   Q.   How many times did you speak to her?
18   A.   Twice, three times that day.
19   Q.   How long were the phone calls?
20   A.   Not long.  Just checking in, seeing what's
21        going on.
22   Q.   When you say not long, can you give me an
23        estimate?
24   A.   3 to 5 minutes, tops.  Tops, tops.
25   Q.   Did you speak to anybody else on the phone
```

```
 1          during that time period?
 2    A.    No.
 3    Q.    Did you use the phone to look at Facebook or
 4          the internet during that time period?
 5    A.    Nope.
 6    Q.    After you played video games with your friend,
 7          did you go to the birthday party or did you do
 8          something in between?
 9    A.    I actually came home and my mom and me went up
10          there.
11    Q.    When you say went up there, you mean to the
12          birthday party?
13    A.    To my pastor's, yeah.
14    Q.    Did you use your iPhone during that time you
15          were at home with your mom?
16    A.    I don't remember, ma'am.
17    Q.    Did you make any phone calls?
18    A.    I don't remember, ma'am.  I don't remember.
19    Q.    Did you use it to look at the internet or
20          Facebook or anything like that?
21    A.    I'm sure I did, but I don't remember.
22    Q.    Did you use the iPhone while you were at the
23          birthday party?
24    A.    No, I did not.  There's a new pastor coming in
25          and I was talking to him, so no, I did not.
```

```
 1   Q.    Did you have the phone on at this point?
 2   A.    Yes.  Yeah, I didn't turn it off.  Yeah, it
 3         was on as soon as I got done working.  He
 4         hates it when it's on while working, pissed
 5         off at it, so --
 6   Q.    I forgot to ask this before.  Do you use the
 7         device to send text messages?
 8   A.    Yes, I did, ma'am.
 9   Q.    How often would you say you use the device to
10         text on an average day?
11   A.    Maybe 7 to 10 times.
12   Q.    Did you use the device to send text messages
13         during that day, we can just say from the time
14         you woke up through the birthday party?
15   A.    Yes.
16   Q.    How often did you use it to send texts during
17         that time period?
18   A.    I don't recall, ma'am.
19   Q.    What did you do when you left the birthday
20         party around 6:30, 7 p.m.?
21   A.    What's that?
22   Q.    What did you do when you left the birthday
23         party?
24   A.    Went fishing.
25   Q.    Where did you go fishing?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

121

```
 1    A.    On the Ohio River up by Dashield Dam.

 2    Q.    Did you go fishing with anybody?

 3    A.    Yep.

 4    Q.    Who did you go fishing with?

 5    A.    My good friend, Justin Biesenkamp.

 6    Q.    Can you describe for me how you go fishing,

 7          meaning are you in a boat, are you on shore?

 8    A.    I'm on the shore.  On the shore.

 9    Q.    Did you have your iPhone with you during the

10          time you were fishing?

11    A.    I'm sure I did, yes.

12    Q.    How long did you fish for?

13    A.    Five, six hours.

14    Q.    Did you catch anything?

15    A.    I don't remember.  I remember a big ship came

16          through, the Duquesne Clipper.  I catch a lot

17          of fish, so --

18    Q.    Were you drinking beers while you were

19          fishing?

20    A.    No.  But I did have some drinks at Mr. Ord's,

21          my pastor's.  Nope.  My buddy was there the

22          whole time too and he was there to testify

23          because I did not drink one drink the whole

24          time I was there.  I had heartburn so bad, so

25          --
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1    Q.    About how many drinks did you have during the
 2          birthday party?
 3    A.    Oh, I don't know.  Three or four.
 4    Q.    Did you feel intoxicated when you left the
 5          party?
 6    A.    No.
 7    Q.    How did you get to the fishing spot?
 8    A.    My father drove us.
 9    Q.    He drove both you and your friend?
10    A.    Yes.
11    Q.    How far away is the fishing spot?
12    A.    5 minutes, not even.  5 minutes.  I wouldn't
13          say 5 minutes.  3 minutes.
14    Q.    What time did you leave the fishing spot?
15    A.    Between 12:30 and 2.  12:30 and 2.
16    Q.    12:30 a.m. and 2 a.m.?
17    A.    Yes, ma'am.
18    Q.    How did you -- or sorry.  Where did you go
19          after you left the fishing spot?
20    A.    We drove.  We drove, dropped off my buddy and
21          I came home.  Was outside with my father
22          because my father was always outside sitting
23          in his seat.  Sat there and talked with him a
24          little bit.  And then I went upstairs because
25          I had to go to work.  Combed my hair, cleaned
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

123

```
 1          up.  I have dentures.  I got my dentures.
 2          Went into my room, plugged my phone in and I
 3          was talking to him.  I told him it was
 4          freaking hot because I was talking to him
 5          while I was doing this.  Because he would
 6          always -- he would get me prepared on what we
 7          were going to do the next day.  So I plugged
 8          it in and I didn't make it to work the next
 9          day.
10   Q.     So I'm going to back you up a little bit.
11   A.     Here's what I looked like.
12                MR. SANTICOLA:  We'll see that
13          later.  Put that down.
14   A.     I need a break.
15                MR. SANTICOLA:  You need a break.
16          All right.  How long do you need?
17   A.     15 minutes.
18                THE VIDEOGRAPHER:  The time is
19          1:29 p.m., and we are off the record.
20                        - - - -
21      There was a brief Recess in the proceedings.
22                        - - - -
23                THE VIDEOGRAPHER:  The time is
24          approximately 2:02 p.m., and we are on the
25          record.  Lili, if you want to make a statement
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

124

```
1          that we're going off.
2                    MS. OZAROWSKI:  Sure.  We have
3          discussed while we were off the record that
4          we're going to pause the deposition today due
5          to Mr. Stiffler's inability to continue at
6          this time and we will pick up the deposition
7          on next Friday, January 14th.
8                    MR. SANTICOLA:  That's correct.
9                    THE WITNESS:  That's my birthday,
10         that's perfect.  I'll get some sleep.  January
11         17th, like I said before.  January 17th.
12                   THE VIDEOGRAPHER:  The time is
13         2:03 p.m., and the deposition has concluded.
14                           - - - -
15                   (Thereupon, the deposition was
16         continued at 2:03 p.m.)
17                           - - - -
18                   MR. SANTICOLA:  Thank you, guys.
19                   COURT REPORTER:  Counsel, do you
20         want etrans?
21                   MS. OZAROWSKI:  Yes.
22                   MR. SANTICOLA:  Yes, that's fine.
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

125

```
 1                    CERTIFICATE
 2   COMMONWEALTH OF PENNSYLVANIA)
                                 )  SS:
 3   COUNTY OF INDIANA           )
 4          I, Tammie Elias, RPR and Notary Public in
     and for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, ROBERT STIFFLER, was by me
     first duly sworn to testify to the truth, the whole
 6   truth, and nothing but the truth; that the foregoing
     deposition was taken at the time and place stated
 7   herein; and that the said deposition was recorded
     stenographically by me and then reduced to printing
 8   under my direction, and constitutes a true record of
     the testimony given by said witness.
 9
            I further certify that the inspection,
10   reading and signing of said deposition were not
     waived by counsel for the respective parties and by
11   the witness.
12          I further certify that I am not a relative
     or employee of any of the parties, or a relative or
13   employee of either counsel, and that I am in no way
     interested directly or indirectly in this action.
14
            IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my seal of office this 17th day of
     January, 2022.
16
17          _____
18          Commonwealth of Pennsylvania
            Tammie Elias, Notary Public
19          Center Township, Indiana County
            My Commission Expires December 9, 2023
20
21
22
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

126

1               E R R A T A

2        I, ROBERT STIFFLER, have read the foregoing
   pages of my deposition given on Friday, January 7,
3  2022, and wish to make the following, if any,
   amendments, additions, deletions or corrections:

4
   Pg. No.  Line No.    Change and reason for change:
5

6

7

8

9

10

11

12

13

14

15

16
   In all other respects, the transcript is true and
17 correct.

18                      _____

19                                ROBERT STIFFLER

20 Subscribed and sworn to before me this
   _____ day of _____, 2022.
21

22 _____

23            Notary Public
            Reference No. TE81405
24

25

```
 1              NETWORK DEPOSITION SERVICES
                 Suite 1101, Gulf Tower
 2                  707 Grant Street
                 Pittsburgh, PA  15219
 3                  412-281-7908
 4
 5   January 17, 2022
 6
 7     Michael F. Santicola, Esq.
       michael@ssslawyer.com
 8     SANTICOLA STEELE & FEDELES, P.C.
       722 Turnpike Street
 9     Beaver, PA  15009
       724-775-3392
10
           NOTICE OF NON-WAIVER OF SIGNATURE
11
          Please have the deponent read his deposition
12   transcript.  All corrections are to be noted on the
     preceding Errata Sheet.
13
          Upon completion of the above, the Deponent must
14   affix his signature on the Errata Sheet, and it is
     to then be notarized.
15
          Please forward the signed original of the Errata
16   Sheet to Lili C. Ozarowski, Esq. for attachment to
     the Original Transcript, which is in her possession.
17   Send a copy of same to all counsel, and also a copy
     to me.
18
          As per the rules, if the witness does not sign
19   the signature page within 30 after receipt of the
     transcript, signature is deemed waived.
20
21
22   Tammie Elias, RPR
     Court Reporter
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2

 3                       - - - -
 4    ROBERT STIFFLER,           )
                                 )
 5                               )
              Plaintiff,         )   Civil Action No.
 6                               )   2:21-cv-00523-JFC
              - vs -             )
 7                               )
      APPLE INCORPORATED and     )
 8    VERIZON, INCORPORATED,     )
                                 )
 9                               )
              Defendants.        )
10

11
                         - - - -
12
           CONTINUED REMOTE VIDEOTAPE DEPOSITION OF:
13                    ROBERT STIFFLER

14                     (Volume II)

15                       - - - -

16                 DATE:  January 14, 2022
                          Friday, 10:12 a.m.
17
                   TAKEN BY:  Defendants
18
                   REPORTED BY:  Tammie Elias, RPR
19                               Notary Public
                                 No. TE81508
20

21                       - - - -

22
               NETWORK DEPOSITION SERVICES
23                  1101 GULF TOWER
                    707 GRANT STREET
24          PITTSBURGH, PENNSYLVANIA  15219
                     412-281-7908
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

129

```
 1          CONTINUED REMOTE VIDEOTAPE DEPOSITION OF
                    ROBERT STIFFLER,
 2    a witness, called by the Defendants for examination,
      in accordance with the Federal Rules of Civil
 3    Procedure, taken by and before Tammie Elias, RPR and
      Notary Public in and for the Commonwealth of
 4    Pennsylvania, at Zoom Meeting, on Friday, December
      14, 2022, commencing at 10:12 a.m.

 5

 6                      - - - -

 7    APPEARANCES:

 8         FOR THE PLAINTIFF:
        Michael F. Santicola, Esq.
 9      michael@ssslawyer.com
        SANTICOLA STEELE & FEDELES, P.C.
10      722 Turnpike Street
        Beaver, PA  15009
11      724-775-3392

12
           FOR THE DEFENDANTS:
13      Lili C. Ozarowski, Esq.
        lozarowski@schiffhardin.com
14      SCHIFF HARDIN, LLP
        1185 Avenue of the Americas
15      Suite 3000
        New York, NY  10036
16      212-753-5000 p
        212-753-5044 f
17

18
           ALSO PRESENT:
19      AJ Simeone, Videographer

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

130

```
 1                    EXAMINATION INDEX

 2

 3   ROBERT STIFFLER
          CONTINUED BY MS. OZAROWSKI . . . . . . . . . 131
 4

 5
     Certificate of Court Reporter . . . . . . 328
 6   Errata Sheet  . . . . . . . . . . . . . 329
     Notice of Non-Waiver of Signature . . . . 330
 7

 8

 9                     EXHIBIT INDEX

10

11
                                                      MAR
12   Stiffler
       A      Diagram                                 152
13
       B      Diagram                                 184
14
       C      Diagram                                 233
15
       D      27-page PDF                             277
16
       E      Photograph DSC_0354                     310
17
       F      Photograph DSC_0355 and 0356            312
18
       G      Photograph DSC_0357 and 0358            314
19

20

21      (Exhibits are not attached to the deposition

22   transcript, and are in the possession of counsel.)

23

24

25
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

131

```
 1                    - - - -

 2                 PROCEEDINGS

 3                    - - - -

 4            THE VIDEOGRAPHER:  Good morning.

 5     The date today is January 14th, 2022, and the

 6     time is 10:12 a.m.  This is the continuation

 7     of the videotape deposition of Robert

 8     Stiffler.  The witness is still under oath.

 9     You may proceed.

10                    - - - -

11              CONTINUED EXAMINATION

12                    - - - -

13  BY MS. OZAROWSKI:

14  Q.    Good morning, Mr. Stiffler.

15  A.    Good morning.

16  Q.    As you recall from last week, my name is Lili

17     Ozarowski and I represent Apple in this

18     matter.  I'm going to quickly go over the

19     rules that we discussed last time just to

20     remind you.

21              The first one is, as you know, this

22     deposition is being conducted over Zoom, so

23     please keep your voice up and try to speak

24     clearly and towards the camera.  Do you

25     understand?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

132

```
 1   A.     Yes, ma'am.

 2   Q.     Please also answer all the questions verbally

 3          because we have a court reporter taking down

 4          what we say and she's not able to write down

 5          hand gestures or words like uh-huh or uh-uh.

 6          Do you understand?

 7   A.     Yes, ma'am.

 8   Q.     Please let me finish asking a question fully

 9          before starting to answer it, even if you can

10          anticipate what I'm going to say so that we

11          have a clear record.  Do you understand?

12   A.     Yes, ma'am.  Yes, ma'am.

13   Q.     If the answer to a question is that you don't

14          know, that's a fine answer.  We don't want you

15          to guess.  However, if you can make an

16          educated guess about something, that's fine.

17          Please just let me know that you're making an

18          educated guess.  Do you understand?

19   A.     Yes, ma'am.

20   Q.     If you want to take a break at any time, just

21          like last time, I ask that you finish any open

22          question first and then we're free to take a

23          break.  Do you understand?

24   A.     Yes, ma'am.  Am I being too loud?

25                 MR. SANTICOLA:  No, you're good.
```

```
 1    A.    I don't want to be too loud.
 2    BY MS. OZAROWSKI:
 3    Q.    No.  Just like last time, loud is great.
 4    A.    Okay.
 5    Q.    Have you taken any medications within the past
 6          24 hours?
 7    A.    Yes, ma'am.
 8    Q.    What medications have you taken?
 9    A.    I have taken two Oxycodone.  Methadone, I took
10          30 milligrams.  And I take my Restoril, which
11          is Temazepam for sleep.
12    Q.    When did you take the Oxy?
13    A.    Yesterday.
14    Q.    At what time?
15    A.    11 and 8 last night.  11 a.m. and 8 p.m.
16    Q.    What milligrams did you take?
17    A.    30 milligrams.
18    Q.    Each time?
19    A.    Yes, ma'am.
20    Q.    Are you scheduled to take your next dose today
21          around 11?
22    A.    Well, yes.  Yes, I am.  Yes, ma'am.
23    Q.    When did you take the Methadone?
24    A.    This morning.
25    Q.    At what time?
```

```
 1    A.    6:00.

 2    Q.    When are you scheduled to take your next dose?

 3    A.    Tomorrow at 6 a.m.

 4    Q.    Did I write it down correctly that you took 3

 5          milligrams?

 6    A.    Of what, ma'am?

 7    Q.    Of Methadone.

 8    A.    No.  I take -- I take 40 milligrams in the

 9          morning and I'm supposed to.  It's 80.  And

10          then 40 at night.  But I get constipated, so I

11          try to spread it apart.

12    Q.    Did you take your Methadone last night?

13    A.    No.  I didn't take no Methadone last night.

14    Q.    When did you take your sleeping medication?

15    A.    Last night about 11 p.m.

16    Q.    How much did you take?

17    A.    30 milligrams.

18    Q.    Did you take an antipsychotic today?

19    A.    No, ma'am.

20    Q.    Are you supposed to take an antipsychotic

21          today?

22    A.    We're switching medicines.  So antipsychotic,

23          I'm not taking the Risperdal right now because

24          it's actually making me go manic.

25    Q.    Which doctor told you not to take it anymore?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

135

```
 1   A.     Dr. Kang.

 2   Q.     When did Dr. Kang tell you that?

 3   A.     It was two months ago, so I want to say

 4          November 25th.

 5   Q.     Why were you taken off that medication?

 6   A.     Well, because the protocol for a burn patient

 7          should be on Seroquel.  So I need to be put on

 8          something that will calm me down because the

 9          Risperdal isn't a medicine that brings you

10          down.  Because anybody that -- everybody

11          that's burned like how I'm burned, is on

12          Seroquel.  But it makes me -- Seroquel make me

13          manic, so --

14   Q.     You took Risperidone prior to the fire in

15          2018, isn't that correct?

16   A.     Yes, ma'am.

17   Q.     What years did you take it prior to the fire?

18   A.     2015 to present.  Ma'am, they have had me on

19          so many medicines.

20   Q.     What does this Risperidone treat, is it your

21          anxiety disorder or something else?

22   A.     Anxiety disorder, ma'am.

23              MS. OZAROWSKI:  I'm going to take a

24          step back and make a statement on the record

25          right now.  I'm noting that we have not yet
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

136

1          received the medical records from there's a
2          list that was provided by plaintiff's counsel.
3          The medical providers are:  Dr. Ziembicki,
4          Dr. Corlos, Dr. Butcher, Doctor --
5    A.    Rosengart?
6                MS. OZAROWSKI:  I have Rusilko.
7    A.    Rusilko.  Yes, I have tons of doctors.
8                MS. OZAROWSKI:  Dr. Stofman and
9          Drayer Physical Therapy.  We also have not yet
10         received the completed responses to
11         plaintiff's -- to the interrogatories that
12         were served on plaintiff.
13               Because of this, we are reserving
14         our right to a continuation of this deposition
15         once we have these medical records and the
16         responses to interrogatories.
17   A.    Doctor --
18               MR. SANTICOLA:  You don't have to
19         say anything.  Fair enough, Lili.
20               MS. OZAROWSKI:  And similar to the
21         last session, we're also reserving our right
22         to question Mr. Stiffler's competency based on
23         the medications that he's taking.  We are
24         moving forward with the deposition is not --
25         we're not conceding that we agree that he's

```
 1          competent to testify at this point, but we're
 2          going to move forward anyway.
 3   A.     Okay.
 4                 MR. SANTICOLA:  Yep, noted.  You
 5          don't have to worry about that.  That's for
 6          me.
 7   BY MS. OZAROWSKI:
 8   Q.     Are there any medications that you were
 9          supposed to take that you have not taken
10          within the last 24 hours other than that dose
11          of Methadone we already spoke about?
12   A.     Risperdal.
13   Q.     And Risperdal is the sleeping medication; is
14          that correct?
15   A.     No.  That's the antipsychotic.  Restoril is
16          the sleeping medicine.
17   Q.     Okay.  And you didn't take the antipsychotic
18          because you're working it out with your
19          doctor, as you just testified; is that
20          correct?
21   A.     Yes, ma'am.
22   Q.     Have you had any alcohol within the past 24
23          hours?
24   A.     Yes, I did.  Last night I had a little bit.
25   Q.     What did you drink?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

138

```
 1   A.    Twisted Tea.  I had a 32 ounce Twisted Tea.

 2   Q.    Around what time?

 3   A.    11:00.

 4   Q.    Did you have anything else?

 5   A.    No.

 6   Q.    Have you taken any illegal substances within

 7         the past 24 hours?

 8   A.    No.

 9              MS. OZAROWSKI:  Counsel, I'll just

10         remind you again that you are answering

11         Mr. Stiffler's question.

12              MR. SANTICOLA:  I'm sorry.  I was

13         actually not.  I was looking at something else

14         right now, but I apologize.

15              MS. OZAROWSKI:  Understood.

16   BY MS. OZAROWSKI:

17   Q.    In the past 24 hours, have you taken any

18         prescription drugs recreationally?

19   A.    No, ma'am.

20   Q.    In between today and the last session of your

21         deposition, which was last Friday, did you

22         prepare in any way to give testimony?

23   A.    No, ma'am.

24   Q.    Did you look at any documents or photographs

25         in preparation for today's deposition?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

139

```
 1    A.    No, ma'am.

 2    Q.    Did you have health insurance in July 2018?

 3    A.    Yes, ma'am.

 4    Q.    What kind of health insurance did you have?

 5    A.    Gateway.

 6    Q.    What was this through?

 7    A.    Through the state.

 8    Q.    How long had you had Gateway in 2018?

 9    A.    How long did I have it prior to that?

10    Q.    Correct.

11    A.    2010.

12    Q.    Have you ever been covered by Medicaid?

13    A.    No, ma'am.

14    Q.    Did you have health insurance prior to 2010?

15    A.    Yes, ma'am.

16    Q.    What health insurance did you have?

17    A.    The VA.

18    Q.    How long did you have the health insurance

19          through the VA?

20    A.    Five years.  Actually, wait.  Wait.  My fault.

21          2001 to 2009, so eight years.

22    Q.    And was there any gap in coverage or did you

23          go straight from your coverage with the VA to

24          Gateway?

25    A.    No.  No gap, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

140

```
1    Q.    Prior to health insurance coverage with the
2          VA, did you have health insurance?
3    A.    Yes, I did.  Yes, ma'am.
4    Q.    What kind of health insurance did you have?
5    A.    Blue Cross and Blue Shield.
6    Q.    What was this through?
7    A.    Through my mother's work.  My mother's work.
8    Q.    All right.  Now, I know we discussed your past
9          medical history quite a bit last session.
10         There were just a few questions that were
11         missed in discussing.  So my first question
12         is:  When was the first time that you were
13         diagnosed with any sort of mental health
14         issue?
15   A.    March of 1999.
16   Q.    What were you diagnosed with?
17   A.    Manic.  Anxiety and mania.
18   Q.    Was there an event that preceded this
19         diagnosis?
20   A.    No.  My fault.  Let me take that back.  When I
21         went to the military, 2001 I was first
22         diagnosed.  Because I had a seizure and I got
23         manic and then they put me on medication when
24         I came back home.
25   Q.    Now, last session we discussed the seizure
```

1        that you had while you were in the military --

2    A.    Yes.

3    Q.    -- is this the event that you're talking

4        about?

5    A.    Yes, ma'am.

6    Q.    What doctor diagnosed you, was it a doctor

7        through the military?

8    A.    Yes, ma'am.

9    Q.    Had you ever been diagnosed with depression

10       prior to 1999 or about 2000 when you were in

11       the military?

12   A.    No, ma'am.

13   Q.    Did your diagnosis of mania, anxiety and

14       manic, as you just testified, prevent you from

15       being able to do anything?

16   A.    No.  No, ma'am.

17   Q.    You have testified a few times that Seroquel

18       is a drug that doesn't agree with you.  Have

19       you taken Seroquel in the past?

20   A.    Yes, ma'am.

21   Q.    When did you take it?

22   A.    March of 2002.

23   Q.    How long did you take it?

24   A.    I took it one time and I was manic.

25   Q.    Is that when you were prescribed the

```
 1          Risperidone?
 2     A.    No.  Actually I was prescribed Imipramine
 3          first, then they gave me Seroquel.
 4     Q.    When did you first start taking Xanax?
 5     A.    2005.
 6     Q.    Was this after the gunshot incident?
 7     A.    Yes, ma'am.
 8     Q.    Now, I understand from your testimony that you
 9          had some lingering stomach issues as a result
10          of the gunshot wound in 2005.  How often do
11          you deal with issues related to constipation?
12     A.    Constantly.
13     Q.    Are these --
14     A.    Well, I was going down on medicine with my PCP
15          until this happened, and I was doing good
16          until she had to put me back on the pain
17          medicine, levels higher again, that it started
18          all up again.  So 2018 again, July 16th.
19     Q.    To your understanding, what causes the
20          constipation, is it the medication, is it the
21          injury to your body or something different?
22     A.    Medication.  I'm sure the medication and all
23          of my surgeries too.
24     Q.    Is there anything that you used to be able to
25          do that you're no longer able to do because of
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

143

```
 1          the removal of a portion of your bowel?
 2   A.     No.  I can do -- I was fine until this
 3          happened.  I was fine.  I could -- I don't
 4          know.  You should see pictures of me before
 5          this.  I was fine.  I was in great shape,
 6          doing good.
 7   Q.     Did you have any food restrictions as a result
 8          of the surgeries after the gunshot wound?
 9   A.     No.  No, ma'am.  I was offered to do it, but
10          Dr. Rosengart, my surgeon, told me I could go
11          on a regular diet.
12   Q.     It's my understanding from your previous
13          testimony that you first started taking
14          Methadone after the gunshot incident; is that
15          correct?
16   A.     Yes.  It's about 2006 because -- because when
17          I got -- yes.  Yes.  After the gunshot
18          incident.
19   Q.     Do you have an understanding as to why you
20          were prescribed Methadone versus a different
21          sort of medication?
22   A.     He said it was for the pain.  He said it's a
23          longer-acting pain medicine.
24   Q.     When you say he, to whom are you referring?
25   A.     Dr. Stephen Osmanski.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

144

```
 1   Q.    You testified last session that at some point
 2         you had a seizure while you were at work.
 3   A.    Yes.
 4   Q.    Can you explain to me when that happened?
 5   A.    I was working for Tuma, and I was on a
 6         walk-behind lawn mower, and I had a seizure
 7         right there when I was coming up a hill.  So
 8         it almost came back on me.
 9   Q.    You said you were working for Tuma at the
10         time; is that correct?
11   A.    Yeah.  Tuma Landscaping.
12   Q.    When was this, what year?
13   A.    2004.
14   Q.    So this was prior to the gunshot incident; is
15         that correct?
16   A.    Yes, ma'am.
17   Q.    How long did you work for Tuma Landscaping?
18   A.    A little over a year.  Say 14 months.
19   Q.    Did you go on disability after this incident?
20   A.    Not at first, no.
21   Q.    Can you explain what you mean by that?
22   A.    They wouldn't -- I got a better job at
23         Landscapes and More for more money and I moved
24         to that job.
25   Q.    What was the name of the second place?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

145

```
 1    A.    Landscapes and More, Hopewell Township,

 2          Pennsylvania.

 3    Q.    How long did you work there?

 4    A.    For years.

 5    Q.    I'm sorry?

 6    A.    Two and a half, three years.

 7    Q.    You testified last session to taking a

 8          medication called, forgive me if I pronounce

 9          this wrong, Depakote?

10    A.    Yes, ma'am.

11    Q.    What is that?

12    A.    It's a mood stabilizer.

13    Q.    When did you take that medication?

14    A.    2007 to about 2010.

15    Q.    Who prescribed that?

16    A.    Dr. Peter Van Nickell.

17    Q.    What sort of a doctor is Dr. Van Nickell?

18    A.    He's a head of psychiatry for Allegheny

19          General.

20    Q.    Why did you take this medication?

21    A.    He gave it to me.  He said that with my

22          antidepressant, the mood stabilizer, I should

23          be, you know, better off.

24    Q.    Why did you stop taking it in 2010?

25    A.    Because I don't like needles and you have to
```

```
 1          get bloodwork every month on that.  So I hate
 2          needles, so I told him I didn't want to be on
 3          it anymore.
 4    Q.    Did you start taking a different medication in
 5          place of the Depakote?
 6    A.    No, ma'am.
 7    Q.    Did you have a driver's license in 2018?
 8    A.    No, I did not.
 9    Q.    Why not?
10    A.    Because I didn't pursue it.  I could have had
11          one, but I didn't get it.
12    Q.    Did you ever have a --
13    A.    I could -- sorry.
14    Q.    My apologies for cutting you off.  What were
15          you saying?
16    A.    No.  I could have had a license, I just didn't
17          pursue it.
18    Q.    Can you explain what you mean by that?
19    A.    I wasn't feeling good with my stomach for a
20          little bit, and then I just didn't get my
21          license.
22    Q.    Had you had a license at some point prior to
23          2018?
24    A.    Oh, yes.  Yes, ma'am.
25    Q.    When did you -- when had you last had a
```

```
 1          license prior to 2018?

 2    A.    2011.

 3    Q.    What happened to your license in 2011?

 4    A.    I had a DUI in 2009.

 5    Q.    Did that impact your driver's license in any

 6          way?

 7    A.    No.  It was just an ARD.  Yeah, 30 days it got

 8          suspension of the license.

 9    Q.    And then how did you no longer have a license

10          after 2011?

11    A.    How did I no longer have one?

12    Q.    Correct.  I believe you testified that the

13          last time your license was valid, it was in

14          2011; is that correct?

15    A.    Yes.  It was valid before that.  I just didn't

16          go get a license.

17    Q.    Did it expire in 2011, was it revoked in 2011

18          or something different?

19    A.    Yes.  It expired and I didn't pursue it to get

20          my license because you have to pay off your

21          fines first before you can get your license

22          back.  So actually it took me that much time

23          to pay my fines back, then it expired.  That's

24          what happened.

25    Q.    Have you paid off your fines since then?
```

```
 1    A.    Yes, ma'am.

 2    Q.    Do you have a driver's license now?

 3    A.    Yes, ma'am.

 4    Q.    When did you get it?

 5    A.    2019.

 6    Q.    Did you have to take a driver's test or a road

 7          test or was your license just reinstated or

 8          something different?

 9    A.    I had to take a written test.

10    Q.    Last session you gave testimony that you work

11          with your best friend.  Can you explain what

12          you mean by that?

13    A.    I don't work with him no more.

14    Q.    When did you work with him?

15    A.    I can't work.  Before the fire I did.

16    Q.    What years would that have been?

17    A.    Off and on from 2013 to 2018.

18    Q.    Who is your best friend -- or who was your

19          best friend?

20    A.    Kevin Held.

21    Q.    What was his last name?

22    A.    Held, H-E-L-D.

23    Q.    What did you do with Kevin?

24    A.    I was laboring for he owns his plumbing and

25          heating company.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

149

```
 1    Q.    How many hours a week did you work with Kevin?

