# Exhibit F

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3
     ------------------------------
 4                                :
     ROBERT STIFFLER,             :
 5                   Plaintiff    :
     vs.                          :
 6                                : 2:21-cv-00523-JFC
 7                                :
     APPLE INCORPORATED and       :
 8   VERIZON INCORPORATED,        :
                  Defendants      :
 9   ------------------------------

10

11

12

13      Deposition of: ROBERT G. RYHAL

14      Taken by     : Defendant

15      Before       : Joyce a. Wise, RMR

16      Date         : Monday, July 25, 2022
                       10:04 a.m.
17
        Place        : Zoom Deposition
18

19

20

21

22

23          NETWORK DEPOSITION SERVICES
                1101 GULF TOWER
24              707 GRANT STREET
           PITTSBURGH, PENNSYLVANIA 15219
25               (412) 281-7908
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

2

1

2    APPEARANCES:

3

4        SANTICOLA, STEELE & FEDELES, P.C.
         BY:  Michael F. Santicola, Esquire
5        722 Turnpike Street
         Beaver, PA  15009
6
         Counsel for Plaintiff
7

8        ARENT FOX SCHIFF
         BY: Stephen M. Copenhaver, Esquire
9        233 South Wacker Drive
         Suite 7100
10       Chicago, IL 312.258.5500

11       Counsel for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

3

```
 1
 2                      INDEX OF EXHIBITS
 3    RYHAL DEPOSITION                        PAGE
 4    1: Notice of Deposition...............7
 5    2: Curriculum Vitae ..................8
 6    3: Current CV.........................9
 7    4: Court Testimony list...............9
 8    5: Communications with Client........22
 9    6: Correspondence with Fire Marshal...24
10    7: Photos ...........................27
11    8: Text messages ....................31
12    9: iPhone article just as a place holder
13    10:Billing statements ...............37
14    11:Page 25 of 33 of Henry Report .....73
15
16     (Exhibits Retained)
17
18
19
20
21
22
23
24
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

4

```
 1                    STIPULATION

 2          It is hereby stipulated and agreed by

 3    and between counsel for the respective parties

 4    that the deposition is being taken for discovery;

 5    that reading, signing, sealing, certification, and

 6    filing are waived; that all objections, except as

 7    to the form of the question, are reserved to the

 8    time of trial.
                        *   *   *   *
 9                 ROBERT G. RYHAL,

10    called upon by Defendant to give testimony, being

11    duly sworn or affirmed by me, testified as:

12                    EXAMINATION

13    BY MR. COPENHAVER:

14          Q.   Good morning, Mr. Ryhal.

15               Spell your last name for the record.

16          A.   Robert George Ryhal, R-Y-H-A-L.

17          Q.   All right.  Mr. Ryhal, I'm gonna try to

18    remember the pronunciation of your last name.

19               I'll do my best, but if I mess up, my

20    apologies.

21               So we're here today to take your

22    deposition in the matter of Robert Stiffler versus

23    Apple, et al.

24               I understand you've been retained as an

25    expert on behalf of the plaintiff.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

5

```
 1              Is that your understanding?
 2       A.    Correct.
 3       Q.    I'm sure you've been through this
 4  process a number of times, so I'm not going to
 5  belabor them.
 6              But a couple of ground rules I want to
 7  go over with you that are primarily intended make
 8  the court reporter's job a little easier.
 9              Please try to wait for me to finish
10  asking my question before you start your answer
11  and I'll try to wait for you to finish answering
12  before I start my question.
13              Is that fair?
14       A.    Yes.
15       Q.    If I ask a question that you don't
16  understand or is confusing, please let me know and
17  I can attempt to rephrase it.
18              Okay?
19       A.    Correct.
20       Q.    I tend to take breaks on the hour.  If
21  you need a break at any point in time other than
22  that, however, please just let me know.
23              I would just ask that you answer
24  whatever question is pending and then we take a
25  break for everyone.  Okay?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

6

```
 1        A.   Yep.  Great.

 2        Q.   You're doing great so far, but just

 3   please continue to answer out loud and verbally.

 4   I can see you and I know if you nod or shake your

 5   head what you mean, but that doesn't show up real

 6   well on the record.

 7             Okay?

 8        A.   Correct.

 9        Q.   Do you have a copy of the Notice of

10   Deposition in front of you?

11        A.   No, I do not.

12        Q.   Have you been sent a copy of that

13   notice?

14        A.   I received an e-mail.

15        Q.   So I have up on my screen what we'll

16   mark Exhibit 1, which is a Notice of Deposition of

17   Robert G Ryhal.

18             Do you see that?

19        A.   Yes.

20             (Ryhal Deposition Exhibit

21              Number 1 marked.)

22   BY MR. COPENHAVER:

23        Q.   Is that a document you have seen before?

24        A.   Yes.

25        Q.   Okay.  And do you recall that on the
```

1  second and third page of that document, there was

2  a list of items that you were requested to produce

3  in advance of the deposition?

4       A.   I saw that list, yes.

5       Q.   Okay.  Did you provide those materials

6  to counsel?

7       A.   I believe everything that was requested,

8  they had reviewed it and asked me to provide X, Y,

9  Z.

10           So, truthfully, I didn't go line by

11  line, because I thought that they had taken care

12  of it.

13      Q.   Let's go ahead and do that to make sure

14  I have everything that you have.

15           The first thing is a copy of your

16  current CV.

17           Do you see that?

18      A.   Yes.

19      Q.   Okay.  Let me see if I can pull that up,

20  make sure what I have is the current one.

21           Up on the screen I have pulled up a

22  document entitled curriculum vitae of Robert G.

23  Ryhal.

24           Is that your CV?

25      A.   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

8

1        Q.   It looks like a rev date of 7/20/20 in
2   the upper right-hand corner?
3        A.   Yeah, I don't think that's the current
4   one.
5        Q.   So I'm going to go ahead and mark this
6   as Exhibit 2.
7                (Ryhal Deposition Exhibit Number 2
8                 marked.)
9   BY MR. COPENHAVER:
10       Q.   Would you be able to provide a current
11  CV to counsel so that it can be provided to us?
12       A.   Sure.
13       Q.   All right.  Do you know -- off the top
14  of your head, do you know what the substantive
15  changes are between the current version and the
16  one we marked as Exhibit 2?
17       A.   Traditionally, it's just relative to the
18  number of fires.
19            In this instance, you know, I'm chairman
20  of a local charity, things like that.  Nothing
21  significant.
22       Q.   Okay.  I would like a current version,
23  so we will sort of preemptively mark the current
24  vision as Exhibit 3 or 12 or remain blank for now.
25       A.   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

9

```
 1              (Ryhal Deposition Exhibit Number
 2               3 marked.)
 3    BY MR. COPENHAVER:
 4        Q.   The next item -- and we'll obviously go
 5    through your CV, but I just want to continue down
 6    this list a little bit.
 7              The next item requested was a list of
 8    your testimony.
 9        A.   I believe that was provided.
10        Q.   So I have up on the screen a document
11    dated May 31, 2022, entitled Court Testimony of
12    Robert G. Ryhal, which we will mark as Exhibit 4.
13              Is that an up-to-date list of your court
14    testimony?
15        A.   Yes.
16              (Ryhal Deposition Exhibit Number 4
17               marked.)
18    BY MR. COPENHAVER:
19        Q.   Does this list all instances in which
20    you provided sworn testimony in the past?
21        A.   I would like to say yes, but there's
22    instances, I believe, where, you know, I didn't
23    record it properly.
24              For example, I was in Warren County
25    Court and the judge advised me that I had actually
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

10

1   spoken as an expert in her courtroom prior and I

2   didn't have it.

3       Q.   Okay.  But other than, you know,

4   inadvertent omissions like that, this is intended

5   to be comprehensive?

6       A.   Yes.

7       Q.   Can you tell me which of these are

8   instances in which you testified as a retained

9   expert in a civil case?

10          Are you looking at your own copy of this

11  or do you need me to scroll?

12      A.   No.  You're good where you're at.

13      Q.   I'm going to stop sharing that, unless

14  you're reading from mine.

15      A.   Can you scan up a bit?

16      Q.   Sure.

17      A.   And scan up to the next page, please,

18  first page, okay, to the second page.

19          I think from 18 -- 18, 19, 20 onward

20  would generally be for various clients.

21          I'm not sure of 18.  For some reason

22  it's just not -- it's not coming to my forefront,

23  what that was about.

24          But generally those would be the ones

25  that would be on behalf of an insurance client,

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

11

1    looks like it.

2        Q.   You think 18 -- more or less 18 through

3    29?

4        A.   Yes.

5        Q.   Do you believe that you have provided

6    testimony as an obtained expert in a civil case on

7    approximately 12 prior occasions?

8        A.   Yes.  In 12 -- I mean, 22, I'm sorry,

9    that was a homicide trial, Freddie Robinson.  That

10   was after I retired.  But it was a criminal case

11   for the State Police.

12       Q.   Okay.  So somewhere between 10 or 12

13   times you think, would that be a fair estimate,

14   that you testified in civil trials as a retained

15   expert?

16       A.   Yes.

17       Q.   How many of those have been against an

18   insurance company in a subrogation action?

19       A.   I would say all of them.

20       Q.   So all of the instances in which you

21   have testified as a retained expert in a civil

22   matter have been on behalf of insurance companies

23   in subrogation actions in which they sought to

24   recover monies paid out pursuant to a policy.

25            Is that your understanding?

12

1          A.   Generally, yes.  I would say, yes,
2     that's correct.
3          Q.   Have you ever testified for a defendant
4     in a civil litigation?
5          A.   I don't believe so.  Wait a minute.  You
6     said a defendant?
7          Q.   A defendant.
8          A.   Let's go -- can you scroll up?
9          Q.   Tell me when to stop.
10         A.   Stop, please.  Please go down again and
11    stop.
12              I'm looking for a case that was in
13    Allegheny County Court.  I thought it was -- there
14    you go, 23.
15         Q.   Is that a case in which you testified on
16    behalf of the defendant?
17         A.   Yeah, for defendant, Francis Kish
18    Construction.
19         Q.   And can you just generally describe the
20    circumstances of that case?
21         A.   That had been my client had done some
22    work at a house.  And I forget if they were
23    insulating or something to that effect.  But they
24    were accused of, when they left, having left a
25    lightbulb on in insulation, something to that

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

13

```
 1   effect.
 2        Q.   And what was your opinion in that case?
 3        A.   My opinion was that they -- they didn't
 4   have or collect the lightbulb they were alleging
 5   was the cause of the fire.
 6        Q.   Why was it significant in your view that
 7   they didn't collect the lightbulb that they had
 8   said was the cause of the fire?
 9        A.   It would have determined if the
10   lightbulb was on or off.
11        Q.   And was it your opinion that in the
12   absence of them collecting that lightbulb to
13   assess its condition at the time of the fire, it
14   was inappropriate for them to have attributed the
15   cause of the fire to that lightbulb?
16        A.   I think that was the general discussion,
17   yes.
18        Q.   Are there any other instances in which
19   you can think of where you were retained and
20   testified on behalf of a defendant in civil
21   litigation?
22        A.   Please rephrase your question.
23        Q.   Sure.  Other than that one instance, the
24   one Number 23, on Exhibit 4, can you think of any
25   other instances in which you were retained and
```

1  testified on behalf of the defendant in civil

2  litigation?

3          That may not have been a rephrasing, but

4  let me know if you don't understand it.

5      A.   No, it was whether or not you stated it

6  was testimony.

7      Q.   Got it.

8      A.   No, I don't believe so.

9      Q.   Did any of these cases in which you

10  testified in civil litigation concern or relate to

11  lithium ion batteries?

12      A.   I would have to say no.

13      Q.   What about more broadly speaking, are

14  any of the cases in which you've testified in any

15  capacity, have any of those related to lithium ion

16  batteries?

17      A.   I believe no.

18          Can you go back to that one more time?

19      Q.   Sure can.

20          And just for the record, I've pulled up

21  the Court Testimony list.

22      A.   16, I don't believe that had anything to

23  do with batteries.  That was the one that caught

24  my eye as you flipped away.

25      Q.   Okay.  If it has to do with batteries,

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

15

1    let me know --

2         A.   I don't believe so.

3         Q.   Okay.  The next item on the deposition

4    notice that was requested was number three.  And

5    it requested your entire file relating to

6    captioned lawsuit filed by plaintiff.

7         Q.   Yes.  Documents, yes.

8         Q.   Do you have an index of that?  Or do you

9    have that in front of you and we can walk through

10   it and I can make sure that I have everything

11   that's in your file.

12        A.   I don't have an index, but I have the

13   documents that were provided to me.

14        Q.   Can you just list those -- list

15   everything that's in your file to make sure that I

16   have a copy of it, please?

17        A.   So we have the transcripts of Sandra

18   Arthur and Robert Stiffler.

19             We have the motorist report by John

20   Henry and motorist file, which I believe includes

21   some of the adjustor work.

22             The purchase receipt of an Apple iPhone.

23             Can you hear me okay?

24        Q.   I sure can.

25        A.   I have an Allegheny County Emergency

1    Services Report.  There are some newspaper

2    articles, Cresson Township Police Department

3    Report, some online stories about Apple iPhones.

4           And we have a record of investigations

5    into the iPhones from Apple.  In addition to that,

6    I have obtained the photographs of John Henry, in

7    addition to his report.

8           The photographs of the Allegheny County

9    Fire Marshal.  I think that's pretty much it.

10          Oh, and the medical records.

11          I don't have those in front of me.  I

12    don't know if those were a PDF.  There's a large

13    file of medical records.

14    Q.    All right.  Online stories about Apple

15    iPhones.  Did you find those or were those

16    provided to you?

17    A.    Provided to me.

18    Q.    By whom?

19    A.    Counsel.

20    Q.    For what purpose were those provided to

21    you?

22    A.    Truthfully, it was never discussed why

23    he provided them to me.  He provided them to me.

24    Q.    Are they of any significance to your

25    evaluation?

```
 1        A.   In this instance, no.  I mean, only that
 2   people are reporting that they had a problem with
 3   the iPhone.
 4        Q.   Do you know the circumstances under
 5   which any of those, what you're calling problems,
 6   arose?
 7        A.   I can't -- I mean, I read the articles.
 8   I can't recall what exactly the problems were.
 9        Q.   Do you have the articles in front of
10   you?
11        A.   The first one is a date stamp of
12   November 24th, '21.  Apple investigating iPhone 6
13   exploding in California.  I'm thinking the date's
14   gonna be on this one.
15             Man sues Apple for iPhone 6 battery
16   explosion caused by alleged defect.
17             IPhone S6 explodes causing second degree
18   burns in user in Australia.
19             The lawsuits filed against Apple after
20   iPhone and Smart Watch overheat and catch fire.
21             That's it.
22        Q.   When were those provided to you?
23        A.   I think these came with the initial file
24   that included John Henry's report.
25             And I think with John Henry's report, I
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

18

1    would have had the Allegheny County Fire Marshal's

2    report.

3         Q.    So when you were first provided a file

4    relative to your work on this case, counsel

5    provided you with articles dealing with alleged

6    battery thermal events for certain Apple products?

7         A.    I can't say exactly when, but, yeah, I

8    believe it was early on.

9         Q.    Okay.  And what did that suggest to you

10   about anything?

11        A.    Relative to my investigation, nothing.

12        Q.    Were you asked specifically to

13   determine -- were you asked explicitly about the

14   iPhone, to investigate the iPhone when you were

15   retained in this case?

16        A.    No.  I was asked to look at the reports

17   and the information provided and provide my client

18   with my opinion.

19        Q.    Did counsel provide you with articles

20   about anything other than Apple products?

21        A.    Well, the articles, I would assume, from

22   what counsel advised me, is that his client was

23   making the complaint that it was the phone.

24        Q.    So my question was, did counsel provide

25   you with articles about any product other than an

1    Apple product?

2         A.    Okay.   No.

3         Q.    What's the model of iPhone that is

4    alleged to have been involved in this incident?

5         A.    IPhone 6+, I believe.

6         Q.    Did any of those articles concern an

7    iPhone 6+?

8         A.    I don't believe so.

9         Q.    So, again, other than indicating to you

10   that certain people had reported alleged issues

11   with products other than the one at issue in this

12   lawsuit, did those articles have any significance

13   at all to your evaluation of this case?

14        A.    No.

15        Q.    Did you ask why they were provided to

16   you?

17        A.    Typically you'll get a bunch of

18   extraneous material, whether it's relevant or not

19   is for my analysis to determine.

20             MR. COPENHAVER:  All right.  Counsel, I

21   assume there's no issue in providing those

22   articles to us?

23             MR. SANTICOLA:  Oh, no, no.  They're

24   right off the internet, so they're public

25   knowledge.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

20

```
 1              MR. COPENHAVER:  But you can provide
 2    them so we know what he looked at?
 3              MR. SANTICOLA:  Sure.
 4    BY MR. COPENHAVER:
 5       Q.   Did you do any of your own online
 6    searches or investigation about iPhones?
 7       A.   No, I did not.
 8       Q.   One of the other things you mentioned is
 9    a report of investigations into iPhones by Apple.
10              I want to make sure I understand what
11    you are referring to there.
12              Can you describe that for me with a
13    little greater detail?
14              MR. SANTICOLA:  I believe that's what
15    you guys provided to us in discovery.
16              MR. COPENHAVER:  That spreadsheet or
17    chart?
18              MR. SANTICOLA:  Yes.
19              MR. COPENHAVER:  Okay.
20              THE DEPONENT:  I'm sorry.  I thought you
21    were referring to the article -- the list of
22    articles.
23    BY MR. COPENHAVER:
24       Q.   No, sir.
25              You had referred to it as a record of
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

21

```
 1    investigation into iPhones and I wanted to make
 2    sure I understood what you meant by that.
 3         A.   Yes.
 4         Q.   Okay.  Okay.  Anything else in your file
 5    in front of you?
 6         A.   No, I believe that's it.
 7         Q.   Okay.  The next thing on the notice that
 8    you were requested to provide were any and all
 9    documents and things you've reviewed, considered
10    or relied upon in doing any of your work in this
11    lawsuit.
12              Is there anything that you have reviewed
13    or relied upon other than the materials that we
14    just discussed that are in your file?
15         A.   Communications with the client.
16         Q.   Okay.  Have you provided those?
17         A.   No, I have not.
18         Q.   Do you have copies of those?
19         A.   I believe I have e-mails communicating
20    with the client.
21         Q.   Okay.  So I'm gonna put a place hold in
22    here as Exhibit 5 for correspondence with counsel.
23         A.   Okay.
24              (Ryhal Deposition Exhibit Number 5
25               marked.)
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

22

```
 1   BY MR. COPENHAVER:

 2        Q.    Could I ask you to please collect and

 3   send to counsel copies of that correspondence?

 4        A.    I believe that my client would have

 5   them.

 6        Q.    I'm sure that he would but I need it

 7   from you.

 8        A.    Okay.

 9        Q.    All right.  Have you communicated with

10   anyone other than plaintiff's counsel relating to

11   your work in this case?

12        A.    Yes.  I had a conversation with -- I

13   believe the Fire Marshal I spoke to briefly

14   asking -- I think I made an inquiry for photos.

15            And he was on the fire scene.  I believe

16   I asked him about the photos for his

17   investigation.  I have the report.  I didn't have

18   the photos.

19        Q.    Did you have any -- I'm sorry.  I didn't

20   mean to cut you off.

21        A.    Donnie Brucker, the Chief Deputy Fire

22   Marshal, told me that I wouldn't get the photos,

23   but they subsequently came back in the mail from

24   my request.

25            I may be confusing another file, too,
```

```
1    Counsel.

2              I sent my wife down to Allegheny County

3    to pick up pictures.  That could be this file.

4    I'm not sure.

5              Anyway, that is what that was limited

6    to.

7              I did speak with John Henry.

8         Q.   Let me first exhaust the Fire Marshal

9    conversation you may have had.

10             Did you have any substantive

11   conversations with anybody from the Fire Marshal's

12   office regarding anything other than just whether

13   or not photographs were available?

14        A.   The Fire Marshal I just simply asked --

15   I think there was a general question what was --

16   what had occurred, what was going on and I said

17   that there was a lawsuit concerning Apple.

18        Q.   And what, if anything, did the Fire

19   Marshal's office say?

20        A.   I limited the conversation to that.

21        Q.   Did they say anything about Apple or an

22   iPhone or any other product?

23        A.   No, it was limited to what I said it was

24   limited to.

25        Q.   Okay.  Do you have any correspondence in
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

24

1    the Fire Marshal's case related to this case?

2        A.   Generally you produce a letter in order

3    to get the photographs and checks to pay for

4    obtaining the images.

5        Q.   Is that something that you could provide

6    counsel?

7        A.   Yeah, I should be able to.

8            MR. COPENHAVER:  We're gonna mark those

9    as Exhibit 6 to be received.

10           (Ryhal Deposition Exhibit Number 6

11            marked.)

12   BY MR. COPENHAVER:

13       Q.   Okay.  And you also mentioned that you

14   spoke with Mr. Henry?

15       A.   Correct.

16       Q.   When did you speak with Mr. Henry?

17       A.   I spoke with Mr. Henry sometime after

18   receiving his report.  I would have to look that

19   up.  I might have a text where I asked John to

20   call me, where I texted him.

21       Q.   So tell me about -- you said that was

22   before you completed your report?

23       A.   Correct.

24       Q.   All right.  Tell me what you can

25   recall -- any conversation you had with

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

25

1  Mr. Henry -- well, first of all, how many times

2  did you speak with him about this case?

3       A.   I would say no more than two times.

4       Q.   All right.  Let's focus on the first

5  time.

6            Do you know how long before you

7  completed your report that first conversation

8  happened?

9       A.   I'd have to look it up.  I think -- I

10  would say it's fair to say that it's after I

11  received his report, because I was looking for

12  photographs.

13       Q.   All right.  Tell me what you can recall

14  about that conversation.

15       A.   The gist of the conversation was about

16  the photographs, and I read his report.

17            He had made the comments, I think, about

18  Mr. Stiffler and his drug and alcohol and a lot of

19  smoking going on, that sort of thing.

20            And I think the only thing I said to him

21  was, well, I think there's a lot more to it than

22  just that and you never really got a chance to

23  talk to the guy.