 2    A.    I could only work 17 hours a week.

 3    Q.    What were you paid?

 4    A.    $10.

 5    Q.    Was that an hour or something different?

 6    A.    An hour.

 7    Q.    Was this on the books or off the books?

 8    A.    It was on the books.

 9    Q.    Did you need to hold any sort of license or

10          certificate to be able to have this position

11          with Kevin?

12    A.    No, ma'am.

13    Q.    Is Kevin a licensed plumber?

14    A.    Yes, ma'am.

15    Q.    You testified last session that you have

16          dentures.  When did you first get dentures?

17    A.    2005.

18    Q.    Was there a precipitating event to getting

19          dentures?

20    A.    I used to -- I got into a lot of fights prior

21          to that and stuff happened.  I had my teeth.

22          I don't know.  Yeah, so I have got teeth

23          punched out.  I never started any of the

24          fights though, it's amazing.  I didn't.

25    Q.    Was there a specific event that occurred in
```

```
 1           2005 that led you to get dentures or was it an
 2           accumulation of damage to your teeth or
 3           something different?
 4    A.     I had a front tooth missing, so I just -- some
 5           of my teeth were, you know, bad in the back,
 6           so I just decided to get them pulled out and
 7           get dentures.
 8    Q.     With what doctor did you have your teeth
 9           pulled?
10    A.     Dr. Scarlareco.
11    Q.     Can you spell that, please?
12    A.     No.  S-C-L-A-R -- wait.  No.  No.  He's not in
13           practice no more.
14    Q.     What's his first name?
15    A.     I don't remember, ma'am.
16    Q.     Can you say his last name again and I'll try
17           to write it down phonetically?
18    A.     Scarlareco.  Like scar, L-E-C-O.
19           S-C-A-R-L-A-R-E-C-O.  I actually went to
20           school with his boy, so I'm trying to think.
21    Q.     Did he work out of a dentistry group or did he
22           have a private practice or something
23           different?
24    A.     Private practice, ma'am.
25    Q.     Obviously we're going to be discussing the
```

```
 1          night of the fire today, but before we get

 2          into any details about that, I just want to

 3          clarify something.  You testified last session

 4          that the night of the fire you returned home

 5          from fishing and you went up to your room to

 6          get ready for work.  Can you explain what you

 7          mean by that?

 8    A.    I just took out my teeth, washed my face.  And

 9          I was talking -- do you want to know what

10          happened all the way before I went to bed or

11          just --

12    Q.    I will later.  And I apologize, let me clarify

13          what I meant.  Can you clarify what you meant

14          by that you had work, did you mean that you

15          were going to work that night, did you mean

16          you were going to work the next day or

17          something different?

18    A.    The next morning.  Sorry.

19    Q.    Where were you going to work?

20    A.    With Kevin.

21    Q.    At what time were you supposed to start?

22    A.    8:00.  8 a.m.

23    Q.    Now, we're going to move on to the night of

24          the fire.  And it could be helpful, this is a

25          little bit more difficult over Zoom, if you
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
1              have a blank piece of paper, would you be able

2              to sketch out for me a diagram of your room,

3              meaning where your bed was, where the major

4              furniture was, where the electronics were and

5              stuff like that?

6    A.    Yes, ma'am.

7                   MS. OZAROWSKI:  I don't believe we

8              have any exhibits marked yet, so we'll mark

9              this as Exhibit A.

10                      - - - -

11             (Exhibit A marked for identification.)

12                      - - - -

13                  MR. SANTICOLA:  While he's doing

14             that, I'm going to look for a marker so you

15             can see when he holds it up.

16                  MS. OZAROWSKI:  Okay.  Perfect.

17   A.    I am going to write like what stuff is.  Like

18             the door, should I do that?

19                  MS. OZAROWSKI:  That would be great.

20             Thank you.  I'm going to step away for one

21             moment, but we can keep the video going.

22   A.    Okay.  I'm good.  I'm good.  Thank you.  I'm

23             done, ma'am.  You can see where I put the door

24             is right here.

25   BY MS. OZAROWSKI:
```

153

```
 1   Q.     I see.  Apologies.  I should have mentioned
 2          this before.  It might be easier if you try to
 3          make it bigger so that it covers most of the
 4          page because then we can -- it will be easier
 5          to see.
 6                  MR. SANTICOLA:  Mark it a little
 7          darker.  Lili, if you want me to, I could take
 8          a picture of it and send it to your cell
 9          phone.
10                  MS. OZAROWSKI:  That would be great.
11          Before you do that, I may ask him where
12          certain things are that he may not have
13          thought to put on.
14                  MR. SANTICOLA:  Yeah.  Did you put
15          the dresser?
16   A.     Yeah, I put my dresser right here.
17                  MR. SANTICOLA:  I'm going to take a
18          quick picture of it for you.
19   A.     I'm not real good drawing.  I'm sorry.
20   BY MS. OZAROWSKI:
21   Q.     That's okay.  We're just interested in the
22          locations of things.
23                  MR. SANTICOLA:  Lili, what's your
24          cell phone number, I'll send it to you right
25          now.  We can go off the record, if you don't
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

154

1          want it on the record or anything.

2                    MS. OZAROWSKI:  Sure.

3                    MR. SANTICOLA:  It's up to you.

4                    MS. OZAROWSKI:  I'll e-mail it to

5          you quickly.

6                    MR. SANTICOLA:  Okay.  That's fine.

7                    MS. OZAROWSKI:  I just sent it.

8                    MR. SANTICOLA:  Okay.

9    A.    You draw a lot better than me.

10                   MR. SANTICOLA:  I just texted it to

11         you.  We're really using technology today,

12         aren't we?

13                   MS. OZAROWSKI:  I haven't received

14         it.  Does it show it was sent?

15                   MR. SANTICOLA:  It's got that line.

16         It's holding up for some reason.

17   BY MS. OZAROWSKI:

18   Q.    All right.  Mr. Stiffler, if you want to

19         hold up the page that you had?

20                   MR. SANTICOLA:  I'll try to e-mail

21         it too, by the way.

22                   MS. OZAROWSKI:  I'm going to ask him

23         to put on extra things, so this might be okay

24         for now.

25   A.    Here's the door coming in.  You come in

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

155

```
 1          through the door.  The door -- you walk in
 2          this way, here's the door.  Can you see that
 3          at all?
 4   BY MS. OZAROWSKI:
 5   Q.    I can.  Can you hold it up?  There we go.  Can
 6          you put it a little bit closer to the camera?
 7          Perfect.  So when you say there's the door,
 8          you're speaking about the bottom right where
 9          you have written door and there's a triangle;
10          correct?
11   A.    Yes, ma'am.  And then this box right here is I
12          had a TV stand with a 50-inch TV right here.
13   Q.    Okay.  Let me just describe it for the record.
14          So when you say here, you're talking about
15          there's a rectangle that is right above the
16          door; is that correct?
17   A.    Yeah.  If you walk into the room, it would be
18          right in front of you.
19              MR. SANTICOLA:  It was delivered by
20          the way.
21              MS. OZAROWSKI:  Oh, I see.  All
22          right.
23   BY MS. OZAROWSKI:
24   Q.    So you don't have to hold up the page anymore,
25          I have a copy of it.  So let me clarify what I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

156

```
 1          was just saying.  You have marked here a
 2          rectangle as the TV, that's what you're
 3          talking about; correct?
 4    A.    I had two TVs in my room.  Yes, ma'am.
 5    Q.    So is the 50-inch TV the rectangle marked TV?
 6    A.    Yes, ma'am.
 7    Q.    Where was that TV plugged in?
 8    A.    That TV was not plugged in.
 9    Q.    Okay.  So there was no power going to that TV;
10          is that correct?
11    A.    No, ma'am.
12    Q.    So this TV just for the record, it's the
13          rectangle marked TV that is to the left of the
14          door triangle.
15    A.    Yes, ma'am.
16    Q.    Where was the second TV in the room?
17    A.    You see that circular right next to my bed
18          right there?
19    Q.    Correct.  Yes.
20    A.    I have a 27-inch TV on there.  It was like a
21          circular stand.  I put a TV there because my
22          eyes are bad.
23    Q.    Where was that TV plugged into power?
24    A.    You see where the window is --
25    Q.    Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

157

```
 1   A.      -- the window?  To the left of there, there
 2           was an AC outlet right there.  I plugged it in
 3           right there.
 4   Q.    Can you put an X where that outlet was?
 5                   MR. SANTICOLA:  Yep.
 6   BY MS. OZAROWSKI:
 7   Q.    And can you label it outlet?
 8   A.    Yes, ma'am.
 9   Q.    While you're doing that, can you mark Xs where
10           any of the other outlets in the room were?
11   A.    That was it.  There's only two outlets.
12   Q.    Okay.
13   A.    Can you see that?
14   Q.    I can.  Thank you.  Now, what was plugged into
15           this outlet that was below the window?
16   A.    My TV and my charger.
17   Q.    When you say your charger, you're talking
18           about the charger to the iPhone; correct?
19   A.    Yes, ma'am.
20   Q.    Were these devices plugged directly into the
21           wall or into a power strip or into an
22           extension cord or something else?
23   A.    Straight into the wall.
24   Q.    Was the charging cord able to reach from that
25           outlet to the table where the TV was?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

158

```
 1   A.     Yes, ma'am.

 2   Q.     Can you please show me the drawing again so I

 3          can see where the other outlets were?  Okay.

 4          I see.

 5   A.     You see them?

 6   Q.     Yes.  There was one other outlet near the

 7          other TV?

 8   A.     Yes, ma'am.

 9   Q.     And were there any other outlets in the room?

10   A.     No, ma'am.

11   Q.     Was anything plugged into that outlet by the

12          55-inch TV?

13   A.     No, ma'am.

14   Q.     Did you have any type of cable box plugged

15          into the 27-inch TV?

16   A.     Yes, I did.

17   Q.     What did you have plugged in?

18   A.     Verizon.

19   Q.     How was that connected to the TV?

20   A.     Through the cable and they hooked it up and

21          then, you know, they plugged it in and they

22          hooked the cable up.

23   Q.     Was the cable box plugged into the outlet?

24   A.     Yes.  Yep.  There was a cable -- yep.  Because

25          I would take that out, my charger, and then
```

```
 1          put that -- you know, plug that in so I didn't

 2          have my charger on all the time.

 3   Q.     Okay.  And for clarity sake, the outlet we're

 4          talking about is the outlet next to the

 5          window; correct?

 6   A.     Yes, ma'am.

 7   Q.     Did you have anything else connected to the

 8          27-inch TV, like a game or anything like that?

 9   A.     No, ma'am.

10   Q.     Did you have a ROKU or Apple TV or any sort of

11          device to stream to the TV?

12   A.     No, ma'am.

13   Q.     It's my understanding that there was an air

14          conditioner in your room at the time of the

15          fire in July of 2018.  Where was that air

16          conditioner?

17   A.     See where I have that window right there?

18   Q.     Yes.

19   A.     It was in that window.  It was a window air

20          conditioner.

21   Q.     At the time of the fire, was the air

22          conditioner installed into the window?

23   A.     Yes, it was, ma'am.

24   Q.     Where did you --

25   A.     Yes, I did.  I had an extension -- a wire from
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

160

```
 1          my -- for my AC that went into my outlet here.
 2          Yes, I did have it plugged in right here in
 3          this outlet right here.
 4    Q.    I'm sorry.  I'm able to see the picture.
 5          Which outlet did you have the air conditioner
 6          in?
 7    A.    The one that's right next to the big TV as
 8          soon as you walked into the room.
 9    Q.    Okay.  So if I understand your testimony
10          correctly --
11    A.    Yes.
12    Q.    -- you testified that the air conditioner was
13          installed into the window and it had an
14          extension cord connecting it to the outlet
15          that was by the 55-inch TV, which is on the
16          same wall as the door; is that correct?
17    A.    No.  The door was on the -- the door, it
18          was --
19    Q.    The door -- so I misspoke.  So the door is
20          perpendicular to that wall; is that correct?
21    A.    Yeah.  Perpendicular, yes.  Yeah, just along
22          where the dresser is.  It's right on -- the
23          door was right there.
24    Q.    So this outlet by the 55-inch TV, it had an
25          extension cord that connected the air
```

```
 1          conditioner to power; is that correct?

 2   A.     Yes, ma'am.

 3   Q.     Was anything else plugged into that outlet?

 4   A.     No.  Nope.  There was nothing plugged in there

 5          except for the AC.  AC.

 6   Q.     Prior to the fire the night of July 16th,

 7          2018, did you have any other appliances in

 8          your room or appliances or electronics?

 9   A.     No, I did not.

10   Q.     Did you have lamps in the room?

11   A.     No, I did not have a lamp.  I had a switch.

12   Q.     How was the room lit?

13   A.     I had a switch.  Like do you want me to break

14          down where the switch was?

15   Q.     Yes, please.

16   A.     As soon as you come in the door, it was right

17          to your right.

18   Q.     Can you put the light switch on the other side

19          of the drawing where you have the larger

20          picture?

21   A.     What's that, ma'am?

22   Q.     On the other side of the page is the larger

23          picture; right?

24                 MR. SANTICOLA:  Yeah.

25   A.     You see it now?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

162

1    BY MS. OZAROWSKI:

2    Q.    Sort of.  Can you put it a little bit closer

3          to the camera, please?  So from what I

4          understand from your drawing, there's a switch

5          to if you're walking --

6    A.    To the right.

7    Q.    -- into your room, to the right of the door;

8          is that correct?

9    A.    Yes, ma'am.

10   Q.    And that light switch controlled an overhead

11         light; is that correct?

12   A.    Yes, ma'am.

13   Q.    Where was the overhead light?

14   A.    Right above the bed.

15   Q.    What kind of light was it, was it a

16         fluorescent light, was it a light that used

17         regular light bulbs or something different?

18   A.    Regular light bulbs.

19   Q.    Were there any other windows in the room

20         besides the window that you have drawn in the

21         diagram?

22   A.    No, ma'am.

23   Q.    In the diagram, there is a rectangle that's

24         above the door, what is that rectangle?

25   A.    Rectangle above the door?  Oh, that's my

```
 1           dresser.  That's my dresser, that's all.
 2    Q.     Could you label it dresser, please?
 3    A.     Yes, ma'am.
 4    Q.     Did the room have a closet?
 5    A.     Yes, it did, ma'am.
 6    Q.     Where was the closet?
 7    A.     It was a double door closet.  Two entrances,
 8           one here and one here.
 9    Q.     Can you mark those entrances as closet,
10           please?  I'm assuming this was a walk-in
11           closet?
12    A.     Yes, ma'am.
13    Q.     What was in the closet?
14    A.     Just I had my dress clothes in there with the
15           hangers, you know, to hang them up.
16    Q.     Was there an outlet --
17    A.     And my trophies.  And my trophies.
18    Q.     What were the trophies for?
19    A.     Soccer, basketball, wrestling, football.
20           Soccer, basketball, wrestling, football.  Yes,
21           that's it.
22    Q.     Was there an outlet in the closet?
23    A.     No, ma'am.
24    Q.     Did the closet have its own light?
25    A.     Yes.  Yes, and you could hit the switch.  I'll
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

164

```
 1          show you.  It's right above the bed, the
 2          switch was.  You hit that switch right in the
 3          middle of the bed and it would turn the light
 4          on in the back right there.
 5   Q.     Were there any free-standing lamps in either
 6          the bedroom or the walk-in closet?
 7   A.     No, ma'am.
 8   Q.     Were there any table lamps in either room?
 9   A.     No, ma'am.
10   Q.     Did you have a clock in the bedroom?
11   A.     No, ma'am.  I didn't have a clock because my
12          cable had the time on it.
13   Q.     I'm sorry?
14   A.     My cable box had the time on it, so I didn't
15          need a clock.
16   Q.     Would you unplug the cable box every night?
17   A.     No, ma'am.
18   Q.     When would you unplug the cable box?
19   A.     Only when I went on vacation or if I was
20          leaving for, you know, a week or more.
21   Q.     How was there room in the outlet next to the
22          window for the TV, the cable box and the
23          iPhone charger?
24   A.     Because I didn't have the charger on all the
25          time.  So I would take -- unplug the charger
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

165

```
 1            and I would have the cable box on.  So there's
 2            lots of times I just didn't have -- you know,
 3            I would charge my phone overnight.
 4                          I never liked electricity or fire
 5            growing up, you know.  I have lots of friends
 6            that will testify for that.  That's why people
 7            are shocked that I had any -- that this
 8            happened to me.
 9   Q.   What do you mean by that you never liked
10            electricity growing up?
11   A.   I just didn't like fireworks, you know,
12            everybody gets into fireworks.  I just didn't
13            get into that.  That's why everybody was
14            shocked of my friends, that I got -- this
15            happened to me, you know.  Plus, I was not --
16            I don't know.  It just -- yeah.  I have people
17            testify for that.
18                          You know how people buy fireworks
19            and stuff, I would never light fireworks or do
20            anything like that.  That's why -- I kept the
21            least amount of stuff in that room that I
22            could possibly keep, whether it's electric or
23            anything.
24   Q.   What was the process when you wanted to charge
25            your iPhone in your bedroom?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

166

```
 1   A.    I plugged it in and stupidly I put it right on
 2         the stand right here and --
 3   Q.    So backing up for a minute.  In the week
 4         before the fire, how did you charge the iPhone
 5         in your bedroom?
 6   A.    Overnight.
 7   Q.    Where would you plug it in?
 8   A.    I plugged it into that outlet right there.
 9   Q.    Which outlet is that, can you describe it in
10         words?
11   A.    Next to the window.
12   Q.    What did you unplug when you plugged in the
13         charger, did you unplug the TV or the cable
14         box or something different?
15   A.    I unplugged the TV.  Because the cable -- the
16         only reason I did that, because the cable box
17         would need to, you know, juice up again if I
18         did that.  It would have to go download
19         process.
20                   Can we stop for 5 minutes, 10
21         minutes because I have to put -- I have to get
22         my neck graft and I haven't been able -- I
23         have to keep this closed.
24   Q.    That's fine.  We can take a break.  How long
25         do you need, is 5 minutes okay?
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

167

```
 1    A.     Like 5, 10 minutes.  10 minutes just so I can
 2           get this --
 3                     MR. SANTICOLA:  Okay.
 4    A.     -- to close that.
 5                     MS. OZAROWSKI:  If you need 10
 6           minutes, that's fine.
 7    A.     I had surgery on that.
 8                     THE VIDEOGRAPHER:  The time is
 9           11:11 a.m.  We're now off the video record.
10                     - - - -
11        There was a brief Recess in the proceedings.
12                     - - - -
13                     THE VIDEOGRAPHER:  The time is
14           11:25 a.m.  We're now back on the video
15           record.
16    BY MS. OZAROWSKI:
17    Q.     Mr. Stiffler, can you please describe for me
18           what belongings you had in your room prior to
19           the fire on July 16th, 2018?
20    A.     Belonging as dresser, like that stuff?
21    Q.     Sure.  You can go through if there was any
22           other -- let me ask you:  Was there any other
23           furniture in the room other than the TV stand
24           and the dresser and the bed that you have
25           already placed on the diagram?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

168

```
 1   A.     Yes, ma'am.  There's a chair.  Can I write the
 2          stuff down?
 3   Q.     Yes, that would be great.
 4                  THE WITNESS:  What are those things
 5          that are about 8 foot tall?
 6                  MR. SANTICOLA:  That's a wardrobe.
 7                  THE WITNESS:  They have an opening.
 8                  MR. SANTICOLA:  Yeah, that's a
 9          wardrobe.
10   BY MS. OZAROWSKI:
11   Q.     Okay.  Can you hold it a little closer to the
12          camera, please?
13   A.     There's a chair.  You can see that in the
14          corner.
15   Q.     By the corner, you mean the bottom left corner
16          to the left of the 55-inch TV?
17   A.     See right here?
18   Q.     Am I correct this is the bottom left corner?
19   A.     Yes, ma'am.
20   Q.     What kind of chair was that, was it an arm
21          chair or a desk chair or something different?
22   A.     Yes, ma'am, an arm chair.
23   Q.     Okay.
24   A.     And then I got a wardrobe thing next to the
25          dresser.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

169

```
 1   Q.    Can you turn it around, please?  Okay.  So
 2         there was a wardrobe in the picture, it's
 3         drawn on the top right corner of the room; is
 4         that correct?
 5   A.    Yes, ma'am.
 6   Q.    Okay.
 7   A.    And then top right.  Yeah, top right.  I have
 8         my trophy stands over there, more trophies
 9         over there right here.
10   Q.    So in looking at the drawing, it's the top
11         left; correct?
12   A.    Yes, ma'am.  That's it.
13   Q.    Am I correct that you drew a second closet
14         next to the 55-inch TV?
15   A.    There's two openings, yes, ma'am.
16   Q.    To a second closet other than the closet
17         that's behind the bed?
18   A.    No.  It's a full closet.  You can come in two
19         ways.  There's two entrances.  I'm sorry.
20   Q.    May I see the picture again?  What have you
21         drawn in between the 55-inch TV and the door
22         to the room?
23   A.    Switch, the switch.
24   Q.    Got it.  What was that switch for?
25   A.    For the closet, like the closet.  You hit that
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

170

```
 1          switch right there and it would turn the light
 2          back in the closet.
 3    Q.    What was on your trophy stand in the corner?
 4    A.    I had my basketball trophies there.  I had
 5          five basketball trophies there.  I have two
 6          wrestling trophies and about six soccer
 7          trophies.
 8    Q.    What was inside the wardrobe?
 9    A.    Clothes.  A lot of clothes.
10    Q.    In 2018, did you vape?
11    A.    No, I didn't vape.  No.
12    Q.    In 2018, did you own any electronics that had
13          batteries you could charge by plugging them
14          into an outlet?
15    A.    No.  No.  Nope.  I never vaped.  I mean,
16          except, you know, if someone else had it, then
17          I smoked.
18    Q.    Did you have any electronics in 2018 that had
19          removable batteries?
20    A.    No, ma'am.
21    Q.    What medications had you taken prior to the
22          fire on July 16th, 2018, starting with that
23          morning?
24    A.    I had Methadone and I was on Xanax.  That's
25          it.
```

```
 1   Q.    How much Methadone did you take the morning of
 2         the fire?
 3   A.    40.
 4   Q.    What was that to treat?
 5   A.    I had a gunshot, then I had peritonitis.  They
 6         took 177 centimeters out of my bowel and then
 7         I had pancreatitis, so they were treating
 8         that.
 9   Q.    What time did you take the Methadone on July
10         16th?
11   A.    It was in the morning, ma'am.
12   Q.    Did you take it a second time in the evening?
13   A.    No, I did not, ma'am.
14   Q.    Why not?
15   A.    I didn't take it because I was at a birthday
16         party, the pastor's birthday party and then I
17         went fishing, and I just didn't take it.  I
18         was constipated at that time, so I was trying
19         to slow down on the pain meds.  That's another
20         reason why.  That was the main reason why.
21   Q.    When did you take the Xanax on July 16th,
22         2018?
23   A.    3:00.  Right before I went to the birthday
24         party.
25   Q.    How much did you take?
```

```
 1    A.    1 milligram.

 2    Q.    What was the Xanax intended to treat?

 3    A.    My mental illness.  My anxiety disorder.

 4    Q.    The day before the fire, did you take any

 5          illegal substances?

 6    A.    No.

 7    Q.    The day of the fire, did you take any illegal

 8          substances?

 9    A.    Nope.  Except -- no.  Except for the medicine

10          that I was prescribed.

11    Q.    The day of the fire, did you take any

12          prescription medicine recreationally?

13    A.    Nope.  No, ma'am.

14    Q.    From what I understand from your previous

15          testimony, the night of the fire your father

16          picked you up from fishing with your friend;

17          is that correct?

18    A.    Yes, ma'am.

19    Q.    What time was that?

20    A.    I would say it's around 1, 12:30, 1.  I'm not

21          sure.  12:30, 1.

22    Q.    When you say 1, you mean 1 a.m.?

23    A.    Yes, ma'am.

24    Q.    Did your father drop off your friend at his

25          house?
```

```
 1    A.    Yes, ma'am.

 2    Q.    And did you come home afterwards?

 3    A.    Yes, ma'am.

 4    Q.    What happened when you arrived home?

 5    A.    I sat in the back porch with my father for a

 6          little bit.  Then my phone rang and I was

 7          talking to Kevin and I was back there talking

 8          to him.  And then my phone, I could see it was

 9          going down, my battery was going down.  It was

10          getting hot too, I felt the heat, because I

11          just got the phone.  And I went upstairs just

12          to plug it in and went upstairs and plugged it

13          in and heard a hiss and a pop and woke up in

14          the burn unit.

15    Q.    When you were outside on the porch with your

16          father, were you smoking cigarettes?

17    A.    Yes, I did have a cigarette.

18    Q.    Did your father have a cigarette?

19    A.    Yes.  I'm sure.  I can't say that.  I don't

20          remember.

21    Q.    How many cigarettes did you have?

22    A.    I just had one.

23    Q.    Where were you when you received the phone

24          call?

25    A.    I was on the back porch.  And then I went out
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

174