24            And I left it at that.

25       Q.   Have you talked to the guy?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

26

```
 1        A.   No.

 2        Q.   And what did Mr. Henry say in response

 3   to all of that?

 4        A.   He generously provided me with -- he

 5   checked with his client, motorist, to see if they

 6   would -- since I had the report, allow me to have

 7   the photos and they agreed and acquiesced and sent

 8   me, I think, the latest scene photos.

 9        Q.   Do you still have those photos?

10        A.   Yes.

11        Q.   I'm not sure we do.

12             Is that something you can provide?

13        A.   Yeah, they are in the report.  They're

14   labeled.

15        Q.   Are those the entirety of those photos?

16        A.   No.  No.  No, I assumed that you guys

17   had them.

18        Q.   Okay.  You can provide that?

19        A.   Sure.  You can accept a link, right, to

20   download?

21        Q.   I'm sure that we can and if not, we'll

22   deal with it.

23             But let's try that to begin with.  We'll

24   mark those as Exhibit 7.

25             (Ryhal Deposition Exhibit Number 7
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

27

```
 1              marked.)
 2   BY MR. COPENHAVER:
 3       Q.   Did Mr. Henry have any response to you
 4   saying he thought -- you thought there was a lot
 5   more going on than Mr. Stiffler's history with
 6   drugs and alcohol and the evidence of smoking in
 7   the house?
 8       A.   He did at one point.  I don't know if
 9   it's the first or second conversation.
10            I actually kept my conversation with him
11   very short, because I advised him, you know, John,
12   you realize you could, you know, get entangled in
13   this.  So I really don't want to discuss much with
14   you.
15            But after reviewing his report, he made
16   the comment that he -- I don't know if you know,
17   John and I were former business partners.
18       Q.   I saw that.
19       A.   And John was just coming out of the
20   insurance industry, so I'm not gonna say I was
21   mentoring him, but I was, you know, trying to work
22   with the reports.
23            And he stated that he wouldn't -- he
24   wouldn't write that report today.  He shouldn't
25   have written it as he did.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

28

```
1          Q.    Why did he say that?

2          A.    Well, I just think to the general

3     content, there is a great potential for

4     informational bias in his report, which he got

5     from Karelitz, I think it is.  That's the

6     Allegheny County Fire Investigator.

7          Q.    There's a great potential for

8     information -- what did you say?

9          A.    That's my comment.

10         Q.    No, I didn't catch it all.

11         A.    I'm just saying, there was -- he

12    received all of his information from the Fire

13    Marshal, didn't do any interviews and produced his

14    report.

15         Q.    He did an inspection, didn't he?

16         A.    You want my opinion, did he do an

17    inspection?  I can't testify to what he did.

18               I can only testify to what the photos

19    show and --

20         Q.    Is it your understanding --

21         A.    There's a lot of cigarette photos.

22         Q.    Is it your understanding that he did an

23    inspection of the home?

24         A.    Yes.  He was present.  He took

25    photographs.  He produced the report.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

29

1     Q.    So it's your testimony that he told you

2   he wouldn't write that report the way that he did,

3   because he received all his information from the

4   Fire Marshal?

5     A.    You added the last line.

6     Q.    Okay.  My question to you is, why did he

7   tell you, if he said, why he wouldn't write that

8   report today?

9     A.    I think the general -- it was a short

10  conversation.  I don't have the time of it.  But

11  it was relative to, you didn't interview anyone.

12  There's more to the story.

13    Q.    Okay.

14    A.    And that was his response.  I think

15  after he re-read his report, I think he -- my

16  opinion is he realized he may have walked out onto

17  a limb that he didn't want to be on.

18    Q.    Well, I'm less interested in your

19  opinion about it and more interested in what he

20  told you about it.

21          Did he say that?

22    A.    Say what?

23    Q.    That he -- that he walked out onto a

24  limb that he didn't want to be on, in sum and

25  substance?

```
 1        A.    No.
 2        Q.    Okay.  Did he tell you that he would
 3   have changed his conclusion in the report?
 4        A.    No.
 5        Q.    Did he tell you that he would have
 6   blamed the iPhone?
 7        A.    No.
 8        Q.    Did he tell you he would have blamed
 9   anything other than smoking, which is what he
10   blamed in the report?
11        A.    He didn't refer to his conclusion.
12        Q.    Did he tell you he would have altered
13   his conclusion?
14        A.    He simply told me he would not have
15   written that report as he did.
16        Q.    Did he tell you he would have changed or
17   altered his conclusion?
18        A.    He told me he would not all -- he would
19   not have written his report as he did.
20        Q.    I understand that and that can mean a
21   lot of different things.
22              So I'm asking you a very specific
23   question.
24              Did he tell you that he would alter or
25   change his conclusion?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

31

```
 1        A.    No.

 2        Q.    Does that, what we just talked about,

 3   cover your second conversation as well?  Because

 4   it sounds like there may have been some overlap

 5   between the two.

 6        A.    Yeah, it was limited.  I'd have to

 7   refer -- there's a few texts, but it was very

 8   limited.

 9        Q.    Okay.  Do you still have those text

10   messages?

11        A.    I may.  I'll look for them.

12        Q.    And you could provide those to counsel?

13        A.    Sure.

14             MR. COPENHAVER:  All right.  We're gonna

15   mark those as Exhibit 8.

16             (Ryhal Deposition Exhibit Number 8

17              marked.)

18   BY MR. COPENHAVER:

19        Q.    Do you have any correspondence with

20   Mr. Henry other than your text messages?

21        A.    No.  Well, I would in other files, but

22   not this file.

23        Q.    Fair enough.

24             So relative to the Stiffler case, this

25   particular fire, are your communications with
```

32

```
 1    Mr. Henry limited to those texts?

 2         A.   And the phone calls, yes.

 3         Q.   Right.

 4              I assume those weren't recorded and you

 5    can't provide those?

 6         A.   No.

 7         Q.   Okay.  So other than obviously counsel,

 8    people with the Fire Marshal's office and

 9    Mr. Henry, have you spoken to anyone else about

10    this case?

11         A.   No.  Well, I -- you said anyone else,

12    correct?

13         Q.   Correct.

14         A.   I did speak with my son, he's a

15    physician, relative to the medical records and the

16    drug screen, and I believe there was a presence of

17    methadone or some kind of drug, as to the

18    mechanics of how that occurs.

19              And he basically told me that absent a

20    time stamp, that those results could come from

21    treatment.  They're sort of anticipated.

22         Q.   Did that have any significance to your

23    opinions in this case?

24         A.   Well, it just goes to looking at the

25    degree -- what is the physical state of Robert
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

33

```
 1    Stiffler when he gets to the hospital.
 2         Q.   And your understanding is Mr. Stiffler
 3    tested positive for opiates and benzos shortly
 4    after the fire?
 5         A.   After the drug screen at the hospital,
 6    yes.
 7         Q.   Is it your understanding that he tested
 8    positive for methamphetamine as well?
 9         A.   That's what I was referring to, yes.
10         Q.   And so tell me again what -- well, the
11    fact that Mr. Stiffler tested positive for
12    methamphetamines, opiates and benzos during his
13    drug screen the morning after the fire, what
14    significance, if any, that had on your
15    investigation of this case?
16         A.   Well, the analysis was relative to what
17    was his -- if any, what was his degree of
18    intoxication or influence of drugs or alcohol at
19    the time prior to him arriving at the hospital.
20         Q.   And do you know what his level of
21    intoxication on methamphetamines, opiates or
22    benzos was at the time of the fire?
23         A.   Well, based on what I just previously
24    said from the inquiry I made, it was inconclusive.
25              The only thing, I recall there being --
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

34

```
 1    he had a blood alcohol -- a lower level of blood
 2    alcohol.
 3            So he had been drinking.
 4       Q.   He had been drinking.  He tested
 5    positive for methamphetamine, opiates and benzos,
 6    but his level of intoxication at the time of the
 7    fire is inconclusive based on the records you've
 8    reviewed, is that correct?
 9       A.   Correct.
10       Q.   And if Mr. Stiffler had been under the
11    influence of and impaired by drugs and alcohol at
12    the time of the fire, how would that affect your
13    analysis?
14       A.   Well, as an investigator, it's important
15    to analyze that and review it against the
16    statements of the individual relative to the
17    accuracy, the dependability of the statement.
18       Q.   And if the fact that Mr. Stiffler was
19    under the influence of methamphetamines, opiates,
20    benzos and/or alcohol, would that affect the
21    credibility of the statements he provided?
22       A.    In cases of extreme intoxication, yes.
23    Yeah, I would strongly consider that.
24       Q.   And do you know whether or not he had
25    that level of intoxication at the time of the
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

35

1   fire?

2        A.   From the record that I could see, no, he

3   didn't.

4             He had some alcohol in his blood.  I

5   don't want to say it's .04, but it wasn't anything

6   that concerned me.

7        Q.   What about his level -- what about the

8   level of drugs in his system?

9        A.   Well, he has regular medications that he

10  takes.  So, I mean, I'm not a medical

11  professional.  I won't speak to exactly what the

12  results are.

13            But relative to the methamphetamines, in

14  the course of his treatment, that drug panel, it

15  was explained to me, would show up positive.

16            So without any degree of -- or level of

17  blood -- blood level that would be determined in

18  the screening, it's -- doesn't serve me any

19  purpose.

20       Q.   Okay.  So the most you can say is that

21  he tested positive for methamphetamine, opiates,

22  and benzos, but you can't say whether or not he

23  was impaired to the extent that would affect his

24  credibility in reporting facts on the night of the

25  incident, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

36

```
 1        A.    Correct.

 2        Q.    The next thing that is asked in the

 3   notice are copies of any peer reviewed or other

 4   articles that have authored or co-authored

 5   pertinent or supporting your opinions in this

 6   lawsuit.

 7              Do you have any of those?

 8        A.    I would say no.

 9        Q.    Okay.  Number 14 asks for any articles

10   of any nature that you have reviewed or relied

11   upon in connection with your opinions in this

12   lawsuit.

13              Other than the internet articles that

14   you referenced earlier, and that you're gonna

15   provide to us, do you have any other articles of

16   any nature that you've reviewed or relied upon in

17   connection with your opinions?

18        A.    No, I don't believe so.

19        Q.    All right.  I don't think we -- I'm

20   gonna mark as Exhibit 9 those iPhone articles that

21   were provided to you.

22              (Ryhal Deposition Exhibit Number 9

23               marked.)

24   BY MR. COPENHAVER:

25        Q.    Number 15 asks for your time and billing
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

37

1    records for your work or work performed by anyone

2    under your direction and control relative to this

3    lawsuit.

4              Can you provide those?

5         A.   Yeah.   I'm a bit behind, but after this

6    deposition, I'll provide.

7              MR. COPENHAVER:   We'll mark those as

8    Exhibit 10.

9              (Ryhal Deposition Exhibit Number 10

10             marked.)

11   BY MR. COPENHAVER:

12        Q.   How much do you charge for your time?

13        A.   150 an hour.

14        Q.   And approximately how many hours have

15   you spent on this file?

16        A.   I want to say that with the report,

17   probably around 40.

18             You said Exhibit 10, correct, Counsel?

19        Q.   Exhibit 10.

20        A.   Okay.

21        Q.   Other than you, is there anyone under

22   your direction or control who also worked in this

23   case?

24        A.   The only one that would be included is

25   if I sent my wife down to get the photographs we

38

1    talked about.

2        Q.   Okay.

3        A.   Pick up records, things like that.

4        Q.   The last category of documents are any

5    and all documents relied upon in preparation of

6    your report not previously produced in discovery.

7             Is there any other document that you've

8    relied upon in formulating your opinions or in

9    preparing your report other than what we have

10   already identified and discussed?

11       A.   No.

12            Counsel, your first name is?

13       Q.   Steve.

14       A.   Steve, what was it, Exhibit 9 was the --

15       Q.   Exhibit 9 were the iPhone articles that

16   were provided to you.

17       A.   Thank you.

18       Q.   All right.  So now that that's out of

19   the way, let's talk a little bit about you.

20            Can you give me your educational

21   background, please?

22       A.   I attended Penn State and studied

23   architecture, that involved design of buildings,

24   structural analysis, system design, fire

25   protection material analysis and use in building.

39

1              And then went and I worked in the
2    telephone -- with a telephone company for a year
3    and a half, two years prior to finally going into
4    the State Police.
5              In the State Police, of course, I went
6    to the State Police Academy for six months and
7    then graduated.
8              I served 10 years on the road in patrol
9    duties, which included -- I got involved in
10   accident reconstruction, which would be the
11   mathematical analysis of accidents.
12             I spent about two-and-a-half years in
13   criminal investigation, involving everything from
14   homicides down to thefts.
15             And then I began serving as -- that time
16   period as an alternate for the Fire Marshal's
17   Division.  And then entered the Fire Marshal's
18   Division and spent the last approximately
19   12-and-a-half, 13 years of my career doing Fire
20   Marshal work.
21             Upon my retirement, I started Ryhal
22   Associates and began investigating as a private
23   investigator.
24             Relative to the education in the Fire
25   Marshal Division, I've been to the State Fire

1    Academy.  I became an instructor.  I developed a

2    curriculum.

3            There was never a formal book.  We

4    produced a book back in the day.  And then I was

5    an educator.

6            I also got involved with the

7    Pennsylvania Association of Arson Investigators.

8    Eventually became president.  Went through the

9    various chairs, including chairman of the training

10   committee.  I was responsible for putting the

11   training on and also at the National Fire Academy,

12   got involved in instruction there and taught there

13   for several years.

14           And I also developed a relationship with

15   Dan Madrokowski as they were trying to develop a

16   program for the National Academy on Fire Modeling,

17   which involves, so to speak, as a guinea pig, I

18   and another Fire Marshal in developing the fire

19   Dynamics Program for the National Fire Academy.

20      Q.   All right.  So let's start at the

21   beginning.

22           What years did you attend Penn State?

23      A.   '76 to '80.

24      Q.   Did you obtain a degree?

25      A.   No.  I think I'm two -- two classes shy

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

41

1    of a degree.

2        Q.    Just out of curiosity, why did you leave

3    two classes early?

4        A.    Well, it -- I did take some classes,

5    probably my resume doesn't read quite right.  But

6    I had classes after that.  I wasn't up to my

7    credits for a couple years.  But marriage, family,

8    children.  I had two electives left.

9            And at the time, the four-year program

10   was in a Bachelor's Degree in Design.  So those

11   credits would require me to have a project, so to

12   speak, like, you know, I bought six of those

13   credits when I designed my house and built it.

14           So life got busy and I had to make a

15   decision.

16       Q.    Understood.

17           What telephone company did you work for

18   immediately after Penn State?

19       A.    It was Pymatuning Telephone Company.

20       Q.    What did you do for them?

21       A.    I was basically a laborer, help string

22   lines, install telephones, dig ditches, wherever

23   they needed me.

24       Q.    Okay.  You've never had any experience

25   designing or manufacturing actual phones, correct?

```
 1        A.    Correct.

 2        Q.    And that includes phone batteries?

 3        A.    Correct.  They were just getting the

 4   push button phones back then.

 5        Q.    Fair enough.

 6              For the State Police work, what year did

 7   you begin serving as an alternate for the Fire

 8   Marshal Division?

 9        A.    It's in my resume.  I want to say that

10   that was 2002.

11        Q.    Help me understand --

12        A.    I'm sorry.  1992.

13        Q.    '92.

14              And help me understand that transition.

15              Why did you want to seek that out?  What

16   did that involve?

17        A.    Well, from day one in the State Police,

18   I realized the value of forensics.  You know, I

19   was a patrolman that would try to take latent

20   prints off of doorknobs or, you know, whatever the

21   case would be, power traps.

22              I got involved in my investigations.  So

23   I loved forensics.  And the fire and the

24   architecture, together with my investigative skill

25   sets, I believe, were a perfect fit.
```

43

1        Q.    I mean, you spent approximately 12 or 13

2   years working for the Fire Marshal's Division, if

3   I understood that correctly?

4        A.    Correct.

5        Q.    Okay.  Were you a fire investigator?

6        A.    Correct.

7        Q.    How many people were in that division?

8        A.    In the state?  I would say there were

9   probably 50 or 60 full-timers.

10       Q.    During your work for the Fire Marshal

11  Division, did you ever investigate a fire that was

12  determined to have been caused by a lithium ion

13  battery?

14       A.    No.

15       Q.    Have you ever investigated a fire, other

16  than this one, that you've determined to have been

17  caused by a lithium ion battery?

18       A.    Yes.

19       Q.    Okay.  How many times?

20       A.    I would say it's probably less than six.

21  Doesn't necessarily mean a lithium ion battery was

22  determined to be the cause.

23       Q.    Help me understand what you mean by

24  that.

25       A.    Well, as a final conclusion whether or

1    not the lithium ion battery -- and I'm kind of

2    guessing here.  But I currently only have one

3    other file that I'm working on that actually has a

4    lithium ion batteries.

5         There was a file about a year ago where

6    it was failure of a lithium ion battery, but the

7    degree of damage was so significant to the battery

8    itself that the client didn't decide to go on with

9    it.

10         I had an E-bike fire with lithium ion

11    batteries.  Again, the client decided not to go on

12    with an investigation to determine it.

13    Q.   Let me ask you this.

14         Have you ever offered the opinion on a

15    more-probably-than-not basis that a lithium ion

16    battery was the cause of the fire that you were

17    investigating?

18    A.   I would have in those two last instances

19    I referred to based on the physical damage and the

20    localized damage to the batteries, but I wasn't

21    asked to provide an opinion.

22    Q.   And it was based upon your inspection of

23    the batteries themselves that caused you to offer

24    that opinion or at least you would have been it

25    provided you had been provided that opportunity?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

45

```
 1        A.   Yes.

 2        Q.   There's one with an E-bike.

 3             What was the first one?

 4        A.   What was that?  It was the remote

 5   control cars.

 6        A.   Oh, and I also have another battery

 7   failure with their -- the cell batteries for air

 8   guns, the paintball guns.

 9        Q.   Is that a case in which you've

10   testified?

11        A.   I don't think I've given a deposition.

12   That's not on my list yet.

13        Q.   It's an active file?

14        A.   Yes.

15        Q.   You mentioned at one point you had

16   developed some curriculum relative to or related

17   to your work as a fire investigator.

18             Do you recall that?

19        A.   Yes.

20        Q.   What curriculum did you develop?

21        A.   The basic fire investigation course for

22   the State Fire Academy.

23        Q.   Do you have any documents related to

24   that curriculum in your possession?

25        A.   I would have to dig through the books.
```

46

```
 1    I might be able to find it, the manual that we
 2    produced.
 3              This was the early days of computer,
 4    let's put it that way.
 5        Q.   Fair enough.
 6              I'm gonna ask you to look for that and
 7    provide it if you're able to find it.  And I'm
 8    going to mark that Exhibit 11, pending its
 9    location.
10              (Ryhal Deposition Exhibit Number 11
11               marked.)
12    BY MR. COPENHAVER:
13        Q.   Do you hold any -- well, let me ask you
14    about Ryhal and Associates.
15              When did you start that?
16        A.   2008.
17        Q.   How many employees are there at Ryhal
18    and Associates?
19        A.   I currently have one investigator,
20    certified investigator; two assistants.  One's
21    sort of seeking a retirement mode in Florida.
22              And then I have a girl that does office
23    administration, billing, that sort of thing,
24    payroll.
25        Q.   Are you the principal and sole owner of
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

47

1    Ryhal and Associates?

2         A.    Correct.

3         Q.    Other than testifying in fire cases,

4    does Ryhal and Associates do anything else?

5         A.    Not too often.  I mean, I have a private

6    detective license, so I've done some private

7    detective work, but my fire caseload keeps me

8    pretty busy.

9              I did do -- an engineer was retiring, I

10   did do an accident reconstruction in Pittsburgh

11   for a fatal traffic accident.

12        Q.    On a percentage basis, how much of Ryhal

13   and Associates' work is related to fire

14   investigation?

15        A.    Currently I would say 99 percent.

16        Q.    And of those, is it all civil?

17        A.    I have -- on a couple of occasions, the

18   State Police have asked me to testify relative to

19   a criminal prosecution.

20        Q.    How much of your fire investigation work

21   for Ryhal and Associates is criminal in nature?

22        A.    Are you asking the percentage of

23   incendiary fires?

24        Q.    So my question is, how much is your work

25   on behalf of -- or in the context of criminal

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

48

```
1    investigation as opposed to a civil lawsuit?
2         A.   We're talking less than half a percent.
3    I mean, there's only been a couple of occasions.
4              I can only think of one right now where
5    I was actually the private investigator in that
6    file.
7         Q.   And of the civil work -- it sounds like
8    that's the predominant type of work performed by
9    your company.
10             How much of that is on behalf of a
11   plaintiff, either a personal injury plaintiff or
12   an insurance plaintiff?
13        A.   It's probably somewhere in the
14   70 percent range, maybe 80.
15        Q.   There's still 20 to 30 percent that is
16   on behalf of defendants.  Can you help me
17   understand why?
18             I think we identified only one instance
19   in which you've provided testimony on behalf of a
20   defendant.
21        A.   The files resolved, the files go away.
22        Q.   For the work that you have done on
23   behalf of plaintiffs, how much is that on behalf
24   of insurance companies in subrogation cases as
25   opposed to personal injury plaintiffs?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

49

```
1        A.   Versus personal injury claims?

2        Q.   Correct.

3        A.   95 percent.

4        Q.   95 percent subro work?

5        A.   Yeah.  There's not too much in the way

6   of personal injury.

7        Q.   Have you ever testified on behalf of a

8   personal injury plaintiff?

9        A.   I can't think of any.

10        Q.   Okay.  Have you ever done any work with

11   the Santicola firm?

12        A.   No.

13        Q.   Do you do any teaching?

14        A.   I did.  I haven't since I started my

15   private business.  But I taught at the National

16   Fire Academy, the State Fire Academy.

17             I taught locally at the community

18   colleges.  Currently, no.

19        Q.   And that's in the last 14 or so years?

20        A.   There may be a few instances where I

21   taught after retirement, but I would say generally

22   no.

23        Q.   Okay.  Have you ever published anything

24   on fire investigation?

25        A.   No.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

50

1      Q.    Okay.  Do you currently hold any

2    licenses or certifications other than a private

3    investigator license?

4      A.    Well, my certification for fire

5    investigation was back to the National

6    Professional Qualifications System when I was in

7    the State Police.

8          This certification as a fire

9    investigator.  This is a certification as an

10   instructor.

11     Q.    Are those things that are time limited

12   or lapse or are those active today?

13     A.    I don't believe they are time limited.

14     Q.    Are there any continuing ed requirements

15   to maintain those?

16     A.    I'm not aware.

17     Q.    Have you ever performed any type of

18   forensic testing on cell phones?

19     A.    No.

20     Q.    Have you ever performed any type of

21   forensic testing on phone batteries?

22     A.    You're saying me personally, not being

23   present --

24     Q.    I'm asking you personally.

25     A.    No.

1        Q.   I bet you can guess what my follow-up
2    question is going to be.
3             Have you ever been present while anyone
4    else has performed any type of forensic testing on
5    phones or their batteries?
6        A.   Yes.
7        Q.   Okay.  How many times?
8        A.   It would be a wild guess, but I would
9    say a dozen would be fair.
10       Q.   Can you give me the context?
11       A.   Generally it'd just be a battery that --
12   a lithium ion battery generally that is in the
13   area of origin that's examined as a matter of a
14   forensic examination allowed.
15       Q.   Got it.
16            So this would be a post incident lithium
17   ion battery that was found in either the room or
18   area of origin that underwent sort of typical
19   artifact examination after recovery from a scene,
20   is that correct?
21       A.   Correct.
22       Q.   Would it have included anything other
23   than visual, photographic or radiographic
24   examination of the device?
25       A.   I would say it would be limited to that.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

52

1      Q.   What's a live burn exercise?

2      A.   So generally we would build cells, small

3   room, you would arrange the furniture, electronics

4   if you were gonna demonstrate arc mapping and then

5   set the fire, document it.  And then have the

6   investigators come in afterwards and investigate

7   it.

8      Q.   Have you ever done any experiments or

9   live burn exercises involving cell phones?

10     A.   No.

11     Q.   Have you ever done any experiments or

12  live burn exercises regarding cell phone lithium

13  ion batteries?

14     A.   No.

15     Q.   What about any other kind of lithium ion

16  batteries?

17     A.   No.

18     Q.   What's a battery thermal event?

19     A.   So a battery's thermal event is a

20  failure of the battery.  It's a chemical reaction

21  where the battery heats up because all the

22  fuels -- my understanding, all the fuels are

23  present that results in a battery failure.

24     Q.   So one more time.  What's your

25  understanding of how a battery thermal event

53

1    actually happens?

2        A.   I don't understand -- I couldn't state

3    the chemical reaction, but I believe it's a

4    chemical reaction.

5        Q.   And what precipitates the chemical

6    reaction?

7        A.   A failure -- an internal failure within

8    the membrane of the cells of the battery.

9        Q.   What type of failure?

10       A.   I think that the insulating material

11   becomes compromised in some way.

12       Q.   And what effect does that have?

13       A.   Well, the effect of would be that the

14   battery produces enough energy to ignite the

15   combustible materials.

16       Q.   Well, so that's the battery thermal

17   event.

18            I'm more interested in what's going on

19   inside of a battery, to your understanding, that

20   would cause that to happen?

21       A.   I would say I'd stay in my lane and say

22   I'm gonna limit it to what I just gave you.

23       Q.   To what?

24       A.   Stay in my lane and I'm gonna limit it

25   to what I told you, that it's a chemical reaction

54

1    of the battery due to a fail -- internal failure.

2         Q.   And beyond that, you lack the ability to

3    dig down any greater detail and provide greater

4    detail as to the actual mechanism of the battery

5    thermal event beyond what you just provided?

6         A.   Correct.

7         Q.   Can external damage to a battery cause a

8    battery thermal event?

9         A.   I would believe that could be a

10   contributing factor, yes.

11        Q.   Can exposure to external heat sources

12   cause a battery thermal event?

13        A.   I believe that could be possible, yes.

14        Q.   Are there other things that you're aware

15   of that can cause a battery thermal event?

16        A.   The introduction of water.

17        Q.   Okay.  Anything else?

18        A.   Overcharging.

19        Q.   Anything else that --

20        A.   That would be a failure of the battery's

21   ability to maintain its voltage.

22        Q.   Anything else that you're aware of?

23        A.   I think we covered it.

24        Q.   Okay.  Have you reviewed any literature

25   that you can cite to me on the cause of or

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

55

1    mechanism of battery thermal events involving

2    lithium ion battery?

3        A.    Other than in this instance I used the

4    information provided by Apple that it's possible.

5        Q.    And the information provided by Apple

6    were the instances in which -- that we talked

7    about earlier in which consumers on that -- on

8    that chart reported instances of claimed battery

9    thermal events on their products?

10       A.    Correct.

11       Q.    Anything beyond that?

12       A.    No.

13       Q.    Have you ever caused a cell phone to go

14   thermal?

15       A.    No.

16       Q.    Have you ever inspected an iPhone 6S or

17   a 6S Plus?

18       A.    No.

19       Q.    Have you ever tested an iPhone 6S Plus?

20       A.    No.

21       Q.    Have you ever take apart and looked at

22   the components of an iPhone 6S Plus?

23       A.    No.

24       Q.    Have you ever reviewed any documents

25   concerning the design off an Apple iPhone 6+?