```
1              off the porch and I sat down on the stoop and
2              I was talking to him.  And then I see my power
3              was going, so I came upstairs and I told him,
4              you know, I'll see him in the morning, my
5              battery is dying, it's hot too.  He remembers
6              this.  And I turned it, you know, I just
7              plugged it in, laid down.
8                        And I always lay on my right side
9              like this.  And that's -- and I had my -- I
10             can show you.  I had my TV is right here.  So
11             the hiss and the pop, that's why I got so much
12             damage on my left side.
13    Q.       Backing up to when you were on the porch when
14             you received the phone call.  At what time did
15             you receive the phone call?
16    A.       I'm going to say 1:15, 1:30.
17    Q.       How long did you speak with Kevin while you
18             were sitting on the step by the porch?
19    A.       Half an hour, 40 minutes.
20    Q.       For clarification, was Kevin the friend that
21             you had gone fishing with or had you gone
22             fishing with somebody else?
23    A.       I went fishing with somebody else.
24    Q.       Who did you go fishing with?
25    A.       Justin Biesenkamp.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

175

```
 1   Q.    When you say you noticed your battery going

 2         down, can you explain what you mean by that?

 3   A.    You know, I seen 2 percent.  I think it was

 4         getting hot, that's why I grabbed it and it

 5         just -- I just got the phone.  And he was the

 6         one that was pushing me to get these iPhones

 7         because I had Droids since before this.

 8                      And I noticed it had 2 percent.  I

 9         went up, you know, got off the phone with him

10         and I plugged it in.  And I would plug it in

11         here and then I put my phone right here.  So

12         it was pretty much put right in my face.  I

13         didn't --

14   Q.    I'm going to have you describe that in a

15         minute.  I'll remind you that because we have

16         the court reporter, we need to describe

17         everything that we're saying in words.

18   A.    Okay.

19   Q.    So if you're going to reference the photograph

20         and say something like I plugged it in here,

21         please describe where that is with words.  But

22         before we get to that, let me ask you:  When

23         did you first notice, as you have testified,

24         the phone getting hot?

25   A.    When I was outside with him.  I was talking to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

176

```
 1          him, I could feel it getting hot.  That's why
 2          I looked at the phone.  I said this thing is
 3          getting unusually hot, you know, I could tell.
 4          And went upstairs and got off the phone with
 5          him and plugged it in because I need the phone
 6          to work with too.
 7   Q.     What portion of the phone did you feel getting
 8          hot, what area?
 9   A.     The back, the back of it.  Just the back of
10          it.  Yep, just the back of it.  It was
11          unusually hot.
12   Q.     What area --
13   A.     My hand -- I had Droids and stuff.  I just
14          never had that heat like that.  And I didn't
15          know about phones blowing up either, so --
16   Q.     What area of the back of the phone felt hot to
17          you?
18   A.     The whole back.  The whole back was hot.  The
19          whole back.  Like me holding it, I could feel
20          it all over my hand.
21   Q.     At this point were you holding the phone up to
22          your ear to speak?
23   A.     Yes.  Yes.  Yes.
24   Q.     Where did you feel the heat, was it on your
25          face, was it on your hand or something
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

177

```
 1          different?
 2    A.    It was on my hand because I was holding the
 3          phone like this.
 4    Q.    So when you say like this, you mean you were
 5          holding it against your ear and against your
 6          cheek?
 7    A.    Yes.  Like this, like you talk.  Yes, ma'am.
 8                MS. OZAROWSKI:  And just for the
 9          record, plaintiff is indicating holding the
10          phone to his ear.
11    BY MS. OZAROWSKI:
12    Q.    Did the heat from the phone burn your hand
13          while you were sitting on the porch?
14    A.    No.
15    Q.    Were any apps running while you were talking
16          on the phone and sitting on the porch step?
17    A.    No, ma'am.
18    Q.    What apps had you used earlier in the day on
19          the phone?
20    A.    Just Facebook.
21    Q.    Had you used Safari?
22    A.    No.
23    Q.    Had you used the map function for any reason?
24    A.    No.  No, ma'am.
25    Q.    Had you checked e-mail on the phone that day?
```

```
 1    A.      No.  No, ma'am.

 2    Q.      Had you played any games on the phone that

 3            day?

 4    A.      No, ma'am.

 5    Q.      Had you used the camera that day?

 6    A.      Yes, I did.

 7    Q.      When did you use the camera?

 8    A.      At my pastor's birthday party.

 9    Q.      What did you do with the camera at the

10            birthday party?

11    A.      I took a few pictures.

12    Q.      Did you take any videos?

13    A.      No.  I didn't take no videos, ma'am.

14    Q.      Did you use Pandora that day?

15    A.      No.  No, I did not, ma'am.

16    Q.      When did you end the phone call with Kevin?

17    A.      I'm going to say 2.  I'm going to say around

18            2.

19    Q.      Where were you when you said goodbye?

20    A.      I was up in my bedroom.

21    Q.      Where were you when you told him that you felt

22            the phone getting hot?

23    A.      Outside on the porch.

24    Q.      When you felt the heat, was it something that

25            you felt suddenly, was it gradual or something
```

```
 1        else?
 2   A.   It was suddenly, like it got hot.  I mean, it
 3        wasn't gradually.  It got hot.
 4   Q.   When you felt the device getting hot, did you
 5        look at the face of the phone?
 6   A.   Yeah.  That's why I seen 2 percent on the
 7        phone.
 8   Q.   You say 2 percent, is that battery?
 9   A.   Yes, ma'am.
10   Q.   Did you see anything else on the face of the
11        phone?
12   A.   No, ma'am.  Just the screen.
13   Q.   What was on the screen?
14   A.   Just the apps that are I guess -- it's an
15        iPhone 6 Plus, so I guess when you're
16        talking -- no.  It's what you see when you're
17        talking, it's got the voice.  It's got the,
18        you know, time going.
19                    If I can go get my phone, I can show
20        you like you could see when you're calling,
21        you know what I mean.  Do you want me to get
22        my phone to show you?
23                    MR. SANTICOLA:  No.
24   BY MS. OZAROWSKI:
25   Q.   No, that's okay.  How long after you noticed
```

180

```
 1          the phone getting hot did you go inside?
 2   A.     Oh, within 5 minutes because it was only 2
 3          percent, so I knew the phone was going to die.
 4   Q.     While you were speaking to Kevin on the phone,
 5          were you smoking a cigarette?
 6   A.     I was at first, but I was talking to him for a
 7          little bit.  So at first I was, yes.
 8   Q.     Where did you put the cigarette?
 9   A.     I put it out.
10   Q.     Where did you put it out?
11   A.     I stepped on it and I put it out and put it in
12          the ashtray as I came in.
13   Q.     Where was the ashtray?
14   A.     It was on the inside of the porch because we
15          have -- I have a niece and nephew and don't
16          want them picking them up.  At that time they
17          were young.
18   Q.     Mr. Stiffler, I'm going to ask you to lean
19          over a tiny bit because your face is out of
20          the screen.  Thank you so much.
21                        Was your father on the porch while
22          you were talking on the phone with Kevin?
23   A.     Yes, he was.
24   Q.     When you went upstairs to your room, was he
25          still on the porch?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

181

```
 1    A.     Yes, he was.

 2    Q.     What happened when you entered the house while

 3           you were on the phone with Kevin?

 4    A.     What happened, I put the cigarette butt in the

 5           ashtray, walked upstairs, and I told him

 6           goodbye, see you in the morning.  Plugged the

 7           phone in, took my stuff off, laid down.  And

 8           then I heard a hiss and a pop and then -- can

 9           I go in further?

10                    MR. SANTICOLA:  Let her ask and you

11           answer.

12                    THE WITNESS:  My fault.

13    BY MS. OZAROWSKI:

14    Q.     That's okay.  Let's back up a minute.  Where

15           were you when you said goodbye to Kevin?

16    A.     I was in my bedroom, ma'am.

17    Q.     Where in your bedroom?

18    A.     I was sitting -- see where that X is on the

19           bed?

20    Q.     Okay.

21    A.     That's where I was sitting right there because

22           I was getting ready to plug it in.

23    Q.     Where was the charger when you entered your

24           room that night?

25    A.     Right next to my stand that was right
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1          underneath it.  The charger and the box, the
 2          USB, whatever.
 3    Q.    What do you mean it was underneath it, what
 4          was it underneath?
 5    A.    Right underneath the stand.  There's a stand
 6          right here.  See the stand, ma'am?
 7    Q.    Yes.  So the circle next to your bed, is that
 8          what you're talking about?
 9    A.    Yeah.  It was right to the left of that.  Like
10          right there, yes, ma'am.
11    Q.    When you say right to the left of that, was it
12          on the ground, was it on the circular stand,
13          was it somewhere else?
14    A.    No, it was on the ground.  It was on the
15          ground.
16    Q.    What portion of it was on the ground?
17    A.    Just the wire and then the USB was on my
18          stand.
19    Q.    Was it plugged into the wall?
20    A.    No, it wasn't plugged in.
21    Q.    Did you plug it in?
22    A.    Yes, I did, ma'am.
23    Q.    Where did you plug it in?
24    A.    I plugged it into this outlet right here.
25    Q.    And are you indicating the outlet that's next
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

183

```
1              to the window on the far wall?

2    A.    Yes.  I unplugged the TV and I put it in

3          there.

4    Q.    Were you still talking to Kevin when you did

5          this?

6    A.    No.  I hung up with him by then.

7    Q.    When you hung up the phone with Kevin, what

8          did you see on the face of the phone?

9    A.    The phone actually I think died, so it was

10         black.  So I put it on the charger and I take

11         my clothes off and laid down.

12   Q.    Immediately after the phone died, what did you

13         do?

14   A.    Immediately after the phone died?

15   Q.    Correct.

16   A.    I plugged it into the wall and put it right up

17         on the stand.

18   Q.    Where on the -- or strike that.

19                   Would it be possible to take another

20         piece of paper and draw a circle representing

21         the night stand and then draw where the TV

22         was?

23                   MS. OZAROWSKI:  We can go ahead and

24         mark this second drawing as Exhibit B.

25                   - - - -
```

184

```
 1          (Exhibit B marked for identification.)

 2                      - - - -

 3   A.    Do you want the stand?  Repeat, please, if you

 4         could.

 5   BY MS. OZAROWSKI:

 6   Q.    Can you draw a circle representing the TV

 7         stand -- or sorry, strike that.

 8                         Can you draw a circle representing

 9         the piece of furniture that the TV was on?

10   A.    And what else?

11   Q.    Can you draw where the TV was, where the cable

12         box was, and where anything else on that table

13         was located?

14   A.    Do you want me to show you, go to the outlet,

15         everything, where the outlet was too?

16   Q.    That would be great.

17   A.    You want me to show you where the wire was and

18         everything?

19   Q.    Yes.

20   A.    I'll put where the phone was too.

21              MS. OZAROWSKI:  Mike, would it be

22         possible to take a picture of that and send it

23         to me?

24              MR. SANTICOLA:  Absolutely.

25   A.    My hands don't work.
```

```
 1                    MR. SANTICOLA:  Yeah, that's good.
 2     A.    Boy, I wish this didn't happen.
 3                    MR. SANTICOLA:  It's on its way.
 4                    MS. OZAROWSKI:  Great.  Thank you.
 5                    MR. SANTICOLA:  It's still on
 6          holdup.  It will hopefully get there in a
 7          minute.
 8                    MS. OZAROWSKI:  Great.  Thank you.
 9                    MR. SANTICOLA:  Did you get the
10          e-mail that I had sent?
11                    MS. OZAROWSKI:  I did.
12                    MR. SANTICOLA:  Were you able to
13          open it?  Was it a strange size?
14                    MS. OZAROWSKI:  It went through.
15                    MR. SANTICOLA:  Okay.  Because I can
16          do that too.
17                    MS. OZAROWSKI:  Yes.  And that --
18                    MR. SANTICOLA:  It went through.
19          You should get it.
20                    MS. OZAROWSKI:  That version of the
21          photograph or of the entire room was the old
22          one, so at some point I'll ask you to resend
23          that.
24                    MR. SANTICOLA:  Okay.
25                    MS. OZAROWSKI:  But I just received
```

186

```
 1          this second photograph.
 2                    MR. SANTICOLA:  Yep.
 3    BY MS. OZAROWSKI:
 4    Q.    Okay.  Mr. Stiffler, taking a look at this
 5          drawing that we have marked as Exhibit B, the
 6          circle represents the piece of furniture; is
 7          that correct?
 8    A.    Yes, ma'am.
 9    Q.    What was the stand made out of?
10    A.    Like a wood.  It was like a pressed wood.
11    Q.    Did it have a tablecloth or any fabric
12          covering?
13    A.    No.  No, it did not.
14    Q.    When you say it was pressed wood, do you mean
15          particle board or something different?
16    A.    No.  It was not cheap particle board.  It
17          was -- did you ever see pressed wood?  Did you
18          ever see pressed wood?  Like a post, did you
19          ever see a post?
20    Q.    Okay.
21    A.    A post, a four-sided post.  It's pressed wood
22          it's made out of.
23    Q.    Where was the stand from?
24    A.    Oh, it was right next to my bed.  I mean, it
25          was -- let me see.  I'll show you.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

187

```
 1                    MR. SANTICOLA:  Did you ask where it
 2          was from or --
 3   A.    Was it from?
 4   BY MS. OZAROWSKI:
 5   Q.    I did.  But I'm also interested in how close
 6          it was to the bed, so if you would want to
 7          tell me that first.
 8   A.    I'll show you a picture, but I have no clue
 9          where it was from.  It was from a house
10          that --
11   Q.    Approximately how old was the stand?
12   A.    It was brand new, but it was in the house.  Do
13          you see it?
14   Q.    I can see it in your drawing.  About how many
15          inches would you estimate were in between the
16          stand and the bed?
17   A.    God.  Maybe like 2 inches.  It was right
18          on -- it was actually because it had three
19          legs on it, so part of it would actually come
20          over the bed a little bit.  Do you understand
21          what I mean?
22   Q.    Yes.  When you say that the stand was brand
23          new, what do you mean by that?
24   A.    It was never used before.  It was downstairs.
25          It was never used before.  It was brand new.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

188

```
 1   Q.    Who purchased the stand?

 2   A.    My mother did.

 3   Q.    When did she purchase it?

 4   A.    I have no clue, ma'am.

 5   Q.    Was it a week before the incident?

 6   A.    No.

 7   Q.    Was it a month before the incident?

 8   A.    I don't know, ma'am.  You have to ask --

 9   Q.    At what point did you put that stand in your

10         room?

11   A.    This happened July 16th.  I'd say May.

12   Q.    How old was the television that was on that

13         stand?

14   A.    It was a brand new television.

15   Q.    When did you purchase that?

16   A.    Maybe a month before.

17   Q.    Would that be approximately June 2018?

18   A.    Yes.  Yes, ma'am.

19   Q.    Where did you purchase -- from where did you

20         purchase the TV?

21   A.    Best Buy, Robinson.

22   Q.    What kind of TV was it?

23   A.    Magnavox.

24   Q.    Was it a smart TV?

25   A.    No.  No, ma'am.
```

```
 1   Q.    When did you have cable installed in your
 2         bedroom?
 3   A.    Maybe a year before that.  So July 2017.
 4   Q.    Did the cable box have a cable wire extending
 5         from its back?
 6   A.    Yeah.  Yes, it did.  It didn't -- it screwed
 7         into the wall.
 8   Q.    Where was the wire coming out of the wall
 9         that -- the cable wire?
10   A.    Want me to draw it?  Is it all right if I draw
11         it, ma'am?
12   Q.    Yes.
13   A.    Right there is where it went into it, you
14         know, the eye, where you put the screw in.
15         And then it was just about a 5 foot distance
16         from that point to the back of the box.
17   Q.    Okay.  So for the record, you have drawn a
18         square on the top left area of the bed; is
19         that correct?
20   A.    Yes, ma'am.  Right here, top left.  Yes,
21         ma'am.
22   Q.    Sorry.  I was misunderstanding.
23   A.    Here, and came right into here.
24   Q.    So the cable connection was to the left of the
25         bed on the wall; is that correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

190

```
 1   A.    Yes, ma'am.  And then there was a -- you know,
 2         I can go into the closet right there too.  It
 3         was to the left of the closet door.
 4   Q.    Okay.  And why did you have the cable
 5         installed in July of 2017?
 6   A.    When I moved into that room.  I was living
 7         next door.  We had a duplex.
 8   Q.    Did you have a TV in the room prior to the
 9         Best Buy TV you purchased in 2018?
10   A.    I had the 55-inch TV and it went -- it didn't
11         went.  It didn't go.  It was very dark and I
12         couldn't see it.  You know, it was an older
13         model, so it was -- not just wasn't -- it
14         wasn't an older model.  It was an RCA Cinema.
15         So it was like a 2014, but it was dark.  And
16         my eyes aren't real good, so that's why I
17         brought that up closer like that.
18   Q.    So when you first had that cable wire
19         installed, was it connected to the 55-inch TV
20         that was across from the room from your bed?
21   A.    No, ma'am.
22   Q.    To what was it connected?
23   A.    What was what connected, ma'am?  The cable?
24   Q.    Yes.  The cable cord.
25   A.    It was connected to the 27-inch TV.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

191

```
 1   Q.    From July 2017 to the time that you purchased

 2         the 27-inch TV in 2018, was the cable

 3         connected to anything?

 4   A.    What do you mean?  To the box?  I'm not

 5         understanding what you're saying.

 6   Q.    Sorry.

 7   A.    Was it connected to the box?

 8   Q.    Let me try to clarify that.  So your testimony

 9         is that the TV that was next to your bed at

10         the time of the fire was purchased around June

11         2018; is that correct?

12   A.    2017.  Yeah, it was a month before.  About

13         2/28 yeah, that's right.  June.  June.

14   Q.    Prior to that time, so your testimony is also

15         that the cable was installed in July of 2017.

16         From July of 2017 to about June of 2018, did

17         you have cable in your bedroom?

18   A.    No.  Nope.

19   Q.    Why did you have the cable installed in 2017?

20   A.    Because I just wanted to have cable in my

21         room.

22   Q.    Was it connected to anything until you

23         purchased the 27-inch TV in 2018?

24   A.    No.

25   Q.    Were you paying for cable service from July
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

192

```
 1           2017 to June 2018?
 2    A.     Yes.
 3    Q.     So turning back to this drawing you have made
 4           of the TV stand.
 5    A.     Yes, ma'am.
 6    Q.     In the middle of this circle, there is a
 7           rectangle with another rectangle inside of it.
 8           Can you explain that to me?
 9    A.     There's the table, there's the -- I'll show
10           you.  There's the table.
11    Q.     Yes.
12    A.     There's the phone.
13    Q.     Okay.
14    A.     There's the box on top.  The box was the box
15           was -- I think I had the box below.  My fault.
16           It was like a pedestal stand.  Like your
17           27-inch TV has those two legs that go like
18           that, and I had the box on top of the TV.
19    Q.     So let me make sure I understand your
20           testimony correctly.  You have just for the
21           record indicated that the rectangle that has
22           an arrow going to it that says phone, that is
23           intended to represent the iPhone; is that
24           correct?
25    A.     Yes.  This is the iPhone right here.
```

1    Q.    And you're indicating the rectangle, that you

2          have an arrow to it that says phone; is that

3          correct?

4    A.    Yes.  It says phone.

5    Q.    And then there are two rectangles, one inside

6          of the other rectangle, and those are intended

7          to represent the TV and the cable box; is that

8          correct?

9    A.    Yes, ma'am.

10   Q.    And if I understand your testimony correctly,

11         the cable box was on top of the TV, is that

12         accurate?

13   A.    No.  The TV was on top of the cable box.

14   Q.    So was this TV a thin TV?

15   A.    Yeah.  It was like a flat TV.  It didn't

16         have like the legs that go like vertical legs,

17         you know, vertical legs.

18   Q.    So you had the cable box -- am I correct in

19         understanding you that you had the cable box

20         underneath the TV in between the TV's two

21         legs?

22   A.    Yes.  I had the two legs and then I had the

23         cable box underneath the TV.  Like the only

24         thing you could see was the two legs.

25   Q.    Understood.  Now, can you show me that picture

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

194

```
 1          again?  It's a little bit different from the
 2          one that your attorney sent me.  On the upper
 3          left side of the bed, there's what looks to me
 4          like a square with a circle on it?
 5    A.    Yeah.  That's to go into the cable.  You know
 6          how it has like a threading that you go in.
 7    Q.    Okay.  All right.  So --
 8    A.    It goes in and it comes to the cable box and
 9          then it threads back in there.
10    Q.    So the connection to the cable that would lead
11          to outside of the house, was that underneath
12          the bed or behind the bed?
13    A.    What's that?  The cable that was --
14    Q.    Correct.
15    A.    You mean -- I'm trying to understand.  Repeat
16          that again.
17    Q.    So the way that the cable cord entered your
18          bedroom was through a port by the bed; is that
19          correct?
20    A.    Yeah.  They drilled I guess the side of the
21          house that came in through the vinyl siding
22          and then came in like that.  I don't remember.
23          I'm not sure.
24    Q.    Where was that connection, was it underneath
25          the bed, was it behind the bed, was it above
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

195

```
 1          the bed or something different?
 2    A.    No, it was right there.  Right beside it.
 3          Right on the other side of entering that
 4          closet -- I mean, the closet.  My fault.  See
 5          how it entered, it came through here and it
 6          was right here.  And you can enter the closet
 7          right through here and it entered right there.
 8    Q.    So now you're --
 9    A.    It came into the side of the house.
10    Q.    So to clarify for the record.  You're
11          indicating there's a dot that's to the left of
12          the bed, that that's on the bed, and that's
13          where the cable came into your bedroom; is
14          that correct?
15    A.    This, this right here.  This dot I put right
16          here is because I put the bed over there.  I
17          didn't know I would be drawing that.  This is
18          the table where you put the -- that has the
19          threading that you would put in.  You know
20          what I'm talking about?
21    Q.    Yes.  I understand.  I think my confusion is
22          that right now there are two different areas
23          and I'm not sure which one.
24    A.    Because I didn't know.  Let me get this out of
25          the way.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

196

```
 1   Q.    Okay.  Perfect.  So now you have removed the
 2         square with the dot in it from on the bed?
 3   A.    Yes.  It wasn't on the bed.  That's because I
 4         made that after.  I put the bed up.
 5   Q.    Perfect.  Now I understand you.  Was there
 6         anything else on that TV stand, the table,
 7         prior to the fire?
 8   A.    There's nothing on there.  Just my phone was
 9         on there and I had a TV.  Nope.  Just the TV
10         and the box and I had a controller that I put
11         up there.  That's it.
12   Q.    When you say controller, was that a remote for
13         the TV or a remote --
14   A.    Yeah, the Verizon controller.  Sorry.
15   Q.    Where was the TV -- or rather the cable
16         controller on the TV stand?
17   A.    I'm guessing.  I'm not sure.  I don't know.
18   Q.    Were there any articles of clothing on the TV
19         stand?
20   A.    No.  No, ma'am.
21   Q.    Were there any pieces of paper on the piece of
22         furniture?
23   A.    No, ma'am.  No, ma'am.
24   Q.    When you entered your room the night of the
25         fire, was your bed made?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

197

```
 1    A.    Yes, it was.

 2    Q.    Who made your bed?

 3    A.    I do in the morning.

 4    Q.    What was on the bed?

 5    A.    I just had my comforter.  And then I had a

 6          Steeler blanket because it was summertime.

 7          And then I had my pillows underneath the

 8          Steeler blanket.  That's it.  Steeler blanket

 9          and there was a comforter underneath there.

10          And there was a sheet underneath that and

11          there was like, you know, all of my linens.

12    Q.    Was there a fitted sheet on the mattress?

13    A.    Yeah.  Below the sheet there's a fitted one

14          where it stretched.

15    Q.    Did you have a mattress pad on the mattress?

16    A.    No, ma'am.

17    Q.    Was this a platform bed or a bed that had a

18          mattress and a box spring or something

19          different?

20    A.    No, it was a mattress with a box spring.

21          Mattress and a box spring.

22    Q.    What size bed was it?

23    A.    Queen.

24    Q.    How old was the bed?

25    A.    Three or four years old, tops.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

198

```
1    Q.    How many pillows did you have on the bed?

2    A.    Four.

3    Q.    Where were they?

4    A.    At the top.

5    Q.    What type of pillows were they?

6    A.    Just regular pillows.  They weren't no

7          feathered pillows or anything.  They were just

8          regular pillows.  Like cotton in them.

9    Q.    Were any of them gel pillows or memory foam or

10         anything like that?

11   A.    Nope.  No, ma'am.

12   Q.    Did the pillows have pillowcases on them?

13   A.    Yes, ma'am.

14   Q.    What fabric were the sheets and the

15         pillowcases made out of?

16   A.    Cotton.

17   Q.    Was there anything else on the bed prior to

18         the fire?

19   A.    No, ma'am.

20   Q.    Did you change into pajamas before going to

21         sleep that night?

22   A.    No.  I sleep in my boxer shorts.

23   Q.    When did you take off the clothing that you

24         had worn that day?