```
 1       A.    No.

 2       Q.    Do you know whether or not the iPhone 6+

 3  is certified for compliance with any industry or

 4  safety standards?

 5       A.    The information provided in

 6  Mr. Hoffman's expert report makes several

 7  references to standards that they comply with.

 8       Q.    Do you know what those standards are?

 9       A.    I couldn't cite them to you, no.

10       Q.    Do you know what they require?

11       A.    No.

12       Q.    Do you know what design features the

13  iPhone 6S Plus has to protect against battery

14  thermal events?

15       A.    The specifics, no.

16       Q.    Have you reviewed any testing

17  documents -- or I'm sorry, certification documents

18  for the iPhone 6S Plus?

19       A.    No.

20       Q.    Have you reviewed any testing documents

21  regarding testing of an iPhone 6S Plus devices

22  performed by anyone other than yourself?

23       A.    No.

24       Q.    Can you describe for me the type of

25  battery that's in an iPhone 6S Plus?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

57

```
 1        A.   Not familiar with it.

 2        Q.   Do you know what it's made out of?

 3        A.   I believe it's a book of business.

 4        Q.   But beyond that?

 5        A.   I do not.

 6        Q.   Do you know the form of lithium inside

 7   the battery?

 8        A.   I do not.

 9        Q.   Do you know the construction of the

10   battery itself?

11        A.   I do not.

12        Q.   Do you know how many cells are in the

13   lithium ion battery inside an 6S Plus?

14        A.   I do not.

15        Q.   Okay.  All right.  I told you we're

16   going to take a break on the hour.  That's

17   apparently a lie.  It's now 20 after.

18             Are we good for five minutes?

19             MR. SANTICOLA:  Sure.

20             (Recess - 11:21 a.m. - 11:29 a.m.)

21   BY MR. COPENHAVER:

22        Q.   All right.  Mr. Ryhal, we're back from a

23   quick break.

24             Are you okay to continue?

25        A.   Yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

58

1      Q.   When were you retained in this case?

2      A.   I think I was actually retained in 2021.

3      Q.   And as part of your file, you have the

4  report from Mr. Henry, from the Recon Group.  You

5  mentioned you and Mr. Henry had a prior business

6  relationship or professional relationship of some

7  sort?

8      A.   Correct.

9      Q.   What is that?

10     A.   When John decided to come out of the

11  insurance industry and called me and wanted me to

12  lead the fire investigations and so I agreed to

13  it.

14          And then we worked together about a year

15  and a half and our business styles and -- let's

16  just say our business plans didn't agree with each

17  other.

18     Q.   Did you work for Recon Group?

19     A.   Yeah.  I was vice-president of fire

20  investigations.  Whatever it was.

21     Q.   And what was Mr. Henry's role?

22     A.   Well, he was the president.  And at the

23  time, he was leading -- basically conducting the

24  private detective work.

25          So he had a lot of clients, for example,

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

59

1    in the coal industry in West Virginia and he would

2    do background investigations and that sort of

3    thing.

4         Q.    And he is also a certified fire

5    investigator?

6         A.    Yes.  He got his certification, yes.

7         Q.    Do you believe him to be a competent

8    fire investigator?

9         A.    Yeah, John's a good investigator.

10         Q.    Okay.  His report is dated August 15,

11    2018, is that right?

12         A.    Forgive me for a second.  I was trying

13    to get my glasses to go from sunlight to office.

14         Q.    Fair enough.

15         A.    August 15, 2018, correct.

16         Q.    Okay.  And you understand that Mr. Henry

17    conducted an origin of cause investigation for

18    this fire on behalf of the Stifflers' insurance

19    company?

20         A.    Motorist group, yep.

21         Q.    And that was to identify whether or not

22    there could be a potential subrogation action to

23    recoupe some of the monies that the company paid

24    out pursuant to the policy, right?

25         A.    Correct.  Or an intentionally set fire.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

60

1    I mean, that's always part of the equation.  It's

2    not simply subrogation.

3         Q.   Sure.

4              It's to determine whether or not they

5    need to pay out money; and if so, whether they can

6    recoup it from an at-fault entity, right?

7         A.   Correct.

8         Q.   Okay.  What was the date of the fire?

9         A.   The date of the loss, I thought, was

10   August 15th, was it?  No.  No.  No.  What was it?

11        Q.   August 15th is the date of his report.

12        A.   July 16th.

13        Q.   Okay.  And Mr. Henry's origin and cause

14   of the investigation was conducted shortly after

15   that fire?

16        A.   I believe the following day.

17        Q.   As part of that investigation, he

18   conducted an inspection of the scene I think we

19   discussed, right?

20        A.   Correct.

21        Q.   And he took some photographs, correct?

22        A.   Correct.

23        Q.   And he talked with the Stifflers, right?

24        A.   No.  I don't believe he did.

25        Q.   Okay.  It's your understanding that he

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

61

```
 1    didn't perform any interviews with the insureds?

 2         A.   I'm referring to the report.

 3         Q.   Sure.

 4              I'm gonna refer you to the second page

 5    of the report, the second full paragraph, where he

 6    says, based upon my interviews with the insureds.

 7         A.   Correct.

 8         Q.   So he interviewed the Stifflers?

 9         A.   Yes.

10              MR. SANTICOLA:   I'm sorry to interrupt

11    you, Steve.

12              Just before you're talking about the

13    Stifflers, Mr. and Mrs. Stiffler, not all of them?

14              MR. COPENHAVER:   The insureds.

15              MR. SANTICOLA:   Yeah, I gotcha.   Okay.

16    BY MR. COPENHAVER:

17         Q.   Okay.   So he interviewed the Stifflers,

18    the insureds, correct?

19         A.   Correct.

20         Q.   And conducted a scene examination of the

21    incident scene?

22         A.   Correct.

23         Q.   Neither of which are things that you

24    did, correct?

25         A.   Correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

62

```
 1         Q.   All right.  And Mr. Henry found ample
 2    evidence of careless smoking in various rooms of
 3    the structure, correct?
 4         A.   In one room of the structure, yes, he
 5    did.
 6         Q.   Well, I'm reading from his report.
 7              Ample evidence of careless smoking in
 8    various rooms of the structure, correct?
 9         A.   That's what his report says.  That's not
10    my analysis of what he reported, what I saw in the
11    photographs.
12         Q.   He was there at the scene, you were not,
13    correct?
14         A.   Yes.
15         Q.   All right.  And what he reports is that
16    he found, based upon his examination of the scene
17    at which you were not present, he found ample
18    evidence of careless smoking in various rooms of
19    the structure, correct?
20         A.   That's what he reports, correct.
21         Q.   Okay.  He also determined that
22    Mr. Stiffler's bedroom underwent flashover during
23    the fire, correct?
24         A.   Correct.
25         Q.   What's a flashover?
```

63

```
 1        A.    Flashover is when basically all of the
 2   components of the room ignite and were decomposed
 3   from the heat of the fire.
 4        Q.    Okay.  And based upon the condition of
 5   the room, Mr. Henry was unable to identify a
 6   particular point of origin within the room,
 7   correct?
 8        A.    That's his conclusion, yes.
 9        Q.    And does flashover affect the ability to
10   identify a particular point of origin?
11        A.    It can, yes.
12        Q.    And it can because it can cover up or
13   otherwise change fire patterns that were present
14   prior to flashover?
15        A.    It can obliterate patterns and it
16   involves the introduction of air entrainment to
17   alter the patterns.
18        Q.    In addition to the sunroom, Mr. Henry
19   found cigarette butts in the kitchen garbage,
20   correct?
21        A.    Yes.  Appeared -- well, he did find
22   them -- I believe his pictures do show that.
23   You're correct.
24        Q.    And he found cigarette butts on the
25   floor in the basement, correct?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

64

```
1          A.   He found a couple, yep.
2          Q.   All right.  Is that consistent in your
3     view with responsible disposal of smoking
4     materials?
5          A.   I believe the manner that the Stifflers
6     were disposing of their cigarette butts was not
7     safe.
8          Q.   Okay.  Is there -- when you say not
9     safe, is there a risk associated with careless
10    disposal of smoking materials, cigarette butts?
11         A.   Yes.  They can, if not probably
12    extinguished, ignite either a large container of
13    cigarette butts and/or combustible materials if
14    there's sufficient fuel surrounding them.
15         Q.   Okay.  Based upon Mr. Henry's inspection
16    of the scene, the photographs he took and
17    reviewed, his interviews with the Stifflers,
18    Mr. Henry concluded that the most probable cause
19    of the fire was careless handling of ignited
20    smoking materials.
21              True?
22         A.   Correct.
23         Q.   All right.  Did you also review the
24    report by a Deputy Fire Marshal Karelitz?
25         A.   Yes, I did.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

65

1        Q.    Do you know Deputy Karelitz?

2        A.    Not real well.  I know most of the guys

3    pretty well, but he's newer to me.

4        Q.    I'm mostly just asking whether or not

5    I'm pronouncing his name correctly.

6        A.    I think that's fair.

7        Q.    Now, Deputy Karelitz also inspected the

8    scene in order to conduct an origin and cause of

9    the investigation, correct?

10       A.    Correct.

11       Q.    And his analysis, like Mr. Henry's,

12   included interviews, right?

13       A.    Correct.

14       Q.    And he conducted a fire pattern

15   analysis?

16       A.    Correct.

17       Q.    And he also inspected all pre-fire

18   available ignition sources within the general area

19   of origin, right?

20       A.    I believe that's correct.

21       Q.    And Deputy Karelitz found smoking

22   materials within what he believed to be the area

23   of origin, correct?

24       A.    I believe if that includes the pipe --

25       Q.    Again, I'm reading from his report.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

66

1  Deputy Karelitz found smoking materials within the

2  area of origin, correct?

3      A.   Please repeat your question.

4      Q.   Sure.

5           Deputy Karelitz found smoking materials

6  within the area of origin, correct?

7      A.   Deputy Karelitz found a pipe in the area

8  of his origin, I believe, based on how he report

9  his report, correct.

10     Q.   Does the sentence, smoking materials

11  were observed within the area of origin, appear in

12  Deputy Karelitz's investigation report?

13     A.   Yes.

14     Q.   All right.  So Deputy Karelitz found

15  smoking materials within the area of origin.

16          True?

17     A.   In his area of origin, correct.

18     Q.   All right.  And his area of origin was

19  in Robert Stiffler's bedroom, right?

20     A.   Correct.

21     Q.   And that's your area of origin as well,

22  correct?

23     A.   Correct.

24     Q.   Do you disagree that there were smoking

25  materials in Mr. Stiffler's bedroom?

1        A.    No, I believe I discussed them in my

2    report though.

3        Q.    You've discussed the pipe, right?

4        A.    Correct.

5        Q.    And the pack of Marlboro cigarettes?

6        A.    Correct.

7        Q.    So there were smoking materials in

8    Mr. Stiffler's bedroom?

9        A.    Correct.

10       Q.    And smoking materials are a competent

11   ignition source as Detective Karelitz found,

12   correct?

13       A.    That's what he opined, yes.

14       Q.    Do you not believe smoking materials are

15   a compentent ignition source?

16             I thought we just talked about the risks

17   of carelessly disregarded smoking materials.

18       A.    Yeah, I believe they can be a competent

19   ignition source.

20       Q.    It's important for something to be a

21   competent ignition source, because if it's not a

22   competent ignition source, it can't be the source

23   of any ignition?

24       A.    Correct.

25       Q.    Deputy Karelitz reported that the

1    combined opinion of the fire scene investigators

2    is that the fire was caused by careless smoking.

3            Do you recall that?

4        A.   Yes.

5        Q.   All right.  And he, in fact, eliminated

6    all other potential ignition sources.

7            True?

8        A.   He believes he did, yes.

9        Q.   Okay.  In fact, he said that all

10   ignition sources in the area of origin -- which

11   again is Mr. Stiffler's bedroom, right?

12       A.   Correct.

13       Q.   All right.  All ignition sources within

14   the area of origin were identified, examined

15   and/or considered.

16           Is that what he reports?

17       A.   Where did you get that in the report?

18       Q.   So I'm under the -- on page 4 of the

19   report under potential ignition sources.

20       A.   You're looking at a PDF?

21       Q.   I am.

22           So I don't know if your page numbers are

23   correct, but it's the fourth page of the PDF.

24       A.   You'll have to forgive me, Steve.  I

25   don't have any page numbers.

69

```
1          Q.   I don't either.

2               So it says narrative at the top of it.

3     Narrative, paren, two and then the second to last

4     section is potential ignition sources.

5          A.   Got it.  Thank you.

6          Q.   Uh-huh.  And I'll just read it for the

7     record, it says, examinations were conducted in

8     effort to identify the pre-fire available ignition

9     sources within the general area of origin.

10              All ignition sources in the area of

11    origin were examined, identified and/or

12    considered.

13              Do you see that?

14         A.   Yep.

15         Q.   And that's something Deputy Karelitz and

16    his team conducted and you were not able to do

17    because you weren't involved or present at the

18    scene, correct?

19         A.   Correct.

20         Q.   All right.  And it mentions that there

21    was external heat and fire damage only to those

22    items.

23              Do you see that?

24         A.   Yes.

25         Q.   And that there were no indication of any
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

70

1    failures or malfunctions of those items.

2            Do you see that?

3        A.    Yes.

4        Q.    And Deputy Karelitz and his team

5    eliminated all ignition sources, other than the

6    carelessly disregarded smoking materials, correct?

7        A.    Correct.

8        Q.    So I want to see if you agree with me

9    here.

10            Are you aware of any other fire

11    investigators, other than Deputy Karelitz and

12    Mr. Henry, who conducted an actual fire

13    investigation of the scene and interviewed the

14    Stifflers?

15        A.    No, other than the police interaction,

16    whatever that was, no, I don't believe so.  And

17    the fire department.

18        Q.    Did they conduct an origin of cause

19    investigation?

20        A.    I don't believe so.

21        Q.    So do you agree that the only two people

22    to have conducted an origin of cause investigation

23    that involved going to the scene, performing a

24    scene examination, evaluating potential ignition

25    sources and discussing this case with the

71

1    Stifflers were Mr. Henry and Deputy Karelitz?

2         A.    Correct.

3         Q.    Okay.  And both of them determined that

4    the likely cause of this fire was carelessly

5    discarded smoking materials, correct?

6         A.    Correct.

7         Q.    And Deputy Karelitz, in fact, considered

8    and excluded all other potential ignition sources

9    within the area of origin.

10              True?

11        A.    Correct.

12        Q.    Did anyone look at the iPhone?

13        A.    It's not reported that anyone looked at

14   the iPhone.

15        Q.    Do you know one way or the other?

16        A.    All I can tell you is it's not reported

17   that anyone looked at the iPhone.

18        Q.    Do you know whether it was included in

19   Deputy Karelitz's artifacts inspection?

20        A.    From what I can read in his report or

21   recall, I haven't read it recently, he didn't

22   identify the iPhone.

23        Q.    Has anyone identified the iPhone in the

24   house at all, the physical remnants of it?

25        A.    Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

72

```
 1        Q.   Who's that?

 2        A.   Me.

 3        Q.   Well, you weren't there.

 4        A.   It's in the photographs.

 5        Q.   Okay.  Has anyone conducted an

 6   inspection of the iPhone, to your knowledge?

 7        A.   Not to my knowledge, no.

 8        Q.   Has anyone x-rayed it?

 9        A.   No.

10        Q.   Any CTs of it that you're aware of?

11        A.   No.

12        Q.   Any microscopy?

13        A.   No.

14        Q.   Any photographs of it that allow you to

15   draw any conclusions as to its condition?

16        A.   No.

17        Q.   While we're at it, can you point me to

18   the photos that you believe depict the iPhone?

19        A.   I always find it amazing in these

20   depositions how you can know your report front and

21   back but can't find it now.

22             You're looking at PDF?

23        Q.   I am.

24        A.   Page 24?

25        Q.   Okay.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

73

1          A.   If you look in the lower right, off the
2     edge of the table, there appears to be the remains
3     of a rectangular-shaped object similar to an
4     iPhone.
5          Q.   So this is what I'm looking at.  I'm on
6     page 24, PDF 24.
7               Is this the photograph you're looking
8     at?
9          A.   Look at the page numbers at the bottom.
10    23, 24.
11         Q.   All right.  So I'm looking at the --
12    page 24 of 33 of your report.  It's the 25th page
13    on the PDF, which we will go ahead and mark as
14    Exhibit 11.
15              (Ryhal Deposition Exhibit Number 11
16               marked.)
17    BY MR. COPENHAVER:
18         Q.   And I'm looking at a photo that's figure
19    Henry 166.
20              Do you see that?
21         A.   Correct.
22         Q.   All right.  And where on this image is
23    what you believe is a rectangle similar in size to
24    an iPhone?
25         A.   Let's see, you go to 5:00.  Right there.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

74

1    You were just on it.  It's right there.

2         Q.   This?

3         A.   Yep.

4         Q.   Do you have a better image of this?

5         A.   That's Henry's photo.  That's --

6    whatever resolution it is may be better.

7              My image is better than yours, but I've

8    got a large screen TV, so --

9         Q.   I just think that it's the fact that

10   it's in -- I don't know, I'm sure a PDF has been

11   compressed a few times.

12             Why is it that you believe whatever it

13   is we're depicting here or is depicted here is an

14   iPhone?

15        A.   Based on its physical characteristics

16   and shape.

17        Q.   The fact that it's a rectangle?

18        A.   Yeah, and it has a rounded edge to it.

19   You know, it's similar in size to an iPhone.  I

20   believe it's there on the table.

21             This is the table that sat next to the

22   bed as described by Mr. Stiffler where he had the

23   iPhone.

24        Q.   So if we assume for purposes of the

25   question that that is an iPhone, and I'm still

```
 1    having trouble seeing it, what significance does

 2    that have to you, other than the fact that there

 3    was an iPhone on the table?

 4            I mean, is there anything about the

 5    condition or depiction of the iPhone that is of

 6    any significance to your evaluation other than the

 7    fact that it was present?

 8       A.   And it's collapsed down onto the floor

 9    on the table, which is in the general area of

10    origin that I believe is on the west side of the

11    bed.

12       Q.   Right.  So that's what I meant by

13    present.

14            That it was present in what you believe

15    to be the general area of origin.

16            But in terms of the condition of the

17    iPhone, is there anything of significance to your

18    evaluation based upon the depiction of the iPhone,

19    that's what it is, as it appears in this

20    photograph in your report?

21       A.   Only that it's -- it appears

22    potentially -- well, not potentially.  I believe

23    it is -- looks like a phone to me and it's

24    present.

25            The question was drawn up or asked by
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

76

1    Hoffman in his report whether or not the iPhone

2    was even in the room.

3         Q.   Okay.  And if this is the iPhone, its

4    significance to your evaluation is that it appears

5    to have been present on this table?

6         A.   One of the potential ignition sources

7    identified by the Stifflers.

8         Q.   Okay.  And to your knowledge, was that

9    iPhone ever retained?

10        A.   To my knowledge, no.

11        Q.   It was never made available to you to

12   inspect?

13        A.   No.

14        Q.   Would you have done so if you were

15   provided that opportunity?

16        A.   Yes.

17        Q.   Why?

18        A.   Because it would have permitted further

19   analysis of the device and the other components

20   that were located with it.

21        Q.   What could it have told you?

22        A.   Potentially if there was an internal

23   failure of the phone.

24        Q.   And in the absence of having that to

25   inspect, you were not able to evaluate whether or

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

77

1    not there's an internal failure of that phone,

2    correct?

3          A.    Correct.

4          Q.    Does this report that we're looking at,

5    which has been marked as Exhibit 11, and which is

6    dated May 16th, 2022, contain all of the opinions

7    that you reached in this case?

8          A.    You're referring to my report, correct?

9          Q.    That's correct.

10              And just so we're clear, I moved to the

11   top of the page what we've marked as Exhibit 11,

12   is dated May 16, 2022, prepared by Robert G. Ryhal

13   and it's a 34-page document.

14         A.    Correct.

15         Q.    Does that contain all of the opinions

16   you've reached in this case?

17         A.    To date -- to that date, yes.

18         Q.    Are those opinions final based upon the

19   information available to you?

20         A.    At this time.

21              If there's other information that would

22   become available, would strengthen or potentially

23   I don't think change my position as to what I

24   believe the ignition scenario is, but may be

25   supportive.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1        Q.    Did you offer any supplemental or

2     additional report other than this one?

3        A.    Not as of today.

4        Q.    Have you been asked to do so?

5        A.    No.

6        Q.    Do you have opinions that you intend to

7     express, if there's a trial in this matter, other

8     than those contained in the report that we marked

9     as Exhibit 11?

10       A.    Not based upon where I am today with the

11    information I've been provided with.

12       Q.    Okay.  Do you anticipate doing any

13    additional work on this case?

14       A.    I'm not aware of any additional that I

15    would be doing.

16       Q.    Did you formulate any opinions based

17    upon your review of Dr. Hoffman's report?

18       A.    No.  I received Dr. Hoffman's report --

19    actually I just recently reviewed it.  I believe

20    it was Friday I reviewed his report.

21       Q.    Did you generate any opinions responsive

22    to that report?

23       A.    To my client?  No.

24       Q.    What about to yourself?

25       A.    Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

79

1          Q.    What are those opinions?

2          A.    He is relying upon informational bias,

3    which it permeates the Fire Marshal and Henry's

4    report and he repeats it.

5                I also found it surprising that he

6    basically accuses me of being a defense -- we'll

7    use the word lackey as, you know, a kind word.

8                But at the same time in his analysis of

9    things, he fails to address the fact that Apple

10   produced records which show that the iPhone is

11   capable of having a thermal event.

12               So the prejudice that he's accusing me

13   of in actuality I believe he's guilty of it

14   himself.

15               But basically he has taken the word --

16   the investigations of the Fire Marshal and

17   Mr. Henry, which was extremely biased because of

18   the informational process of it that was received

19   by Henry is from Karelitz.

20               So that idea that this was a

21   smoking-related fire, that the insured is a drug

22   addict, a drunkard, permeated the reports and that

23   causes them to not, I guess, analyze the potential

24   ignition sources in the room of origin in a

25   reasonable manner that I would expect them to.

1        Q.    All right.   What didn't they do for the

2    other potential ignition sources in the room that

3    you believe would have been a reasonable

4    investigation?

5        A.    He should have put the brakes on and

6    waited and interviewed Robert Stiffler when he was

7    ready to talk, then went back in and conducted the

8    scene examination.

9        Q.    Anything else from Hoffman?

10       A.    I mean, he cites that the particular

11   battery in question, I believe, was x-rayed as

12   part of their procedures.

13            He spends considerable time on the

14   2 percent battery level as reported by Robert

15   Stiffler, but he doesn't acknowledge or address

16   the fact that the battery maintenance system could

17   be compromised and/or the thermal temperature in

18   the battery itself could alter that.

19            I'm not sure of the specifics but I

20   believe that it has a battery maintenance system

21   most likely from my understanding of these battery

22   systems and he doesn't address that issue.

23            He only uses that as the reason why it's

24   excluded.

25       Q.    I don't understand any of that.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

81

```
 1            So he doesn't acknowledge or address
 2    that the BMU could be compromised  -- are you
 3    saying the BMU was compromised?
 4            Well, let's back up.  What's a BMU?
 5       A.   Well, the BMU is the battery management
 6    system.  You're managing the battery health charge
 7    and discharge, that kind of thing.
 8            I do have a general understanding that
 9    that's what occurs with these batteries.  And if
10    that system fails, and there's a compromise to the
11    battery, you can have a thermal event and a
12    chemical reaction.
13       Q.   You're not saying that's what
14    happened --
15       A.   He doesn't address --
16       Q.   Hold on.  I'll let you finish, but I
17    just want to make sure I'm clear.
18            You're not saying that's what happened
19    on this phone.  You're saying he didn't address
20    it, is that right?
21       A.   Right.  Right.
22       Q.   Okay.  Continue.
23       A.   So, again, I was talking about
24    informational bias and the accusations that he
25    leveled in his report.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

82

1          I would say he's equally guilty of it,

2    because he hasn't -- he didn't address those

3    issues.  He just skimmed over them.