25   A.    Right after.  I'm not going to guess.  I don't
```

**Johnstown - Erie - Pittsburgh - Greensburg**
**866-565-1929**

```
 1          remember.  I'm sure right before I went to
 2          bed, but -- you know, right after I plugged it
 3          in, I'm sure I took my clothes all off.  I
 4          sleep with just my boxer shorts on.
 5     Q.   At the time of the fire, what were you
 6          wearing?
 7     A.   I was wearing shorts.  I had flip-flops and a
 8          tank top.
 9     Q.   When you say shorts, do you mean shorts you
10          would wear outside or boxer shorts or
11          something else?
12     A.   No.  Shorts you would wear outside.  They were
13          swimming shorts because I was fishing.  They
14          were swimming shorts.
15     Q.   You testified earlier that the night of the
16          fire you took out your teeth, when did you do
17          that?
18     A.   I did that prior when I was washing my -- I
19          washed my face, took out my teeth and put my
20          Polident in.  And then I came in and did, like
21          I said -- you know, I came in, the phone was
22          down.  The phone was actually dead and then I
23          plugged it in.  And I'm sure I took off all of
24          my clothes right there.  As I was sitting
25          right here, I was probably sitting right here
```

```
 1           like I always do and I took all of my clothes
 2           off and then I always sleep on my right side.
 3    Q.     Let's back up for a moment.  Do you have
 4           your -- strike that.
 5                        In 2018, did you have your own
 6           bathroom?
 7    A.     Yeah, pretty much is mine, yes.  Yes.
 8    Q.     Where is that in relation to your bedroom?
 9    A.     It's a pretty big home.  As soon as you came
10           out of the door right here, the door is
11           right -- let me see.  It's right --
12    Q.     You can use the other picture if that's easier
13           because that one has the door on it.
14    A.     This is kind of small, but walked here,
15           there's stairs here.  It was a big bedroom.
16           There's the door right there.
17    Q.     Right there, you're indicating the bottom
18           right of the room; correct?
19    A.     Yes.  So yes.  So walk here, then the stairs
20           are right here.  You see the stairs right
21           there?
22    Q.     I see two lines that are right outside of the
23           door.
24    A.     Those are stairs.
25    Q.     Okay.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

201

```
 1    A.    And then I make a left right here and I open
 2          the door and the bathroom is right here.
 3    Q.    And you --
 4    A.    Kind of like --
 5    Q.    You have marked this on the diagram as
 6          bathroom; correct?
 7    A.    Yes.  Yes, ma'am.
 8    Q.    So when you're saying right here, you're
 9          indicating the area you have marked bathroom;
10          correct?
11    A.    Yes.  Just say this to help you out.  See how
12          the closet was back here, when I showed you
13          the closet in my bathroom --
14    Q.    And back here you mean --
15    A.    -- if you kept on extending it, it would be
16          the bathroom.
17    Q.    Great.  We're getting a little sloppy with
18          talking over each other.  Let's try very hard
19          not to speak over each other.
20    A.    I'm sorry.
21    Q.    So the bathroom that you have drawn on your
22          diagram, is that where you washed your face
23          and took out your teeth the night of the fire?
24    A.    Yes, ma'am.
25    Q.    Were you still on the phone with Kevin when
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

202

```
 1          did you this?

 2    A.    No, I was not.  Nope.  I was not on the phone

 3          with him.

 4    Q.    Where was the phone while you washed your

 5          face?

 6    A.    It was in my bedroom.

 7    Q.    Where in the bedroom?

 8    A.    I had it charging.  I just plugged it in and

 9          went in and cleaned my face up real quick.

10          And then I came in, took my clothes off, laid

11          down.  A hiss and a pop.  That's why I'm not

12          going to get too far ahead because I'm very

13          agile and very athletic.  I could -- just knew

14          as soon as I got up, I knew something

15          happened.  I knew that phone exploded because

16          I wouldn't let myself get burned like that.

17          Just a little cigarette ash would make me

18          jump.

19    Q.    To clarify your testimony from before.  What

20          were you wearing when you laid down on the bed

21          before the fire?

22    A.    I had my shorts -- I had my swimming trunks

23          on, a tank top and flip-flops and I had a hat

24          on, my Marine Corps hat.

25    Q.    Now, I believe you also testified that you
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

203

```
 1          took off your clothes and you were only

 2          wearing your boxers?

 3   A.     Boxers, yes, ma'am.

 4   Q.     So when did that happen?

 5   A.     When did it happen?  Right before I laid down

 6          to go to bed.

 7   Q.     Okay.  Was this after you had washed your

 8          face?

 9   A.     Yes, this is after.  I was going to bed.

10   Q.     Where did you put your clothes?

11   A.     I put them on the chair in the corner.

12   Q.     And you're indicating on the diagram the chair

13          in the bottom left corner of the room;

14          correct?

15   A.     Yes, ma'am.

16   Q.     The boxers that you wore to sleep, had you

17          been wearing them during the day under your

18          swimming shorts or was this something you put

19          on?

20   A.     They were underneath my swimming shorts.

21   Q.     How long was the phone charging from the time

22          you plugged it in to charge until you laid

23          down to go to sleep?

24   A.     Within 5 minutes.  I heard a hiss and a pop

25          and that was it.  And then I can remember --
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1          can I keep going?
 2    Q.    Well, let me try to get an answer first to
 3          that question.  So my question was --
 4    A.     Five minutes.
 5    Q.    So just to clarify that we're talking about
 6          the same thing.  I'm asking you how long the
 7          phone was charging between the time you
 8          plugged it in and the time you laid down to go
 9          to sleep?
10    A.     Within 5 minutes.
11    Q.    And during that 5 minutes was when you washed
12          your face, took out your teeth and took off
13          your clothes; is that correct?
14    A.     Yes.  Yes, ma'am.
15    Q.    How did you lay down on the bed when you laid
16          down?
17    A.     I laid down to my right.  I lay like this.  I
18          always lay like this.
19    Q.    So like this, you're indicating laying on your
20          right shoulder?
21    A.     On my right side.  My right side.  I'm towards
22          the TV.  So when I laid down, there's the bed,
23          I laid down towards the TV.
24    Q.    Okay.  Can you show me the picture of just the
25          TV stand and the bed?  Can you show me the
```

```
 1          other picture?  Because the two pictures are a
 2          little different, and which is fine, nobody
 3          expects you to be an artist here.  Can you
 4          tell me at what level of the bed was the TV
 5          stand specifically, because in the picture
 6          that's above the TV stand, it's sort of in the
 7          middle of the bed.  In the other picture --
 8     A.   In the --
 9     Q.   Let me finish first.  In the other picture,
10          it's closer to the end of the bed.  Where was
11          the TV stand in relation to the bed?
12     A.   The TV stand is pretty much on the bed, but it
13          was 8 inches, about 8 inches, above the bed.
14     Q.   Okay.
15     A.   Not even that.  I would say 6 inches.  Not
16          even that.  I mean, it was like just above my
17          mattress, so --
18     Q.   And how far away from the head part of the
19          mattress was the TV stand?
20     A.   How far?  Two feet, if that.  Within 2 feet.
21          Two feet.
22     Q.   So was the TV stand closer to the head of the
23          mattress or the feet of the mattress?
24     A.   Oh, the head.  Definitely the head.  It was
25          definitely to the head.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

206

```
 1    Q.    And so was your bed pressed up against that
 2          back wall?
 3    A.    Yes, it was, ma'am.
 4    Q.    So how far away from the wall was the TV
 5          stand?
 6    A.    I'd say about 3 feet tops.  Not even that.
 7          Two and a half feet.  Two and a half feet.
 8          Not before I could -- because my eyes were
 9          bad.  I had the stand and the TV pretty close.
10    Q.    So just to clarify on the two diagrams that
11          you drew.  The TV stand should be about 2 to 3
12          feet from the back wall; is that correct?
13    A.    Two and a half.  Two feet I'd say more or
14          less, yes.
15    Q.    When you laid down in the bed that night, was
16          anything -- or strike that.
17                      When you laid down on the bed that
18          night, what was across from you?
19    A.    What was across?
20    Q.    Let me ask that a better way, so strike that.
21                      When you laid down in the bed that
22          night, where was your face in relation to the
23          TV stand.
24    A.    I'd say a foot and a half tops from the TV
25          stand because here's my body.  I'm laying
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

207

```
 1            down.  See my body on the bed?  That stand is
 2            about right here.  So you're saying very --
 3            I'd say a foot and a half in between right
 4            here.
 5    Q.   So now just to clarify for the record.  You
 6            have drawn a figure on Exhibit B.  Can you
 7            hold it up again, please?
 8    A.    Yes.
 9    Q.    And the rectangle I'm assuming is the pillow;
10            is that correct?
11    A.    Yes, ma'am.
12    Q.    And the shape on top of that rectangle, is
13            that meant to indicate your head?
14    A.    Yes, ma'am.
15    Q.    And then the rest of that drawing is your arms
16            I'm assuming, your torso, am I correct?
17    A.    Yes.  Just to get you clear, there's a window
18            like right not too far behind the TV stand.
19            And the top got in there pretty quick and that
20            blew it, it blew the window out.  It made a
21            lot of force to knock me out too.
22    Q.    When you got into the bed that night, did you
23            get underneath any of the covers or the sheet?
24    A.    Just that Steeler blanket, like a fleece one.
25            A little fleece blanket you have -- what you
```

```
 1            call those, a throw-over.  I got underneath
 2            that.
 3     Q.    Where was the comforter when you laid down
 4            that night?
 5     A.    I was laying on top of it.
 6     Q.    Where were the sheets?
 7     A.    Underneath the comforter.  Still, you know,
 8            stuff gets messed up, you know.  You know, I
 9            still make my bed every day still because I'm
10            training to make my bed every day.  You know,
11            there's just so much right now.
12     Q.    After you laid down on the bed, it's my
13            understanding that you put the blanket on top
14            of yourself --
15     A.    Yes, ma'am.
16     Q.    -- while you were on top of the comforter and
17            the sheets; is that correct?
18     A.    Yes, ma'am.
19     Q.    And it's my understanding from your drawing
20            that you put your head on at least one of the
21            pillows; is that right?
22     A.    Yes, ma'am.  There's two pillows because I had
23            two pillows, one pillow underneath and another
24            pillow and another pillow underneath another
25            pillow.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1    Q.    Where were the other two pillows?

 2    A.    Just right next to me.

 3    Q.    Were they --

 4    A.    Because I was -- you know, if someone else was

 5          sleeping next to me, they would have their two

 6          pillows.

 7    Q.    Were the two pillows next to you behind you or

 8          in front of you?

 9    A.    They are behind me, ma'am.

10    Q.    When you laid down on your bed, did you fall

11          asleep?

12    A.    No, because the blast, I heard it.  And then I

13          must have after it knocked -- can I go into

14          this a little bit?  No?

15    Q.    Sure.  Why don't you walk me through exactly

16          what happened from the moment you put your

17          head on the pillow to the moment of the

18          incident?

19    A.    Okay.  What happened was that happened, that

20          hiss, pop.  And then I can remember I got up

21          and I fell and I fell right on my mattress and

22          you can see where it hit the mattress.  Just

23          the left side right here.

24                MR. SANTICOLA:  Walk her through

25          what happened.  Like go step by step what
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

210

```
 1          happened.
 2    A.      Yeah.
 3    BY MS. OZAROWSKI:
 4    Q.      Sorry.  Let me clarify to try to make it
 5            easier for you.  Can you walk me through what
 6            happened right after you put your head on the
 7            pillow?
 8    A.      I laid down for about, let's say, three or
 9            four minutes and I hear the hiss and a pop.
10            And then --
11    Q.      Sorry.  Not to interrupt you.  Just to get all
12            the information we can.  Did you fall asleep
13            during that three to four minutes?
14    A.      No.  No.  I was up, but it knocked me out and
15            it felt like I was dreaming.  So when I got
16            up, I got up and I seen that this side where
17            the TV is and everything is on fire.  Right
18            here.
19    Q.      Okay.  So --
20    A.      At this point, from this point I was on fire.
21            And it had -- so at that point it was -- I
22            don't know how much longer I was knocked out.
23    Q.      Okay.  So --
24    A.      All I know is I fell down and you can see
25            where I fell into the side of the bed.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

211

```
 1    Q.    Let's back up for a moment.  And so I
 2          understand from your testimony that you laid
 3          down and put your head on the pillow for about
 4          three to four minutes, then you heard
 5          something.  Can you describe to me what you
 6          heard?
 7    A.    I heard like a hiss and then it went pop.
 8    Q.    How long was the hiss?
 9    A.    It was short, very short.  I mean, I'm saying
10          within 5 seconds and it was pop.
11    Q.    What did the hiss sound like, if you can
12          describe it?
13    A.    Did you ever hear -- like when you let off a
14          green firework, you know, fire -- like say a
15          firework, there's a green thick wick.  It
16          sounded like that type of wick.  It was a very
17          loud hiss.  Like a hiss and then a pop.  Not
18          like a -- you know, I don't know.  You know
19          what I'm talking about.  A wick, it sounded
20          like that.  It was a hiss, like that.  Let's
21          just say a snake hiss, like a hiss, pop.
22    Q.    And do I understand from your testimony that
23          you estimate that hiss lasted about 5 seconds?
24    A.    If that, yeah.  It was so quick.  It was so
25          quick.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

212

1    Q.    What did the pop sound like, if you can
2          describe it?
3    A.    It wasn't real loud.  I been around a lot of
4          loud pops, it knocked me out.  I don't know
5          how to explain the pop.
6    Q.    Where were you when you heard the hiss?
7    A.    I was sleeping in my bed.  I was just looking
8          -- you know, I sleep on my right side, so --
9    Q.    So for clarity, when you say you were
10         sleeping, were you asleep?
11   A.    I wasn't sleeping.  I was laying down trying
12         to go to bed and it popped.  I was not
13         sleeping yet.
14   Q.    Did you open your eyes when you heard the
15         hiss?
16   A.    No, I did not.  I did not open my eyes.  The
17         first time I opened my eyes is when I got up
18         and I looked around and then I fell.  And then
19         when I fell, that's when my neck got all
20         messed up.
21   Q.    So where were you when you heard the pop?
22   A.    I don't know.  In the bed I guess I'm sure.
23         It knocked me out and I had to get back up
24         because --
25   Q.    What knocked you out?

 1   A.    The phone knocked me out.

 2   Q.    Can you explain that to me?

 3   A.    The phone exploded, it knocked me out.

 4   Q.    When did the phone explode?

 5   A.    I'm saying right within that hiss, then pop.

 6         And then it right after that hiss and a pop, I

 7         went out because I don't remember nothing from

 8         that point.  I remember getting up.

 9   Q.    Did you see the phone explode?

10   A.    No, I did not.

11   Q.    When you say you remembered getting up, was

12         that before or after the pop?

13   A.    After the pop.

14   Q.    So what happened at the time of the pop?

15   A.    I just went out.  It was like nothing.  It

16         was -- I went out.  I remember nothing.  And

17         when I got up, it seemed like I was dreaming.

18         And then when I got myself up, then I fell.

19   Q.    How did you -- can you describe to me how you

20         got yourself up, did you stand up, did you sit

21         on the bed?

22   A.    I got up and I was already up like this.  When

23         I got up, I was up and then my body dropped.

24   Q.    So to clarify for the record, you're saying

25         when you got up, you mean you stood up fully

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

214

```
 1            out of bed; is that correct?
 2    A.    I don't remember.  I had to have.  I had to
 3          have.  Unless God picked me up and did it, I
 4          mean.  Seriously, I don't - I'm just saying I
 5          was standing up.  And then I seen that
 6          concentrate area on this side on fire, like
 7          that all on fire right there.  And then --
 8    Q.    Just to clarify the record.  When you're
 9          saying you saw this area on fire, you have
10          drawn some lines in between the TV stand and
11          the wall perpendicular to the pillows on the
12          bed; is that correct?  Or correct that, sorry.
13                      You have drawn some lines that are
14          in between the TV stand and the wall to the
15          left of the bed; correct?
16    A.    It was on fire all through here.  I do not
17          remember standing up.  I remember looking
18          around and it was just engulfed, you know, and
19          then I fell --
20    Q.    Where did you --
21    A.    -- and then it --
22    Q.    Where did you see the fire, was it on the TV
23          stand, was it on the floor or somewhere else?
24    A.    It was on the TV stand right here and it ran
25          like up into the like closet.  It was all here
```

```
 1          and the fire here on the cover, which was the

 2          comforter -- not the cover, not the

 3          throw-over, but the cover was engulfed.  And I

 4          must have been out for at least 5 minutes for

 5          it to be inflamed that much.

 6     Q.   When you say the cover was engulfed, what

 7          cover do you mean?

 8     A.   The comforter, the comforter was.  Then it was

 9          like a dream.  It was so weird.

10     Q.   So I'm just going to focus on exactly what you

11          saw when you opened your eyes for a minute.

12          Did you see fire on the floor?

13     A.   No.  Because how I was on that, no, I did not

14          see fire on the floor.

15     Q.   At what point did you stand up?

16     A.   I don't know.

17     Q.   When you opened your eyes, how far away from

18          you was the fire?

19     A.   Oh, it was right there.  It was right there.

20          It was so much engulfed in that time and I was

21          burnt and I woke up burnt very bad.  It was

22          engulfed.  That's why --

23     Q.   When you say it was engulfed, what are you

24          meaning?

25     A.   The bed was, the bed and the comforter.  This
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

216

```
 1          whole side was.  And then it caught up
 2          through -- it was just all through here.
 3   Q.    When you say all through here, you're talking
 4          about the pillow area of bed?
 5   A.    Yeah.  That's why when I fell, I got burned
 6          right there really concentrated.
 7   Q.    When did you fall?
 8   A.    As soon as I got up and I walked, I was
 9          falling.  As soon as I looked around, it was
10          basically within 5 seconds I fell.  It was not
11          like real.  It was -- I mean, it was real, but
12          it was like in my mind I was dreaming, you
13          know what I mean.  That was -- but I knew I
14          fell.
15                       That's why I said when I went into
16          the hospital, they were scrubbing me real bad
17          right here and I said I got burnt really bad
18          right there, but they couldn't see it at
19          first.  But three months later it all came
20          out, I mean, the burns.  I don't know.  I have
21          pictures.  It took -- because I was burned so
22          bad, it took three months for it to even show
23          itself.
24   Q.    So backing up a little.  When you fell, where
25          did you land?
```

```
 1                  MR. SANTICOLA:  If you know.
 2    A.    All I know, I fell and I woke up and I was on
 3          the ground.
 4    BY MS. OZAROWSKI:
 5    Q.    Where on the ground were you?
 6    A.    I was right by the dresser.  Here's the
 7          dresser right here.
 8    Q.    Hold it up a little higher.  I'm sorry.  I
 9          can't see.
10    A.    This isn't that hard.  This is probably about
11          a foot and a half from the bed to the dresser.
12    Q.    And the --
13    A.    When I woke up and I crawled out of my
14          bedroom, I had to crawl because my skin was
15          flattened.
16    Q.    Okay.  So just to clarify what you just
17          explained.  You were saying when you fell, it
18          was to the right side of the bed, so in
19          between what you have marked as the dresser
20          and the bed; is that correct?
21    A.    Yeah.  Yeah, I'm sure to get myself away from
22          that, you know, the concentration of fire that
23          was right there is I'm sure I went to the --
24          I'm sure I didn't want to go to the fire.  I
25          don't remember.  I can't say anything because
```

```
 1          I don't remember.
 2   Q.    When you say that concentration of the fire,
 3         where do you mean?
 4   A.     It was by the TV and right, you know, it was
 5         by the TV and it was along the comforter and
 6         so I'm just saying when I got up, I fell.
 7         And, like I said, I don't remember.  And I can
 8         remember waking up, Army crawling a little
 9         bit.  And then I went out again.  And then all
10         of a sudden I got into the open of my house
11         because as you come up the steps of my home, I
12         must have been able to -- I was grabbing fresh
13         air.
14                   MR. SANTICOLA:  Only if you
15         remember.  Don't guess.
16   A.     No, I was grabbing fresh air.  But my mom said
17         I yelled house fire, house fire three times.
18         But on the fourth time, I grabbed my breath
19         and I yelled house fire one more time.  So
20         that was the fourth time, but I can't say
21         that.  My mom is saying that.  She said I said
22         it four times, but the fourth time I remember
23         because like I got that fresh air in me or
24         else she would have died in the bedroom.
25   BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1   Q.    Did you have a smoke alarm in your room?

 2   A.    No.

 3   Q.    Was there smoke alarm in the hallway near your

 4         bedroom?

 5   A.    I don't believe so.

 6   Q.    Backing up for a moment.  When you said you

 7         plugged in the phone prior to the fire, did it

 8         have the case that you described last session

 9         on it?

10   A.    Yeah, it had the Lifeproof case on it.

11         Actually my best friend bought that Lifeproof

12         case for me.

13   Q.    When you laid down and you put the cover over

14         you prior to the fire, what portion of your

15         body did the cover cover?

16   A.    I'm 6 foot 3, so it came up to about here.

17   Q.    And by here, you're indicating your chest?

18   A.    My lower chest.  My lower chest.

19   Q.    Were your arms under or over the blanket?

20   A.    They were over.  They were over.

21   Q.    Where were your arms and your hands when you

22         laid down?

23   A.    My left hand was over the comforter and this

24         hand I'm sure was like this and it hangs over

25         the mattress.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

220

```
 1   Q.    So your right hand hangs over the mattress to
 2         what?  I can't see.
 3   A.    I'm sorry.  I'm like this, you know, sleep
 4         like this.  This was above this.  Can you see
 5         that now?
 6   Q.    When you say this, where was your right hand,
 7         was it over the floor or something else?
 8   A.    Yeah, thank God.  Yes, it was not in the path
 9         of it.  Because my right hand is my power
10         hand.
11   Q.    And if I understand from your testimony, your
12         left hand was on your thigh or part of your
13         leg; is that correct?
14   A.    I do not know.  I know it was on the top of
15         it.  I just don't know where it was at.  But
16         it was enough for it to get damaged as bad as
17         it is.
18   Q.    At the time of the hiss and the pop, where was
19         your face facing?
20   A.    Towards the TV.  I know it was because that's
21         the way I lay.
22   Q.    When you laid down on the bed, on what part of
23         the bed did you lay, meaning were you on the
24         left side of the bed, were you in the middle
25         of the bed or were you on the right side of
```

```
 1        the bed?
 2   A.    I was on the left side of the bed.
 3   Q.    Did you take your sleeping medication the
 4         night of the fire?
 5   A.    No, I did not.  No, I did not.
 6   Q.    Why not?
 7   A.    Because my mom was sleeping and I didn't want
 8         to wake her up because she has to get up for
 9         work early and I don't fish too much like at
10         nighttime.  I used to kayak fish and I just
11         didn't wake her up.
12   Q.    Why would you need to wake up your mother, did
13         she have your medication or something?
14   A.    Yeah.  She -- yeah.  Because when I fish, I'm
15         afraid my medicine -- I got my medicine right
16         before.
17   Q.    I'm sorry.  I didn't hear what you said.
18   A.    I have got my medicine right before.  I'm on
19         the Ohio River, it's kind of like -- like when
20         you fish -- like I fish for a flathead
21         catfish.  So sometimes you have to go in and
22         get the catfish because they'll wrap around
23         the rocks.  So I give her all of the medicine
24         so I don't lose my medicine because I need
25         that medicine.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

222

```
 1   Q.   Had you taken your Methadone the night of the
 2        fire?
 3   A.   No, I did not.  I took 40 earlier in the
 4        morning.
 5   Q.   Why didn't you take the Methadone that night?
 6   A.   I was constipated and I was -- I was trying to
 7        get myself to go to the bathroom.  And he has
 8        me on so much Miralax lately, and I was trying
 9        to get myself to go because I know the
10        Methadone is doing it.
11   Q.   At the time of the hiss, did you smell
12        anything?
13   A.   I don't remember.  I don't remember.
14   Q.   Did you smell anything in your room at any
15        point before the fire?
16   A.   No.  No.
17   Q.   At the time of the hiss, did you see any
18        smoke?
19   A.   I don't remember.
20   Q.   At the time of the pop, did you see any smoke?
21   A.   No.  I don't remember.
22   Q.   Do you remember seeing smoke in the room at
23        any point either just prior to the fire?
24   A.   Not until I got up.  Then I looked around and
25        that's when I fell.  That's the only time I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

223

```
 1            seen the smoke and the fire, that's it.  Then
 2            what I recall is like seconds.  And then I can
 3            remember grabbing breath when I got to the
 4            staircase.  I guess it was my fourth yell, but
 5            I can't say that.  My mom was -- that's
 6            hearsay, so you can talk to my mom.
 7     Q.     Why did you Army crawl to the door rather than
 8            walk?
 9     A.     I was -- I'm sure I could not get myself up
10            because I have pictures with my hands like
11            that.  They got burnt so bad, they were
12            flattened, both sides of my hands from going
13            like this.  They were flattened from the heat.
14     Q.     When you say going like this, do you mean
15            leaning on your hands?
16     A.     To Army crawl.  Do you want to know what Army
17            crawl is?
18     Q.     I'm just asking you to describe.
19     A.     Oh, yeah.  Like Army crawl, so I was going
20            like this, this.  I'm sure -- I don't know how
21            else they could get flattened like that.
22     Q.     And just to remind you, because we have the
23            court reporter writing down everything that
24            you say, if you're going to say something like
25            the phrase like this, please describe what you
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

224

```
 1          mean by like this.  Do you understand?
 2   A.     Okay.  Yes, ma'am.
 3   Q.     Was there smoke in your room when you got up
 4          from the bed?
 5   A.     Yes.  Yes, there was.
 6   Q.     What color was it?
 7   A.     It was so thick, I can't really remember.  It
 8          was just so thick that I couldn't -- the light
 9          was hardly visible.  I can't remember the
10          color.  It was just so -- I don't know.  It
11          was just like like it -- I cannot say exactly
12          what color it was, but it was so thick, I
13          cannot see -- I could hardly see the light
14          bulb.
15   Q.     Had you turned off the light before you went
16          to bed or left it on?
17   A.     My bedroom light?
18   Q.     Correct.
19   A.     Oh, I turned it off.  But somehow, I was able
20          to see that it was so -- I don't know.  I was
21          able to see that.  See, I remember parts,
22          so --
23   Q.     When you say you could see the light bulb
24          through the smoke, what light bulb do you
25          mean?
```

```
 1   A.    The light bulb in my room.  My father got me

 2         out of there.  I'm sure when he talks to you,

 3         he can tell you how fast and how bad it got.

 4   Q.    Okay.  So right now I'm just asking you about

 5         your recollections.

 6   A.    Yes, I know.

 7   Q.    And from what you recall, when you say you saw

 8         the light bulb through the smoke, was the

 9         light on or off?

10   A.    I must have got up and turned the light on.  I

11         just don't -- I just can't recall.

12               MR. SANTICOLA:  Tell her.

13   A.    I can't recall.  I can't recall.  Can we take

14         a little 5-minute break here in a little bit?

15               MR. SANTICOLA:  How much more you

16         got, quite a bit?

17               MS. OZAROWSKI:  I'm sorry?

18               MR. SANTICOLA:  How much more do you

19         have for Robert?

20               MS. OZAROWSKI:  We do.  I mean, we

21         haven't discussed his treatment after the

22         incident.

23               MR. SANTICOLA:  Yeah.

24               MS. OZAROWSKI:  And then I wanted to

25         ask him about a few pictures and then his
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

226

```
 1            current condition and any special damages,

 2            anything like that.