4          You asked me my opinion of reading his

5    report and, you know, he threw an insult out in

6    that report towards me and I think -- he's the pot

7    calling the kettle black.  That's how I look at

8    it.

9          He doesn't say anything -- of all of the

10   photos available to him, he talks about flashover

11   and how it obliterates all patterns.

12         But the patterns that do exist, that can

13   be analyzed outside of ventilation patterns, he

14   doesn't address either.  He ignores all of that.

15      Q.   How does the battery management system

16   relate to his 2 percent battery level comment, if

17   you know?

18      A.   He's solely relying on the statement of

19   Mr. Stiffler that that battery only had 2 percent

20   based on his testimony.

21      Q.   Do you not believe the phone had

22   2 percent battery?

23      A.   I believe that Mr. Stiffler reported

24   that the battery was reporting it had 2 percent.

25   He also reported that the battery was hot.  He

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

83

1    also reported it began to charge.

2        Q.   Do you have any information to suggest

3    the battery was -- was at anything other than a

4    2 percent charge at the time that Mr. Stiffler

5    plugged it in?

6        A.   I don't.

7        Q.   Do you dispute that the battery was at a

8    2 percent charge when it was plugged in?

9        A.   Well, I raise the question that --

10   solely relying on Stiffler.  So I am disputing it.

11   Yeah, I'm disputing that it could not be at

12   2 percent.

13       Q.   Well, I'm asking you -- do you have an

14   opinion of what it was at?

15       A.   All I can state is that Stiffler

16   reported it as 2 percent and the previous comments

17   relative to the thermal heat that he was

18   reporting.  It began charging.

19       Q.   Do you have any information anywhere in

20   the record to suggest that the battery was at

21   anything other than 2 percent state of charge when

22   it was plugged in?

23       A.   No.

24       Q.   Do you intend to offer the opinion that

25   the battery was anything other than at the

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

84

1    2 percent state of charge when it was plugged in?

2         A.    I wouldn't be offering that sort of

3    opinion, no.

4         Q.    How long was it plugged in before the

5    fire occurred?

6         A.    I believe Mr. Stiffler guesses five

7    minutes.

8         Q.    Do you have any idea of what percent can

9    be added to the battery in a four-to-five-minute

10   period of time after being plugged in when it

11   starts at a 2 percent state of charge?

12        A.    I mean, I can only say from my personal

13   experience of my phones, it couldn't be more than

14   5 or 10 percent.

15        Q.    Have you ever conducted any type of

16   analysis whatsoever to determine whether or not a

17   battery thermal event on a battery that's at a,

18   for example, 10 percent state of charge is a

19   competent ignition source for any type of fuel?

20        A.    No.

21        Q.    Are you aware of any studies performed

22   by anyone else to determine whether or not an

23   iPhone at that low state of charge is a competent

24   ignition source if there's a battery thermal

25   event?

1          A.    No, I'm not aware of any.

2          Q.    Do you know whether -- strike that.

3                Do you have an opinion, based upon

4    anything that you can cite to, that a battery with

5    that low state of charge is a competent ignition

6    source if it undergoes a battery thermal event?

7          A.    Please repeat the question.

8          Q.    Yeah, it's probably a bad one.

9                So if Mr. Stiffler's iPhone was at a

10   2 percent state of charge at the time he plugged

11   it in and it charged for a period of five minutes

12   and remained as we discussed at a relatively low

13   state of charge, are you aware of any testing,

14   experiments, literature or any other basis to say

15   that that device would be a competent ignition

16   source at that low state of charge if it underwent

17   a battery thermal event?

18         A.    Your question is after assuming that

19   level of charge and charging it, would I expect it

20   to be a competent ignition source?

21         Q.    Correct.

22         A.    I'm not sure that I can say one way or

23   the other.

24         Q.    Okay.  What's NFPA 921?

25         A.    The guide for fire and explosion

86

1    evaluation investigations.

2         Q.    What does NFPA stand for?

3         A.    National Fire Protection Association.

4         Q.    Is it sort of the -- sets out the best

5    practices for origin and cause investigations?

6         A.    That's correct.

7         Q.    Is it a guide that you typically follow

8    in your practice?

9         A.    Yes.

10        Q.    It's sort of the industry standard for O

11   and C investigations, correct?

12        A.    I wouldn't say standard areas.

13   Recommendations.

14        Q.    They are recommendations that you think

15   are good to follow in conducting a competent

16   origin of cause investigation.

17              Fair?

18        A.    If applicable to the investigation

19   that's underway.

20        Q.    Sure.

21              And NFPA says if you can't determine an

22   origin, then generally cause can't be determined,

23   correct?

24        A.    Correct.

25        Q.    Do you agree with that?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

87

1        A.    Yes.

2        Q.    And under NFPA, there are three

3    categories of information that are important to an

4    origin opinion.

5              And those are witness testimony, fire

6    patterns and fire dynamics, is that right?

7        A.    Correct.

8        Q.    Okay.  Let's sort of take those in

9    order.

10             Did you interview any witnesses in

11    connection with forming your opinions as to

12    origin?

13       A.    Well, I reviewed the deposition of the

14    principals and spoke with my client about specific

15    questions I had relative to the witness

16    statements.

17       Q.    So you did not interview any witnesses

18    to the fire?

19       A.    Directly?  No.

20       Q.    Is it true that NFPA says that timely

21    interviews of witnesses are important because

22    memories fade over time?

23       A.    Correct.

24       Q.    Okay.  The depositions that you reviewed

25    were taken how long after the incident?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

88

```
 1        A.    A year and a half probably.

 2        Q.    Sure it wasn't more like

 3   three-and-a-half years?

 4        A.    Oh, I'm sorry.  Okay.  That's fair.

 5        Q.    Okay.  Is that accurate --

 6        A.    There was another attorney involved.

 7        Q.    Is that significant to you?

 8        A.    I mean, it's something you've got to

 9   consider when you're analyzing the information,

10   yes.

11        Q.    Would you have interviewed the Stifflers

12   early on had you been retained early in this

13   investigation to conduct the origin and cause

14   investigation?

15        A.    If that was what the client wanted, yes.

16        Q.    Why didn't you interview the Stifflers

17   in this case?

18        A.    The depositions were provided and that

19   was the limit of my interaction with them.  I felt

20   that the information that I got was sufficient.

21        Q.    Okay.  Nobody testified or provided any

22   statements to anyone that they ever saw the iPhone

23   catch fire, correct?

24        A.    Correct.

25        Q.    And nobody mentioned the iPhone to any
```

89

1    investigators who investigated this incident at

2    the time of those investigations, correct?

3        A.   I don't know that.  It's not in the

4    reports.

5        Q.   You've seen no indication that an iPhone

6    was ever mentioned to any of the investigators

7    when they were investigating the origin and cause

8    of this incident, correct?

9        A.   Based on the reports, correct.

10       Q.   In fact, the first time you saw the

11   iPhone mentioned was in the context of litigation,

12   true?

13       A.   Correct.

14       Q.   And that was after the attorneys -- or

15   the insurance company declined subrogation in this

16   case, correct?

17       A.   I don't have any knowledge of any of

18   that, so -- I don't have any knowledge of that.

19       Q.   Well, was there a subrogation case here,

20   do you know?

21       A.   I don't have any knowledge of any of

22   that.

23       Q.   Okay.  Well, you do have knowledge that

24   the origin and cause investigator hired by the

25   insurance company determined there not to be a

90

1    subrogation action here, correct?

2        A.   Oh, excuse me.  Excuse me.  You're

3    right.  That was correspondence between motorist

4    and Robert -- I can't recall the name of the

5    attorney.

6             Yeah, there was something in there --

7    there was an e-mail exchange, correct.

8        Q.   Okay.  In fact, there was a -- did you

9    see the letter from Mr. Walker at Cozen O'Conor to

10   the insurance company based upon the

11   investigations that were done saying that there's

12   no subrogation here and we're gonna close our

13   file?

14       A.   Correct.

15       Q.   Okay.  And there was no discussion of

16   the iPhone in any of that, correct?

17       A.   Correct.

18       Q.   And so the first time, based upon your

19   view of the materials, you ever saw the iPhone

20   mentioned was in the context of this litigation,

21   correct?

22       A.   Correct.

23       Q.   Did you find that to be interesting?

24       A.   You want my opinion?

25       Q.   I do want your opinion.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

91

```
 1              That's why we're here.
 2      A.   So that informational bias I talked
 3  about that flowed its way through John Henry's
 4  report was provided to -- the same information was
 5  provided to Walker.  Walker made decisions based
 6  on that.
 7              When you said subrogation, I didn't
 8  think -- why I originally said I'm not aware of
 9  that is I thought you meant there had been some
10  effort put into it.
11              As I see it, many times in a lot of
12  these cases, an attorney will ask whether or not
13  they believe there's credible subrogation involved
14  and they'll accept a report, a verbal report, a
15  handout.
16              And based on that they'll tell the
17  insurance company, we're either going to proceed
18  or not proceed.
19              And I saw that, as Walker was doing, was
20  simply a matter of practice to ask that question.
21  He based his information on what Henry gave him.
22  Careless smoking.  The guy's a drunk.  He's a drug
23  addict.
24      Q.   Do you think that the Fire Marshal's
25  office did a bad job here?
```

92

```
 1          A.   You're trying to ruin my career in
 2   dealing with these agencies?
 3               There are occasions where in the private
 4   sector I would say that their degree of effort,
 5   based on their workload, is insufficient in fairly
 6   determining the origin and cause.
 7          Q.   What did they miss?  What did they do
 8   wrong here?
 9          A.   They should have stopped and maybe
10   recovered the basic top layer of debris and then
11   started to try to identify potential ignition
12   sources and then wait to speak with Mr. Stiffler,
13   with Robert Stiffler.
14          Q.   Why is it important to capture potential
15   ignition sources?
16          A.   Well, the origin of the fire is
17   dependent upon a capable, a credible ignition
18   source and having sufficient fuel and fuel
19   configuration in order to propagate the fire.
20          Q.   Yeah.  But why is it important to
21   capture the artifacts?
22          A.   Well, it's to preserve them.  That
23   initial phase it is to preserve them, not to
24   disturb them, not to move them.
25          Q.   Preserve them to what end?
```

1        A.   As to their location, function.

2        Q.   Is it to be able to inspect them?

3        A.   Correct.

4        Q.   And why is it important to inspect them?

5        A.   Because based on the information

6    provided, those ignition sources can be identified

7    that are relative to the area of origin.

8             So in this instance, although we haven't

9    talked about it, the burn injuries to

10   Mr. Stiffler, to Robert Stiffler, are significant

11   and they are actually testimony to the fire, the

12   development of the fire.

13       Q.   Well, we'll get there.

14            But I'm talking more -- you said it's

15   important to capture the artifacts.  I'm trying to

16   figure out why.

17       A.   Well, the scene investigation should

18   require one to remove the debris and identify the

19   available ignition sources.

20       Q.   And once those ignition sources are

21   identified, what's the next step?

22       A.   To analyze them relative to them

23   being -- their credibility of being a competent

24   ignition source.

25       Q.   What does that entail?  Sorry.  I didn't

1    mean to cut you off, Mr. Ryhal.

2         A.   And whether or not those ignition

3    sources, based on the timeline of the ignition

4    scenario, fit into that timeline.

5         Q.   And what is the -- what does the

6    analysis of those potential ignition sources to

7    determine whether or not they're competent

8    ignition sources entail?

9         A.   In the instance of, for example, the

10   cable TV box, what's the power consumption of the

11   cable TV box?  How is it wired?  Where is the

12   appliance cord?  How it's routed.

13             In the instance of the television in

14   this case, it wasn't plugged in, so it's not a

15   competent ignition source.

16             In the instance -- in this case, the

17   iPhone's reported to be there, appears to me to be

18   there in the location, in the immediate location

19   where Mr. Stiffler suffered injuries.

20             So is it a credible ignition source?  I

21   think Apple's reports state that it is.  It can

22   suffer a thermal event.

23             So those in this case -- and I know I'm

24   getting ahead of myself, I want to finish my

25   thought process out while we're at it.

1          Those are the two ignition sources in
2    the area of origin where Mr. Stiffler receives his
3    injuries, which are localized and directional and
4    specific.
5          And those injuries aren't received from
6    a fire developing in the corner of the room.
7    They're developed from close exposure to a smaller
8    fire.
9          So those are the important factors in
10   this instance.  And had the Fire Marshal stopped
11   what he was doing, did the interviews, he would
12   have went back and maybe his report would read
13   different today.
14        Q.   Do you think the cable box then should
15   have been recovered and the questions answered
16   that you just posed as to its power and its
17   ability to be a competent ignition source?
18        A.   Well, the cable power cords, according
19   to the Fire Marshal, they looked at.  And I
20   believe they're capable of -- you know, arcing on
21   a cord is not rocket science.  It doesn't require
22   a Ph.D. to determine that.
23          Anyone who's investigated a number or
24   degree of fires can tell whether or not what it
25   looks like on an appliance cord.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

96

1              So that leaves us with the cable box

2    itself.  A metal box with -- consuming 20 watts of

3    power, I do not believe is a credible ignition

4    source in this time period and in the fuel

5    configuration that we're talking about.

6         Q.   I guess we're skipping origin.  I didn't

7    intend to.

8              We started talking about whether -- we

9    started talking about interviews and that you

10   didn't interview anyone because you had the

11   depositions that were taken three-and-a-half years

12   later.

13             I thought I asked whether or not anyone

14   testified that based on an iPhone hot fire to any

15   of the investigators.

16             Your answer was no, correct?

17        A.   Correct.

18        Q.   So if we focus in on origin, was there

19   any testimony or other statements that you relied

20   upon from any witnesses that were helpful in your

21   determination of origin?

22        A.   Yes.

23        Q.   All right.  Tell me what those are.

24        A.   Mrs. Stiffler.

25        Q.   Mrs. Stiffler?

```
 1          A.    The fire got --
 2          Q.    Her testimony about the fire dynamics or
 3    the physical evidence of the fire dynamics?
 4          A.    Her testimony.
 5          Q.    Okay.  What about it?
 6          A.    When she comes out into the hallway,
 7    she's standing upright.  She sees Robert on the
 8    floor.  She can see fire down the hallway at the
 9    ceiling level and black smoke coming out of his
10    room.
11              So she doesn't see a room in flashover.
12    She can stand upright in the hallway, which is
13    beginning to get smokey because the door to the
14    bedroom is open now and the fire gases are now
15    coming down the hallway.
16              So the room wasn't in flashover.  The
17    configuration of the ceiling, the sloped ceiling,
18    in the location where she sees the fire, puts the
19    fire back to the right, which would be the
20    northwest -- let's just say it's the northern part
21    of the room based on what she sees.
22          Q.    Why?
23          A.    Well, if the fire had started along the
24    south wall with the open doorway, for example, in
25    the area of the sofa, the chair, the sofa chair or
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

98

1    the large projection TV, she would have seen fire

2    burning from the floor upward to the ceiling.

3        Q.    So does that suggest to you that the

4    origin to the fire was at least to the --

5        A.    North.

6        Q.    -- north of the visible site through the

7    door?

8        A.    Correct.

9        Q.    That would be the north, what, 4/5th of

10   the room?

11       A.    Correct.

12       Q.    Anything else from any of the interviews

13   or testimony that was relevant to your origin

14   determination?

15             Again, just focusing not on the physical

16   evidence yet, but on the witness statements or

17   testimony.

18       A.    Robert Stiffler's deposition.  He

19   basically states that he woke up to encounter fire

20   and that he fell at some point and was trying to

21   get out of the room.

22       Q.    What does that suggest to you in terms

23   of your area of origin determination?

24       A.    He was lying on his right side.  His

25   burn injuries are to the front of his face, not to

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

99

1    the side of his head, not to the back of his head,

2    not to the left side of his head.  They were on

3    his face and his hands, which indicates thermal

4    exposure in the area of the face.

5            He stated he got up and fell down.

6    There was burn injury to his knee and the bottom

7    of his feet.  Again, consistent with the area of

8    origin being at his head and in the immediate

9    vicinity of the table, which contained the iPhone

10   and the cable box.

11       Q.   If the fire had been on his bed in the

12   area of his face, would those injuries have been

13   any different?

14       A.   The way that he describes how he sleeps,

15   the injuries, if it had been on the bed where his

16   pillows were, where his head was, the injuries

17   would be to his head, the side of his head, his

18   hair.  You're talking about fire, throat, chest,

19   shoulder.

20       Q.   Why?  Why would the fire moving a foot

21   from the table to the bed have that impact on the

22   location of his burn injuries?

23       A.   The way that he described it from his

24   deposition is, he is sleeping right next to the

25   table.  It was right in front of his face, the

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

 1    iPhone was.

 2              If his bed is on fire, which would cause

 3    the bedding to catch fire, I would expect that

 4    injury would be to the right side of his head,

 5    because he's lying on a pillow.

 6              So you made the theoretical point, what

 7    if the bed's on fire?  Well, then the injuries

 8    would be to his right side.  He's lying on his

 9    right side on the bed.

10        Q.   I don't mean the bed underneath him was

11    on fire.

12              What if whatever caught fire was in

13    front of his face?

14        A.   That's entirely possible.  That would be

15    consistent with the burn injury he received.

16        Q.   Okay.  Anything else?

17        A.   I think I lost my train of thought there

18    as we went through that.

19        Q.   Yeah, so just to orient you.  We were

20    talking about -- we're not talking about fire

21    patterns or fire dynamics yet.

22              We're talking about testimonial evidence

23    or witness statements that you relied upon in your

24    origin determinations.

25        A.   His burn injuries were testified to

```
 1    during the deposition, so that's why I brought
 2    that in.
 3         Q.    Yeah, right.   Yep.
 4         A.    And the development of the fire as
 5    reported by both Mrs. Stiffler and Arthur Stiffler
 6    is consistent with the room fire that has not
 7    failed auto ventilated yet, in that when the door
 8    opens to the room, it would call for fresh air to
 9    entrain into the room, which would lift the smoke.
10              Those patterns are visible on the wall
11    in the hallway.   They're clearly visible.
12              And until the bedroom window fails, that
13    smoke layer would develop in the hallway, which
14    the Stifflers testified to, it rapidly descending
15    dark black smoke.
16              And then the physical pattern showed
17    that the window, the only opening in the room, had
18    to have failed because the progression of the
19    ceiling jet stopped before it got to the stairwell
20    and then would have recessed back into the room
21    with the ventilation -- auto ventilation of the
22    window on the west wall.
23              So those were testimony as to the fire
24    dynamics, the patterns that were observed, the
25    smoke that was observed.   They're all consistent
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