 3                      MR. SANTICOLA:  Okay.  You need 5 or

 4            do you want to keep going?

 5                      THE WITNESS:  No, I need a little

 6            bit of a break.  I need to take a break.

 7                      MR. SANTICOLA:  Okay.  We'll do 5

 8            minutes.  We'll do a quick one.

 9                      THE WITNESS:  How much longer do you

10            have?

11                      THE VIDEOGRAPHER:  The time is

12            12:56 p.m.  We're off the video record.

13                          - - - -

14       There was a brief Recess in the proceedings

15                          - - - -

16                      THE VIDEOGRAPHER:  The time is

17            1:02 p.m.  We're now back on the video record.

18  BY MS. OZAROWSKI:

19  Q.    Before you left your bedroom, do you recall

20        coming into contact with any of the fire?

21  A.    No, I don't.

22  Q.    It's my understanding that you sustained burns

23        to your face, to your neck and your hands and

24        your feet, is that accurate?

25  A.    Yes, plus more.  My neck, my whole forehead
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

227

```
 1          here, this is all Cardova.  This is all hog
 2          intestine.
 3                    MR. SANTICOLA:  Just tell her where
 4          you were burned.  Is that your phone?  Sorry,
 5          there's a phone ringing in the background.
 6    A.    My whole forehead got burned out.
 7                    MR. SANTICOLA:  Remember, just
 8          answer the question she's asking.  We'll get
 9          into that later.
10    A.    This was burned right here.
11                    MR. SANTICOLA:  You have to describe
12          it because right here, they can't get that on
13          the record.
14    A.    I was going to.  The forehead, burned all of
15          my forehead off.  All of my head was all
16          burned.  Okay.  My neck was all burned.  My
17          hands.
18                    MR. SANTICOLA:  Yeah.
19    A.    My legs, all of my right side.  My left side
20          really got it bad.  I can't show you, but I
21          had a big --
22                    MR. SANTICOLA:  Describe it.
23    A.    I had a big hole right in my calf.  And then
24          my left foot, the whole foot was burned off
25          where the flap fell off.  And then I was
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

228

```
 1          burned on my right side through all here.
 2   BY MS. OZAROWSKI:
 3   Q.    When you say through here, can you describe
 4         that for me?
 5               MR. SANTICOLA:  Describe it.  No.
 6         No.  You can't show her.  You have to describe
 7         it in words.  Like where on your body.
 8   A.    I was burned in my right side, right thigh
 9         area.
10   BY MS. OZAROWSKI:
11   Q.    So starting from your waist or somewhere else?
12   A.    Starting at my waist, I was burned from my
13         right side.  And then on my left side, I had a
14         burn all from my calf and then my heel was all
15         burnt off.
16   Q.    On the right side, how long did the burn
17         extend?
18   A.    Well, I have just hunk marks of burns because
19         the burns, they had to graft me and take off
20         all the skin, but you could -- just big hunks
21         were burned.  You can see where the burns are
22         from the grafting.
23   Q.    So just for clarity --
24   A.    And both of my knees were totally burned off,
25         gone.  They were gone.
```

1    Q.    Are you alleging that any of these burns were

2          sustained from the initial explosion?

3    A.    No.  I'm saying -- I'm saying partial was the

4          initial, but the rest of it was because of it.

5    Q.    Which burns were sustained from the initial --

6    A.    Face.

7    Q.    -- portion?

8    A.    The worst ones, the face.

9              MS. OZAROWSKI:  Counsel, just be

10         careful about answering the questions for your

11         client.

12   A.    Counsel?  That's me.

13             MR. SANTICOLA:  Got it.

14   A.    That's me.

15   BY MS. OZAROWSKI:

16   Q.    I'm listening to you.

17             MR. SANTICOLA:  So he answered -- he

18         answered the question on the record was his

19         face the worst part, right?

20   A.    Face.  Face, my face got burns and then my

21         legs had to get burned bad.  I mean, there was

22         a hole in my calf, in my calf area that went

23         down 2 inches.

24   BY MS. OZAROWSKI:

25   Q.    So are you alleging that the burn on your calf

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

230

1          was sustained during the initial explosion?

2    A.    Yes.  And I had shrapnel of the parts of the

3          phone in my face.

4    Q.    Where was the shrapnel?

5    A.    All through my left side.  Dr. Stofman, my

6          plastic surgeon, has pieces of all of it too.

7    Q.    When you use the term shrapnel, where did that

8          come from?

9    A.    I was in the military.  Shrapnel is pieces of,

10         you know -- shrapnel is pieces of objects that

11         fly into your face.  He even used it, so --

12   Q.    Who is he?

13   A.    Dr. Guy Stofman, plastic surgeon.  Head of

14         plastic surgery for Mercy.

15   Q.    How many pieces of what you're calling

16         shrapnel were in your cheek?

17   A.    I have no clue.  It was quite -- I don't know.

18         I don't know.

19   Q.    Was it more or less than five?

20   A.    More.

21   Q.    Was it more or less than 10?

22   A.    More.

23   Q.    Was it more or less than 15?

24   A.    More.

25   Q.    Was it more or less than 20?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

231

```
 1    A.    I'm not sure.  Right around there.

 2    Q.    What was the shrapnel made out of?

 3    A.    The backing of the phone.

 4    Q.    How do you know this?

 5    A.    Because they could tell what the phone is made

 6          out of and he told me because he knows what --

 7          I mean --

 8    Q.    Who told you?

 9    A.    It's not hard to see it.  Like when you see

10          it, you'll know it's pieces of the phone.

11          Dr. Guy Stofman told me too, and Dr. Butcher,

12          another plastic surgeon.  And Amy, who is a

13          physician assistant.  That is his assistant.

14    Q.    What is Amy's last name?

15    A.    I don't know, ma'am.

16    Q.    Where did Amy work?

17    A.    She still works there.  She works at UPMC

18          Mercy, plastic surgery.

19    Q.    When was this shrapnel removed from your left

20          cheek?

21    A.    That night.  I had surgery that night and then

22          I had surgery 2:30 the next day.  So I don't

23          know which surgery.

24    Q.    What did Dr. Stofman say specifically about

25          the shrapnel?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

232

```
 1                    MR. SANTICOLA:  If you remember.

 2   A.    I don't remember.  I was so out of it, I don't

 3         remember.

 4                    MS. OZAROWSKI:  Counsel, please

 5         don't give your client the answers.

 6                    MR. SANTICOLA:  I didn't.  I just

 7         said if he remembers.

 8                    MS. OZAROWSKI:  Okay.  But, you

 9         know --

10   A.    Because I don't remember.  It was very

11         traumatic.

12   BY MS. OZAROWSKI:

13   Q.    Understood.  But at this point, Mr. Stiffler,

14         every question I'm asking is only if he knows.

15   A.    Okay.  Understand, ma'am.

16   Q.    Have you seen what you're calling shrapnel

17         that was removed from your face?

18   A.    Yes, I have.

19   Q.    What did it look like?

20   A.    If I grabbed my phone and I threw it on the

21         ground, there's pieces that would be there.

22         That's what they look like.

23   Q.    How big were the pieces?

24   A.    They are just -- some of them were small, some

25         of them are big.  Can I write them down to
```

233

```
 1         show you some of the sizes?
 2    Q.    Sure.  If you want to put it on one of those
 3         pages, that would be fine.
 4    A.    I had some in my head too.
 5    Q.    Okay.  So where on this exhibit have you drawn
 6         this?
 7    A.    Is it all right if I write shrapnel?
 8    Q.    Sure.  Which drawing did you put this on, the
 9         drawing of the bed or the entire room?
10    A.    Of the little -- you know, the one that was
11         too small.
12    Q.    So this is the back of Exhibit A.
13              MS. OZAROWSKI:  Why don't we go
14         ahead just to make things clear and mark this
15         as Exhibit C.  It's the page that says
16         shrapnel at the top.
17                     - - - -
18         (Exhibit C marked for identification.)
19                     - - - -
20  BY MS. OZAROWSKI:
21    Q.    Can you show me that page again?  Is it your
22         testimony that the shrapnel that you saw was
23         the size of these circles you have drawn?
24    A.    Yes.  Some smaller, some bigger.
25    Q.    Were there pieces of shrapnel you saw that
```

234

```
 1          were bigger than that larger circle that you
 2          have drawn?
 3   A.     Yes.
 4   Q.     How big was the largest piece of shrapnel that
 5          you saw?
 6   A.     About a quarter.  Maybe a little bit smaller,
 7          but close to the size of a quarter.
 8   Q.     When did you see these pieces of shrapnel?
 9   A.     I seen them a few times.  I seen them when I
10          was getting hydrotherapy, which is when they
11          scrub you.  It's called eschar debridement, it
12          was a nightmare.  I seen them during that.
13          And when I went up to the visits to go -- you
14          know, return visits to do more surgery and
15          more surgery, he showed me what was in me and
16          what was in my face, my head and my -- I had
17          pieces in my side of my leg too, I mean.  I
18          don't know.
19   Q.     When did you have the hydrotherapy where you
20          saw the shrapnel?
21   A.     Tons of times.  I had hydrotherapy every
22          single day, so I would say four times I seen
23          them.  I don't remember the dates.
24   Q.     Was this during your initial hospital
25          admission or something else?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

235

```
 1    A.    Yeah, initial.

 2    Q.    When you saw the shrapnel for the first time

 3          during hydrotherapy, where was it?

 4    A.    It was in a picture.  And then I seen it up

 5          close because Amy does -- she's the only one

 6          that goes down to hydrotherapy.  He don't go

 7          down to the hydro -- the eschar debridement,

 8          because I don't want to be in there and she

 9          showed me.  I got to see them for real when I

10          seen Dr. Stofman because he does not go in

11          there.

12    Q.    So the first time you saw the shrapnel, am I

13          understanding correctly that it was a

14          photograph?

15    A.    Yes.

16    Q.    How did you see the photograph, was it printed

17          out, was it on a screen, something else?

18    A.    It was on her phone, ma'am.

19    Q.    Amy's phone?

20    A.    Yes, ma'am.  She just -- you know, I had all

21          of these marks and all of these indents into

22          my face and that's what she showed me what was

23          going on.  I was like why is my face like

24          that, you know, because I was afraid it wasn't

25          going to heal.
```

```
 1    Q.    And what did she say when she showed you the
 2          picture on her phone?
 3    A.    She said that the shrapnel, there's parts of
 4          other stuff on my -- you know, that were in my
 5          face.
 6    Q.    Did she say what the shrapnel was made out of?
 7    A.    No, she did not.  No.  Dr. Stofman did, but
 8          not her.
 9    Q.    When did Dr. Stofman show you the shrapnel?
10    A.    He showed me in the hospital.  I don't
11          remember the date.  Then he showed me on
12          follow-ups and surgeries too.
13    Q.    The first time Dr. Stofman showed you this
14          shrapnel, was it a photograph, was it the
15          actual pieces or something different?
16    A.    Actual pieces.
17    Q.    How did he show them to you?
18    A.    They were in like a porcelain cup.
19    Q.    How many pieces were in the porcelain cup?
20    A.    As I said, around 20.  There was other stuff
21          in there.
22    Q.    What else was in the cup?
23    A.    There was staples, pieces of staples.  I don't
24          remember really, ma'am.  That was
25          overwhelming.  I don't remember.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

237

```
 1    Q.     What did Dr. Stofman say when he showed you
 2           the porcelain cup?
 3    A.     He just said that was in your face.  This is
 4           why you have all of this indentions in your
 5           face.
 6    Q.     Did he explain what the pieces in the
 7           porcelain cup were?
 8    A.     Yes.  But I don't remember to what degree, but
 9           he did explain, you know, it blew up into my
10           face.
11    Q.     What did he say blew up into your face?
12    A.     He believes it was a phone, but I mean, I do
13           too.  I know it was, but he said he believes
14           it's the phone that blew up in my face, 100, I
15           mean.
16                  MR. SANTICOLA:  I'm sorry.  Which
17           doctor are we referring to?
18                  THE WITNESS:  Dr. Guy Stofman.
19    BY MS. OZAROWSKI:
20    Q.     When you say Dr. Stofman believes it was the
21           phone, how do you know that?
22    A.     Well, he told me to do this, for me to press
23           the charges, for me to go do this, that's why.
24           He believes that the phone blew up.  I believe
25           it did 100 percent too.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

238

```
 1   Q.    What did he say --
 2   A.    I was already -- I was already going to do it.
 3         Sorry.
 4   Q.    Well, what did Dr. Stofman say to you about
 5         initiating a lawsuit?
 6   A.    Nothing.  He just said -- I said that phone
 7         blew up in my face, I know it did.  And he
 8         just said something happened that exploded he
 9         goes, you know, and here's what we have.  I
10         don't know too much more.  We can talk to him.
11   Q.    Did Dr. Stofman say that he believes the phone
12         exploded?
13   A.    In a few words, but, you know, no, he did not,
14         but he believes it was an explosion.  He just
15         said to go on with the case.  No, he just told
16         me something exploded and -- I don't remember.
17         Like I said, too much -- it's like so much has
18         happened.  I don't remember.
19   Q.    Can you try to keep your face closer to the
20         camera because you're leaning a little bit
21         away?  Thank you.
22                       Did Dr. Stofman specifically say
23         what he believed the shrapnel was made out of?
24   A.    He did not, ma'am.  I don't remember.  If he
25         did, I don't remember.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

239

```
 1    Q.    The second time you saw this shrapnel with
 2          Dr. Stofman, did you see the pieces or did you
 3          see a photograph or something different?
 4    A.    I seen pieces, but it was through -- I seen
 5          pieces.
 6    Q.    In what context?
 7    A.    Everything after --
 8    Q.    You can continue.
 9    A.    Everything after that was so much, you know,
10          just taking it in.  I wasn't ready to leave
11          the hospital when they let me go.  I thought I
12          needed more time in there and they let me out.
13    Q.    You testified a moment ago that in the
14          porcelain cup there were also staples, is that
15          correct?
16    A.    Yes, ma'am.
17    Q.    Do you have an understanding of when those
18          staples were placed in your skin?
19    A.    No.
20    Q.    How did the staples come to be in your skin?
21    A.    I don't know.
22    Q.    Were the staples something that you sustained
23          in the fire or are they something that the
24          medical personnel placed or something
25          different?
```

```
 1   A.    Something I sustained during the fire.  During
 2         the explosion I say, 100.
 3   Q.    Did you have staples in your room prior to the
 4         fire?
 5   A.    Only inside the bed, what the mattress is made
 6         out of, tons of staples.
 7   Q.    What is the last thing that you remember from
 8         the fire itself?
 9   A.    Like the last thing I remember is catching my
10         breath that to yell out another house fire.
11         And then I can remember a little bit because
12         my dad had to come up and grab me and he
13         pulled.  And I can remember, he told me this,
14         but I can remember falling down the steps
15         because when he came to the top of the steps,
16         he grabbed me and he pulled and my mom was
17         behind him and we all rolled down the steps.
18         I can remember that little bit, that's the
19         last thing.
20                     And I can remember when I was in the
21         ambulance, I was screaming and holding my face
22         and they had to pull my hands down.  That's
23         the last thing I remember.  I can remember
24         hearing them talk, trying to get ahold of a
25         doctor to get me pain medicine, you know, to
```

```
 1          see if they could -- if the doctor allowed to

 2          give me Morphine.

 3    Q.    Was the doctor allowed to give you Morphine?

 4    A.    I don't remember.  I went out, but, you know,

 5          I just remember them doing that and then I

 6          don't remember.

 7    Q.    Is there a reason why you wouldn't have been

 8          allowed to have Morphine?

 9    A.    No, there's no reason.  Just they gave it to

10          me.  Just that's what I remember.

11    Q.    Am I correct that you were transported to the

12          hospital from the fire scene by ambulance?

13    A.    Yes, I was.

14    Q.    Did anybody go in the ambulance with you?

15    A.    I don't remember.  I don't --

16                MR. SANTICOLA:  If you don't

17          remember.

18    A.    I don't remember.  I don't remember.

19                MS. OZAROWSKI:  Counsel, I think

20          he's aware that if he doesn't remember or if

21          he doesn't know, he knows to give that answer.

22    BY MS. OZAROWSKI:

23    Q.    What is the first thing you remember from when

24          you got to the hospital?

25    A.    I remember that I got pneumonia while I was in
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

242

```
 1              there and they had to wake me up.  My fault.
 2              My fault.  I actually got up out of the bed
 3              and I fell on my knees and alarms were going
 4              off like crazy, and that's the last thing I
 5              remember.  Isn't that what you just asked?
 6    Q.   Yes.  Yes.  Are you able to describe to me
 7              what happened when you first got to the
 8              hospital that night?
 9    A.   No.  No.  Nope.  Nope.  My mother would be
10              able to tell you though.
11    Q.   Am I correct that you were unconscious for
12              some portion of time when you first got to the
13              hospital?
14    A.   Yes.  And then they put me into an induced
15              coma.
16    Q.   How long were you in the induced coma?
17    A.   A good while.  I don't really remember.  I'd
18              say three weeks.  I don't know.
19    Q.   How long were you admitted to the hospital
20              after the fire?
21    A.   37 days.
22    Q.   Is it possible to give me a general timeline
23              of what happened while you were in the
24              hospital?
25    A.   My goodness.  No.  There's so much going on.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

243

```
 1          I had crazy dreams.  I was -- no.  No.
 2    Q.    Let me try to ask you a better question.  With
 3          what were you diagnosed while you were in the
 4          hospital after the fire?
 5    A.    What do you mean diagnosed?  You mean third
 6          and fourth degree burns?
 7    Q.    Yes.  What were the diagnoses you received
 8          while you were in the hospital?
 9    A.    Well, I had a problem with my heart too.  The
10          EKG wasn't sending signals to my heart after
11          that.  And then I got -- when I guess -- I
12          don't know.  Like I said, something went into
13          my neck and went through my esophagus, so I
14          was throwing up blood all the time and I
15          couldn't -- just blood was coming out of my
16          mouth.
17    Q.    When you say something went into your neck,
18          was this during the fire or was this a medical
19          procedure or something else?
20    A.    No, no, no.  It happened when I fell.  I
21          believe it happened when I fell into the
22          mattress, but no, this happened during the
23          fire.  It went right through my esophagus.  I
24          don't want to take this off, but it got right
25          in through here, went through my skin, in
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

244

```
 1          through my esophagus.
 2     Q.   So this is an injury that you sustained during
 3          the fire; correct?
 4     A.   Yes, ma'am.
 5     Q.   Did you ever receive a diagnosis with regard
 6          to this injury?
 7     A.   They gave me this numbing agent for my throat
 8          because my throat hurt so bad.  All I could --
 9          anything that came up was blood, so I couldn't
10          eat or anything and they were giving me
11          through a feeding tube.
12     Q.   How long did you have the feeding tube?
13     A.   Three weeks.
14     Q.   Did you have the feeding tube while you were
15          in the coma or after you were in the coma or
16          something else?
17     A.   While I was in the coma and after.
18     Q.   For how long after did you have the feeding
19          tube after the coma?
20     A.   I couldn't tell you.  I'd say seven days, just
21          an educated guess.
22     Q.   Did you have surgery on this wound in your
23          neck?
24     A.   I don't remember.  I had so many surgeries, I
25          do not remember.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

245

```
 1    Q.    You currently have what looks to me like a
 2          bandage of some sort on your neck; is that
 3          correct?
 4    A.    Yes, ma'am.
 5    Q.    What is that bandage treating right now?
 6    A.    Well, my neck, I had surgery on my neck, but
 7          there's infection that when I -- I guess
 8          there's still a hole right there in my neck
 9          and they have to take skin off it and graft
10          that because it's wide open.  And that's where
11          -- that's where if I show you, that's where it
12          went through my neck and went into my
13          esophagus.
14    Q.    So you're indicating an area of your neck
15          under your left cheek?
16    A.    It went right through here.
17               MR. SANTICOLA:  We would stipulate
18          to that.  That's correct, for the record, what
19          he's gesturing through with his hands.
20    A.    That's where it went through.
21    BY MS. OZAROWSKI:
22    Q.    Did you see what went through your neck?
23    A.    No, ma'am.  Nope.
24    Q.    Did anyone ever explain to you what it was
25          that went into your neck?
```

```
 1    A.    He doesn't know.  He doesn't know exactly what
 2          happened.
 3    Q.    When you say he, who do you mean?
 4    A.    I mean Dr. Guy Stofman, head of plastic
 5          surgery.  The head of the burn unit.
 6    Q.    Is the injury to your neck a burn or a
 7          puncture wound or something else?
 8    A.    It's a puncture wound that it came through my
 9          skin and through my esophagus.
10    Q.    How were your burns treated while you were in
11          the hospital?
12    A.    They scrubbed, they scrubbed them.  They did
13          eschar scrubbing, the debridement.  And
14          then -- that's it.  And that took seven, eight
15          hours every single day.  Then plus I had to be
16          scrubbed in the face four times a day above
17          that.  Nightmare.
18    Q.    Did you have any skin grafting done while you
19          were in the hospital?
20                   MR. SANTICOLA:  Verbal answer.
21    A.    Yes, I did.  Big time.
22    BY MS. OZAROWSKI:
23    Q.    Which areas of your body received skin grafts?
24    A.    My hand and my neck.  My fingers right through
25          here.  That's all I know right now.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

247

```
 1    Q.    When you say your hand, was it both hands?

 2    A.    Both hands.  Oh, yeah.  This is totally skin,

 3          this whole hand is totally skin from my

 4          thighs.

 5    Q.    And when you say this, you're talking about

 6          your left hand?

 7    A.    Yes, my left hand.  They take all the skin off

 8          my thighs and they put the skin all over my

 9          hands.

10    Q.    If I understand your testimony correctly, you

11          had skin grafting to both hands and to your

12          neck.  Did you have skin grafting anywhere

13          else?

14    A.    Right there too that I know of.  See how they

15          took a chunk right there off?

16    Q.    When you're saying there, you're talking about

17          there was skin taken from your --

18    A.    Right here.

19    Q.    -- right arm and put on your right hand?

20    A.    Put on right here.

21    Q.    Is that correct?

22    A.    Yes, ma'am.

23    Q.    Did you undergo any surgeries while you were

24          in the hospital after the incident?

25    A.    Oh, yes.  Tons of surgeries.  I just don't
```

```
 1              know how many.  I had so many surgeries
 2              because -- I don't know.  I'd say ten at
 3              least.
 4     Q.      What types of surgeries did you have?
 5     A.      I don't know.  I had the grafting.  I had they
 6              had to cut -- when I get into the pictures,
 7              but they had to cut me and take all the
 8              infection out.  They thought they got it all
 9              out, but they haven't got it all out.
10     Q.      When you're saying -- sorry.  Just to clarify
11              for the record.  When you're saying that they
12              had to cut you and they had to get the
13              infection out, you're talking about the wound
14              to your neck; is that correct?
15     A.      Yeah, they cut that all out.  They tried to,
16              but they didn't get it all.
17     Q.      Are you aware that when you were admitted to
18              the hospital after the fire, a toxicology
19              screen was performed?
20     A.      Yes, ma'am.
21     Q.      And are you aware that the results were that
22              you were positive for methamphetamines,
23              opiates, Oxycodone and benzodiazepines?
24     A.      Methamphetamines?
25                    MR. SANTICOLA:  She's asking if you
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

249

```
 1         are aware.
 2    BY MS. OZAROWSKI:
 3    Q.    Are you aware of that?
 4    A.    No.  What's methamphetamines?
 5    Q.    I'm just asking if you're aware that that's
 6          what the toxicology report showed?
 7    A.    Say that again.
 8    Q.    So my question is whether or not you were
 9          aware that that's what the toxicology report
10          showed?
11    A.    And I asked you what was --
12                MR. SANTICOLA:  Just answer.  You
13          don't ask.  You just answer her question.  In
14          your deposition, you answer her questions.
15          That's it.
16    A.    No, I wasn't aware.
17                MR. SANTICOLA:  That's it.  Simple
18          as that.
19    BY MS. OZAROWSKI:
20    Q.    Do you have any explanation for the results of
21          the toxicology report?
22    A.    No.  Because I asked you what was in my system
23          and I don't -- I didn't get it all, so no.  If
24          you repeat it, I can help you.
25    Q.    So the medical records indicate that the
```

```
 1            toxicology report showed that you were
 2            positive for methamphetamines, opiates,
 3            Oxycodone and benzodiazepines.  Do you have
 4            any explanation for that?
 5                 MR. SANTICOLA:  I would object and
 6            maybe lay a foundation and ask him if he knows
 7            what they are and then ask him if there's a
 8            explanation.  I don't think he understands
 9            what they are based on your question.
10   A.    I don't know what methamphetamines.  I know
11         what the Oxycodone is because I'm prescribed
12         it.  The benzodiazepine is Xanax.  But the
13         methamphetamine, I'm lost here.
14   BY MS. OZAROWSKI:
15   Q.    Okay.  My question is whether or not you have
16         an explanation for the results of the
17         toxicology screen and your answer is your
18         answer.
19   A.    Amen.  Okay.  No, I don't.  I don't know what
20         to say.  I mean, methamphetamine, I don't
21         know.  I don't know.  I didn't take any
22         methamphetamine.  They found me and just found
23         me.  But the Oxycodone and Xanax, I'm
24         prescribed it through Dr. Kang and
25         Dr. Osmanski.
```

251

```
1    Q.    While you were in the hospital after the fire,
2          did you undergo any physical therapy?
3    A.    Oh, yes.  I went to -- yes.  Yes, ma'am.
4    Q.    What sort of physical therapy did you undergo?
5    A.    For my hands.
6    Q.    How often did you go to physical therapy for
7          your hands?
8    A.    Every day for six months.
9    Q.    When you say you went every day for six
10         months, was that six months after your
11         discharge from the hospital or including the
12         time you were in the hospital?
13   A.    That's my discharge, but the whole time I was
14         in the hospital I was getting it done too.  I
15         was going to occupational and physical.
16   Q.    Did you get the physical therapy and the
17         occupational therapy from the same people?
18   A.    No.  No, ma'am.
19   Q.    Who performed the physical therapy?
20   A.    Drayer.
21   Q.    Is Drayer the name of a facility or a medical
22         group?
23   A.    Yes, ma'am.  D-R-A-Y-E-R.
24   Q.    Is that a physical therapy group?
25   A.    Yes, ma'am.
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

252

```
 1   Q.    From whom did you receive the occupational
 2         therapy?
 3   A.    I didn't have any after I left the hospital,
 4         but I did have some -- I did have it in the
 5         hospital.
 6   Q.    What was the occupational therapy for in the
 7         hospital?
 8   A.    Because I needed it because I was burned.
 9         They gave me like neck movements and --
10         because I was burned.
11   Q.    What types of treatment did you receive after
12         you were discharged from the hospital in 2018?
13                    So to clarify, you have just
14         testified that you went to physical therapy
15         for about six months.  Was there other
16         treatment you underwent after you were
17         discharged from the hospital?
18   A.    Oh, yeah.  I had to wear a mask over my head
19         for 18 months.  I had to wear compression
20         gloves.  That mask and my gloves with
21         silicone.  I had to wear that 23 hours a day.
22   Q.    Who prescribed the mask and the gloves?
23   A.    Dr. Guy Stofman.
24   Q.    What medications did you take when you were
25         discharged from the hospital in 2018?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

253

```
 1   A.     Methadone, Oxycodone.  I forget.  They had me
 2          on so much stuff when I left, ma'am, I don't
 3          know.
 4   Q.    Did your medications change at some point from
 5          the time you were released from the hospital
 6          until now?
 7   A.     Yeah.  They weaned down a lot more.  A lot of
 8          stuff I'm off.  Like the Neurontin, I'm weaned
 9          down to a little bit, but that's for my nerves
10          because I have no nerves.  It hurts my body.
11                   MS. OZAROWSKI:  Off the record for a
12          second.
13                   MR. SANTICOLA:  Yep.
14                   THE VIDEOGRAPHER:  We're now off the
15          video record.
16                        - - - -
17      There was a brief Recess in the proceedings.
18                        - - - -
19                   THE VIDEOGRAPHER:  The time is
20          1:49 p.m.  We're now back on the video record.
21   BY MS. OZAROWSKI:
22   Q.    Mr. Stiffler, before we broke, you were
23          testifying about Neurontin.  When did you take
24          that?
25   A.    I guess it was -- I'm still taking it.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

254

```
 1    Q.    How often do you take it?