102

```
 1    in my book.

 2        Q.   Do those suggest anything to you other

 3    than that the room of origin was Robert Stiffler's

 4    bedroom?

 5        A.   When you put Robert Stiffler in that

 6    room of origin with his burn injuries, it puts him

 7    at the area of origin, encounters the area of

 8    origin immediately with his face.

 9        Q.   All right.  Anything else on witness

10    statements that was significant to your origin

11    determination?

12        A.   No, I think that kind of sums it up.

13             MR. COPENHAVER:  We've been going for a

14    little bit more than an hour.  I don't know what

15    you all feel about lunch.  I've obviously got a

16    lot left but I'll do what you guys want.

17             MR. SANTICOLA:  I mean, I don't need a

18    break for lunch but if anybody else does, again

19    it's okay with me.

20             (Recess - 12:31 p.m. - 12:52 p.m.)

21    BY MR. COPENHAVER:

22        Q.   Mr. Ryhal, we're back from a break.

23             Are you okay to keep going?

24        A.   Yes.

25        Q.   Okay.  So the second thing in conducting
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

103

1    an origin determination at NFPA includes an

2    analysis of fire patterns.

3              Is that your understanding?

4        A.   Correct.

5        Q.   Did you analyze the fire patterns in

6    this case?

7        A.   Yes, I did.

8        Q.   And can you tell me how your analysis of

9    fire patterns informed your opinion on origin?

10       A.   We looked at the structure of the

11   ceiling.  It involved a dropped two-by-four

12   ceiling with drywall gypsum board.

13             An analysis of those structural elements

14   was also consistent with the area of origin being

15   along the west side of the bed.

16             Additionally, there was --

17       Q.   Does it make sense to take these

18   seriatim?  Or for you just to say everything and

19   then for us to dig into them?

20             I'll do them whatever way is easiest for

21   you.

22       A.   It's easier thought-wise if you just let

23   me answer.

24       Q.   Okay.  Got it.

25       A.   So there was that structural analysis.

1              Additionally, the hole burnt in the

2    floor -- so the hole burnt in the floor along the

3    west side of the bed isn't consistent with

4    ventilation patterns, more consistent with the

5    duration of burn in that area, which was mirrored

6    in the ceiling above.

7              Those were the primary patterns that I

8    observed, as well as there's a hole burn in the

9    center of the floor at the top of the bed.

10             But the patterns that I observed under

11   the lower third, the foot that the Fire Marshal

12   refers to, to me were consistent with air

13   entraining into the room.

14             Then you have the loss of mass of the

15   clothing in the closet, as well as the structural

16   elements from that closet were consumed at the

17   head of the bed where Mr. Stiffler was lying.

18             If you compare that observed damage in

19   the photographs to the nightstand located on the

20   east side of the bed, the wood components still

21   remained at floor level.

22        Q.   The what components?

23        A.   The wood components of the nightstand.

24   The wood members.

25        Q.   Anything else under the fire pattern

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1  heading?

2      A.   The patterns in the hallway corroborate

3  the witness statements through the depositions

4  relative to the development of the fire.

5          And it also points to the fact that that

6  room was not in flashover when Mrs. Stippler

7  entered the hallway.

8          And that after the fresh air was entered

9  into the room, the ventilation patterns change and

10  auto ventilate out the window on the west wall,

11  which is consistent with the area of origin being

12  away from the window and near the bed.

13          I think that's it.

14      Q.   Okay.  Let's take those in order.

15          First thing you mentioned was a

16  structural analysis that included the ceiling, the

17  structural elements of the ceiling.

18          And that, in your view, was consistent

19  with the area of origin being alongside the west

20  side of the bed.

21          Did I get that correct?

22      A.   Correct.

23      Q.   Are there some photographs that help

24  indicate what you're talking about so you can

25  explain it to me?

1      A.   Wouldn't hurt occasionally, Steve, if
2  you'd just refer to the page number.
3      Q.   Well, I didn't know which ones you
4  were -- I don't know which ones you're --
5      A.   I thought you were talking about --
6  there's photographs in my report with numbers.
7      Q.   Yeah.  I just don't know which of those
8  you want.
9           I'm happy to generally do that if I'm
10  referring to one, but I don't know which one
11  you're going to pull up.
12      A.   Page 22 of 33.
13      Q.   Okay.
14      A.   It shows the ceiling joists, which are
15  labeled one, which would be the western wall.
16  Then two, three, four, five, eastward towards the
17  hallway.
18           You can see in the center, underneath
19  number two, the carpenters lowered the ceiling
20  level and they applied two-by-fours as the new
21  ceiling joists and tied them in with the
22  stringers, which is right above number two.
23      Q.   I'm having a really hard time seeing
24  anything in these photographs because they're of
25  such poor quality in the PDF.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

107

1          Can I have -- can I get these Henry

2   photographs so I can actually see a JPEG of them

3   or at least a better PDF of them?

4          A.   If you give me a second.

5          Q.   Sure.

6          (Pause.)

7   BY MR. COPENHAVER:

8          Q.   So we were referring to a photograph

9   depicting some of the ceiling joists in Robert

10  Stiffler's room.

11         And I think you had referred me to the

12  image that's on page 22 of your report, which is

13  titled Henry 173-174.

14         I pulled up Henry 174 of the ones you

15  have shown me and that appears to be a little

16  better version -- or at least a more clear version

17  of the photograph that's embedded in your report.

18         So using Henry 174 as a reference point,

19  can you help describe what you're intending to

20  show with this photograph?

21         A.   Does it show the top half of the room?

22         Q.   I'll just share my screen, show you what

23  I have.

24         Can you see that?

25         A.   Yes.

1       Q.    So that's the photograph I'm looking

2    that's labeled Henry 174 by JPEG.

3       A.    So I was referring to these stringers

4    that they had used to tie the two-by-fours into

5    the existing -- or the previous ceiling joists.

6       Q.    Okay.

7       A.    If you look immediately in the center of

8    the room and just to the right.  Stop.  Go

9    straight up.  Stop.

10             Just immediate -- move it to the right,

11   that's one of those stringers with a piece of

12   two-by-four still attached to it.

13             So I analyzed those in reference to the

14   damage in the room based on the duration of burn,

15   heat exposure, failure of the ceiling membrane,

16   i.e. the gypsum board.

17             And that is the area of the ceiling

18   which would be over the western edge of the bed

19   that exhibited the greatest damage to the

20   renovated ceiling two-by-fours.

21      Q.    So I'm gonna try to say back portions of

22   what you said to me to make sure I understand it.

23   If I'm not, let me know.

24             But the ceiling joists in and around

25   where my cursor is here, where that sort of piece

109

1    is perpendicularly hanging down on the top of

2    Henry 174, in your view depicts the most amount of

3    damage to the ceiling?

4         A.   No.  You'd have to go to the diagram in

5    my report.  And the dotted line shows you where

6    that ceiling joist -- the lower one for the

7    renovation would have run.  And it's consumed.

8         Q.   That's here?

9         A.   Correct.

10             No.  You're looking at number one there.

11             Number two would be over to your left.

12        Q.   Here?

13        A.   Right there.  Yep.

14        Q.   Off of this beam here?

15        A.   Yeah.

16        Q.   Is there one of those that hasn't been

17   consumed?

18        A.   Yeah.  Number three, immediately to the

19   left.

20        Q.   That's this one?

21        A.   Yep.

22        Q.   So -- and is this the remnants of one?

23        A.   Yes.

24        Q.   And two would have been here?

25        A.   Correct.

1      Q.   And three is here?

2      A.   Correct.

3      Q.   All right.  How do you know two was

4   here?

5      A.   You simply follow the joists above it

6   over to the wall stud and go down.  The bottom of

7   the rafter, the previous ceiling rafter.

8      Q.   This?

9      A.   Yes.

10      Q.   What about that?

11      A.   That's it.  Follow that to the wall

12   stud.

13      Q.   Okay.

14      A.   All the way -- you're on number one.  Go

15   to number two to your left.  Right there.  Go

16   down.

17           That's where the lowered ceiling members

18   should have run.

19      Q.   Yeah.  How do you know it was there?

20      A.   That's interesting.

21           So they ran the stringer without --

22   you're saying they ran the stringer down without

23   running the joist?

24           I don't think it would be possible to do

25   that construction-wise.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

111

1        Q.   So if I'm understanding, your opinion is

2    that this perpendicular piece hanging down in the

3    middle of the photo was tied into the lower joists

4    that had an origin point around here and would

5    have come across like this, is that right?

6        A.   I'm sorry.  I was looking at another

7    photo to show you.  Please do it again.

8        Q.   Sure.  Let me see if I can -- I'm gonna

9    see if I can do something here.

10            So this perpendicular piece here, you're

11   saying, was tied into a lower ceiling -- lower

12   joist that would have had its origin point around

13   there?

14       A.   Correct.

15       Q.   And that would have come across, if

16   we're ignoring the 3-D aspect of this, like that?

17       A.   Sure.

18       Q.   Is that your opinion?

19       A.   Correct.

20       Q.   And the fact that that is missing is

21   evidence that -- of what?

22       A.   It is evidence to loss of mass in an

23   analysis of duration of burn absent ventilation

24   patterns.

25       Q.   And how much of that is in relation to

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

112

```
1    amount, type and proximity of fuel as opposed to

2    origin?

3         A.   That's a consideration, too, like, for

4    example, when you make that statement and the bed

5    is located a horizontal plane across, let's say,

6    40 percent of the floor, so we go to page 23,

7    Henry 171 and 172, and you can see that the

8    structural elements over the bed -- or the major

9    body of the bed, not the western edge, are intact.

10            So the structural damage is specific to

11   the western edge of the bed.  You got it right

12   there.

13            So in the upper right corner is, we'll

14   call it, joist number one, correct?

15            Then there's joist number two.  Now,

16   those were the upper joists, not the lower ones.

17        Q.   Right.

18        A.   But the remainder of the lower joists

19   are all intact.

20        Q.   Well, is that -- is number one intact?

21        A.   No.  You're looking at the upper joists.

22        Q.   Like what about this perpendicular thing

23   that hangs down?  Isn't that the same as here that

24   would have been connected to a cross one?

25        A.   That's the stringer, correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

113

```
 1        Q.   And is this for number one?

 2        A.   Yes.

 3        Q.   And that's missing as well?

 4        A.   Yeah, one's missing.

 5        Q.   And two's missing as well?

 6        A.   Correct.

 7        Q.   All right.  And where's the window in

 8   172?

 9        A.   That would be at your back.

10        Q.   Is it this way?

11        A.   Behind you.

12        Q.   This way?  If that's coming towards me?

13        A.   Yeah.

14        Q.   All right.  Could the direction and

15   location of ventilation account for the disparate

16   damage to lower ceiling joists?

17        A.   Well, maybe upper gas layer.  I don't

18   see that as ventilation patterns.  That's duration

19   of exposure.

20        Q.   And so I'm trying to understand why

21   that's -- why --

22        A.   So out of the window, the ventilation

23   gases exiting are going to be out of the top

24   window, the top half or two-thirds in this case,

25   because we have air being fed from down below.
```

1   And it could, in fact, be completely filled with

2   ventilation gases.

3          So the ventilation patterns would be

4   derived at the floor where the air is being drawn

5   in and interacting with the hot fire gases.

6          So, if anything, the upper gas layer

7   would be not a dead zone, because it's

8   experiencing heat and decay of the mass of

9   members, but, no, that's not a ventilation

10  pattern.

11      Q.   Okay.  And what does the presence and

12  location of fuel, what effect does that have on

13  the burn patterns on these cross joists?

14      A.   They can generate those patterns.  So,

15  for example, part of those patterns, the

16  generation would be from the chair in the corner.

17          So this is all post flashover.

18      Q.   Sure.

19          So then if we look at 172 or the first

20  one you directed me to, which is -- let's look at

21  174.

22      A.   Page 23?  Or 22?

23      Q.   Page 22 of your report.  Henry 174.

24      A.   Yep.

25      Q.   Orient me as to which way we're looking

1    here.

2           So the window is along the west side of

3    the wall, correct?

4       A.   The window is to your right.  It's the

5    rectangle white spot in the middle.

6       Q.   Right.

7            But on a compass, that's the west side?

8       A.   Yes.  Yes, I'm sorry.

9       Q.   Okay.  And the table as it were would be

10   between the bed and that window?

11      A.   Correct.

12      Q.   The foot of the bed would be towards

13   that lathe and plaster and the brick wall we see

14   in this photograph?

15      A.   The foot of the bed is in the photo and

16   it is -- right in the center is the lower right

17   portion of the bed.

18      Q.   I guess we're looking at 173 then.

19      A.   I'm sorry.  Yeah.  Yeah.  That's a

20   collage of two photos joined together.

21      Q.   I'm just realizing that.

22           So the photograph that you have in -- on

23   page 22 of your report titled Henry 173, 174, you

24   have combined two separate photographs?

25      A.   Correct.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

116

1          Q.    How did you do that?

2          A.    It's pretty simple.  You just put them

3    on a page in a diagram block and then you size

4    them by orientation of objects that they match up

5    in the photos.

6                Might seem complicated, but it's

7    actually very simple.

8          Q.    So it explains why I couldn't see the

9    bed on 174.

10         A.    Do you see -- see to the right, the hole

11   in the floor that leads over and then it looks

12   like there's some paper or might be something

13   below the floor?

14         Q.    I do on 173.

15         A.    Yeah, you can see it.

16               So that's -- you would take those two

17   images and you would join them together where they

18   kind of mesh together.

19               You can't always get them perfect, but

20   you can get them pretty close if the photographer

21   doesn't change his stance.

22         Q.    Yep.  So this is -- so the foot of the

23   bed then would be the part of the bed that is

24   facing toward the television in Henry 173, the

25   farthest away from the camera?

```
 1        A.   No.  The location of the bed, that is
 2   where Mr. Stiffler's head would be, is in the
 3   lower right corner.
 4        Q.   Correct.
 5             So do you see the television?
 6        A.   Correct.
 7        Q.   That's the foot end of the bed?
 8        A.   Okay.  Yes.
 9        Q.   Okay.  And the head end of the bed is
10   the one closest to the camera in this photograph?
11        A.   Right.  Correct.
12        Q.   The table would be between the bed and
13   the window that we see in the photograph?
14        A.   Correct.
15        Q.   And then the chair would be immediately
16   to the left of the bed, on the head side of the
17   bed as depicted in this photograph?
18        A.   Yeah, the chair is at an angle off the
19   bed.  You can see the general outline of the chair
20   to the corner.
21        Q.   Yeah.  I'm just trying to orient us so
22   when I go back and look at these later.
23             These photographs were taken after the
24   collection of artifacts from the scene?
25        A.   These photographs were taken by Henry
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

118

1    during his walk-through the day following the Fire

2    Marshal's visit.

3         Q.   Okay.  Had the table been removed from

4    the room at this point in time?

5         A.   So the table, from my analysis of

6    everyone's photos, appears that during overhaul,

7    it was moved basically over to the foot of the

8    bed, which would be -- maybe the easier way to do

9    this is -- so see the left side of the bed?

10        A.   I do.

11        Q.   That's the A wall in the room.

12             The B wall would be where the TV is.

13             The C, Charlie, wall, the west wall, is

14   over where the window is.

15             And then the A wall is up at the head of

16   the bed.  That's the north wall.

17        Q.   So that is different from how you've

18   depicted it in your scene diagram in your report?

19   Which I'm happy to do, I just want to make sure

20   we're consistent.

21        A.   No, my diagram's correct.

22        Q.   You just said the A wall was the head of

23   the bed.

24        A.   Yeah, I'm sorry, I meant to say D wall.

25   I said C wall was the west wall.

119

```
 1        Q.   I'm sorry?
 2        A.   I misspoke.
 3        Q.   All right.  So just so we're on the same
 4    page.  The foot of the bed where -- the wall
 5    facing the foot of the bed where the TV is would
 6    be the B, Bravo, wall?
 7        A.   Correct.
 8        Q.   If we're just going clockwise from
 9    there, the wall with the window is the C, Charlie,
10    wall?
11        A.   Correct.
12        Q.   The wall on the other side of the head
13    of the bed would be the D wall, correct?  D as in
14    David?
15        A.   Correct.
16        Q.   On the remaining one, on the one that
17    the chair is closest to would be the A, Alpha,
18    wall?
19        A.   Correct.
20        Q.   All right.  So you were saying something
21    about the table?
22        A.   So the table appears to have been moved
23    during the overhaul process.  It ended up off of
24    the southeast corner of the bed frame, which would
25    be the A, B corner of the bed.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

120

1       Q.      So it was moved over to where my cursor

2  is?

3       A.      Yep.

4       Q.      And is that essentially, from your

5  understanding, the complete opposite side of the

6  bed in which it started?

7       A.      Yes.

8       Q.      Which would be in the C, D corner of the

9  bed?

10      A.      Correct.

11      Q.      All right.  Do you have any photographs

12  depicting the table in its original location?

13      A.      No, I do not.

14      Q.      How have you located the table in your

15  diagram to the position which you believe it was

16  at the time of the fire?

17      A.      The diagram was produced from

18  questionnaires to the insureds.

19      Q.      Is there any physical evidence or

20  photographic evidence on which you're relying that

21  is either confirmatory or different from the

22  positioning of the table in the diagram that you

23  have embedded into your report?

24      A.      The only thing I noted was that there

25  was an area absent debris, which I believe I noted

1     in my report.  Allegheny County Fire Marshal photo

2     338.

3          Q.    One second.

4          A.    Page 18 of 33.

5          Q.    So I've pulled up Allegheny County photo

6     338.

7                Do you see that?

8          A.    Yes.

9          Q.    And it looks like we're looking directly

10    at Charlie wall?

11         A.    Correct.

12         Q.    And we're standing at the foot of the

13    bed?

14         A.    Correct.

15         Q.    What is significant about this

16    photograph?

17         A.    Just to the left of the Fire Marshal's

18    boot, there appears to be no excavation that's

19    been done.  There's a protected area on the floor.

20         Q.    Okay.

21         A.    If you look at the collapse of the

22    table, the outlines are similar in shape.  And

23    that table -- I thought there was an earlier

24    photograph showing the table.  There is one.  Page

25    21 of 33.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1      Q.   Okay.

2      A.   21 of 33 you can see the remnants of the

3   table.

4      Q.   So I need the Allegheny County photo

5   number.

6      A.   286.

7      Q.   286.

8           It's just easier for me to pull those

9   photos up.  They're a little better.

10          All right.  So I've pulled up Allegheny

11   County photo 0286.  And what -- is this the one

12   that's from your report?

13     A.   Let me go back to that.

14     A.   What page was that?

15     Q.   21.

16     A.   Thank you.

17          And your question is?

18     Q.   Why did you direct me to this photo?

19     A.   So if you look to the left of the

20   cabinet, the metal cabinet, which has a protected

21   area on the bottom because it was sitting on the

22   floor before being disturbed by overhaul

23   operations, the table was located on the floor to

24   the left of that.

25     Q.   All right.  And orient me as to where we

1    are in the room when this photo is taken.

2        A.   So we would be standing in the doorway

3    to the bedroom looking pretty much directly right

4    down at the floor.

5            And if you notice in the lower right

6    corner of the metal cabinet, you can see the bed

7    rail for the bed.  It goes off to your right.

8        Q.   This?

9        A.   Yep.  Yep.  You got it.

10       Q.   So if we're standing in the doorway,

11   that would be the -- if we're standing in the

12   doorway, wouldn't that be the Alpha, Bravo corner

13   of the bed?

14       A.   Correct.

15       Q.   So the table --

16       A.   Looks like it's closer to the wall, but

17   I can't tell how much of the cabinet is covering

18   the bed.

19       Q.   Would that be the Alpha wall or the

20   Bravo wall?

21       A.   To your left is Bravo.

22       Q.   Okay.

23       A.   You're standing on the Alpha wall.

24       Q.   And so then the table here would be at

25   the foot end of the bed?

```
 1        A.   Correct.
 2        Q.   All right.  So the table as it was found
 3   in the room by the Allegheny Fire Department was
 4   at the foot end of the bed?
 5        A.   I don't know where the fire department
 6   found it, because obviously overhaul operations
 7   have occurred, because the cabinet speaks to that.
 8             So whether it was found there or it was
 9   over -- the other only place I could essentially
10   put it would be where there's a clearing in the
11   floor.  Something was removed.
12        Q.   So let me show you Allegheny County
13   0285.
14             Do you see that?
15        A.   Yes.
16        Q.   I'm sharing too many screens here.
17   There we go.
18             How does that look?  Can you see that?
19        A.   Yes.
20        Q.   I don't have my e-mail up or anything,
21   do I?
22             All right.  So this is sort of a zoomed
23   out photo of what we were just looking at.  So
24   this would be sort of the panoramic that would
25   have shot the floor and then they lifted the
```

1  camera up, shooting towards the northwest corner,

2  the C, D corner of the room.

3      Q.   That's why I've been trying to use

4  whatever those are called.

5          So we're still along the Alpha wall here

6  on Exhibit 35 facing the Charlie, Delta corner?

7      A.   Correct.

8      Q.   And the table that you identified as

9  being under the metal cabinet would be on the foot

10  end of the bed?

11      A.   It would be underneath the oxidation on

12  the cabinet on the left, to the lower left.

13      Q.   And that's towards the foot end of the

14  bed?

15      A.   Yes.

16      Q.   And then where's the clear --

17      A.   Looks closer to the wall to me.  Seems

18  closer to the Bravo wall to me than the bed.

19      Q.   Okay.  Perfect.

20          That's fine.

21          But the Bravo wall is the one facing the

22  foot end of the bed, correct?

23      A.   Correct.

24      Q.   Do you see any indication from this

25  photograph that the table was located along the --

1    near the Charlie, Delta corner of the bed, the

2    head end of the bed, at the time of the fire?

3         A.    No.

4         Q.    Is there any physical evidence or

5    photographic evidence suggesting that it was?

6         A.    No.

7         Q.    Okay.  Does this --

8         A.    With the exception of what I previously

9    said, where there's a cleared area on the floor,

10   that isn't accounted for.

11        Q.    But this photograph that we're looking

12   at 285, was before that area was cleared, was it

13   not?

14        A.    Yeah.  There's a lot of debris,

15   insulation, the rafters from up above, the wall

16   studs.

17        Q.    Okay.  And before that area was cleared

18   out, it's apparent that that table was not there,

19   correct?

20        A.    Correct.

21        Q.    All right.  So there -- let me ask

22   again.

23              Is there any physical evidence at all

24   that that table was actually at the head end of

25   the bed at the time of the fire?

127

```
 1        A.    No.
 2        Q.    You just have to accept that as true,
 3   based upon the diagram that you were provided,
 4   correct?
 5        A.    Well, and other practical
 6   considerations.
 7        Q.    Well, there could be a table next to a
 8   chair that was along the Charlie, Bravo corner of
 9   the room, correct?
10        A.    Pardon?
11        Q.    Wasn't there a chair in the Charlie,
12   Bravo corner of the room?
13        A.    No, the chair is in the Bravo, Charlie
14   corner.
15        Q.    That's -- I thought that's what I meant.
16   I thought that's what I said.
17        A.    I thought you said Charlie, Delta.
18        Q.    I thought I said Charlie, Bravo.
19   There's a chair in the the --
20        A.    I'm so sorry.
21        Q.    There's a chair in the Charlie, Bravo
22   corner of the room, correct?
23        A.    Correct.
24        Q.    Would there be a practical reason to
25   have a side table next to a chair?
```

```
 1        A.    Sure.  I'm sure that could be.

 2        Q.    Was there a cable box on that table?

 3        A.    In the debris field?

 4        Q.    Yes.

 5        A.    No, I didn't see one.

 6        Q.    Okay.  Where was the cable box located?

 7        A.    The cable box is in the debris that --

 8  there is a group photo, I think, of a bunch of

 9  them artifacts that they recovered.

10        Q.    Where did they recover the cable box

11  from?

12        A.    I don't know.

13        Q.    Would it make sense that that was near

14  the television?

15        A.    The cable box?

16        Q.    Correct.

17        A.    Yes.

18        Q.    And that would be along the Bravo side

19  of the room?

20        A.    The cable box was located to a TV, which

21  reportedly was located on the western side of the

22  bed.

23              The table that's observed in the hallway

24  has the remains of what appeared to be the

25  speakers for the television, which was on the
```

```
 1    table.
 2         Q.   You said the western side of the room.
 3    Wasn't it along the southern or Bravo wall of the
 4    room?
 5         A.   You're talking about where the table's
 6    found?
 7         Q.   Where the television was.
 8         A.   Well, the television is -- if you refer
 9    to Exhibit 1.
10         Q.   The Notice?
11         A.   Page number is 10.
12         Q.   Oh, Exhibit 1 in your report --
13         A.   Correct.
14         Q.   -- of Exhibit 11.  Okay.
15              Okay.
16         A.   Yeah.
17         Q.   I see the diagram.
18         A.   I see the confusion.
19         Q.   We're on the same page then.
20         A.   All right.  Very good.
21              So on that long, linear rectangle on the
22    oval is the television that was located sitting on
23    top of the cable box.
24         Q.   Got it.
25              So he had two televisions in his room?
```

```
1        A.   The projection TV was not plugged in and
2   basically was a dust collector.
3        Q.   Right.
4             But there were two televisions in his
5   room?
6        A.   Correct.
7        Q.   Okay.  And, again, the orientation of
8   that -- or the position of that table is
9   provided -- your opinion about the position of
10  that table is because of this diagram, correct,
11  rather than the physical evidence from the scene?
12       A.   No, I think that would be a shallow
13  interpretation, because there's only two
14  receptacles in the room.
15            So without an extension cord, the
16  television, cable box and Apple iPhone need to be
17  plugged into receptacle R-2, which to scale is no
18  more than 4 to 5 feet away.
19            So the reported diagram -- yes, it --
20  this is how it was reported, but physically, it's
21  the only way it could have been.
22       Q.   Okay.  How long is the cord for the
23  iPhone?
24       A.   I don't know.  Long enough to reach that
25  wall.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

131

```
 1        Q.   Well, sort of by definition, if the

 2   phone was charging on this table, that table had

 3   to be close enough to that receptacle to be

 4   plugged in?

 5        A.   Correct.

 6        Q.   And you don't know what that distance

 7   is?

 8        A.   No, I could estimate.

 9        Q.   How far is Charlie wall from where the

10   bed is located?

11        A.   From the rafters, from the location of

12   the bed, it appears to be within 4 feet.  And then

13   you got the table to minimize that distance,

14   because the table obviously is not at the edge of

15   the bed.  It extends towards the western wall.

16        Q.   It's obviously not as depicted in this

17   photograph?

18        A.   No.  No.  I'm saying the table -- if the

19   left side of the Stiffler's bed is at 4 feet, you

20   know, the table will have dimensions and it's

21   closer to the receptacle than the bed.

22        Q.   But in terms of the table's orientation

23   north/south, so towards the D wall or towards the

24   B wall, that's based upon the information provided

25   to you in this diagram?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

132

1      A.   Correct.

2      Q.   All right.  But where it was found after

3  the fire was not in the orientation in which it

4  was suggested to you by this diagram, correct?

5      A.   Correct.

6      Q.   And there's otherwise no physical

7  evidence that it was in that -- in the location in

8  which it was identified in the diagram, correct?

9      A.   Absent my previous discussion about the

10 area before that appeared to be cleared.