 2    A.    Once a day.

 3    Q.    How many milligrams do take?

 4    A.    400.

 5    Q.    Who prescribed the Neurontin?

 6    A.    Doctor Kang.

 7    Q.    What does the Neurontin treat?

 8    A.    Nerve damage.

 9    Q.    Have you taken the Neurontin since you were

10          discharged from the hospital or something

11          else?

12    A.    Off and on.

13    Q.    Had you ever taken Neurontin before July 2018?

14    A.    Yes, I have.

15    Q.    When did you take it previously?

16    A.    When I got shot.

17    Q.    During what years did you take the Neurontin?

18    A.    I think 2005 to 2008.

19    Q.    When was the last time you took the Neurontin

20          from today?

21    A.    It's been a while.  It's been a while, ma'am.

22          Like four months.

23    Q.    Is this a medication that you can take as

24          needed or are you instructed to take it at

25          certain points or something different?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

255

```
 1    A.    As needed.

 2    Q.    When do you take it?

 3    A.    I haven't taken it for a while, but I was

 4          taking it at nighttime.

 5    Q.    I'll ask a better question.  What I meant was

 6          if the medication is as needed, what symptoms

 7          do you -- when you take it, what symptoms are

 8          you experiencing?

 9    A.    My hands hurt real bad.

10    Q.    When you took the Neurontin after the gunshot,

11          for what area of the body were you taking the

12          medication?

13    A.    My upper abdominal area.  I still have a

14          bullet in me.

15    Q.    Do you still have any bullets in you?

16    A.    Yes, I do.  I have a .38 in me.  I don't want

17          to talk about that.  I don't want to talk

18          about that, we don't need to.

19    Q.    Are there any other medications that you have

20          been prescribed on an as-needed basis that you

21          have an active prescription for but you aren't

22          currently taking?

23    A.    No, ma'am.  Oh, stool softener.  I don't take

24          my -- I forget the name of it.  I just don't

25          take it anymore.  It makes me nauseated.
```

```
 1   Q.    Before we broke, you testified that your
 2         medications had gone down since you were
 3         discharged from the hospital in 2018, can you
 4         explain that to me?
 5   A.    I don't take the Ambien.  I don't remember,
 6         but I'm off a lot of the medicines that I was
 7         on.  I don't know which ones, but I was on
 8         lots of medicines when I got out.  I just
 9         don't remember, ma'am.
10   Q.    Do you remember which conditions these
11         medicines were meant to treat?
12   A.    I don't.  I don't.
13   Q.    After you were discharged from the hospital in
14         2018, what medical providers did you continue
15         to treat with?
16   A.    Well, my PCP I have been with since 2005, and
17         I have stayed with him.  And my psychiatrist,
18         I have been with since 2005, and I stayed with
19         him.
20   Q.    Am I correct that Dr. Kang is your
21         psychiatrist?
22   A.    Yes, ma'am.
23   Q.    And can you please remind me who your primary
24         care physician is?
25   A.    Dr. Stephen Osmanski.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

257

```
 1   Q.    And you continue to treat with Dr. Stofman; is
 2         that correct?
 3   A.    Stofman, yes, ma'am.  S-T-O-F-M-A-N.
 4   Q.    Stofman?
 5   A.    Yeah.  He's got a weird name.  And
 6         Dr. Ziembicki too.
 7   Q.    Are there any other doctors with whom you
 8         continue to treat?
 9   A.    No, ma'am.
10   Q.    Do you currently treat with any doctors for
11         your peritonitis?
12   A.    No.  Dr. Fusco.  Dr. Fusco.  He just does the
13         upper GIs on me.
14   Q.    How do you spell that?
15   A.    F-U-S-C-O, Dr. Fusco.
16   Q.    How often do you see this doctor?
17   A.    Only when I need upper and lower GIs.  So
18         maybe every six months just to see how my
19         bowel is doing.
20   Q.    When you say only when you need upper and
21         lower GI, what do you mean by that?
22   A.    Well, I got shot like 76 times went through my
23         bowel.  So all the adhesions are closing up,
24         so it's not letting my food go through, so
25         they got to make sure they keep that open.
```

258

```
 1    Q.    When you see Dr. Fusco, do you have imaging
 2          performed?
 3    A.    Yes.  Yes, I do.  He does a camera of my rear
 4          end and down my throat.
 5    Q.    So he performs a colonoscopy or something
 6          along those lines?
 7    A.    He does an upper and lower GI I think it's
 8          called, upper and lower.  They put a plastic
 9          thing in my mouth and they go through there
10          and then they go up through my rear end.
11    Q.    Is it possible that it's an endoscopy?
12    A.    Yeah.  They shoot me.
13    Q.    But these are procedures where he puts a
14          camera into your body to look around?
15    A.    Yes, ma'am.
16    Q.    How often do you see Dr. Kang currently?
17    A.    I see him every month.  He makes me see him
18          every month.
19    Q.    How often do you currently see Dr. Osmanski?
20    A.    Every six months.
21    Q.    Do Dr. Stofman and Ziembicki work together?
22    A.    Dr. Stofman is the head of plastic surgery and
23          Dr. Ziembicki is the head of burns.  So it's
24          like, you know, they are both the head of
25          their own department.  But I see both of them.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

259

```
 1    Q.     How often do you see each one of them?

 2    A.     I see them a lot because I'm going to have to

 3           have surgery here.  I just seen them three

 4           months ago to get surgery on my neck.

 5    Q.     Who performed surgery on your neck, which one?

 6    A.     That's Dr. Stofman.  And he did a graft right

 7           here too, so -- see, they just did that graft

 8           right there.

 9    Q.     How often do you treat with Dr. Ziembicki?

10    A.     Every three months just to see, you know, he

11           keeps up with me because Dr. Stofman does my

12           surgeries.

13    Q.     Are both of these doctors affiliated with

14           Mercy?

15    A.     Yes, ma'am.  They are the head of their

16           departments.

17    Q.     Are you currently employed?

18    A.     No, I'm not.  I'm not allowed to work.

19           Through my SSI, I'm 100 percent disabled.

20    Q.     What payment do you receive from SSI?

21    A.     My mom takes it because I pay for rent I do,

22           and I don't know how much I get, ma'am.

23                  MR. SANTICOLA:  We can get that to

24           you, Lili.

25    BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1   Q.     When were you declared 100 percent disabled?

 2   A.     15 days after I got out of the hospital from

 3          this phone.

 4   Q.     What medical condition prevents you from being

 5          able to work?

 6   A.     My hands.  My leg, I can't really walk a

 7          little bit on my left leg.  Yeah.

 8   Q.     In connection with applying for disability,

 9          did you undergo a physical examination?

10   A.     I did physical, psychiatric.  They did

11          everything.  I have gone to Oakland.

12   Q.      I'm sorry?

13   A.     Oakland.  Oakland up on Forbes Avenue in

14          Pittsburgh.  They did a psychiatric.  They did

15          a physical.  They did all kinds of stuff and

16          they determined.

17   Q.     How do you receive your SSI payments?

18   A.     Come through like I have a card and it just

19          gets deposited.  She keeps the card, so I'm

20          pretty much a little kid again, so --

21   Q.     When you say she keeps the card, do you mean

22          your mother or somebody else?

23   A.     My mother.  Nope.  Yeah, my mother.

24   Q.     Do you have any other forms of income

25          currently other than disability?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

261

```
 1   A.    Nope.  That's it, ma'am.  I used to make that
 2         every day.
 3   Q.    I'm sorry.  I didn't hear what you said.
 4   A.    I said I used to make that every day that I
 5         get in a whole month.
 6   Q.    Can you try to lean back in the camera frame,
 7         please?
 8   A.    Sure.  No problem.
 9   Q.    Are you currently undergoing any form of
10         physical therapy?
11   A.    No.  No, ma'am.
12   Q.    When did you finish with physical therapy?
13   A.    About two months ago.
14   Q.    Why was physical therapy ended?
15   A.    Because they told me I was done.  I had enough
16         too.
17   Q.    What do you mean by that?
18   A.    I'm done.  I just -- I'm done.  I don't
19         want -- I can't -- I'm just -- I'm fed up.
20         I'm done.  I'm just saying they are done too
21         with my hands.  It was just my finger here and
22         that was my last physical therapy.
23   Q.    Are you currently treating with any
24         occupational therapists?
25   A.    No, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

262

```
 1   Q.     When was the last time you treated with an
 2          occupational therapist?
 3   A.     Maybe a year ago.
 4   Q.     What conditions did you work on with the
 5          occupational therapist?
 6   A.     Just my neck because my neck, I couldn't turn
 7          it to the left.  So we did the, you know, neck
 8          exercises so I could get mobility back into my
 9          neck.
10   Q.     Was the occupational therapist part of a
11          medical facility or medical group?
12   A.     Yes, ma'am.
13   Q.     What was that?
14   A.     Drayer.  Drayer.  The same Drayer institution.
15   Q.     And that's the same place where you received
16          physical therapy; is that correct?
17   A.     Yes, ma'am.
18   Q.     Can you describe to me your current physical
19          condition?
20   A.     Not doing good physically, mentally.  What
21          else do you mean?  My hands, I can't move my
22          hands real good.  Mentally I'm not doing good.
23   Q.     Can you explain what you mean by that?
24   A.     It's like depression.  I get anxiety, like the
25          stuff going on, and I don't know how to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

263

```
 1          explain it too much.  Just overwhelmed too
 2          much.  The physical and the mental part, just
 3          too much.  It's overwhelming.  I mean, I
 4          was -- I was in great health before this.  It
 5          sucks.  You know, I can't do anything I used
 6          to be able to do.
 7     Q.   What did you used to be able to do that you
 8          can't do anymore?
 9     A.   Use my hands.  My hands used to be like rocks.
10          I used to lift.  I used to be able to kayak.
11          I used to be able to do so much with my
12          fishing on the Ohio River.  Yeah, I lifted a
13          lot.  I can't do my work.  I mean, I can't do
14          plumbing or, you know, HVAC, I can't do that
15          with these hands.  Work is horrible, you know.
16          I don't want to be stuck at home.
17     Q.   When you say you can't lift, do you mean lift
18          weights?
19     A.   Yeah.  Lift weights, yep.
20     Q.   Why can't you lift weights anymore?
21     A.   Because my hands, I'm not allowed to put that
22          much on it.  You see my hands?
23     Q.   How often did you lift weights prior to the
24          fire?
25     A.   Five days a week.  I mean, I have pictures
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

264

```
 1          that would show you.  I mean, now I'm 160
 2          pounds.
 3    Q.    Where did you lift weights?
 4    A.    I had my own downstairs, I had my own
 5          facility.  I have been lifting weights since I
 6          have been 16 years old.
 7    Q.    Why are you no longer able to kayak?
 8    A.    Because my hands.  I can't do it with my
 9          hands, there's no way.  They hurt so bad,
10          there's no way I would be able to do it.
11    Q.    How often did you go kayaking prior to the
12          fire?
13    A.    During the summer months, the spring months.
14          It was five days a week at least.  I'm a
15          fisherman.
16    Q.    When was the last time you had gone kayaking
17          prior to the fire?
18    A.    Prior to the fire, I went the day before.  I
19          went the 15th.
20    Q.    Did you go kayaking on the 15th?
21    A.    Yes.  Yeah, I go fishing, kayak fishing.
22    Q.    Did you bring the iPhone with you when you
23          went kayaking?
24    A.    No, I did not.
25    Q.    Why not?
```

```
 1    A.     Because I just -- because I had a Droid and it
 2           fell in the water and I don't want to take
 3           that chance, especially with an iPhone for how
 4           much they cost.  It's $550 for the iPhone 6
 5           IED.
 6    Q.     Where did you leave the iPhone while you went
 7           kayaking?
 8    A.      In the house.
 9    Q.     Why did you use the iPhone case on the iPhone
10           6?
11    A.     Just to protect it.  My buddy bought it for me
12           because you know -- you know, I don't know.
13           He just bought it for me and I put it on.  I
14           mean, why not.  Lifeproof case, it's very
15           nice.
16    Q.     It's my understanding that that case was, from
17           what you understand, waterproof; is that
18           correct?
19    A.      I'm sure.  Is it?  Yeah, it's waterproof.  I'm
20           sure, yeah.  They are all water -- OtterBox,
21           they are all waterproof.
22    Q.     At any point between the time you purchased
23           the subject iPhone and the fire, did you test
24           out or -- strike that.
25                          At any point between the time that
```

```
 1          you acquired the subject iPhone and the fire,
 2          did you get the Lifeproof case that was
 3          surrounding the iPhone wet?
 4    A.    No.  No.  That Lifeproof case was very
 5          expensive.
 6    Q.    Can you clarify for me, please, where you were
 7          working in 2018 prior to the fire?
 8    A.    I was with Held Plumbing and Heating.  Held
 9          Plumbing and Heating, LLC.
10    Q.    And I think I understand from your prior
11          testimony that you were working 17 hours a
12          week; is that correct?
13    A.    Yeah.  17 hours a week, the average, yes.
14          Yes, ma'am.
15    Q.    Why are you no longer able to work for Held
16          Plumbing and Heating?
17    A.    Because of my hands.  How could I do plumbing
18          with my hands?
19                MR. SANTICOLA:  She's just getting
20          it on the record, that's all.
21  BY MS. OZAROWSKI:
22    Q.    Can you explain it to me, please?
23                MR. SANTICOLA:  Explain why.
24    A.    I cannot pick up hot water tanks.  I cannot do
25          anything of that type.  I cannot -- you know,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

267

```
 1          plumbing and HVAC work, I mean, that's small
 2          screwing.  That's why I can't work with him.
 3          There's no way I could work with him.  My
 4          hands hurt so bad, there's no way.  Look at
 5          it.  I mean, I got third and fourth degree
 6          burns on my hands.  What do you think, do you
 7          think they could work?
 8  BY MS. OZAROWSKI:
 9  Q.    I'm just asking you --
10  A.    No.  I'm just saying I can't work.
11  Q.    Sure.  But I'm just asking you my questions
12          and your responses are your responses.
13  A.    I'm sorry.  I just -- I think you want more
14          than I can give you.
15  Q.    Is there anything else that you used to be
16          able to do that you're no longer able to do?
17  A.    I can't name everything.  I can't name
18          everything.  My hands are everything.  My
19          hands were like bricks.  My hands were so
20          strong.  I mean, I can't do -- I just don't
21          want to give too much, I mean.  Name it.
22  Q.    Well, you tell me.  What --
23  A.    I can't close drawers, my drawers.  If I try
24          to close drawers, I hit into these.  Look at
25          my knuckles.  You know what I mean, just
```

```
 1        everything is a battle.  Everything is a
 2        battle, everything.  I break lamps all the
 3        time because I can't -- I mean, I can't
 4        even -- I went through three lamps down in my
 5        basement, you know.  My mom will talk to you.
 6        Just don't have my hands.
 7                         I mean, I can't throw a football or
 8        nothing.  I used to love throwing a football.
 9        I got a very strong arm.  I used to be able to
10        throw the football over 62 yards to throw a
11        football, I can't do that.  I'm very athletic.
12        This crushed me.
13   Q.   When was the last time you had thrown a
14        football prior to the fire?
15   A.   I throw all the time.  I used to go up there's
16        a park right up here and do it all the time.
17        I'd say maybe two days before that.
18   Q.   What were you doing at the park two days
19        before the fire?
20   A.   Throwing a football.  I just -- I throw the
21        football with my good buddy just had passed
22        away, but he has a strong arm too and we just
23        sit up there and we used to just test
24        ourselves up there.  You know, I don't know,
25        to get out of the house.  I'm very active.  I
```

```
 1            have always been very active.  It's just this
 2            has totally changed my life.
 3    Q.    Are there other ways --
 4    A.    I have a hard time -- I have a hard time
 5            casting my pole.  I have a hard time.  I get
 6            frustrated with that.  It's just -- you know,
 7            plus -- let me think.  I could go on all day.
 8            Especially sliding glass doors.  I can't hold
 9            -- and I leave the -- I leave the refrigerator
10            on.  He just seen that.  I can't close it with
11            my left hand real good, so the refrigerator
12            goes beep, beep, beep, beep, beep, and they
13            freaking yell at me.  I'm trying to get the
14            heck out of the house.  Because if I don't
15            close the door with the hand like this, I have
16            a hard time closing the door.  Anything with
17            pressure, you know, is -- I don't want to talk
18            about it.  Just a lot of stuff.
19    Q.    Am I correct in understanding that most of the
20            limitations you have just testified to are as
21            a result of the current condition of your
22            hands; is that right?
23    A.    100, yes.
24    Q.    Is there anything that makes the condition of
25            your hands better?
```

```
 1   A.    No.  They have to amputate my pinky, so that
 2         pinky will be gone here shortly.
 3   Q.    What do you mean by that?
 4   A.    They have to amputate my pinky.  It's a fourth
 5         degree burn, but I'm just pushing it back.
 6         I'm scared to death.  Dr. Stofman wants it
 7         gone.
 8   Q.    Why is that?
 9   A.    It's a fourth degree burn, it's dead.  It
10         hurts.  It hurts badly and I just don't want
11         to get my finger amputated.
12   Q.    Do you have that procedure scheduled?
13   A.    Nope.  Nope.
14   Q.    When did Dr. Stofman tell you that?
15   A.    Last year, but he can't make me.
16   Q.    So to make sure I understand you correctly,
17         last year at some point Dr. Stofman
18         recommended that your pinky finger be
19         amputated?
20   A.    Yep.  And doctor -- another doctor too,
21         Dr. Sisco wanted to do it ASAP.  He wanted to
22         do it just last year he wanted to do it there
23         at the office and I wouldn't let him do it.
24   Q.    Did they explain to you why they wanted to
25         have the digit amputated?
```

```
 1   A.     Because it's hurting me and it's burnt to the
 2          bone, fourth degree burn, which means the bone
 3          is burned.  So they wanted to get it so it
 4          would -- so the pain wouldn't be as bad.
 5   Q.     I apologize, this may be a difficult question.
 6          But I'm wondering if you recall at any point
 7          during the fire any portions of your body
 8          being on fire?
 9   A.     Yes, my face.  Yes, my face.  It was like --
10          just like my clothes.  I had a tank top on and
11          it was on fire and it was on my neck.  I tried
12          to grab my face and they had to pull my hands
13          down.
14   Q.     When was this?
15   A.     In back of the paramedics thing.  And then I
16          hear him calling asking for Morphine and then
17          I went out again.
18   Q.     Do you recall --
19   A.     I used to -- I have pictures of me with --
20          there's pictures for like a year that my hands
21          just went all the way down my face.  I have
22          pictures to show.
23   Q.     Do you recall any fire on your hands?
24   A.     No.  No, I don't.
25   Q.     Where were you when you saw the fire on your
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

272

```
 1        shirt?
 2   A.   I was in the back of the ambulance.  You see
 3        my knuckles, you see how just from hitting it,
 4        just bang, bang.  Going into a drawer.  It's
 5        just too much.
 6   Q.   Can you please describe a typical day in your
 7        life for me?
 8   A.   I get up.  I don't really -- I get up.
 9   Q.   What time do you get up in the morning
10        usually?
11   A.   About 7:30, 8.  I take my medicine and then I
12        watch TV because I can't do too much.  I'm
13        constipated all the time, so my stomach is
14        killing me.  And then my hands hurt.  My neck
15        is all messed up.  You know, it's always
16        something, you know.  I don't do nothing.  I
17        do nothing but take care of myself.
18                        I mean, I don't know what else to
19        tell you.  I don't do too much.  I don't do
20        hardly nothing, I can't.  For the time being,
21        I can't do nothing.  I sit around and watch TV
22        and every Doctor Phil episode.  I don't know
23        what else to say to you.
24   Q.   I'm not sure I heard the last part.
25   A.   I don't know what else to say to you.  I just
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

273

```
 1            watch a lot of TV.  I just don't know.  I
 2            don't do too much.
 3   Q.    Are you able to make your own meals?
 4   A.    No.  My mom does that.  But I can make like
 5            Nutribullets, like stuff like that, but she
 6            precuts everything, you know.
 7   Q.    Did your mother make your meals before the
 8            fire?
 9   A.    No.  I made my food.  I was -- I went to
10            school for culinary in high school.  So, yeah,
11            I could make pretty much anything I wanted.  I
12            used to be like -- I used to live next door,
13            so I made all my -- I used to have my own
14            home, my own house, but I was engaged and
15            stuff, so I did all of my stuff by myself.
16                    MS. OZAROWSKI:  Tammie, would it be
17            possible to read that answer back to me?
18                         - - - -
19                    (The record was read back by the
20            Reporter.)
21                         - - - -
22   BY MS. OZAROWSKI:
23   Q.    When you say you used to live next door, did
24            you used to live next door to the house you're
25            currently in?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

274

```
 1   A.    Yes.  It was a different address.  It used to
 2         be a duplex.  The house burnt down.  It's not
 3         a duplex no more, so it's just one home.
 4   Q.    I think I understand you now because I believe
 5         you testified last session that at some point
 6         prior to the fire you lived in the second
 7         portion of the house, is that accurate?
 8   A.    Yeah.  It was a totally different address and
 9         everything.  It was totally different.  It
10         totally was two different homes.
11   Q.    During what years were you engaged?
12   A.    2009 to 2014, '15.  Not 2009, 2015.  And then
13         I left her.  I told her it wasn't going good
14         my way.
15   Q.    Are you able to do your own grocery shopping?
16   A.    No.  My mom does that.
17   Q.    Did you do your own grocery shopping before
18         the fire?
19   A.    Yeah.
20   Q.    Who does your laundry?
21   A.    Mom.
22   Q.    Who did your laundry before the fire?
23   A.    Me.
24   Q.    Is there a reason you're not able to do
25         laundry?
```

```
 1    A.     Just my hands.  The least I can do.  They just
 2           hurt.  I just don't want -- and I can't.  If I
 3           did my laundry, my hands would kill me, you
 4           know.  Then I have to take more pain medicine,
 5           you know.
 6    Q.     Is there a reason you're not able to go
 7           grocery shopping?
 8    A.     Because it's hard on my hands.  It's just, you
 9           know, you're just grabbing stuff.  And then
10           you have to grab your bags, and them bags are
11           just awful on your hands, you know.  I used to
12           be able to put 15 bags and come in, but that's
13           the reason.  There's too much activity on
14           them.
15    Q.     Are you currently able to drive?
16    A.     I drive, but I don't want anybody to take my
17           license.  I drive, but I drive when I can.  I
18           don't drive that much.  But my license though,
19           it took me ten years.  I just want my license.
20           I don't want you to take my license.
21                     I just don't -- like I want to have
22           to drive when I need to because I drive to my
23           doctors and stuff, you know.  I just don't
24           want anything to make my dad do it because my
25           dad has prostate cancer and, you know, he
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

276

```
 1          can't do that no more.
 2    Q.    Do you currently have a car?
 3    A.    Yes, I do.
 4    Q.    How long have you had that car?
 5    A.    I got it 2019.  I have a truck.  2019.  It's
 6          too hard on my hands, as I said.  It's so hard
 7          to pull the steering wheel and I do as much as
 8          I can.
 9    Q.    Where did you buy the truck?
10    A.    Colussy Chevrolet.
11    Q.    Did you purchase the truck new or used or
12          something else?
13    A.    Used, ma'am.  Used.
14    Q.    On an average week, how often would you say
15          you drive?
16    A.    Maybe ten hours in a week.  Five to ten hours.
17          Not even that.  I'd say four to six hours.
18    Q.    Where do you drive?
19    A.    I go -- I have doctor appointments and
20          sometimes I'll go get my dad something to eat.
21          I go see my niece and nephew when I can.
22          That's about it.
23    Q.    On an average week, where do you go?
24    A.    Where do I go?
25    Q.    Right.
```

```
 1   A.     Not too many places.  I mean, up to my

 2          sister's house.  I go to my buddy's house at

 3          times.  I don't go too many places.  I don't

 4          do too much.  I don't know what to tell you.

 5   Q.     What town does your sister live in?

 6   A.     Robinson Township.

 7   Q.     About how far away is that?

 8   A.     Like 10, 15 minutes, if that.

 9   Q.     Your buddy's house where you go, where is

10          that?

11   A.     Oh, goodness.  He's 20 minutes down the road.

12          Justin, the kid that was with me that night.

13                   MS. OZAROWSKI:  Okay.  I'm going to

14          mark for identification the documents that

15          were provided by Plaintiff's counsel in this

16          case.  It is a -- it's a 27-page PDF.  I

17          believe we were up to Exhibit D at this point.

18                       - - - -

19          (Exhibit D marked for identification.)

20                       - - - -

21                   MS. OZAROWSKI:  Mike, do you have a

22          copy of this with you?