11     Q.   Yeah.  But that's -- that's why I wanted

12 to show you photo 285, which is before it was

13 cleared, and there's no table there.

14          We agree?

15     A.   Correct.

16     Q.   Okay.  So let me ask that question

17 again.

18          There's no physical evidence that

19 supports that the table was in the position in

20 which it was depicted in that diagram at the time

21 the fire started.

22          True?

23     A.   Correct.

24     Q.   But nonetheless, you believe that it was

25 in or around the location of the table as depicted

133

1    to you in the diagram that was the point of origin

2    for the fire, correct?

3         A.    Correct.

4         Q.    And if the table was not in a position

5    in which it was suggested to you in that diagram,

6    then it would be -- that wouldn't change your

7    point of origin, would it?

8         A.    No.  No.

9         Q.    I mean, your point of origin is not

10   dependent upon a table being in that location, is

11   it?

12        A.    My point of origin is dependent upon the

13   burn injuries suffered by Mr. Stiffler.

14        Q.    Right.

15             So whether or not the table was there is

16   not -- is not the reason that your point of origin

17   is where it is.

18             It's based upon the things that NFPA

19   suggests, which is fire patterns, fire dynamics

20   and witness statements, correct?

21        A.    Correct.

22        Q.    So if it turns out that the table was

23   not in the position in which it was represented to

24   be in the diagram that you were provided, your

25   point of origin would still be the same, correct?

134

1       A.   My point of origin is relative to

2   Mr. Stiffler's burns and the statements relative

3   to the configuration of the room.

4       Q.   Okay.  But my question to you, if the

5   table wasn't there, if the table was in the

6   position in which it was found by the

7   investigating fire agency before they cleaned the

8   room, your point of origin would not change, would

9   it?

10      A.   No.  Because I'm assuming the table was

11  moved even during Mr. Stiffler's escape from the

12  room and/or the fire department's operations.

13      Q.   Well, I'm not -- well, first of all, do

14  you have any evidence --

15      A.   You're giving me a theoretical, Steve.

16      Q.   I am giving you a hypothetical.  That's

17  why I said if.

18          So let me give you the hypothetical

19  again.

20          If the table was in the position in

21  which it was found again -- or it's depicted in

22  the photos from the Allegheny Fire Department and

23  not in the position in which it was represented to

24  you in the diagram you were provided, your point

25  of origin would not change.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

135

1           True?

2      A.    True.

3      Q.    And if the phone was on the table, that

4  would mean to you that the phone could not have

5  been the cause of the fire.

6           True?

7      A.    In your theoretical, yes.

8      Q.    Do you have any evidence, physical or

9  otherwise, that the table was moved to the

10 position in which it was depicted by the Allegheny

11 County Fire Department photographs before those

12 photos were taken?

13     A.    Repeat it?

14     Q.    I don't know if I can, but I'll try to

15 get the gist of it in this new question.

16          Is there any evidence in the record that

17 the table was moved to the position in which it

18 was -- in which it's depicted in these Allegheny

19 County Fire Department photographs after the fire

20 occurred and before these photos were taken?

21     A.    From their photographs, no.  Only that

22 overhaul has occurred, because the cabinets are

23 knocked over.

24     Q.    Okay.  But specific to that table, is

25 there anything you can point to in the record

1   showing that that table was moved prior to these

2   photos being taken?

3       A.   There appears to be a protected area on

4   the table, which is inconsistent with the floor in

5   that area.

6       Q.   What do you mean?  Show me what you

7   mean.

8       A.   Page 19.  Allegheny County Fire Marshal

9   340.

10      Q.   Let me just pull up 340.  One minute.

11  What page did you say in yours?

12      A.   Page 19.

13      Q.   19.  Thank you.  Okay.

14      A.   The Allegheny County Fire Marshal photo,

15  the area that was absent debris, has a piece of

16  carpet remaining on the floor.  Something was on

17  the floor and was removed.

18      Q.   Hold on.  So I have 340 up.

19           Do you see that?

20      A.   Yes.

21      Q.   All right.  And tell me what you're

22  looking for.

23      A.   Follow the floor joists on the left side

24  of the photo.

25      Q.   This one?

```
 1        A.    Next one over.

 2        Q.    This one?

 3        A.    Follow it right up to the floor

 4   material -- follow it right up to where the floor

 5   material was burned away.  It begins to be present

 6   again.  Let's put it that way.

 7        Q.    In the joist?

 8        A.    Here's the joist.

 9        Q.    Yep.  Where am I going?

10        A.    Go up a little bit.  Right there.  Stop.

11   Down a quarter inch.

12              Do you see that semicircular reddish in

13   color right there?

14        Q.    Yep.

15        A.    Piece of carpet on the floor, protected

16   area.  Something was in that area.

17        Q.    That's not the size or shape of the

18   table, is it?

19        A.    No, it isn't.

20        Q.    How big is that protected area?

21        A.    The table was immersed in fire.  If you

22   go to photo, page 21, bottom, 286.  Allegheny

23   County Fire Marshal 286.

24        Q.    Okay.

25        A.    You can see the table to the left of a
```

1    metal cabinet.

2         Q.   Yep.

3         A.   There's also something there that's

4    unburned, small.

5         Q.   Okay.  What is that?

6         A.   I don't know.

7              At some point maybe debris added or it's

8    protected.  But, again, the idea that things have

9    been moved around.  So the damage to the table, if

10   we look at it -- page 24.

11        Q.   Okay.  What number?

12        A.   166 Henry.

13        Q.   Okay.

14        A.   The table was obviously completely

15   emersed in fire.  The melted mass that the table

16   has fallen down into, which appears to have the TV

17   speakers in it, there are no protected areas on

18   the floor that match that area.

19             The only observed patterns that match

20   that area that I could see is in the following

21   photo, on page 25.

22             It is the area of the floor which is

23   absent debris and has the hole in it.  This would

24   be immediately adjacent to where the table was

25   reported to be.

1              If you look at the bottom of the photo

2   of Allegheny County Fire, 338, you can see that

3   there's still a considerable amount of debris on

4   the floor at the foot of the bed.

5        Q.   Let me pull up 338.  I have Allegheny

6   County 338 here.

7              And you're suggesting -- you're

8   suggesting what now?

9              Wait.  Hold on.  I'm gonna change my

10  question.  This is after the metal cabinet was

11  removed, correct?

12             Because -- what we're seeing here in 338

13  at the foot of the bed is where that metal cabinet

14  was depicted in those earlier photographs?

15       A.   Yes.

16       Q.   And underneath that metal cabinet was

17  the remnants of the table, correct?

18       A.   Correct.

19       Q.   Okay.  So you're suggesting that later

20  on that the remnants of that table were then moved

21  back over to the other side of the bed near where

22  the firefighter's foot is?

23       A.   I couldn't say that.

24       Q.   Well, what are you saying?

25       A.   I'm saying that the table has been

140

1    moved, that the burn patterns and damage to the

2    floor are consistent with the area of origin being

3    on the western side of the bed and that the table

4    was moved either by overhaul and/or Mr. Stiffler

5    trying to escape the room.

6         Q.    And what I'm trying to figure out is, if

7    the basis for your opinion that the table was

8    alongside or between the window and the bed is the

9    debris field underneath this firefighter's

10   photo -- or underneath this firefighter's foot as

11   depicted in 338, how you account for the fact that

12   the table in photographs prior to this,

13   sequentially prior to this, was at a different

14   location towards the foot end of the bed?

15        A.    Again, if you look at photograph 167,

16   168 on -- it's on my page 26.

17        Q.    Okay.

18        A.    There is a protected area at the foot of

19   the bed underneath the carpeting.

20             Do you see where it remains, the carpet

21   pattern?

22        Q.    Here.

23        A.    We're having trouble seeing your arrow,

24   Steve.  Okay.  I see it now.  All right.  Yep.

25             So the issue at hand there is, is that

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

141

 1    the table -- where they recovered the table?  I

 2    don't know, because I didn't talk to the Fire

 3    Marshal.  And, you know, that analysis hasn't been

 4    done.  But the table was moved.

 5         Q.   From where?

 6         A.   From its location up at the head of the

 7    bed.

 8         Q.   How do you know it was at the head of

 9    the bed other than the diagram that was provided

10    to you?

11         A.   Witness testimony.

12         Q.   Okay.  But, again, no physical evidence

13    that supports that?

14         A.   I don't think it's that shallow of an

15    argument.  I think the idea that there was only

16    two receptacles in the room and you have the

17    statement from the individuals and the physical

18    characteristics of the table, you want me to

19    presume that in -- for this evening or days before

20    the fire, that Mr. Stiffler took his cable,

21    removed it from the side of his bed where it has

22    been testified to by his mother, et cetera, and

23    moved it to the foot of the bed.  That's pure

24    conjecture.

25         Q.   I'm just asking whether there's any

1   physical evidence for it.

2       A.   Previously I said there was no physical

3   evidence that it was at the head of the bed

4   because it's been removed.

5       Q.   In 167, you can see the receptacle to

6   the left of the window?

7       A.   Yes.

8       Q.   Okay.  And would it not make sense to

9   you to have a table closer to the foot of the bed,

10  especially if you have a television on it?

11      A.   The testimony of Mr. Stiffler during his

12  deposition is that he has extremely poor eyesight.

13      Q.   Uh-huh.

14      A.   And this TV was purchased and placed on

15  that table because he could lie there with his

16  head on the pillow and the TV was in close

17  proximity where he could see it clearly.

18      Q.   Got it.

19           How -- did anyone take the measurement

20  between that receptacle that we see in Henry 167

21  and where you believe the table to have been

22  located?

23      A.   I don't believe so.

24      Q.   Do you know whether it's possible for a

25  charging cord for an Apple iPhone 6S Plus to reach

1    from that receptacle to the area where the table

2    is depicted in the diagram?

3         A.   We have witness testimony and --

4         Q.   I'm not asking if anyone testified to

5    it, I'm asking whether it's physically possible.

6         A.   And we have the components of the room

7    that are only so large and you can only fit so

8    much in the room.

9              Do we have exact measurements?  No.

10        Q.   Let me ask it a more simple way.

11             Do you know how many feet it is from the

12   receptacle to the position that that table is in

13   as depicted in that diagram?

14        A.   Exactly or approximately?

15        Q.   Well, did anyone take the measurement?

16        A.   I don't believe anyone did take a

17   measurement of where that bed was.

18        Q.   So what would be the basis for your

19   approximation?

20        A.   The size of the furniture.

21        Q.   Okay.  So tell me what your

22   approximation --

23        A.   The side of the room.

24        Q.   And give me the basis for it.

25        A.   The bed is generally 5-foot wide,

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1    queen-sized bed.  And based on the dimensions of

2    the room, I want to say it was 12 -- 14 feet --

3    I'd have to look at the scale diagram.  But you

4    have a chair to the right or the A, Alpha side,

5    which they could pass through.  Cabinets on the

6    right wall.

7           And the location of the frame rail for

8    the bed is directly underneath ceiling joist

9    number two, which are at most 2 feet on center.

10       Q.   So what's your opinion?

11       A.   I think the bed's within 4 feet of the

12   wall.

13       Q.   Okay.  And then how far toward the foot

14   end of the bed from the location that the table

15   was reported to you to be in is that receptacle?

16       A.   You're saying along the Charlie wall?

17       Q.   Let's do this.  Let me show you your

18   report.

19           If this is approximately 4 feet, the

20   distance between the wall and the table, how far

21   is it between the table and receptacle two going

22   north/south?

23           Because in 167, I'll tell you the

24   receptacle looks to be sort of parallel with the

25   foot end of the bed.  I can show you that as well.

1          So I pulled up Henry 167.  You can see

2     the receptacle along Charlie wall and to my eye,

3     it's more or less along the lines of the foot end

4     of the bed.

5          So how far south from the position that

6     you believe the table to have been in do you have

7     to go along that way to get to the receptacle?

8          A.   Of the window?

9          Q.   From the table to the receptacle.

10          Yeah, we'll use the window for the

11     reference point.

12          A.   I would say it's approximately 2 feet.

13          Q.   So that in order to reach -- even if it

14     was on the very edge of the table, in order to

15     reach that receptacle, the cord would have to be

16     over 4 feet long?

17          A.   I believe so, yes.

18          Q.   And do you know if the charging cable

19     provided with an Apple iPhone 6S Plus is that

20     long?

21          A.   I would believe it would be generally

22     6 feet long.

23          Q.   Is that a guess or are you basing that

24     on something?

25          A.   No, I'm just basing it on experience.  I

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

146

1    do not know specifically what that cord was.

2         Q.   Okay.  And if the cord wasn't that long,

3    would that suggest to you that it was not being

4    charged with the original cord or that the table

5    was not in the position in which it was

6    represented to be or something else?

7         A.   I wouldn't know any of those.  All I

8    have is what we were informed is that it was the

9    original cord for the phone.

10        Q.   And my suggestion to you is, if the cord

11   as provided is not long enough for it to be

12   physically possible to be charging the phone in

13   that receptacle with the table in the position

14   which was reported to you, what does that tell

15   you?

16        A.   Well, if that were the case, it might

17   tell you there was a different cord being used.

18   I'm not sure of the dimensions, because they

19   weren't taken.

20        Q.   Could it also tell you that the table

21   wasn't in the position in which it was reported to

22   you?

23        A.   Well, the table, as reported to me, if

24   it moves a little further south -- it's actually

25   in the diagram.

1          The table, based upon where the

2    receptacle is is closer to where the receptacle

3    is.

4          Q.   So --

5          A.   I want to look at a photo here.

6          Q.   Great.

7          A.   It's Allegheny County photo 313.

8          Q.   Okay.

9          A.   If you look at the receptacle, it's in

10   the center of the wall near the floor.

11         Q.   I see it.

12         A.   It has a cord coming out of it.

13         Q.   I see it.

14         A.   Those planks, it's vertical planking, a

15   plank-style house.  And they're generally a foot

16   wide.

17         So that places the receptacle within or

18   less than 2 feet of the window.  The window is in

19   the corner of the room.

20         Q.   You believe that the window is in the

21   corner of the room?

22         A.   Nearly at the corner.  Yeah, that's the

23   way it was described to me.

24         Q.   Well, we have photographs of it, don't

25   we?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

148

```
 1        A.   Yeah.  But you're missing the closet.

 2        Q.   Okay.

 3        A.   So it appears to me that's directly

 4   towards the top of the bed, the top half of the

 5   bed where the cable was reportedly located.

 6        Q.   So how do you account for the -- I mean,

 7   we can see where the receptacle is relative to the

 8   bed in the photographs.

 9             We don't have to look at the width of

10   the planks.  There's a photograph of both the bed

11   and the receptacle.

12        A.   My point is that I believe that's in

13   pretty close proximity to the head of the bed.

14        Q.   So let me pull up Henry 167 again.

15             Do you see that?

16        A.   Yes.

17        Q.   You're telling me that that receptacle

18   in Henry 167 is closest to the head of the bed?

19   Does that make sense?

20        A.   Yeah.

21        Q.   Cool.  Okay.

22        A.   You're assuming the bed hasn't been

23   moved.

24        Q.   So everything in the room was moved.  We

25   just have to take Stiffler's word over what all
```

1    the physical evidence is, is that right?

2         A.   I believe he is the strongest evidence,

3    yes.

4         Q.   Got it.  More than the physical

5    evidence.  More than the photographs.  More than

6    where things were found.  It's just -- it's

7    Mr. Stiffler?

8         A.   And his mother.

9         Q.   Got it.  Okay.  Thank you for agreeing

10   with that.

11              All right.  In fact, I want to do this

12   again.  I want to make sure we're really clear

13   here.

14              Henry 167, what you're telling the jury

15   is that the receptacle that we see along the wall

16   next to the window is alongside the head end of

17   the bed, that's what you're saying?

18        A.   Yes.

19        Q.   Okay.  You agree with me that the foot

20   end of the bed is the one that's closest to the

21   camera, right?

22        A.   Correct.

23        Q.   And in the diagram as provided to you,

24   you would agree -- in fact, the one that's

25   embedded in your report, you'd agree that the

150

1    position of the receptacle was closer to the foot

2    end of the bed, not the head end of the bed,

3    right?

4        A.   Yeah, I guess that was more of a

5    random -- I didn't scale that out.  I didn't have

6    cause to.

7        Q.   Just random?

8             You're just throwing receptacles in

9    there?

10       A.   No.  The receptacle's on that wall.

11   Exactly where it was located, I don't know if the

12   other diagram exhibit is adjusted.

13       Q.   So the receptacle as depicted in the

14   diagram you embedded in your report and that

15   contains the opinions you plan to offer in trial

16   in this case shows the receptacle at the foot end

17   of the bed.

18            The photographs that Mr. Henry took on

19   the day after the fire, which you previously

20   agreed showed the receptacle essentially alongside

21   the foot of the bed, you're now saying we have to

22   disregard all of that?

23            Why?  Because Mr. Stiffler says the

24   table was towards the head end of the bed?

25       A.   I think the perspective is skewing your

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

151

1    comments.  But, I mean, the planking has the

2    receptacle within 2 feet of the window.

3         Q.   Why?  Did you measure it?  Did anyone

4    measure it?

5         A.   No, but there's probably a way to look

6    back at it now that you brought these questions up

7    and maybe look at the planking on the wall and see

8    how many planks there are for the size of the

9    room.

10        Q.   Did you do that?

11        A.   Generally, yeah, I did consider the

12   location of the receptacle to the cable and asked

13   myself, was the receptacle close enough to the

14   cable.  And I believe it was.

15             And I believe for that reason, the

16   location of the cable could only have been -- if

17   in use by Mr. Stiffler -- on the west side of the

18   bed.

19             So the idea to propose that the table is

20   where it was found at the foot of the bed prior to

21   the fire originating is preposterous, right?

22             I don't think it's a consideration.  You

23   can make that argument to a jury, right?

24        Q.   If we get there.

25        A.   And they would have to believe either

1    the argument you're making or believe that what

2    I'm saying and what the Stifflers are saying is

3    reasonable.

4         Q.   To be fair, you didn't conduct any --

5    you didn't take any measurements whatsoever for

6    the orientation or position of that receptacle,

7    true?

8         A.   I was not present to do that, correct.

9         Q.   And you didn't take any measurements for

10   the -- to indicate or position the bed within the

11   room relative to any of the walls, correct?

12        A.   Correct.

13        Q.   And you didn't take any measurement from

14   how far the receptacle is to where Mr. Stiffler

15   said the table was, correct?

16        A.   Correct.

17        Q.   And you don't know the measurement of

18   the charging cord that was ostensibly being used

19   to charge the phone at the time of the fire,

20   correct?

21        A.   Correct.

22        Q.   And you don't know whether that cord was

23   long enough to get from the receptacle to that

24   phone sitting on that table if, indeed, it was in

25   the positin in which Mr. Stiffler reported it,

1    correct?

2         A.   Correct.

3         Q.   Okay.  And, in fact, the only thing --

4    one of the things you can say is that despite what

5    Henry 167 shows and what you previously agreed

6    depicts the receptacle alongside of the foot end

7    of the bed, you now believe that contrary to what

8    is plainly evident from the photograph, that

9    receptacle is actually at the head end of the bed.

10             Is that your perspective?

11        A.   I believe that the -- I believe that the

12   receptacle is within 2 feet of the window.  And I

13   believe that that bed's within 4 feet of the wall.

14   The length of the cord I do not know.

15        Q.   Okay.

16        A.   The dimensions of the table, I do not

17   know.

18        Q.   How wide is that receptacle?

19        A.   A standard receptacle?

20        Q.   Sure.

21        A.   Two-and-a-half inches, 3 inches.

22        Q.   Which one?

23        A.   Which one?

24        Q.   Yeah.  3 inches, two-and-a-half or

25   something different?

```
 1        A.    The cover's probably 3 inches.  The
 2   rough opening is probably two-and-a-half.
 3        Q.    Does the damage to the lowered ceiling
 4   joists depict or indicate to you anything other
 5   than that the fire originated in the western half
 6   of the room?
 7        A.    It's consistent with the fire
 8   originating in the western half of the room.
 9        Q.    Anything else?
10        A.    Duration of burn, when you compare it to
11   the other structural members.
12        Q.    That it just burned longer in the
13   western half of the room?
14        A.    Well, what happens is the drywall will
15   expand and collapse.  So over an origin of a fire,
16   you can lose the drywall, the membrane, and then
17   permit fire to travel vertically.
18        Q.    Have we talked about all of your
19   opinions related to the structural analysis you
20   did of the ceiling and how that formed your area
21   of origin analysis?
22        A.    It simply supports that analysis.
23        Q.    Okay.  The next thing you mentioned was
24   the hole burned in the floor alongside the west of
25   the bed, which you believe was consistent with the
```

1    duration of burns in that area.

2          What do you mean by that?

3    A.    That a fire was burning in that area

4    longer when one considers that the bed purportedly

5    was made, and the fuel configuration, being a bed,

6    is equal and the burns outside of the bed, there's

7    reportedly, other than the TV stand, nothing in

8    that location to cause the damage to the floor.

9    Q.    If there was a comparatively more amount

10   of fuel in that location, would that account for

11   the hole in the floor in that location?

12   A.    Yeah.

13   Q.    Meaning, if when Mr. Stiffler got out of

14   the bed, some of the bedding fell onto the floor

15   in that location, would that be consistent with an

16   increased level of damage in that location?

17   A.    Sure.

18   Q.    Okay.  Do you know whether that happened

19   or not?

20   A.    All I know is the damage that resulted.

21   Q.    Okay.  Next you said a hole burned in

22   the center of the floor on the top of the bed.  I

23   don't know what the significance of that was, but

24   can you explain it to us?

25   A.    Yes.  I just noted that that was one of

1    the other areas that there was a hole burned

2    through the floor at the end of the bed in the

3    center.

4        Q.   And what's the significance of that to

5    you in your origin determination?

6        A.   Just that there was something there that

7    had burned for a period of time.

8             There's also, in that general location,

9    the pillows, which generally are foam pillows,

10   they burn rather vigorously, would be consistent

11   with that type of damage.

12       Q.   Very good.

13            And does that relate to your origin

14   determination or just the fact that there was an

15   increased fuel source from the pillows in that

16   location?

17       A.   It's just my analysis of what I'm

18   observing in the physical damage to the structure.

19       Q.   Does it relate to a point of origin?  Or

20   just again, the fact that the pillows were there,

21   pillows burn vigorously and you're likely to see

22   increased damage in the area of the pillows?

23       A.   I mean, that's what I would assume it

24   is.

25       Q.   Okay.  The next thing you mentioned was

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

157

1    loss of mass of the clothing in the closet and the

2    structural elements in the closet were consumed.

3            What's the significance of that?

4        A.   So a fire starting on the western side

5    of the bed and involving the closet, which was

6    open, had a large fuel source to grow rapidly.

7            So in this instance, once the door's

8    open, Mr. Stiffler is in the hallway, you expect

9    rapid development of the fire due to the bedding

10   materials and combustible materials.

11       Q.   Does the fact that the clothing, which

12   was a big fuel source, were consumed in the fire

13   tell you anything about the point of origin of the

14   fire?

15       A.   Well, comparatively, the closet is

16   filled with clothes the whole way across.

17   Clothing remained over towards the eastern wall

18   versus the western wall.

19       Q.   Do you have any photographs that depict

20   what you're explaining?

21       A.   Page 21, Allegheny County Fire Marshal

22   photo 362.

23       Q.   Is there a door to that closet?

24       A.   No.  It was open.

25       Q.   Was it open the whole way across?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

```
 1        A.   Yes.

 2        Q.   Okay.  362?

 3        A.   You can see there's a large pile of

 4   clothes in the upper left corner.

 5        Q.   Hold on.  I'm pulling that up.

 6             Okay.  I see.

 7        A.   So in the analysis of loss of mass in

 8   the room, the compartment fire, the chair and the

 9   bottom of the furniture remained over on the

10   eastern side versus the western side.

11             Same with the closet.

12        Q.   And does that have anything to do with

13   where the fires -- where the flames were

14   ventilating out of?

15        A.   No.

16        Q.   Why not?

17        A.   Because the ventilation patterns

18   wouldn't exist through there.  They would exist

19   from the doorway out through the window.

20        Q.   Right.

21             Away from where those clothes are

22   located, right?

23        A.   Correct.

24        Q.   And that's sort of my question.

25             If the flames were being ventilated away
```

1   from all those, is it not unsurprising that some

2   of them remained unconsumed in that area?