23                   MR. SANTICOLA:  Which one is it?

24                   MS. OZAROWSKI:  So this is the

25          documents you provided.  I can either share my
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

278

```
1              screen, which is kind of annoying, or I can

2              e-mail this to you or if you have it --

3                      MR. SANTICOLA:  I don't have it in

4              paper.  Whatever is easiest for you.  I mean,

5              if you e-mail it to me, I can pull it up on my

6              phone and look at it.

7                      MS. OZAROWSKI:  I don't know if that

8              will be big enough.  Do you think that will be

9              big enough for him to be able to see?

10                     MR. SANTICOLA:  Of the pictures that

11             you're going to ask him to identify.

12                     MS. OZAROWSKI:  I think I'm more

13             asking questions about the papers.

14                     MR. SANTICOLA:  Whatever -- however

15             you want to do it.  I don't have the physical

16             one in front of me, no.

17                     MS. OZAROWSKI:  Let me try to share

18             my screen and we'll see if that works and if

19             it's not working, we can try something else.

20                     MR. SANTICOLA:  Okay.

21     A.    How much more do you think you got?

22                     MR. SANTICOLA:  You're almost done.

23     BY MS. OZAROWSKI:

24     Q.    Mr. Stiffler, can you please try to position

25             yourself back into the camera?
```

```
 1   A.     Sure.  No problem.  No problem.  This is
 2          awful.
 3   Q.     Okay.  Now, you're able to see this should be
 4          page 6 of this PDF.  At the top it says page 3
 5          of 16 on the right-hand side.  And on the
 6          left-hand side it says -- here, I'll do this.
 7                  MR. SANTICOLA:  We can see it very
 8          well.
 9                  MS. OZAROWSKI:  Just to identify for
10          the record.  It says when you will receive
11          your payments.
12   BY MS. OZAROWSKI:
13   Q.     Mr. Stiffler, if you take a look at the top
14          part here, it says -- okay.  Let's go down to
15          information used to determine your payments.
16          It says:
17                      "You meet all the rules to be
18          eligible for SSI beginning April 3rd, 2019."
19                      Was that the first time that you
20          received disability after the fire in 2018?
21   A.     Yes.  Yes, ma'am.  Yes.
22   Q.     Why did the payments start in 2019 versus at
23          some point in 2018?
24   A.     I don't know.  I got my payments, boom, right
25          after this.  I don't have no clue.  You talk
```

```
 1           to my mom.  I got them, boom.  As soon as they
 2           got -- I don't know.  I don't know where you
 3           got that information from, but I got my
 4           payments and she'll be able to show you.  I
 5           didn't get no payments starting October 1st,
 6           2019.  I got my payments, boom, in 2018.
 7    Q.     Okay.  On this sheet --
 8    A.     I have proof.  I don't know.
 9    Q.     I'm sorry.  I didn't mean to interrupt you.
10    A.     I don't know.  I don't know.
11    Q.     On this sheet you can see that there's a
12           circle drawn around the section and a star
13           drawn, who drew that?
14    A.     That's the date that the nightmare happened,
15           that's it.  I don't know.  I didn't do that.
16           I don't write like that.
17    Q.     Do you recognize the handwriting on the star?
18    A.     Looks like my mother's.  I don't know.  I
19           can't see that.  I'm not going to say that.  I
20           can't say that.  Just I don't know.  That's
21           not my writing.  I wish I could write that
22           good.  Who wrote that that said --
23                    MR. SANTICOLA:  Let her ask a
24           question.
25    BY MS. OZAROWSKI:
```

```
 1   Q.    Now, we have scrolled down to page 11 of the
 2         PDF.  This appears to be a printout from
 3         Verizon.  So it's a list in the middle of the
 4         page.  It says iPhone 8, iPhone 6S Plus,
 5         iPhone 6S Plus, and a number of Droids just to
 6         identify this for the record.
 7   A.    Should have stayed with Droid.
 8   Q.    I'm sorry?
 9   A.    I said I should have stayed with Droid.
10   Q.    What do you see on this page?
11   A.    What do I see on the page?  I see that -- what
12         do you mean?  You want me to read the whole
13         page for you?
14   Q.    No.  I'll fix my question for you.  Where did
15         this page come from?
16   A.    Me and my -- do I --
17               MR. SANTICOLA:  Yeah.
18   A.    Me and my lawyer went up and we got this so
19         that we could show that the phone was just
20         purchased right before this happened.  It was
21         a brand new phone.
22   BY MS. OZAROWSKI:
23   Q.    Where did you get this printout?
24   A.    Verizon.
25   Q.    How did you get it from Verizon?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

282

```
 1   A.    Me and my lawyer went in there, they printed
 2         it up, and that's it.  They said if you were
 3         another week later, you wouldn't have been
 4         able to get it.  Like that's F'd up.  I don't
 5         understand that.
 6   Q.    Can you explain what you mean by that?
 7   A.    Somebody at Verizon said if it's after two
 8         years, you cannot get that.  My lawyer can
 9         even -- just my lawyer can justify what he
10         said.
11                   MR. SANTICOLA:  Just answer the
12         question.
13   BY MS. OZAROWSKI:
14   Q.    So --
15   A.    I don't know what they are hiding, but yeah.
16         If that would have been a week later, I
17         wouldn't have been able to got that.
18   Q.    When you say you don't know what they are
19         hiding, who is they?
20   A.    Well, it would be Apple or Verizon.  I don't
21         know.  I mean, what do you got to hide that
22         you have to have it every two years -- if
23         after two years you're stopping it.
24   Q.    Well, what do you mean by stopping it?
25   A.    Well, let me say this again.  If I would have
```

```
 1            not have got this and I would have waited
 2            another week, I wouldn't have been able to got
 3            that.
 4     Q.     When you say that, do you mean the model of
 5            iPhone?
 6     A.     No.  Just the date that I got it.  Just
 7            everything that's written.  See, I wouldn't
 8            have got iPhone 6S Plus, 32 gigabytes, space
 9            gray.  I wouldn't have been able to got any of
10            that July 7, 2018 if I would have waited
11            another week.
12     Q.     Right.  And I'm trying to understand what you
13            mean by that.
14     A.     What do you mean, what are you trying to
15            understand?
16                    MR. SANTICOLA:  Why?  Why?
17     A.     Verizon wouldn't have gave it to me.
18                    MR. SANTICOLA:  Why?
19     A.     I don't know why.
20     BY MS. OZAROWSKI:
21     Q.     What were you told by the Verizon person?
22     A.     I would have to ask my lawyer.  He was there
23            with me and --
24     Q.     Well, what do you recall?
25     A.     I don't -- I just know that -- I'm not going
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

284

```
 1            to say too much.  My lawyer was with me and
 2            that's -- I'm just saying what, I mean --
 3                  MR. SANTICOLA:  You can say what
 4            your understanding is is what she's asking.
 5   A.    That's my understanding is if I would have
 6            waited another week, I wouldn't have been able
 7            to got this.  I wouldn't have been able to
 8            receive this.  That's all.  I don't want to --
 9   BY MS. OZAROWSKI:
10   Q.    When you say you wouldn't have been able to
11            receive this, to what are you referring?
12   A.    What I purchased, the iPhone 6 Plus.  That's
13            all.  Is that hard?  Am I -- is this like
14            English?  I don't understand.  If I wouldn't
15            have done this right here and I would have
16            waited, like say if I would have went up next
17            week from now, I wouldn't have been able to
18            got that.
19   Q.    Am I understanding that you're testifying that
20            this model no longer would have been available
21            or something else?
22   A.    No, no, no.  What I'm saying is that after two
23            years I guess, you cannot get that no more
24            that you --
25                  MR. SANTICOLA:  Get what?  Get this
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

285

```
 1        piece of paper?
 2  A.    Yes.  I cannot get that piece of paper and
 3        that information if I wouldn't have got that
 4        when I did, and that's what's so crazy.
 5  BY MS. OZAROWSKI:
 6  Q.    I think I may be understanding what you're
 7        saying.  Are you saying that -- are you
 8        talking when you say you wouldn't have been
 9        able to got that, is that referring to this
10        paper, is that referring to a particular
11        device or is the word that referring to
12        something else?
13  A.    I wouldn't have been able to get that I
14        purchased the iPhone 6S Plus on that date,
15        July 7th, 2018.  They would have not given it
16        to me.
17  Q.    Who is they?
18  A.    Verizon.  The top says Verizon, they wouldn't
19        have gave it to me.
20  Q.    And when you're saying it, I'm asking what you
21        mean by it, is this that --
22  A.    The receipt.
23  Q.    -- piece of paper?
24  A.    What I can say, the receipt.
25              MR. SANTICOLA:  The receipt and the
```

```
 1          information.
 2     A.    I don't -- she --
 3                 MR. SANTICOLA:  Hold on.  What
 4          you're asking, Lili, so we're being clear, is
 5          this piece of paper and this information
 6          related to your phone.
 7     A.    Would not have been eligible for me to
 8          proceed.
 9                 MR. SANTICOLA:  Because why?
10     A.    I don't know.  Jamie will tell you.
11     BY MS. OZAROWSKI:
12     Q.    I think hopefully this will clear things up.
13          My confusion is I don't know what you're
14          defining it as.  I don't know if you mean the
15          phone or the paper?
16                 MR. SANTICOLA:  The paper.
17     A.    This meaning, yes --
18                 MR. SANTICOLA:  The paper.
19     A.    -- I would not have been able to show that I
20          bought the phone that date.  They wouldn't
21          have given it to me.
22                 MR. SANTICOLA:  Like the information
23          would have been deleted is what he's saying.
24          They wouldn't be able to get a piece of paper
25          that says, that's what he was told.  I was not
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1          the lawyer at the time, so I wasn't there.
 2    BY MS. OZAROWSKI:
 3    Q.    Who was your attorney at this time?
 4    A.    Jamie Bogatay.
 5    Q.    Can you spell that last name, please?
 6              MR. SANTICOLA:  B-O-G-A-T-A-Y.
 7    BY MS. OZAROWSKI:
 8    Q.    How long was this attorney your attorney?
 9    A.    I'd say about two years.
10              MR. SANTICOLA:  I don't know the
11          answer.
12    A.    Two years.  I'm not for sure, ma'am.
13    BY MS. OZAROWSKI:
14    Q.    I'm sorry?
15    A.    I'm not for sure, ma'am.  I would say around
16          two years.  Two years, ma'am.
17    Q.    Was that the first attorney you retained for
18          this incident?
19    A.    Yes, ma'am.  Yes, ma'am.  Yes, ma'am.
20    Q.    Who was your next attorney?
21    A.    Mr. Santicola.
22    Q.    When did you retain Mr. Santicola?
23              MR. SANTICOLA:  I don't remember
24          when.  I would say just soon after the -- soon
25          before the writ was filed I believe.
```

```
 1    BY MS. OZAROWSKI:
 2    Q.    Now, I'm just asking, Mr. Stiffler, why did
 3          you change attorneys?
 4    A.    I was -- my lawyer told me that I should be
 5          with him and I -- my -- Jamie I have known
 6          since I was a little kid, and I met with
 7          Mr. Santicola.
 8    Q.    When did you retain your first attorney?
 9    A.    Right after the fire.
10    Q.    Can you be more specific?
11    A.    August 2018.
12    Q.    Why did you retain an attorney at that time?
13    A.    Because I knew something happened.  I knew the
14          phone blew up.  As soon as I heard the hiss
15          and the pop and my hands being burnt and my
16          face being burnt and I'm very agile and
17          there's no way.  I knew something happened.
18    Q.    Turning back to this exhibit.  In the top
19          right corner, you can see here it says welcome
20          I believe it says Steinku, S-T-E-I-N-K-U.  Is
21          that the --
22                MR. SANTICOLA:  Representative.
23    BY MS. OZAROWSKI:
24    Q.    -- is that the person at Verizon?
25    A.    Yes, ma'am.  Yes, ma'am.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1   Q.    Okay.  So initially I had thought that this
 2         piece of paper was something you printed out
 3         on your own, but now from your testimony, I'm
 4         understanding that this is a piece of paper
 5         you were handed by Verizon when you went into
 6         a Verizon store; is that correct?
 7   A.    Yes, ma'am.
 8   Q.    Now, these other devices that are listed here
 9         under past, are these all devices that you
10         owned at one point?
11   A.    Yes, ma'am.
12   Q.    There is a device that's circled, it's the
13         iPhone 6S Plus, 32 GB, space gray is what it
14         says here.  The number to the right of it is
15         36260 and it's circled.  Who drew that circle
16         on this page?
17   A.    They did.
18   Q.    What is that --
19   A.    I'm sorry.  I don't know who did.  I didn't do
20         it.  I don't know.  I'm not going to say
21         anything.  I don't know.
22   Q.    Do you have an understanding of why that
23         device is circled?
24   A.    No, ma'am.
25   Q.    Is this the device that you believe was
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

290

```
 1           involved in the fire?
 2     A.     Yes.
 3     Q.     And why do you believe that?
 4     A.     Probably because it happened July 16, 2018.  I
 5            bought the phone July 7, 2018.  That's what I
 6            believe.
 7     Q.     Above that device -- I'm sorry.  I didn't mean
 8            to interrupt.
 9                   MR. SANTICOLA:  That's okay.  He was
10            done.
11     A.     That's the only reason.
12    BY MS. OZAROWSKI:
13     Q.     Above that device, there is another device
14            listed, it's an iPhone 6S Plus, 32 gigabyte,
15            space gray, and the number to the right of it
16            again is 36260.  The date to the right of that
17            is September 3rd, 2018.  What device is this?
18     A.     They tried to give me another iPhone after
19            they already gave me the bomb, so I was like
20            why would I want this.  I mean, I just I
21            didn't take it.  I gave it back.  My mom gave
22            it back.  I don't want that.  I don't want it.
23            I can't believe that I was -- and I was in bad
24            shape at that time, you know.  Just I don't
25            know.  They tried to send it to me
```

```
 1      automatically.
 2  Q.    Who is they?
 3  A.    I'm going to say Apple.  Apple sent it to me.
 4        Or Verizon.  I mean, they are all in cahoots,
 5        so Apple or Verizon sent it.
 6  Q.    How did you receive this device?
 7  A.    I bought it from the store.
 8              MR. SANTICOLA:  No, no.  This one,
 9        the one you're talking about.
10  BY MS. OZAROWSKI:
11  Q.    I'm talking about the September 3rd, 2018
12        device.
13              MR. SANTICOLA:  The other one.
14  A.    It just came in the mail, ma'am.  I tell you,
15        like it came in the mail, but -- yeah, it came
16        in the mail.
17  BY MS. OZAROWSKI:
18  Q.    What sort of a box did it arrive in in the
19        mail?
20              MR. SANTICOLA:  We still have the
21        box.
22              MS. OZAROWSKI:  Is it possible to
23        take a photograph of that box and send it to
24        me?
25              MR. SANTICOLA:  Yeah.  That's
```

292

```
 1          probably something you should do when you
 2          interview Mrs. Stiffler.  Robert said he had
 3          no idea.  He just went to throw something
 4          away.  He didn't have any idea.  He doesn't
 5          know anything about that phone.  Mrs. Stiffler
 6          does.  She can authenticate it.  She can tell
 7          you everything.
 8     BY MS. OZAROWSKI:
 9     Q.   So Mr. Stiffler, asking you right now, what do
10          you recall with regards to this September 3rd,
11          2018 device?
12     A.   I don't recall anything, ma'am.  I don't
13          recall.  It's bad shape right there.  I don't
14          recall anything.
15     Q.   Did you request this device from anybody?
16     A.   No.
17     Q.   Did you use this device?
18     A.   No.
19               MS. OZAROWSKI:  Counsel, again
20          please do not answer for your client.
21     A.   He's not answering.  I just answered.
22     BY MS. OZAROWSKI:
23     Q.   What happened to this September 3rd, 2018
24          device?
25     A.   Ma'am, I don't know.  You'd have to talk to my
```

293

```
 1           mother.
 2    Q.     Listed above this iPhone 6S Plus is an iPhone
 3           8, space gray, dated September 16, 2018.  What
 4           is that?
 5    A.     I'm sure I don't know.  Probably another one
 6           they tried to throw at me.  I don't know.  I'm
 7           not going to say anything because I didn't get
 8           it.
 9    Q.     When you say they --
10    A.     At that time I was in so much -- they meaning
11           who do you defend, Apple and Verizon?  Apple.
12           Apple.
13    Q.     I'm asking you what you mean by that?
14    A.     Apple.  They said Apple.
15                  MR. SANTICOLA:  If you don't know,
16           you can say I don't know.
17    A.     It has to be Verizon or Apple.  I just
18           don't -- I don't know.
19    BY MS. OZAROWSKI:
20    Q.     When you went to the Verizon store and asked
21           to have this page printed out, what
22           specifically did you ask for?
23    A.     I'd have to get my other lawyer because I
24           don't know.
25    Q.     Were you present when this list was printed
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

294

```
 1        out?
 2   A.     Yes.  I was in very bad shape.  I just got
 3          done with a surgery.  But I knew that I just
 4          got the phone right before it blew up.
 5   Q.     What surgery did you have performed in July of
 6          2020?
 7   A.     I had shots in my face.  And then I had a --
 8          they put it's called Kenalog.  They shot that
 9          all through my face.  And then they removed --
10          they are removing the infection again in my
11          neck right here.  I had balls of infection.
12   Q.     Does this printed out list that we're looking
13          at right here reflect devices that you have
14          purchased, devices that somebody in your
15          family has purchased or something else?
16   A.     The Droid I purchased.  The Droid Turbo by
17          Motorola, black, I purchased all the way up to
18          the circle.  Then up, I have no clue.  I
19          didn't purchase any of that, the two above the
20          circle.
21   Q.     Are these devices that you purchased, is this
22          the September 3rd, 2018 device and the
23          September 6, 2018 device?
24   A.     Nope.
25   Q.     Do you have an understanding of why they are
```

1            listed on this page?

2    A.    No, ma'am.

3    Q.    Did you have a cell phone in 2018 after the

4          fire?

5    A.    No.  I didn't even get a cell phone until 20

6          -- maybe it was the end of 2019.

7    Q.    What kind of cell phone did you get at the end

8          of 2019?

9    A.    I don't know, ma'am.  I don't know.  I don't

10         know.

11   Q.    Was it an iPhone or a different type of phone?

12   A.    I don't know.

13   Q.    How long did you have the device that you

14         obtained in 2019?

15   A.    I don't know, ma'am.  I'm pleading the Fifth.

16   Q.    What do you mean by that?

17   A.    I don't know.  I don't know.  I swear, I mean,

18         I don't know.  Like these -- I just want to

19         get this done.  I don't know.

20   Q.    Do you currently have a cell phone?

21   A.    Yes, I do.

22   Q.    What kind of cell phone do you have?

23   A.    An iPhone.

24   Q.    What type?

25   A.    I think it's the 10 because it has a pull-down

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

296

```
 1         system.  I had no choice, I had to get it.  I
 2         had to.
 3    Q.   What do you mean by that?
 4    A.   Verizon.  They just when I went up to the
 5         Verizon store, it was automatically like given
 6         to me, I mean.  I mean, or I wouldn't have
 7         taken it.
 8    Q.   Did you pay for it?
 9    A.   I did not pay for it, so I don't know.  And
10         like I said, nothing -- because I didn't pay
11         for it.
12    Q.   Did your mother or your father pay for it?
13    A.   I don't know.
14    Q.   Who paid for it?
15    A.   I don't know.
16    Q.   Did somebody pay for it?
17    A.   I hope so.  I guess.  I hope I didn't take it.
18         I mean, yeah.  Sure.  Right?  I mean, yes, I'm
19         sure.  I didn't steal it.
20    Q.   I'm asking you did somebody pay for this
21         device?
22    A.   Yes.  I mean, I'm pleading the Fifth.  Isn't
23         that --
24              MR. SANTICOLA:  No, that doesn't
25         really apply here.
```

```
 1   A.     Like I say, no.  I don't know if my dad or my
 2          mother paid for it.  I'm sorry.  But somebody
 3          did pay for it.
 4   BY MS. OZAROWSKI:
 5   Q.     When was this iPhone 10 purchased?
 6   A.     I don't know, ma'am.
 7   Q.     Can you estimate a month and a year?
 8   A.     December of 2019.
 9   Q.     Did you have a cell phone in between July 2018
10          and December 2019?
11   A.      Nope.
12   Q.     Why did you choose to get an iPhone in 2019
13          over a different brand of cell phone?
14   A.      I don't know.  I just -- I don't know.  So
15          surgeries and stuff and I don't know.  I'm not
16          going to answer that because I don't -- it was
17          like -- it was like they told me -- I don't
18          know.  You'd have to ask my mom.  She -- I
19          think she bought it, so you'd have to ask her
20          because it was -- I don't know.  I'm not going
21          to answer that because I don't know.  That
22          would be a lie to you.
23   Q.     Scrolling down to page 12 of this PDF, this
24          looks like another page printed out by that
25          same person Steinku, S-T-E-I-N-K-U.  It's
```

```
 1          dated 7/7/20 at the bottom.  This shows a
 2          Apple 8, 64 gigabyte, space gray, and it looks
 3          like it was ordered on September 16th, 2018.
 4          What is this?
 5                    MR. SANTICOLA:  If you know.
 6     A.    I don't know, ma'am.  My mom would know.
 7                    MR. SANTICOLA:  Lili, when you see
 8          up at the top it says 100 percent on top on
 9          the size of that thing.
10                    MS. OZAROWSKI:  Right.
11                    MR. SANTICOLA:  Can you make it a
12          little bigger?
13                    MS. OZAROWSKI:  Make it bigger,
14          sure.
15                    MR. SANTICOLA:  Yeah.
16                    MS. OZAROWSKI:  Is that easier to
17          see?  I can make it bigger too.
18                    MR. SANTICOLA:  No, that works.  I'm
19          sorry to interrupt you.  Do you want to ask
20          that again?
21                    MS. OZAROWSKI:  Sure.
22     BY MS. OZAROWSKI:
23     Q.    My question is:  What is this page and what
24          does it show?
25     A.    It says that either my mother or father
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

1          purchased an iPhone 8.  That's where they

2          purchased -- that's what it shows to me

3          because I don't remember.

4     Q.   Why was this included in your discovery

5          responses?

6     A.   I don't know.  I don't know.  I don't know.  I

7          don't know.  I'm not going to answer.  I don't

8          know.

9               MR. SANTICOLA:  I don't know is a

10         good enough answer.

11    A.   I don't know if it is or isn't.

12    BY MS. OZAROWSKI:

13    Q.   How does this piece of paper or the

14         information contained on this piece of paper

15         relate to your lawsuit?

16    A.   I don't know.

17              MR. SANTICOLA:  I'll object to the

18         form of the question.  And if you know the

19         answer, you can.

20    A.   I don't know.

21              MR. SANTICOLA:  The answer is I

22         don't know?

23    A.   I don't know.

24    BY MS. OZAROWSKI:

25    Q.   Mr. Stiffler, I'm sorry, you can't ask your

```
 1          attorney what the answer is.  You have to
 2          answer the questions to the best of your
 3          ability.
 4   A.     I just said I don't know, ma'am.
 5   Q.     Did you provide this piece of paper to your
 6          attorney?
 7   A.     I didn't provide it.  My mom provided it, but
 8          I didn't do it.  I did not provide it, no.
 9   Q.     We have scrolled down to page 13 of 27 of the
10          PDF.  This is a -- it says date issued on it,
11          10/25/2018 and on the left it says Motorists
12          Mutual.  It appears to be addressed to Sandra
13          Stiffler.  What is this document?
14   A.     I don't know.  I need a break if you're going
15          to keep going.  I don't know.
16                  MR. SANTICOLA:  You can say I don't
17          know.
18   BY MS. OZAROWSKI:
19   Q.     Well, you need to answer the open question.
20   A.     Okay.  I don't know.  I don't know.  I don't
21          know.
22   Q.     Did you provide this document to your
23          attorney?
24   A.     No.  No, ma'am.  No, ma'am.
25   Q.     Who provided this to your attorney?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

301

```
 1   A.     I don't know, ma'am.

 2                MS. OZAROWSKI:  All right.  We can

 3          take a break.

 4                THE WITNESS:  How much --

 5                MR. SANTICOLA:  If you're going to

 6          ask for him to identify those documents, he's

 7          not going to be able to identify any of them I

 8          don't think, if that's what you're -- again,

 9          they can be identified if you ask your next

10          witness.  I don't think he's going to be able

11          to do it.

12                MS. OZAROWSKI:  Okay.  Well, we're

13          still on the record, correct?

14                MR. SANTICOLA:  Yeah.

15                MS. OZAROWSKI:  You know, these were

16          documents that were provided as responses to

17          his interrogatories, so we're entitled to

18          question him about them.

19                MR. SANTICOLA:  I agree.  I get it.

20   A.     I agree too, but I just don't -- I just don't

21          know.  I'm sorry if I'm coming off -- I'm just

22          overwhelmed.

23                MR. SANTICOLA:  You have to take a

24          breath and read it.  Read it and if you don't

25          know, you can say you don't know.  That's it.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1                    THE WITNESS:  I know, but just kind

 2         of like when you say not to say stuff or to

 3         say stuff or not to stay stuff.

 4                    MS. OZAROWSKI:  Are we going to take

 5         a break at this point or are we going to keep

 6         going?

 7                    MR. SANTICOLA:  Five minutes.

 8                    THE VIDEOGRAPHER:  The time is

 9         2:58 p.m.  We're now off the video record.

10                         - - - -

11         There was a brief Recess in the proceedings.

12                         - - - -

13                    THE VIDEOGRAPHER:  The time is

14         3:05 p.m.  We're now back on the video record.

15    BY MS. OZAROWSKI:

16    Q.    So now going back to the Exhibit D that we

17          were just looking at, page 13 of 27.  Do you

18          recognize this document, Mr. Stiffler?

19    A.    No, ma'am.

20    Q.    Did you provide this document to your

21          attorney?