3         A.   No, it's -- the analysis as well is the

4   loss of mass, so what you're assuming is that this

5   air's moving into this room and selectively

6   burning mass in dead air spaces.  And that's not

7   the case.

8               The case is the patterns are visible to

9   the bottom of the bed and the entranceway to the

10  floor where the fresh air is entraining in there

11  and it's causing that heat damage.

12              The closet area is a dead air space, and

13  so it's not -- I wouldn't expect that a

14  ventilation pattern would play a role far into the

15  room, particularly when in between there is the

16  head of the bed, which still has bedding material

17  on it.

18        Q.   Okay.  Anything else?

19        A.   No.

20        Q.   Was there anything else about the fire

21  patterns that informed your origin analysis?

22        A.    Well, there was a lack of damage to the

23  south, the B, Bravo, wall from the combustion of

24  the chair.

25        Q.   What's the significance of that in your

1   view?

2        A.   I would attribute that to air

3   entraining.

4        Q.   I thought you weren't gonna say that

5   anymore.

6             Okay.  But what's the significance of

7   that to your origin opinion?

8        A.   To my origin, nothing.

9             I'm just observing the patterns in the

10  room relative to the reported fuel packages.

11       Q.   All right.  I'm just trying to figure --

12  I'm trying to walk through the three NFBA prongs

13  of an origin analysis.

14            We covered witness testimony.  I think

15  we've now covered fire patterns.

16            But what I'm trying to figure out is

17  whether there are any other fire patterns that

18  informed your analysis of your origin

19  determination before I move on to fire dynamics.

20       A.   No.

21       Q.   Did you also consider fire dynamics in

22  coming up with your origin determination?

23       A.   Yes.

24       Q.   What are fire dynamics?

25       A.   Fire dynamics is the analysis of

1   compartment and the fuels and the arrangement of

2   the ventilation openings relative to a fire's

3   growth in ventilation in a structure.

4       Q.   And so tell me what your analysis with

5   respect to fire dynamics entailed in making your

6   origin determination in this case.

7       A.   So the information provided by

8   Mrs. Stiffler's that she first observed when she

9   entered the hallway is considered -- is consistent

10  with the statement of Mrs. Stiffler and her

11  husband, Arthur, that she walks out into the

12  hallway, she can see the fire and smoke coming out

13  of the bedroom and she goes to get Mr. Stiffler.

14          And as he comes back, the smoke is now

15  pushing its way down towards the floor.  They

16  extricate their son.  Arthur says he extricated

17  his wife also to the outside.

18          And the patterns on the wall indicate

19  that in that period of time, the window to the

20  bedroom failed, because the patterns reversed

21  themselves and began venting out the west wall.

22      Q.   Did the fire pattern suggest to you

23  anything other than the room of origin was Robert

24  Stiffler's bedroom?

25      A.   Well, analysis of dynamics have involved

1    consideration of time.  So how far was the fire

2    developed prior to the door being opened?  How

3    rapidly did the fire grow after the door was

4    opened?

5          And the testimony, which is consistent

6    with the patterns that are observed on the second

7    floor, is that the fire grew rapidly after the

8    door was opened.

9          The observations of Mrs. Stiffler

10   relative to fire dynamics is that the fire is

11   towards the north Delta wall.

12       Q.   And that's what we talked about earlier.

13       A.   Correct.

14       Q.   Her being able to -- from her vantage

15   point in the hallway coming out of the primary

16   bedroom is that the -- if we take her testimony to

17   be true, that the fire would have originated

18   somewhere in the northern 4/5ths of that room as

19   we discussed earlier, correct?

20       A.   Correct.

21       Q.   Does the analysis of fire dynamics

22   narrow it further than just focusing on fire

23   dynamics?

24       A.   No, you have to incorporate other

25   factors, the burn injuries to Mr. Stiffler.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

163

```
 1        Q.    Understood.

 2              I'm just sort of taking them one at a

 3   time.

 4              Okay.  So have we now talked about your

 5   opinions with respect to fire dynamics as it

 6   relates to your origin determination?

 7        A.    Yes.

 8        Q.    Let's take a five-minute break.

 9              Maybe we can finish up origin and move

10   on over to cause, which I'm sure we're all excited

11   to talk about.

12              (Recess - 2:37 p.m. - 2:50 p.m.)

13   BY MR. COPENHAVER:

14        Q.    Mr. Ryhal, we are back from our break.

15              I want to finish up on origin before I

16   move on to cause.

17              So we discussed a lot about fire

18   dynamics and fire patterns and statements from --

19   or the deposition testimony that you reviewed.

20              And from your report that we've marked

21   as Exhibit 11, it appears that you have put the

22   point of origin, quote, in the immediate vicinity

23   of the table, end quote, along the western side of

24   Mr. Stiffler's bed, is that right?

25        A.    Correct.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

164

```
 1        Q.   Okay.  How were you able to pinpoint it
 2   to that degree of specificity in the immediate
 3   vicinity of the table?
 4        A.   Mr. Stiffler's statement and his burn
 5   injuries.
 6        Q.   Well, sir, we already talked about --
 7   well, let me ask this.  When you say immediate
 8   vicinity of the table, how far does that immediate
 9   vicinity extend?
10        A.   Within the area of the table to the bed
11   where Mr. Stiffler's located.
12        Q.   Does it extend under the bed?
13        A.   No, I believe the burn injuries are
14   really specific.  I mean, it could be the edge of
15   the bed.  Obviously there's a bed in there.  There
16   was a fire.
17        Q.   That's what I mean.
18             I mean, if the fire originated on the
19   edge of his bed between his body and the edge of
20   the bed, would not -- I think we talked about this
21   earlier.  Would you not expect his injuries to be
22   the same?
23        A.   No, I wouldn't.
24        Q.   I don't understand.
25        A.   If the bed was on fire, it's a
```

165

1    horizontal surface, it's underneath him, his

2    injuries would reflect that.

3        Q.   I'm not talking about the bed -- I'm not

4    talking about him sleeping on top of a fire.

5             I'm talking about -- how possibly are

6    his injuries different if the fire starts on the

7    table or a foot inwards on the bed but in the

8    same -- but in the same relative position to his

9    face?

10       A.   I think it's fair to say to say that --

11   I would say it's in the immediate vicinity.

12            Can I tell exactly where it started?

13   No.

14       Q.   So what I'm saying is, you allow for the

15   possible -- both the patterns of his injuries and

16   the patterns of the fire are as consistent with it

17   starting immediately under the bed, as it is

18   6 inches away on the table, true?

19            I mean, you can't narrow it down to that

20   level of specificity, can you?

21       A.   I don't think I did.

22       Q.   Okay.  Well, that's why I asked how far

23   does immediate vicinity extend.

24       A.   Immediate is subjective.

25       Q.   That's right.

1           Well, that's why I'm asking --

2      A.   I can't say it's an inch, 5 inches or

3  10 inches.  I'm just saying that I believe that it

4  started in that area and the primary evidence are

5  his burn injuries, how localized they are.  They

6  are localized to his face.

7      Q.   And what I'm asking -- because one of

8  the reasons you said that is the burn injuries.

9  And I'm saying -- and I thought we had covered

10 this earlier, but I just want to make sure that

11 I'm right.

12          If -- you would expect the same injuries

13 whether the fire started on the table top or

14 10 inches over on the bed, but along the same

15 line, true?

16     A.   Mr. Stiffler's lying on the bed.  I

17 would expect that if there's a bed fire, he would

18 have injuries to his shoulders, neck, side of his

19 face.

20     Q.   Are you basing that on anything?

21     A.   I'm basing it on my understanding of our

22 flesh's response to fire.

23     Q.   Okay.  What I'm asking you is, if a fire

24 started in front of his face on the bed, that

25 would first burn his face, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

167

```
 1        A.   Correct.

 2        Q.   And if a fire started on the table,

 3   6 inches away --

 4        A.   But not his chest, right?  In your

 5   argument, the fire was specific to his face.  It's

 6   so localized that it only burns his face.

 7        Q.   If that's what woke him up, sure, before

 8   it got to any portion of his body.

 9             Just like if a fire started 6 inches

10   away on the table top and it got to his face

11   first, you would expect burn injuries on his face,

12   correct?

13        A.   Correct.

14        Q.   Okay.  Is that correct?  I mean, isn't

15   that right?

16        A.   I mean, I'm not saying that the edge of

17   the bed isn't on fire.  I didn't say that.

18             My point is, is that if the bed was on

19   fire -- from a bed fire, a smoking fire, I would

20   expect to see greater injury to Mr. Stiffler.

21        Q.   Okay.  And my question to you -- I mean,

22   if we're just thinking about this chronologically.

23   Let's say it's a smoking fire and he was smoking

24   and passed out or fell asleep, whatever.  I don't

25   care which.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

168

```
1              The cigarette or whatever he was smoking
2    ignited the head side of his bed, not under his
3    shoulder, not under his torso, not under his legs,
4    but 6 inches away from the table.  It burns his
5    face.  It woke him up.
6              Wouldn't those injuries be exactly the
7    same as if something ignited on the table top
8    6 inches away and burned his face and woke him up?
9        A.   You can make that argument.
10       Q.   I'm not making that argument.
11             I'm asking you what your opinion is.
12             MR. SANTICOLA:  Well, I'm gonna object.
13   I mean, I'll let you answer the question, but
14   that's exactly what that is.  That's proposing an
15   answer.  It's an argument.  It's not really a
16   question.
17             There was no smoking material or
18   evidence of smoking material in the area.
19             MR. COPENHAVER:  Well, I'm not going to
20   let you testify.
21             MR. SANTICOLA:  Well, but that's what
22   you're -- you're presupposing something that
23   doesn't exist.
24             MR. COPENHAVER:  I said, if, which is a
25   hypothetical.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

169

```
 1              MR. SANTICOLA:  Which is why I make that
 2    argument but you can ask him again.  He can answer
 3    it.
 4              THE DEPONENT:  It's why I don't like to
 5    answer hypotheticals.
 6    BY MR. COPENHAVER:
 7         Q.   So --
 8         A.   Again, if you're presuming it is a bed
 9    fire, his injuries are actually very directional.
10    They are to the front of his face.  They're not to
11    a portion of his face.  They're to his overall
12    face.
13              He lacks damage on the side of his head
14    which was lying closest to the bed and on the
15    pillow.  He lacks damage to the top side of his
16    head, which was facing open air.  He lacks damage
17    to the back side.
18              So his injuries are consistent with the
19    bed being on fire -- the pillow material which
20    he's lying his head on.  So it is a directional
21    burn.
22              Now, the idea that -- if you want to
23    argue, is it on the bed?  Well, obviously the bed
24    caught on fire.
25              But what was the duration of his
```

170

1    exposure to the fire by his injuries is limited,

2    because his injuries are limited to the immediate

3    frontal lobes of his face.  No neck damage,

4    shoulder damage.  It's localized.

5         Q.   Can you point me to any study,

6    experiment, literature or test that supports the

7    notion that his injuries are inconsistent with a

8    smoking fire?

9         A.   No.

10        Q.   Did you do any -- did you do any

11   evaluation, test, study or analysis to make that

12   determination?

13        A.   I guess I'm just going from my

14   experience of burn injuries, investigating fires

15   with burn injuries.

16        Q.   So did you do any test, study,

17   experiment or analysis for this case to attempt to

18   demonstrate that to a jury?

19        A.   Repeat it?

20        Q.   Did you do any test statement -- test,

21   experiment, study or analysis to attempt to

22   demonstrate that or prove that or assess that for

23   use in this case?

24        A.   The testing of it is developing a

25   hypothetical and examining the burn patterns

1   relative to the various burn scenarios.  Fire

2   would be a better word.

3       Q.   Are there any case studies that you

4   relied on, any surrogate analyses that you relied

5   on that would demonstrate that his injuries are

6   somehow inconsistent with a smoking fire?

7       A.   No.

8       Q.   Are those available in the literature?

9       A.   Smoking-related fires?

10      Q.   Yeah.  An analysis of what types of

11  injuries are or are not consistent with

12  smoking-related fires?

13      A.   I believe there's probably some analysis

14  of that.

15      Q.   Okay.  And you didn't look up any of

16  that for your work in this case?

17      A.   Specifically his injuries are not

18  consistent with my experience with people that

19  have suffered burns from smoking-related fires.

20  Those fires, generally, the injuries are

21  extensive.

22      Q.   But, I mean, I didn't see any -- I don't

23  see that you cited to anything for that in your

24  report or now.  I'm just trying to figure it out.

25      A.   Right.

```
 1        Q.   Is there anything that you can cite to
 2   that supports that?
 3        A.   No, just my belief.
 4        Q.   Is there any type of surrogate testing
 5   that could be done that would demonstrate this
 6   phenomenon that his injuries are inconsistent with
 7   burn injuries from discarded smoking material?
 8        A.   I guess you could try to test that, but
 9   you would have to assume that what he had told us
10   is true, which you are not.
11             Look, I mean, if -- again, we're just
12   guessing, right?
13             You want to put it as a smoking-related
14   fire.
15        Q.   Well --
16        A.   What would his injuries look like then?
17   I don't know.
18        Q.   But you're the expert.
19             You're the one who said it's not a
20   smoking-related -- you're the only one who said
21   it's not a smoking-related fire.
22             There's a burden of proof that you have
23   to demonstrate that.
24             I'm asking what the -- I'm asking what
25   you're citing to to discount smoking as the cause
```

173

1      of the fire based upon his injuries.

2            A.   The injuries to Mr. Stiffler are

3      directly to his face.  They're directional.

4      They're not an area pattern.

5                 So I believe that is evidence of -- that

6      he suffered a thermal burn to his face, which was

7      in the immediate vicinity, according to his

8      testimony, as he slept at night in front of the

9      cable.

10                The injuries to the bottom of his feet

11     are consistent with him standing up in an area

12     where there's fire or getting burnt as he's

13     dragging himself away from it.

14           Q.   Did the fire start on the floor?

15           A.   Apparently there was fire on the floor

16     when he stands up or he is trying to get away.

17     He's in a prone position, because he suffers burns

18     to his knees, his shin and the bottom of his feet.

19           Q.   And he escapes the room in the early

20     part of the fire, we talked about, before

21     flashover, correct?

22           A.   Yes.

23           Q.   And there's fire on the floor when he

24     gets out of the room, correct?  You just said?

25           A.   I didn't say that specifically.  I said,

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

174

1    as he's escaping, he could have pulled the cable

2    and got him down onto his feet as he's trying to

3    get away.  I don't know.  I couldn't say.

4              But all I can say is the burns are so

5    specific, the fire, at the stage where he's

6    involved with it, is a limited fire, because his

7    injuries are specific to different locations of

8    his body.

9              And that is inconsistent with what the

10   Fire Marshal is saying, where the Fire Marshal

11   opined that the fire starts at bottom of the bed,

12   it's smoking-related; therefore, if that were the

13   instance, Mr. Stiffler would have suffered

14   extensive burns to his knees, waist down.

15        Q.   When did the fire start on the floor?

16        A.   The fire on the floor?

17        Q.   Yeah.  Before or after the table?

18        A.   Well, there were no ignition sources on

19   the floor.  The bed skirt does not go down to the

20   floor.

21        Q.   So how do you --

22        A.   So there's a disconnect between the

23   floor and the bedding materials.

24              So a fire on the bed, with the bedding,

25   the bedding is a potential which caused his burns

175

1    to his feet.  I don't know.

2            All I know is it's very specific and

3    that is not from a fire that has grown to any

4    magnitude, his injuries.

5    Q.   All right.  Is it your opinion one way

6    or the other whether there was fire on the floor

7    when he escaped the room?

8    A.   I don't know how he got the injuries to

9    the bottom of his feet, either standing up -- but

10   he doesn't have injuries to his ankles, so,

11   therefore, the fire on the floor is probably not

12   likely that he's standing in fire.  He doesn't

13   have those injuries.

14           He has thermal injuries to the bottom of

15   his feet.  And he had discussed that he was trying

16   to get out of the room, doing a crawl.

17           And at some point, the bottom of his

18   feet were exposed to that area of fire, which also

19   involved his face.

20   Q.   But you don't know how?

21   A.   Well, I know one thing, he can't bend

22   over and receive the burn to his face and his feet

23   at the same time.

24           I know they're two different parts of

25   the body that received burning.  That is clear to

1    anyone that looks at his burns.

2           So it could only have occurred -- and he

3    surmises this in his deposition, he thinks that he

4    remembers getting up, falling in the fire, the

5    fire involving his face and then he has some

6    injuries to his feet.  Exactly how that happens, I

7    can't explain that.

8       Q.   If the fire on -- if the fire did

9    start -- originate on top of the fire [sic] but

10   was ignited by smoking material, how would your

11   analysis be any different?

12          How would his injuries be different?

13      A.   As I repeated, I think that he said he's

14   asleep, that a fire on the bedding where he's

15   sleeping, in the manner that he says he sleeps, at

16   the edge of the bed with his face immediately

17   adjacent to the table, that we would see injuries

18   on the entirety of his head.

19      Q.   Why would it be -- I thought you said

20   that the lack of injuries to the rest of his head

21   suggests that the fire didn't originate on the

22   bed.

23          But I'm saying if it originated on the

24   table, but just the source of the ignition was

25   different -- the source of the ignition is what

1    changes the injuries on his head, in your opinion?

2        A.   I'm not surmising that he was smoking.

3             I have no reason to believe that he was

4    smoking.

5             Mr. Stiffler was outside smoking

6    immediately before he went to bed.  There was no

7    history of Mr. Stiffler smoking in his bedroom.

8        Q.   Hold on.  Hold on.

9        A.   You're saying that he went to bed,

10   immediately lit up to cigarette, fell asleep, lit

11   his bed on fire.

12            How long does that ignition scenario

13   take?

14       Q.   Question.  Hold on.  Back up.

15            You said there's no history of him

16   smoking in his room.  That's what he told you,

17   right?  Or what he testified to, right?

18       A.   And his mother and his father.

19       Q.   Well, his mother said she couldn't rule

20   it out.

21            You saw that, right?

22       A.   She was saying she didn't have absolute

23   certainty, correct.

24       Q.   Do you have absolute certainty?

25       A.   Yeah, I believe the preponderance of the

1    evidence is he was outside smoking and he retired

2    to bed.

3         Q.   Okay.  There's -- the two people who

4    actually investigated it, went to the scene, said

5    there was smoking materials found in his room,

6    correct?

7         A.   Yes.

8         Q.   Okay.  What I'm asking you is, I want

9    you to assume that there was a careless -- there

10   were carelessly discarded smoking materials on the

11   table next to his bed.

12        A.   That's impossible, because if we're

13   gonna assume the Fire Marshal and Mr. Henry are

14   correct, then we're gonna assume the fire's on the

15   bed.

16        Q.   Hold on.  Hold on.  We lost counsel.  I

17   can't do this without him.  We're back.

18             MR. SANTICOLA:  I was on my internet

19   using my laptop and our -- my link went down so I

20   put it on -- you know, my other TV.

21             MR. COPENHAVER:  I stopped when I

22   noticed you were gone.

23             MR. SANTICOLA:  Go right ahead.  Sorry

24   about that.

25             MR. COPENHAVER:  Yeah, no worries.

1    BY MR. COPENHAVER:

2        Q.   Mr. Ryhal, you can continue your

3    response.

4        A.   I said, we are assuming that the Fire

5    Marshal and Mr. Henry are correct and the Fire

6    Marshal has the fire at the base of the bed.

7             It's not consistent with the injuries to

8    Mr. Stiffler.  In fact, I think everything points

9    to the opposite end of the bed.

10       Q.   I'm asking you to come along with me in

11   a hypothetical.  I know you don't like them, but

12   I'm gonna ask you to do that.

13            I want you to assume that Mr. Stiffler

14   carelessly discarded some smoking material on the

15   table next to his bed.

16       A.   On the table?

17       Q.   On the table.

18       A.   Okay.

19       Q.   And that's what ignited whatever fuel

20   was on the table.

21       A.   What type of smoking materials are they?

22            You said there were cigarettes found

23   there, right?

24       Q.   Cigarettes, marijuana pipe, some --

25       A.   No marijuana pipe was found.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

180

1           The marijuana pipe was found underneath

2    the bed and the box spring and it's incapable of

3    traversing down through that series of materials

4    to where it was.

5           It was located under the bed and

6    unrelated to this fire.

7       Q.   Got it.

8           So everything we see in the fire

9    department photos were unmoved during renovation,

10   including the table?

11      A.   Well, no.

12      Q.   Just the table was moved?

13      A.   Don't change the subject.  We're talking

14   about the pipe.  You want me to presume a pipe is

15   where it wasn't found.

16      Q.   So the pipe wasn't moved, just the table

17   was moved.

18           Was anything else moved?

19      A.   The table was moved either by fire

20   department suppression, Mr. Stiffler or both.

21      Q.   Got it.

22           But the pipe definitely wasn't moved?

23      A.   No.  You can go through the series of

24   progression of the recovery of the pipe by the

25   Fire Marshal and it clearly is underneath the bed.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

181

```
 1        Q.   Got it.

 2             So I want you to assume that a fire

 3   started on the table as a result of carelessly

 4   discarded smoking material.

 5        A.   I'm asking you, give me an ignition

 6   source.

 7        Q.   I'm asking you to assume that a fire was

 8   started by carelessly discarded smoking material

 9   on the table.

10             Do you have a basis to say his opinions

11   -- or his injuries would be any different?

12        A.   I believe I could say with a great

13   degree of certainty that I could probably lay

14   about 20 to 50 to a hundred cigarettes on the

15   table, lit, fire safe cigarettes, and they are not

16   going to burst into open flames.

17             So the fire starting on the table with

18   respect to this hypothetical is impossible in my

19   opinion.

20        Q.   What type of fuel would need to be

21   present on the table for a burning cigarette to

22   ignite it?

23        A.   You would need a combustible material,

24   fabric, whatever, that would readily catch on fire

25   with that sort of heat source.
```

182

1      Q.   Was there fabric on the table?

2      A.   No.

3      Q.   Why not?  How do you know?

4      A.   It's a wood table with a wood top.

5      Q.   So you can put anything you want on the

6   table?

7      A.   Pardon?

8      Q.   You can put anything you want on a

9   table?

10          MR. SANTICOLA:  Was that a question?

11   BY MR. COPENHAVER:

12      Q.   Yeah.

13          How do you know there was no -- how do

14   you know there was no fuel source on the table?

15      A.   The statements of Mr. Stiffler.

16      Q.   Got it.

17          Okay.  You mentioned annealing on the

18   box spring or the bed frame.  What does that say

19   about your origin analysis?

20      A.   The annealing is generally consistent

21   across the bottom of the bed and the damage that

22   was observed and the holes in the floor underneath

23   the bed were consistent, in my opinion, with

24   ventilation problems.

25      Q.   So what does that annealing say, if

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

183

1    anything, about your origin analysis?

2        A.   Well, at the area of where I believe the

3    fire started, there is oxidation patterns which

4    are specific to the bed frame.

5            And it's consistent with the general

6    location of a hole in the floor.

7        Q.   So what does that mean about where the

8    fire originated?

9        A.   Generally oxidation reveals patterns

10   which involves a greater heat exposure to steel.

11       Q.   Again, where -- either annealing or

12   oxidation on the bed frame, what does it tell you

13   about the location of where the fire originated?

14       A.   The annealing of the bed just simply

15   exhibits the patterns on the lower half of the

16   bed, which I believe were consistent with

17   ventilation patterns.

18           And the primary, I think, observations I

19   had was the oxidation on the bed frame is specific

20   to a certain location, which is adjacent to where

21   there's a hole in the floor, which is adjacent

22   immediately to the south of where the table was

23   located.

24           MR. COPENHAVER:   Okay.  Hold on.  We

25   lost Mike again.

184

```
 1              MR. SANTICOLA:  Sorry about that.  I'm
 2   not sure what happened there.
 3   BY MR. COPENHAVER:
 4      Q.   I don't think I got an answer to my last
 5   set of questions, which I know you're gonna fight
 6   with me on the hypothetical, but I still want you
 7   to assume it's true.
 8              I want you to imagine a fire was started
 9   on -- that carelessly discarded smoking material
10   has ignited some fuel on the table top adjacent to
11   the bed.
12              Are you with me so far?
13      A.   Okay.
14      Q.   Would you expect his injuries to be any
15   different?
16      A.   I don't know.  I don't know what the
17   fuels are.  I would say they would be less.
18   They're not on the bed --
19              MR. COPENHAVER:  We lost Mike.  Hold on.
20   Hold on.  We lost Mike.
21   BY MR. COPENHAVER:
22      Q.   Why would they be different?  Why would
23   they be less?
24      A.   It would be dependent on the fuel, the
25   carelessly discarded fuel that you're referring
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

185

1    to.