22    A.    No, ma'am.

23    Q.    Scrolling down to page 14 of 17, it states at

24          the top billing notice.  There's the billing

25          date is 10/23 -- pardon.  Billing date,
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

```
 1        10/23/2017.  Mr. Stiffler, do you recognize
 2        this document?
 3   A.   No, ma'am.
 4   Q.   Did you provide this document to your
 5        attorney?
 6   A.   No, ma'am.
 7   Q.   Scrolling down to page 15 of 27 of the PDF.
 8        At the top of it it says homeowners insurance.
 9        Mr. Stiffler, do you recognize this document?
10   A.   No, ma'am.
11   Q.   Did you provide this document to your
12        attorney?
13   A.   No, ma'am.
14   Q.   It looks like this document has more than one
15        page.  The next document on here is page 17 of
16        27 of the PDF.  It appears to be an e-mail to
17        Sandy Stiffler.  Mr. Stiffler, do you
18        recognize this document?
19   A.   No, ma'am.
20   Q.   Did you provide --
21   A.   No, ma'am.
22   Q.   -- this document to your attorney?
23   A.   No, ma'am.  No, ma'am.
24   Q.   The next page is 18 of 27 of the PDF.  In the
25        left it says Duckstein.  At the top it says
```

```
 1          Duckstein Restoration.  Mr. Stiffler, do you
 2          recognize this document?
 3   A.     No, ma'am.
 4   Q.     Did you provide this document to your
 5          attorney?
 6   A.     No, ma'am.
 7   Q.     Are you aware that after the fire, the state
 8          fire marshal performed an investigation into
 9          the cause of the fire?
10   A.     Yes, ma'am.
11   Q.     What is your understanding of that?
12   A.     I heard that it's undetermined, but -- that's
13          all.  It's undetermined.
14   Q.     Do you understand that an investigation was
15          completed?
16   A.     Yeah, but you can -- what I seen was
17          undetermined.
18   Q.     When you say what you have seen, what have you
19          seen?
20   A.     Just the paper that I was given, it said
21          undetermined.
22   Q.     Were you interviewed by any firefighters or
23          the fire marshal in connection with any sort
24          of investigation into the fire?
25   A.     Nope.  Never.
```

```
 1   Q.    What is your understanding of the

 2         investigation that took place by the fire

 3         marshal after the fire?

 4   A.    I have to clue.  They didn't talk to me, so I

 5         have no clue, ma'am.

 6   Q.    Did you ever speak to Motorists Insurance

 7         Company in connection with --

 8   A.    No.

 9   Q.    -- the investigation into this fire?

10   A.    No, ma'am.

11   Q.    You testified earlier that your doctor,

12         Mr. Stofman, had what you testified as

13         shrapnel in a porcelain cup.  What happened to

14         that?

15   A.    I'm sure he still has it.

16   Q.    How do you know?

17   A.    I don't know.  I'm not going to say.  My

18         fault.  I don't know what happened to it.

19   Q.    When was the last time you saw the contents of

20         the porcelain cup?

21   A.    Maybe a year and a half ago.

22   Q.    In what context did you see them?

23   A.    Physically.

24   Q.    Meaning were you there for an appointment or

25         something different?
```

```
 1   A.     Yes.  I went up for an appointment.  I was
 2          just wondering why I had so many marks and
 3          indentions in my face.  He said there's so
 4          many things blow into your face and just like
 5          a kid, it just messed up my face.  I was just
 6          wondering why my face looked like this.  And
 7          it got a little bit better, but it was bad
 8          there for a while.  I had marks and indentions
 9          all through my face.
10   Q.     Where did Dr. Stofman get the porcelain cup
11          when you were having this conversation,
12          meaning where was it stored?
13   A.     I don't know, ma'am.
14   Q.     Where did you see it during that appointment?
15   A.     He had it right there.  I mean, he always has
16          like colleagues working with him, so I wasn't
17          paying attention exactly what was going on, so
18          I can't say anything.  There's like four or
19          five colleagues always with him and other
20          people and I didn't -- I don't know.  He just
21          said, you know, he said I can remember he said
22          this man is lucky to be alive, and I don't
23          know, ma'am.
24   Q.     Was the object that penetrated your neck ever
25          found?
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

```
 1   A.    No, ma'am.

 2   Q.    Was it still in your neck at the time you went

 3         to the hospital?

 4   A.    Oh, yes.  The whole time I was there, there

 5         was blood constantly coming out of me.

 6   Q.    Was the object itself still in your neck

 7         during this time?

 8   A.    No, no, no.  It just punctured it and -- no.

 9         No, ma'am.

10   Q.    Did you pull the object out of your neck

11         yourself?

12   A.    No, ma'am.  I don't remember.  Now, I could

13         have, but I don't remember.

14   Q.    Are you aware that the medical records from

15         your admission after the fire reflect that the

16         skin on your face and scalp was treated with

17         the use of staples?

18   A.    Yes, ma'am.

19   Q.    What is your understanding of that?

20   A.    My understanding, that a lot of staples in my

21         hands and my neck, my head.

22   Q.    What were the staples used for?

23   A.    I think that -- I don't know.  To hold the

24         skin on because they put Cordova.  I had a lot

25         of grafts done, so they had to staple it to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

308

```
 1          keep it down.  Right?  I don't know.  I don't
 2          know.
 3                    MR. SANTICOLA:  Try to answer.
 4     BY MS. OZAROWSKI:
 5     Q.    Is it possible that the items that you saw in
 6          the porcelain cup were staples that were
 7          removed from your scalp and your face?
 8                    MR. SANTICOLA:  I'll object to the
 9          form of the question.  You can go ahead and
10          answer it though.
11     A.    No.  No.  Nope.
12     BY MS. OZAROWSKI:
13     Q.    How do you know?
14     A.    How do I know?  Because just I know it wasn't.
15          You're talking about force, putting it right
16          into my face.  I mean, that's the kind of a --
17          I don't know.  I mean, that's a wild question.
18          No.
19     Q.    What is your basis for that belief?
20     A.    My basis for what belief?  That the staples
21          were -- what do you mean?  I don't -- I mean,
22          talk to me like a 3-year-old.  I don't know
23          what you're trying to say.  You seen that they
24          -- they were in my face.
25                    MR. SANTICOLA:  Hold on.  Rephrase
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

309

```
 1          that for us, Lili.
 2   BY MS. OZAROWSKI:
 3   Q.     Let me rephrase the question.  Is there any
 4          possibility that the objects that you saw in
 5          the porcelain cup in Mr. Stofman's office were
 6          staples that had been used to treat your face
 7          and scalp?
 8   A.     No.  No.  No way.  No way.  No way.
 9   Q.     And what do you base that understanding on?
10   A.     I just base it on that's what I believe.
11   Q.     Going back to Exhibit D.
12                 MR. SANTICOLA:  We can see that one.
13                 MS. OZAROWSKI:  I'm sorry?
14                 MR. SANTICOLA:  We can see that one.
15          You don't need to expand that one.
16                 MS. OZAROWSKI:  Okay.
17   BY MS. OZAROWSKI:
18   Q.     This is page 27 of the PDF, it is a
19          handwritten note.  Mr. Stiffler, do you
20          recognize this handwritten note?
21   A.     No, ma'am.
22   Q.     Do you recognize the handwriting on this
23          handwritten note?
24   A.     No, sir.
25   Q.     Do you know who wrote this list?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

310

```
 1    A.     No, ma'am.

 2    Q.     The entities and individuals that are listed

 3           here, I'll read a few of them.  It says Mercy

 4           Hospital, Dr. Jenny Ziembicki, Alain Corlos.

 5           Are these doctors with whom you have treated

 6           for injuries you allege to have been sustained

 7           in the fire?

 8    A.     Yes.  Dr. Butcher saved my life.

 9    Q.     Was this a list that was written by your

10           mother?

11    A.     I don't know, ma'am.

12    Q.     Mr. Stiffler, I'm going to show you some

13           photographs that were taken of your bedroom

14           during the fire marshal's investigation into

15           this fire.  What is this a photograph of?

16                 MS. OZAROWSKI:  Sorry.  For the

17           record, we can mark it --

18    A.     Oh, this is --

19                 MR. SANTICOLA:  Hold on.

20                 MS. OZAROWSKI:  Wait.  Before you

21           answer, we're going to mark this as Exhibit E.

22           At the top this photograph is labeled, it's

23           DSC_0354.

24                         - - - -

25           (Exhibit E marked for identification.)
```

```
 1                   - - - -
 2   A.    It's a marijuana pipe.
 3   BY MS. OZAROWSKI:
 4   Q.    And is this yours?
 5   A.    Oh, yes, it's mine.
 6   Q.    Are these two marijuana pipes or just one?
 7   A.    No, it's just one.
 8   Q.    When was --
 9   A.    Whoa, whoa, whoa.  It's two.  It's two.  Two.
10   Q.    When was the last time you had used the blue
11         marijuana pipe before the fire?
12   A.    Oh, I don't recall, ma'am.
13   Q.    When was the last time you used the red
14         marijuana pipe?
15   A.    I don't recall.  I don't recall.
16   Q.    When you used to smoke marijuana, where would
17         you smoke it?
18   A.    I got those --
19                  THE WITNESS:  Say a name?
20                  MR. SANTICOLA:  You can say anything
21         you want.
22   A.    Kevin, I guess from my buddy, and I would
23         smoke it up at his house.  And I don't know,
24         they are Kevin's.  I just don't want to lie.
25                  MR. SANTICOLA:  Tell the truth.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

312

```
 1    A.     They are Kevin's.

 2    BY MS. OZAROWSKI:

 3    Q.     Can you see my cursor?

 4                 MR. SANTICOLA:  Yeah.

 5    BY MS. OZAROWSKI:

 6    Q.     So right here I'm circling this top portion of

 7           the blue pipe, what is this part of the pipe

 8           here?  It looks like it's silver on the top of

 9           the blue pipe?

10    A.     I have no clue what that is.  That's not part

11           of the pipe.  That's got to be something --

12           yeah, the pipe -- that's not part of the pipe,

13           ma'am.  That's a piece -- I don't even know

14           what that is.

15                 MR. SANTICOLA:  Keep your voice up.

16    A.     I don't know what that is.

17                 MS. OZAROWSKI:  Okay.  The next

18           photo -- I'm going to share the photo and then

19           I'm going to describe it before I ask you a

20           question.  So we can mark this as Exhibit F.

21           At the top it's marked DSC_0355.

22                       - - - -

23           (Exhibit F marked for identification.)

24                       - - - -

25    BY MS. OZAROWSKI:
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

313

```
 1   Q.    Mr. Stiffler, do you know what this object is

 2         in the middle of this photograph?

 3                   THE WITNESS:  Can we make it bigger?

 4                   MR. SANTICOLA:  No, I don't think we

 5         can make it any bigger.  Maybe you can make it

 6         bigger.  I don't know if you can or not.

 7                   MS. OZAROWSKI:  I actually have a

 8         closer photograph of it.

 9                   MR. SANTICOLA:  Well, based on this

10         photo, do you know what it is?

11   A.    No.

12                   MR. SANTICOLA:  Maybe you can move

13         on to the next one.

14   BY MS. OZAROWSKI:

15   Q.    So I'm going to show you another photograph.

16                   MS. OZAROWSKI:  We can mark -- we

17         can have both photos marked as Exhibit F.  So

18         this will be a two-photograph exhibit.  I'm

19         going to describe it first.  This second part

20         of this exhibit, it's marked at the top

21         DSC_0356.

22   A.    It's aluminum foil.

23                   MR. SANTICOLA:  Let her finish.

24   BY MS. OZAROWSKI:

25   Q.    You can answer.  What is this?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

314

```
 1                      MR. SANTICOLA:  Okay.  What do you
 2          think it is?
 3    A.      It's aluminum foil, ma'am.
 4    BY MS. OZAROWSKI:
 5    Q.      What was this aluminum foil used for?
 6    A.      That's from inside of a cigarette -- a
 7          cigarette pack.  You know a cigarette pack has
 8          that aluminum inside of it, that's what that
 9          is.  100 percent that's what it is.  It's
10          inside of a Marlboro pack.
11    Q.      Was this foil used to smoke drugs?
12    A.      No, it was not used to smoke drugs.
13                      MS. OZAROWSKI:  The next photograph
14          will be Exhibit G.  This photograph is marked
15          at the top DSC_0357.
16                          - - - -
17          (Exhibit G marked for identification.)
18                          - - - -
19    BY MS. OZAROWSKI:
20    Q.      Mr. Stiffler, can you identify anything in
21          this photograph?
22    A.      Yeah.  It's the top of a Marlboro pack.  It's
23          just the top of a Marlboro pack, a little tiny
24          bit of it.
25    Q.      Were you smoking cigarettes in your room the
```

```
 1          night of the fire?

 2   A.     No, I was not.  No, I was not.  Nope.

 3   Q.     Did you ever smoke cigarettes in your room

 4          prior to the fire?

 5   A.     No, I could not, nope.  With the kids, I

 6          cannot smoke cigarettes in the house.  Nope.

 7   Q.     Even when the kids weren't home, would you --

 8   A.     It doesn't matter.

 9                MS. OZAROWSKI:  Strike that.

10   BY MS. OZAROWSKI:

11   Q.     If the children weren't in the house, would

12          you smoke cigarettes in your room?

13   A.     No.

14   Q.     Why not?

15   A.     Because my mom would have kicked me out if she

16          would have smelled cigarette smoke.  I mean, I

17          smoke outside on the porch.  My mom, no

18          cigarette smoke.  She would have kicked me

19          out.

20   Q.     I want to show you one more photograph.

21                MS. OZAROWSKI:  This can also be

22          part of Exhibit G.  This photograph is marked

23          DSC_0358.

24   BY MS. OZAROWSKI:

25   Q.     What do you see in this picture?  It's a
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

316

```
 1           close-up of the last picture.
 2    A.     I see Mountain Water and a top of the Marlboro
 3           pack and then my carpet.
 4    Q.     Do you know what this object is to the right
 5           of the cigarette pack?
 6    A.     It looks like the cellophane off from the
 7           cigarette pack.  It looks like the cellophane.
 8           I could be wrong, but -- I don't know.
 9    Q.     Do you have a Facebook account?
10    A.     No, I don't.  I stopped.  I got off of
11           Facebook because my dad got prostate cancer
12           and my sister writes everything on there, so I
13           just got off.  Yeah, I'm not on Facebook no
14           more.
15    Q.     When did you get off Facebook?
16    A.     Probably two months ago.
17    Q.     Prior to two months ago, did you have a
18           Facebook account?
19    A.     Yes, ma'am.
20    Q.     What was your name on Facebook?
21    A.     Robert Stiffler.
22    Q.     Did you ever post anything about the July 2018
23           fire on Facebook?
24    A.     July 16th, 2018 fire?
25    Q.     Pardon me.  I might have said the wrong date.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

317

```
 1              MS. OZAROWSKI:  Let me withdraw that
 2         question.
 3   A.    Yeah, I might have.
 4   BY MS. OZAROWSKI:
 5   Q.    I'll rephrase the question in case I said the
 6         wrong thing.  Did you ever post anything on
 7         Facebook about the July 16th, 2018 fire?
 8   A.    Yeah, that I got burned because it was all
 9         over the news for three days.  It was
10         everywhere, you know.  And then my sister put
11         stuff on there too just how my progress was
12         going because I was touch and go there for a
13         while, so --
14   Q.    What is your sister's Facebook name?
15   A.    Jamie Richardson -- Jamie Stiffler Richardson.
16   Q.    Did you ever post anything about the iPhone on
17         Facebook?
18   A.    I'm sure I did.  Yep.
19   Q.    What did you post?
20   A.    I'm not sure, ma'am.  I mean, I never put like
21         a post post that would be like a main stream
22         post.  What are you asking, like a message --
23   Q.    Yes.
24   A.    -- to someone?  I don't -- I can't tell you.
25         I might have said that I believed that the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

318

```
 1        phone did this 100 percent, and I know it did
 2        without even questioning it.
 3   Q.   Who did you message that to?
 4   A.   I have no clue.  I'm just saying I might have.
 5        I don't remember.  I mean, I gave you my name,
 6        you can check, but I don't -- I don't know if
 7        I did or didn't.  I don't know.
 8   Q.   What's your basis for thinking that you may
 9        have messaged somebody about the iPhone?
10   A.   My basis is because I believe it did 100
11        percent.  I don't believe it did, I know it
12        did.
13   Q.   Who did you message?
14   A.   I do not know.  I do not know, ma'am.  If I
15        would know, I would tell you.  I don't have
16        nothing to hide.  I'd tell you.
17   Q.   Am I understanding your testimony to be that
18        you know that you did message somebody about
19        the iPhone but you don't know who?
20   A.   No, because -- no.  I would be lying because I
21        don't know if I did or I didn't.  So I'd have
22        to say no.  I can't say no.  I don't know.
23   Q.   Did you ever make any public posts about the
24        subject iPhone --
25   A.   No.
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Stiffler

319

```
 1   Q.     -- on Facebook?

 2   A.     Nope.

 3   Q.     Do you have an Instagram account?

 4   A.     No.

 5   Q.     Have you ever had an Instagram account?

 6   A.     Yeah, I did.

 7   Q.     When did you close your Instagram account?

 8   A.     Like six months ago.

 9   Q.     What was your Instagram name?

10   A.     RobertStiffler@Gmail.com.

11   Q.     What was your Instagram handle, meaning where

12          it would say @ and then a name or the @

13          symbol?

14   A.     I'm trying to understand.  Say that again,

15          please.

16   Q.     So if you wanted someone to be able to find

17          you on Facebook -- or strike that.

18                         If you wanted someone to be able to

19          find you on Instagram, what would you tell

20          them your handle was?

21   A.     I never used that for that ever.  I never -- I

22          never used that.

23   Q.     What did you post on Instagram while you had

24          it?

25   A.     Just pictures.  I never posted any writing.  I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

320

```
 1          posted pictures, I mean.
 2    Q.    Well, what was your Instagram handle?
 3    A.    My handle?
 4               MR. SANTICOLA:  Yeah.
 5    BY MS. OZAROWSKI:
 6    Q.    Your ID name?
 7               MR. SANTICOLA:  ID.
 8    A.    Robert Stiffler@ -- no, wait.
 9          Rob62323@Gmail.com.
10    BY MS. OZAROWSKI:
11    Q.    So I understand that you're giving me an
12          e-mail address --
13    A.    Yes.
14    Q.    -- but what was the name on your Instagram
15          account?
16    A.    Like I don't remember.  I don't remember.
17          Jeez, I don't remember, ma'am.
18    Q.    How long did you have an Instagram account?
19    A.    Maybe for about a year.
20    Q.    During what time period?
21    A.    July 2016 to about June 2017.
22    Q.    Did you create the Instagram account before or
23          after the subject fire?
24    A.    Before.
25    Q.    Why did you close your Instagram account?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

321

```
 1   A.    I just didn't -- I'm not -- you know, just
 2         don't use Instagram that much.  If anything, I
 3         was on Facebook, so all of my stuff is on
 4         Facebook.  You know, I didn't have any friends
 5         on Facebook -- I mean, Instagram.  All of my
 6         friends are on Facebook, so all of my
 7         information is on Facebook.
 8   Q.    Did you ever post anything about the subject
 9         fire on Instagram?
10   A.    Nope.
11   Q.    Did you ever post anything about the injuries
12         allegedly sustained in the subject fire on
13         Instagram?
14   A.    No, ma'am.
15   Q.    Do you have a Twitter account?
16   A.    No, ma'am.
17   Q.    Do you have a blog?
18   A.    No.  No, ma'am.
19   Q.    Do you have a website?
20   A.    Yes.
21   Q.    What is your website?
22   A.    You mean my Gmail?
23   Q.    No.  A website, not an e-mail address.
24              MR. SANTICOLA:  Website.  If you
25         don't know --
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

322

```
 1    BY MS. OZAROWSKI:

 2    Q.    You can ask me.  If you don't understand, you

 3          need to ask me, not your attorney.

 4    A.    What's a website like?

 5    Q.    Do you have a web page that you maintain?

 6    A.    No.  No.  I don't have -- I'm 43.  I didn't

 7          take a computer class in high school, no.

 8                    MR. SANTICOLA:  For the record,

 9          Lili, we're in his house right now using my

10          computer, so they don't have one here at the

11          house.

12    BY MS. OZAROWSKI:

13    Q.    Have you ever made any -- or strike that.

14                              Have you ever written any accounts

15          of the subject incident on any public website?

16    A.    No, ma'am.

17    Q.    Have you ever written about the subject

18          incident on any discussion boards on the

19          internet?

20    A.    No, ma'am.  Well, what -- no.  No, I haven't.

21          No.  Nope.  No, I did not.

22    Q.    Can you explain to me what you were just

23          thinking may have applied to the answer?

24    A.    I was just thinking maybe I would -- I didn't

25          have a blog because I thought -- you know, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

323

```
 1          don't have a blog.  I was thinking if I had a
 2          blog or not, but I don't have a blog.
 3     Q.   Have you ever had a blog?
 4     A.   No.  But a blog is something you write down
 5          everything you're -- like a journal or
 6          something.
 7     Q.   Did you ever have a blog?
 8     A.   No, ma'am.
 9     Q.   Did you ever have a journal?
10     A.   No, ma'am.
11               MS. OZAROWSKI:  I would like to take
12          a minute or two and look through my notes.
13               MR. SANTICOLA:  Make sure you're
14          done, okay.
15               MS. OZAROWSKI:  Right.
16               THE VIDEOGRAPHER:  The time is
17          3:34 p.m.  We're now off the video record.
18                    - - - -
19       There was a brief Recess in the proceedings.
20                    - - - -
21               THE VIDEOGRAPHER:  The time is
22          3:46 p.m.  We're now back on the video record.
23     BY MS. OZAROWSKI:
24     Q.   Mr. Stiffler, I just have a few more questions
25          for you.  The first one is:  How was it that
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

324

```
 1          you came to believe that the hiss and pop as
 2          you have described them came from the subject
 3          cell phone?
 4    A.    I just -- I just -- what else can do that?
 5          What else can do it, throw a hiss and a pop,
 6          blow up?  I mean, my TV wasn't on.  I mean,
 7          what else is up there that's going to give an
 8          explosion like that that's going to knock me
 9          out.  I mean, that's why.  I know for 100
10          percent that phone did it.  I don't care what
11          anybody says.
12    Q.    When you say I don't care what anybody says,
13          what do you mean by that?
14    A.    I just -- my belief is I'm in very good shape.
15          Something had to knock me out to -- I mean, an
16          ash touched you, I jump.  There's something
17          that touched my face.  I would never let
18          anything touch my face, never.  You'll see.
19          You'll see.  You'll see.
20    Q.    I'm sorry.  What was the last part you said?
21    A.    I said I got damage.  I said, we're going to
22          go to -- we're going to find out what
23          happened, right?
24    Q.    Who did you say that to?
25    A.    No.  I said I'm talking to you.  I said it to
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

325

```
 1          you.  Because I'm just -- look what I have

 2          been through.  This is just a nightmare.  I

 3          mean, gosh, this is -- I can't -- I have been

 4          through hell.

 5                    MR. SANTICOLA:  Just answer her

 6          questions, that's all.

 7     A.    I say it to you.

 8                    MR. SANTICOLA:  You're good.

 9     BY MS. OZAROWSKI:

10     Q.    When was the first time that you considered

11          that it was the iPhone that had in your words

12          exploded?

13     A.    Well, I got up -- I mean, when I came out of

14          my coma, I was like -- I would never let my

15          face, especially my hands.  My hands are just

16          my everything and my face.  I mean, I'm a

17          good-looking kid.  I just never asked a girl

18          even out.  I mean, I protect myself.  And for

19          something to burn my face and stuff like that,

20          something blew up in front of me and it was

21          the phone.  I mean, I just bought the damn --

22          I just bought the thing.

23                         And then it even to justify it, when

24          I went and looked about it, it's all iPhone 6

25          Plus that are blowing up.  I mean, the stores
```

```
 1          are taking them out.  I mean, just Google it.
 2          It's amazing.  It's killed over eight people.
 3          It's sad.  It's left me like this, damaged
 4          forever.
 5   Q.     When you say --
 6   A.     I mean --
 7   Q.     Apologies.  I didn't mean to interrupt you.
 8   A.     I'm sorry.  I'm sorry.
 9   Q.     You can continue.
10   A.     No.  I'm sorry.  I'm done.
11   Q.     When you testified you looked into it, are you
12          referring to when you went on the internet and
13          looked up iPhone 6s exploding?
14   A.     IPhone 6 Pluses, the 6Ss, the 6s.  Especially
15          the ones that are made in 2018 because I would
16          just -- I am so astonished by this.
17                  MR. SANTICOLA:  Just answer her
18          question.  She said did you look it up and you
19          said yes.
20   A.     Yes.  Just it's too much.
21   BY MS. OZAROWSKI:
22   Q.     Mr. Stiffler, was there something else that
23          you were starting to say before you were
24          interrupted?
25   A.     No.  I just said it's too much.  And I served
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

327

```
 1        my country and come home to this.

 2                MS. OZAROWSKI:  No further

 3        questions.

 4                MR. SANTICOLA:  Okay.  Thank you.

 5        It's okay to go with Mrs. Stiffler right now

 6        since she took the day off from work?

 7                THE VIDEOGRAPHER:  Can we go off the

 8        video record very quickly?

 9                MS. OZAROWSKI:  Yes.

10                THE VIDEOGRAPHER:  The time is

11        3:51 p.m.  We're now off the video record.

12                        - - - -

13                (Thereupon, the deposition was

14        concluded at 3:51 p.m.)

15                        - - - -

16

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

328

```
 1                     CERTIFICATE

 2   COMMONWEALTH OF PENNSYLVANIA)
                                 )  SS:
 3   COUNTY OF INDIANA           )

 4          I, Tammie Elias, RPR and Notary Public in
     and for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, ROBERT STIFFLER, was by me
     first duly sworn to testify to the truth, the whole
 6   truth, and nothing but the truth; that the foregoing
     deposition was taken at the time and place stated
 7   herein; and that the said deposition was recorded
     stenographically by me and then reduced to printing
 8   under my direction, and constitutes a true record of
     the testimony given by said witness.
 9
            I further certify that the inspection,
10   reading and signing of said deposition were not
     waived by counsel for the respective parties and by
11   the witness.

12          I further certify that I am not a relative
     or employee of any of the parties, or a relative or
13   employee of either counsel, and that I am in no way
     interested directly or indirectly in this action.
14
            IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my seal of office this 31st day of
     January, 2022.
16

17          _____

18           Commonwealth of Pennsylvania
              Tammie Elias, Notary Public
19           Center Township, Indiana County
          My Commission Expires December 9, 2023
20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Stiffler**

329

1                      E R R A T A

2          I, ROBERT STIFFLER, have read the foregoing
   pages of my deposition given on Friday, January 14,
3  2022, and wish to make the following, if any,
   amendments, additions, deletions or corrections:

4
   Pg. No.  Line No.    Change and reason for change:
5

6

7

8

9

10

11

12

13

14

15

16
   In all other respects, the transcript is true and
17 correct.

18                        _____

19                                ROBERT STIFFLER

20 Subscribed and sworn to before me this
   _____ day of _____, 2022.
21

22 _____

23               Notary Public
              Reference No. TE81508
24

25

```
 1                   NETWORK DEPOSITION SERVICES
                       Suite 1101, Gulf Tower
 2                       707 Grant Street
                       Pittsburgh, PA  15219
 3                         412-281-7908

 4

 5    January 31, 2022

 6

 7       Michael F. Santicola, Esq.
         michael@ssslawyer.com
 8       SANTICOLA STEELE & FEDELES, P.C.
         722 Turnpike Street
 9       Beaver, PA  15009
         724-775-3392
10
             NOTICE OF NON-WAIVER OF SIGNATURE
11
            Please have the deponent read his deposition
12    transcript.  All corrections are to be noted on the
      preceding Errata Sheet.
13
            Upon completion of the above, the Deponent must
14    affix his signature on the Errata Sheet, and it is
      to then be notarized.
15
            Please forward the signed original of the Errata
16    Sheet to Lili Ozarowski, Esq. for attachment to the
      Original Transcript, which is in her possession.
17    Send a copy of same to all counsel, and also a copy
      to me.
18
            As per the rules, if the witness does not sign
19    the signature page within 30 after receipt of the
      transcript, signature is deemed waived.
20

21

22    Tammie Elias, RPR
      Court Reporter
23

24

25
```