2         Q.   Well, I'm referring to the smoking

3    materials being carelessly discarded and

4    carelessly discarded meaning being in proximity to

5    whatever fuel was present on that table top.

6              What was the fuel that you believe

7    caused his injuries?

8         A.   The only identifiable fuel that caused

9    his injuries was the iPhone battery, which ignited

10   probably then the bedding.

11        Q.   And we talked about this earlier.

12   Something needs to be a competent ignition source

13   in order to be attributed as the cause of the

14   fire, right?

15        A.   Correct.

16        Q.   And you've done no analysis to determine

17   whether an iPhone at that reported state of charge

18   is a competent ignition source of any fuel,

19   including bedding, correct?

20        A.   Only that it can suffer a thermal event.

21        Q.   Yeah, but my example --

22        A.   Would it be significant enough to ignite

23   combustible materials?  I believe so.

24        Q.   But you've performed no analysis to

25   determine that, correct?

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

186

1          A.    No, I leave that to others.

2          Q.    All right.  And you're aware of no

3    analysis being conducted on that that anyone has

4    conducted, true?

5          A.    True.

6          Q.    And if an iPhone in that start of charge

7    was not a competent source to ignite fuel --

8    sorry, to ignite that or any other type of fuel in

9    proximity, then that stands to reason that it

10   could not have caused the fire, correct?

11         A.    Then my hypothesis would be incorrect,

12   correct.

13         Q.    Can a lit cigarette on top of a bed

14   cause a fire?

15         A.    Yes.

16         Q.    Could a lit cigarette of the type that

17   Mr. Stiffler smokes left on top of bedding cause a

18   fire?

19         A.    It could cause a fire.

20         Q.    A lit cigarette is a competent ignition

21   source?

22         A.    It can be.

23         Q.    The type of cigarettes that Mr. Stiffler

24   smokes could be a competent ignition source?

25         A.    It can be.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1      Q.   Can ignited -- an ignited marijuana pipe

2   be a competent ignition source?

3      A.   It can be.

4      Q.   You ruled out smoking as the cause of

5   the fire in this case, as I understand it, for --

6   based upon Mr. Stiffler's testimony in one

7   respect, correct?

8      A.   Correct.

9      Q.   Based upon the injuries to his face,

10  correct?

11     A.   Correct.

12     Q.   Anything else?

13     A.   There's no evidence of smoking materials

14  in the location of the head of the bed.

15          MR. SANTICOLA:  He has already testified

16  as to the speed of the fire.

17          MR. COPENHAVER:  Hold on, Mike.  Let him

18  testify, please.  I don't want you to do it.

19  BY MR. COPENHAVER:

20     Q.   You didn't -- you said there's no

21  evidence of smoking materials in the area of the

22  head of the bed.

23          You understand that people who inspected

24  the room, unlike yourself, reported finding

25  evidence of smoking materials in the area of

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

188

```
 1   origin, right?

 2        A.   The smoking materials in their area of

 3   origin or your area of origin?  Or my area of

 4   origin?

 5        Q.   In Mr. Stiffler's room.

 6        A.   Smoking-related materials that were

 7   observed in their photographs included a pipe,

 8   which was underneath the bed.  And at the head of

 9   the bed, near the closet, I believe there was a

10   cigarette pack.  I would say it's an older

11   cigarette pack that was not -- I don't know if

12   it's Marlboro, but something was different about

13   it.

14             But anyways, it was underneath clothing.

15   It was protected on the floor.

16             The presence of a cigarette pack, which

17   would have been in a pocket or whatever, there's

18   no lighter discovered, they didn't discover

19   anything that suggested that Mr. Stiffler had any

20   way to even light the cigarette at that point.

21             There's nothing they discovered.

22        Q.   If someone was smoking a cigarette, went

23   into their room and passed out on their bed and

24   that fire ignited that bedding on fire, would you

25   expect to find that cigarette after the fire?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

189

```
 1        A.    That's difficult to say.   The butts,
 2   they'll tend to go away but depends -- but
 3   typically I would expect it would be difficult to
 4   find a cigarette.
 5             As I just addressed, I was addressing
 6   the ignition sources.
 7             Now we have moved from Mr. Stiffler
 8   hiding in his bedroom smoking, so now he's walking
 9   through the house smoking cigarettes.
10        Q.    I just asked a question whether or not
11   you'd expect to find a cigarette in Mr. Stiffler's
12   room after a fire like this, but you've answered
13   it.
14             That's fine.
15             You mentioned the injuries were a reason
16   that you discount smoking and you mentioned
17   Mr. Stiffler's testimony about how he never smokes
18   in his room.
19             Is there anything else that allowed you
20   to discount smoking?
21        A.    The fact that he was smoking immediately
22   prior to going upstairs to bed.
23        Q.    Which suggests to you he wouldn't smoke
24   again in his room?
25        A.    What would have been the purpose?
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

```
 1         Q.    I'm just asking whether that was --

 2         A.    I believe his testimony that he wouldn't

 3    do that based on his testimony and his father's.

 4         Q.    And anything else that allowed you to

 5    discount smoking materials as a likely cause of

 6    this fire?

 7         A.    There's no ashtrays.

 8         Q.    Anything else?

 9         A.    Lack of ignition sources being present,

10    like a lighter, ashtrays.  There was no evidence

11    of smoking occurring in the room.

12         Q.    Anything else?

13         A.    That's it.

14         Q.    Okay.  I take it you're not gonna offer

15    any opinion about what caused -- what you believed

16    caused the iPhone 6S Plus to undergo a battery

17    thermal event?

18         A.    Correct.

19         Q.    Whether it's a result of alleged

20    malfunction of the phone or its exposure to

21    something or to damage or to the battery

22    management system or anything else, that's not an

23    analysis you performed, nor is it an analysis

24    you're -- that's within your lane of expertise as

25    you described earlier?
```

```
 1        A.   Correct.

 2        Q.   Did you -- let's walk through your

 3  report on some of the other potential ignition

 4  sources you considered and ruled out.

 5             We've talked about careless smoking by

 6  Mr. Stiffler, right?

 7        A.   Correct.

 8        Q.   Okay.  We've mentioned the drug

 9  paraphernalia found in the room.  And the reason

10  you discounted that was its position under the bed

11  and Mr. Stiffler's testimony, is that right?

12        A.   Correct.

13        Q.   Is there anything else with respect to

14  the marijuana pipe that caused you to discount it

15  as a potential cause of this fire?

16        A.   There's no other smoking-related

17  materials discovered in the bedroom, other than

18  the cigarette pack that was under clothes.

19        Q.   Fire causation due to failure of a

20  lighting circuit.

21             Did you consider or reject that?

22        A.   Yes, I did.

23        Q.   How?

24        A.   The lighting circuit proceeded over

25  Mr. Stiffler's head and the switch was in the off
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

192

1    position.

2         Q.   Was there any arc mapping performed?

3         A.   According to the Fire Marshal and his

4    team, they -- they looked at the circuitry and

5    found it unremarkable.

6         Q.   Was there any arc mapping that was

7    performed?

8         A.   That generally would be the process.

9    You're looking at the electrical conductors, the

10   process of trying to find arcs.  Until you find an

11   arc, you can't map it.

12        Q.   Right.  But did they --

13        A.   So the circuitry would be drawn out in

14   this instance and it would be arc free.  So your

15   arc map would be absent arcs.

16        Q.   Well, right.  But did they trace all of

17   the circuits?

18        A.   I don't see how at their level that they

19   wouldn't be doing that.  That's sort of a standard

20   procedure.

21        Q.   Do you see -- is there any indication

22   that they did do that?

23        A.   No, only their testimony.

24        Q.   Their testimony?

25        A.   Their statements in the report.

1        Q.    Okay.  But did that indicate that they

2    traced all of the circuits and performed an

3    analysis of arc mapping the way you've described

4    it?

5        A.    Well, absent calling them a liar that he

6    reported that the system was eliminated as a

7    course of ignition for the fire, would lead me to

8    believe that they looked at it and did not find

9    any arcs that would be related to causation.

10        Q.    So have you -- are you relying upon them

11    discounting it for your opinion that it is

12    discounted as a possible ignition source of the

13    fire?

14        A.    You're talking about the lighting

15    circuit?

16        Q.    Well, that was off.

17             But sure.  As long as -- as well as some

18    of these other things.  I mean -- I guess my

19    question is, for any of the electrical systems in

20    the house, did you do any analysis independent of

21    what's reported in the investigative reports that

22    were provided to you?

23        A.    There was limited wiring in the

24    photograph, which is consistent with what the Fire

25    Marshal said.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

194

1          The receptacles I believe were something

2    from below, so the fire didn't -- there was no

3    reason to believe the fire originated anywhere

4    near any of the receptacles.

5          And they eliminated what they believed

6    was the light circuits, which was from their

7    photographs, as I examined it.

8          So there was no indication that any of

9    the hard wiring or circuitry in the room was

10   causal.  And the wiring that was above the

11   ceiling, the fire damage isn't consistent with a

12   fire in the interstitial space above the room of

13   origin.

14   Q.    Page 6, fire causation due to high

15   resistence connection or overheating of the

16   extension cord powering the air conditioner in the

17   northwest bedroom window.

18          Tell me what your analysis was in

19   rejecting that hypothetical.

20   A.    Receptacle R-2, a fire originating in

21   that location would be on the wall, drywall in

22   this instance.  And we have carpeting, nylon

23   carpeting, with no report of extensive fuel load

24   in this room of origin; i.e., clothing, sloppy

25   housekeeping.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

195

1              So the fire's ability to start at that

2    receptacle and traverse itself to result in

3    Mr. Stiffler's injuries is impossible in my

4    opinion.

5         Q.   Fire causation due to mechanical or

6    electrical failure of window air conditioner?

7         A.   Had the fire originated in the window

8    air conditioner, the failure of the window would

9    occur, which would result in a totally different

10   fire that was observed by Mrs. Stiffler, as well

11   as the injuries again to Robert.

12        Q.   Fire causation due to an electrical

13   malfunction of the cable box or its appliance

14   cord?

15        A.   The cable box was off.  Simply showing

16   the time.

17             And I believe that cable box, they -- I

18   want to say it consumed like 20 watts.  It's a low

19   heat device.

20             And if there was a failure inside the

21   box, I would expect it would stay inside the box.

22        Q.   Why?

23        A.   Because it's a steel box with limited

24   combustible materials.

25        Q.   How many watts does the iPhone draw?

1      A.   The charger for the iPhone, I believe,

2  is like EC current.  I thought it was 5 watts.

3      Q.   Is that less than 20?

4      A.   Yes.

5      Q.   Now, anything about the cable box other

6  than that it consumed only 20 watts and that if

7  there was a failure inside the box, you would

8  expect it to stay inside the box?

9      A.   Correct.

10     Q.   Okay.  Did anyone -- well, what

11  analysis, if any, was performed to determine

12  whether or not there was a failure inside the box?

13     A.   None.

14     Q.   Do you know whether there was a failure

15  inside the box?

16     A.   There could be a failure inside the box.

17  As a victim of the fire, certainly.

18     Q.   Well, if no analysis was done to

19  determine whether or not there was a failure

20  inside the box, how do you discount it?

21          Simply because you would expect it to

22  stay inside the box?

23     A.   Yeah, I believe I could almost

24  demonstrate it that that wouldn't be a competent

25  ignition source.

197

1          Q.    But you have not done --

2          A.    And, again, not to get into the

3    hypotheticals again, it wouldn't result in the

4    injuries suffered by Mr. Stiffler.

5          Q.    You've done nothing to demonstrate that

6    despite you saying that could be demonstrated?

7          A.    Right.  It's my mental testing of the

8    scenarios.

9          Q.    Got it.

10               Is there a reason you didn't do any of

11   that testing?

12         A.    That wasn't within the scope of the work

13   I was asked to perform.

14         Q.    If there was a failure inside the cable

15   box that ignited some type of fuel on the table,

16   why is that inconsistent with the injuries he had

17   gotten?

18         A.    No.  Other than the TV, there is nothing

19   else on the table other than cable box and the

20   iPhone.

21               The time and duration for that event to

22   turn into this localized flame, which burns

23   Mr. Stiffler, I don't see it as a credible

24   ignition source.

25         Q.    Why?

```
 1        A.   Well, I've already explained it.

 2        Q.   Well, you just stated --

 3        A.   There's no significant fuel load inside,

 4   other than a circuit board inside that cable box.

 5   It's absent any significant fuel.  And it's

 6   located in the center of the table.

 7             So since it's in a metal enclosure, its

 8   heat release rate, its ability to release energy

 9   caused by a fire would be limited.

10             And I don't believe it's a capable

11   ignition source to result in the injuries that

12   Mr. Stiffler suffered.

13        Q.   Fire causation due to an electrical

14   failure or overheating of the Apple iPhone 6 Plus

15   charging cord.  Question mark.

16             What's the reason that --

17        A.   I was wondering, Steve, what's the

18   question?

19        Q.   I'm just going through your list.

20        A.   All right.  You're saying -- I believe

21   that it's a 5-O cord.  It's not a credible

22   ignition source to cause this fire that occurred

23   at the head of the bed.

24        Q.   Overheating and failure of an Apple 6S

25   Plus battery.
```

```
 1              It seems like you discounted one through

 2    nine and were unable to discount 10 in your view;

 3    and therefore, you attributed the cause of the

 4    fire to that.

 5              Is that essentially the analysis?

 6         A.   That's correct.

 7         Q.   Was there anything affirmative about

 8    anything you saw in the one photo that you think

 9    is the iPhone that is supportive of that opinion?

10         A.   No.

11         Q.   Could you have run a test, in your mind,

12    that would have assessed whether or not an iPhone

13    at the stated level of charge was a credible

14    ignition source of this fire?

15         A.   I don't have that ability.  I relied

16    upon the information provided by Apple that there

17    were thermal events.

18              And based on that, that would lead me to

19    believe it is a credible ignition source.

20         Q.   Okay.  A thermal event is different than

21    something being an actual ignition source, right?

22         A.   Well, Apple provides photos of those

23    thermal events.

24         Q.   Do you believe that just because a

25    battery thermal event occurs, it's automatically
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

200

1    going to ignite something on fire?  Is that your

2    belief?

3         A.    No.

4         Q.    Do you believe that just because a

5    battery thermal event occurs that in all instances

6    it's a competent ignition source?

7         A.    No.

8         Q.    Okay.  Do you know what level of state

9    of charge any of those battery thermal events that

10   have been reported regarding Apple iPhone 6 Pluses

11   were?

12        A.    No, I don't.

13        Q.    Why didn't -- so at the start of your

14   paragraph on page 28 of your report, determination

15   of cause, you say you developed and tested the

16   following hypotheses.

17             Why didn't you -- you didn't test this

18   hypothetical for that Apple iPhone 6+ battery, did

19   you?

20        A.    The testing of hypotheses is against the

21   data known.  That's what the testing is.  Not

22   necessarily actual physical test.  It was a mental

23   exercise.

24        Q.    Why didn't you test -- well, aside from

25   a mental exercise, why didn't you test this to see

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1    whether it was actually possible?

2         A.   Why didn't I?

3         Q.   Yeah.

4         A.   Realistically?

5         Q.   Realistically.

6         A.   I don't have the budget.

7         Q.   Fair enough.

8         A.   If you're gonna give me an engineer,

9    I'll test it all day long.

10              Right?

11        Q.   Do you know whether or not testing has

12   been conducted to determine whether or not battery

13   thermal events at this low state of charge can be

14   a competent ignition for a fire?

15        A.   I want to say that I've heard of some

16   testing, but -- no, I haven't reviewed any reports

17   that would say that.

18        Q.   Okay.  And, you know, I think we've

19   covered all this, but you're not being asked to

20   and certainly don't intend to offer an opinion as

21   to whether or not the subject iPhone had a

22   manufacturing defect, correct?

23        A.   Correct.

24        Q.   And you're not being asked to, nor did

25   you intend to offer any opinions that the subject

1    iPhone had a design defect, correct?

2         A.    Correct.

3         Q.    Don't take anything from this.  I just

4    ask this from everyone, every expert.

5               Have you ever been limited or otherwise

6    prevented from offering testimony in any case?

7         A.    By who?

8         Q.    A Court, a judge?

9         A.    No.

10        Q.    Okay.  All right.  I'm gonna take a look

11   at my notes.  Let's take a five-minute break and

12   then we can wrap up.

13        A.    All right.  Thank you.

14              (Recess - 3:42 p.m. - 3:51 p.m.)

15   BY MR. COPENHAVER:

16        Q.    All right.  Mr. Ryhal, are you okay to

17   finish up now?

18        A.    Yep.

19        Q.    All right.  I just want to make sure

20   that I understand the four corners of your opinion

21   as to the iPhone.

22              As I understand it, you have attributed

23   the iPhone -- or the cause of the fire to the

24   iPhone really by process of elimination by ruling

25   out other things that were within the area of

1   origin as you determined it to be, is that right?

2        A.   Correct.

3        Q.   Okay.  And the area of origin, again, is

4   in the immediate vicinity of the table that you

5   believe was adjacent to Mr. Stiffler's head and

6   face at the head end of the bed, correct?

7        A.   Correct.

8        Q.   All right.  Have you seen the diagram

9   that Mr. Stiffler drew?

10       A.   No.

11       Q.   Do you see that?

12       A.   Yes.

13       Q.   This is Exhibit A from his deposition.

14            And can you see that he drew the table

15   closer to the foot end of the bed?

16       A.   Yes.

17       Q.   All right.  And that's inconsistent with

18   where you believe the fire started?

19       A.   Well, it's inconsistent with where they

20   identified, you know, the table in the diagram,

21   but again, that was not in active communication

22   with them directly, so...

23            That location of the table where

24   Mr. Stiffler has it in his diagram actually is in

25   the area where there's a hole burnt through the

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

204

1    floor with heavy oxidation to the bed frame.

2          Q.   But it's away from his face, is it not?

3          A.   That's against his testimony.

4               What he testified to is that the table

5    was right there.

6          Q.   Right where?

7          A.   Right in front of his face.

8          Q.   So are we believing his testimony, this

9    diagram or the other diagram?

10         A.   I would say in all fairness to

11   Mr. Stiffler, you would not be a viable

12   architectural candidate.  I don't know.

13              It's a diagram.  I don't know what to

14   say about it.  But as a diagram, it's pretty

15   crude.

16         Q.   Okay.  You didn't consider where

17   Mr. Stiffler indicated the table was in performing

18   your origin analysis, based on this diagram at

19   least?

20         A.   No, I didn't see that diagram.  Even if

21   you look at the window, the window is obviously

22   not in the correct location.

23         Q.   All right.  Did -- is the list of

24   hypotheses that you considered, was that generated

25   from what Mr. Stiffler said was in what you

205

1    believe to be the area of origin or based upon

2    materials found by the Allegheny County Fire

3    Department?

4         A.   The list that I developed in the testing

5    for determination of cause is based upon the Fire

6    Marshal's photos and documentation, John Henry's

7    documentation, and the testimony of the Stifflers.

8              So I would have analyzed all their

9    photos, looking for potential ignition sources.

10        Q.   Was the cord for the iPhone ever

11   captured?

12        A.   I'm not aware if it was or it wasn't.

13        Q.   Was it ever identified?

14        A.   Again, I'm unaware if they identified it

15   as a cord or not.

16        Q.   And now that we have the better

17   photos -- that I have the better photos from

18   Mr. Henry, I want to make sure I understand which

19   one you believe to depict the actual phone.

20             Can you remind me of what number that

21   was?

22        A.   You're asking why?

23        Q.   Well, stipulated.

24        A.   Henry 166.

25        Q.   And is there a reason that you didn't

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

1   call that out in your report?

2        A.   I just stated that I believe the iPhone

3   was in the area of origin.  So I don't have a

4   close-up photograph to say with absolute

5   certainty, but to me it appears to be the iPhone.

6        Q.   What color was his phone?

7        A.   I don't know that he had a protective

8   cover on it.

9        Q.   What color was the cover?

10       A.   I don't know that.  Wouldn't matter,

11  because it had been subjected to fire.

12            The color of his iPhone is on the

13  receipt, I thought.

14       Q.   Can you go to Henry 144 and 145?

15       A.   That's not in my report, correct?

16       Q.   Correct, it is not.

17       A.   144 is the bottom of the stairs.

18       Q.   In the basement or on the main level?

19       A.   I believe that's in the kitchen.

20       Q.   Okay.  I just couldn't tell.

21            That's a cigarette, right?

22       A.   Yep.

23       Q.   Is it just -- I mean, like a tobacco

24  cigarette, isn't it?

25       A.   Yeah, there's a trash can that was

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

207

1    knocked over.  It's either to the right in this

2    photo or to the left.  The refrigerator is to the

3    right.

4         Q.   All right.  Have you prepared any

5    exemplars or demonstratives or any type of

6    exhibits you currently intend on showing at trial

7    other than those embedded in your report?

8         A.   No.

9         Q.   Have you been asked to prepare any?

10        A.   No.

11        Q.   Have we talked about all the opinions

12   that you intend to offer at trial?

13        A.   I believe so.

14        Q.   Have you provided me a description of

15   all of the bases for those various opinions?

16        A.   Yes, I have.

17             MR. COPENHAVER:  I think those are all

18   the questions I have with you with the only

19   caveat -- and I don't expect anything where you

20   received from your files to open avenues of

21   questions, but we reserve the right to do so

22   because we didn't get them before the deposition

23   started.

24             MR. SANTICOLA:  Sure.

25             MR. COPENHAVER:  All right.  We're done.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert G. Ryhal**

208

1          THE REPORTER:  Would you like a copy?

2          MR. SANTICOLA:  I do.

3          MR. COPENHAVER:  Electronically.

4          (Deposition concluded at 4:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   COUNTY OF LANCASTER          :
                                  : SS
 2   COMMONWEALTH OF PENNSYLVANIA :

 3        I, Joyce A. Wise, RMR, Court Reporter and

 4   Notary Public, do hereby certify that ROBERT G.

 5   RYHAL, the witness, personally appeared before me,

 6   being first duly sworn or affirmed to testify to

 7   the truth, the whole truth, and nothing but the

 8   truth, in answer to the oral questions propounded

 9   to him by the attorneys for the respective

10   parties, testified as set forth in the foregoing

11   deposition.

12        I further certify that before taking of said

13   deposition, the above witness was duly sworn or

14   affirmed, that the questions and answers were

15   taken down stenographically by the said Joyce A.

16   Wise, RMR, approved and agreed to, and afterwards

17   reduced to print by means of computer-aided

18   transcription under the direction of the aforesaid

19   Reporter.

20        In testimony whereof, I have hereunto

21   subscribed my hand this 9th day of August 2022.

22

23        _____Joyce A. Wise_____
          Joyce A. Wise, RMR
24        Notary Public

25
```